IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JEROME SKOCHIN,
et al.

    Plaintiffs,

v.                                        Civil Action No. 3:19-cv-49

GENWORTH LIFE INSURANCE CO.

    Defendant.

### MEMORANDUM OPINION

This is a matter before the Court on MOTION TO DISMISS THE
AMENDED COMPLAINT (ECF No. 39) (the "Motion to Dismiss"). For the
reasons stated below, the Motion to Dismiss will be granted in
part and denied in part.

Jerome Skochin, Susan Skochin, and Larry Huber (the
"plaintiffs") filed this proposed class action against Genworth
Life Insurance Company ("Genworth"), alleging claims arising out
of the plaintiffs' renewals of PCS Series III Long Term Care
Insurance policies (the "policies"), a type of insurance policy
provided by Genworth. The Amended Complaint (ECF No. 36) asserts
claims for breach of contract, fraud, and violation of the
Pennsylvania Unfair Trade Practices and Consumer Protection Law,
73 Pa. Stat. Ann. § 201-1 *et seq.*(the "UTPCPL"). The facts
reasonably and plausibly pled in the Amended Complaint are recited

below.  And, in doing so, the plaintiffs are given the benefits of all inferences that may be drawn from the well-pleaded facts.

## BACKGROUND

The plaintiffs each bought the policies from Genworth.  The Skochins reside in Pennsylvania while Huber resides in Maryland. Amended Complaint (ECF No. 36) ¶¶ 35-36.  The plaintiffs allege that Genworth has steadily and substantially increased the premiums on the policies.  Id. ¶ 1.  Long Term Care Insurance ("LTC Insurance") is a type of insurance intended to defray costs of home care, assisted living care, nursing home care, and other specialized skilled facility care required when an individual can no longer perform the basic activities of daily life.  Id ¶ 3. Consumers usually begin buying these policies in their 50s or 60s, and, once they buy a policy from one of the providers, they usually never leave, because they have already put a significant sum of money in those policies, and because switching companies is quite expensive.  Id. ¶¶ 6-7.  Policyholders typically pay premiums on LTC insurance for 20-25 years before making a claim.  Id. ¶ 54. Thus, the financial condition and stability of the company are very important when consumers choose a company.  Id. ¶¶ 56-66. Most policies of this type have provisions allowing insurers to increase premiums if the increases are made across the entire policy class and if those new rates are first approved by the policyholder's state insurance regulator.  Id. ¶ 9.

Genworth is the largest provider of LTC insurance, and it previously emphasized that it had never raised rates in the decade in which it had provided LTC insurance, making the plaintiffs expect that Genworth would only make increases at a minimal rate. Id. ¶¶ 12-14. In 2004, although Genworth originally had marketed itself as stable because it was part of General Electric at the time, it was soon after spun off. Id. ¶¶ 69-70.

Genworth represented in 2011 that it had a $17.91 billion reserve fund while only incurring $6.7 billion in claims. Id. ¶ 72. When the LTC insurance market began to fold in 2012 (with many large carriers exiting the market), Genworth remained stable. Id. ¶¶ 74-77. But Genworth ran into trouble in 2014; it had significant decreases in its reserves. Id. ¶ 16. The plaintiffs allege that Genworth relied almost entirely on billions of dollars in future rate increases to plug its reserves. It is also alleged that Genworth needs to continue to make significant rate increases in the future if it is to remain viable. Id. ¶¶ 19-21.

The plaintiffs allege that Genworth has not been honest with insureds, such as the plaintiffs, about the rate increases that it has sought, and will continue to seek, from insurance regulators. Id. ¶¶ 22-23. In 2013 and 2014, Genworth told investors and the SEC that it would have to increase rates at a rate of over 50% to preserve the requisite reserve levels. Id. ¶¶ 89-91. Genworth also told investors (but not policyholders) that its viability

depended on significant price increases or benefit reductions in the policies. Id. ¶ 97. When Genworth did raise premium prices for the policies, Genworth told the plaintiffs only that it was "likely" that a premium rate would increase in the future, without telling the plaintiffs that Genworth had significant reserves holes and without disclosures that Genworth planned to increase premiums by at least 150% over the next few years (and maybe even more than 300% during that period). Id. ¶¶ 24-29. Although Genworth eventually included in its policy letters a description of phased-in premium increases each year, it did not begin the practice of including that information until 2018. Id. ¶¶ 126-28. Further, as to the policies at issue here, Genworth has known for years that it needed to significantly increase its rates. For example, as of 2017, the future rate increases were estimated to be 350% in the next 5-9 years, allegedly material information that it did not disclose to its policyholders. Id. ¶¶ 130-38.

All four counts of the Amended Complaint are predicated on Genworth's failure to adequately disclose certain information. In the plaintiffs' view, Genworth's disclosures fail in four ways: (1) the disclosures fail to inform policyholders that Genworth initially requested approval for significantly higher increases; (2) the disclosures fail to inform policyholders of the magnitude of the rate increase requests; (3) the disclosures fail to inform policyholders that Genworth's internal testing shows that there

will need to be premium increases that are double, triple, or even quadruple in the near future; and (4) the disclosures fail to inform policyholders that Genworth's asset adequacy testing and financial reporting depended upon massive rate increases to ensure that revenues were adequate. Id. ¶ 139. A look at the four claims shows how these failures to disclose are presented.

Count One alleges a breach of the LTC insurance contract in two ways. First, Genworth is alleged to have breached the portion of the contract called the "LTC Insurance Potential Rate Increase Disclosure" section (ECF No. 36-4), which provides that "[t]he company will provide a description of when premium rate or rate schedule adjustments will be effective on the next policy anniversary date." Id. at 5, 10. That breach was accomplished because Genworth did not inform the policyholders that "certain increases it requested would be phased-in over several years and when those rate increases would take effect." Amended Complaint (ECF No. 36) ¶ 199.[1]

Second, the plaintiffs allege in Count One that every LTC "contains an implied covenant of good faith and fair dealing," id.

---

[1] In paragraph 210 of the Amended Complaint, the plaintiffs also allege that Genworth breached its contract "[b]y failing to adequately disclose material information about Genworth's rate increase action plans, current reliance on its planned future increases actually being approved, and the risks to Genworth's solvency if such increases were not approved." Amended Complaint (ECF No. 36) ¶ 210

¶ 211, and that Genworth breached is duty of good faith and fair

dealing by:

> a. Disclosing only that future rate increases were "possible" or "likely," but failing to disclose that each of Genworth's rate increases were part of a Rate Increase Action Plan that *required* significant repeated rate increases in successive years;
>
> b. Not disclosing that Genworth initially requested significantly higher increases than it was initially approved for, and that it *planned* to seek successive rate increases until the first phase of the Rate Increase Action Plan was fully implemented;
>
> c. Not disclosing that Genworth's actuarial testing demonstrated it needed unprecedented additional rate increases to build adequate reserves to pay future claims throughout the relevant period;
>
> d. Not disclosing that Genworth's internal actuarial testing included assumptions for billions of dollars in future (yet to be filed) rate increases; and
>
> e. Not disclosing that if Genworth was unsuccessful in attaining these significant rate increases in the next six to nine years, that its LTC business would be significantly imperiled or that it might be currently insolvent.

Id. ¶ 215.

Count Two alleges a claim for "fraudulent inducement" in that

Genworth made inadequate factual disclosures by failing to

disclose known information that was material to the decisions that

the plaintiffs had to make when renewing the policies at higher

premium rates. The specific alternatives that Genworth made

available to the plaintiffs upon receiving notice of a premium

increase were: (1) an increased premium to maintain the same

6

benefits; (2) pay a lower premium for decreased benefits; or (3) elect the limited "non-forfeiture" option (basically fixed benefits) and pay no further premiums. Id. ¶ 221.

According to the Amended Complaint, Genworth intended that the plaintiffs would rely on the knowingly inadequate disclosures in making the election among those three choices. Further, the plaintiffs allege that they made elections to renew their contracts without material information about Genworth's plans to substantially increase premiums and that "[h]ad they known the full scope and magnitude of Genworth's rate action plans, and the Company's reliance on massive rate increases in the future to remain viable, they would have made different policy option elections." Id. ¶ 224.

Count Three alleges a claim for "fraudulent omission." In all material respects, Count Three is the same as Count Two. And, counsel for the plaintiffs so acknowledged at oral argument on the Motion to Dismiss. See July 12 Hearing Tr. (ECF No. 61) at 99:14-99:23.

Count Four alleges a violation of the "Pennsylvania Unfair Trade Practices and Consumer Protection Law." Amended Complaint (ECF No. 36) ¶¶ 235-45. In essence, Count Four is the same fraud claim as Counts Two and Three, except that the UTPCPL has a slightly lower standard for what constitutes "deceptive conduct" compared to fraud.

As relief, the plaintiffs request:

(1) certification of a class or classes;
(2) a judgment that the conduct alleged is unlawful;
3) an award of compensatory, consequential, and general damages; and
(4) an award of statutory damages.

Id. at pp. 61-62 (Prayer for Relief). The Amended Complaint also asks for unspecified injunctive relief; an award of fees and costs; and interest. Id.[2]

It is now appropriate to understand the particulars of the claims of the named defendants: Jerome Skochin, Susan Skochin, and Larry Huber.

The Skochins, who reside in Pennsylvania, purchased their policy in August 2003 and paid the same premium for 10 years

---

[2] The Skochins and Huber bring their claims on behalf of themselves and a class including all people who renewed their LTC insurance policies with Genworth since 2012 in Arkansas, Arizona, Colorado, Connecticut, District of Columbia, Georgia, Louisiana, Maryland, Mississippi, Montana, North Dakota, Oklahoma, Oregon, Pennsylvania, and South Carolina (the "Class"). Amended Complaint (ECF No. 36) ¶ 178. Additionally, the Skochins bring their claims on behalf of themselves and a class of all people in Pennsylvania who renewed their LTC insurance policies with Genworth since 2012 (the "Pennsylvania Subclass"). Id. ¶ 179. The plaintiffs say that common questions of law and fact exist as to the Class and Pennsylvania Subclass, including (1) whether Genworth omitted material information from the rate increase letters; (2) whether by failing to provide certain information Genworth breached the duty of good faith and fair dealing; (3) whether Genworth should be enjoined from further misconduct; and (4) the appropriate measure of damages or other relief to which Plaintiffs and the Class Members are entitled. Id. ¶ 185. Additionally, a common question as to the Pennsylvania Subclass is "whether Genworth also violated the [UTPCPL]." Id.

($3,558.75 and $3,637.50, separately, or $ 7196.25 in total). Id. ¶ 151. In June 2013, they received a letter proposing a premium increase of 20%, which gave them three options: (1) pay increased premiums to preserve their current benefits; (2) maintain the current premium level in exchange for lesser benefits; or (3) walk away from the policy and retain a "paid-up" contingent non-forfeiture benefit, which meant that if the Skochins ever met the criteria to claim the policies in the future, then they could have claims up to the amount of premiums that had already paid to Genworth. Id. ¶ 153. The Skochins argue that the premium increase announcement essentially renegotiated their policies because they had only been given a statement that an increase was "likely" at some point in the future, and they had no information that Genworth was beginning a plan of increasing premium rates nationwide. Id. ¶¶ 155-56.

Multiple other increases happened in the next few years, which led to the policy premiums almost doubling (in 2016, the policies were $6,661.98 and $6,809.00, separately, or $13,470.98 in total). Id. ¶¶ 157-60. In 2017, the Skochins dropped an important term of the policy in order to reduce their premiums back to roughly their original amount. Id. ¶ 161. In 2018, after an increase of 20% in this policy, the Skochins also received an announcement that Genworth would seek to increase premiums by at least 150% over the next 6-8 years. Id. ¶ 162. At this time, the Skochins elected to

take the third option and walk away and retain a "paid-up" limited benefit, and they argue they would have made the same decision in 2013 if they had been told about the various rate increases and Genworth's financial state. Id. ¶ 163.

Huber, who resides in Maryland, bought his policy in 2004. Id. ¶ 167. His annual premium was $1,446.64 (because his policy benefits were less than the Skochins). He paid the same premium for 10 years. Id. ¶¶ 167-68. He received his first premium increase in January 2014. Id. ¶ 169. Like the Skochins, he did not know that Genworth was suffering financially or that Genworth had planned substantial premium increases. Id. ¶¶ 170-75. Over a few years, the premiums on his policy increased several times, so that, by 2017, his rate was roughly 150% ($2,200.17) of what it was originally. Id. ¶ 175. Huber still has his policy, but he was not told about the increases that Genworth knew to be necessary. Id. ¶¶ 176-77.

The plaintiffs say in the Amended Complaint that they are not asking the Court to reconstitute any of the premium rates or to substitute its judgment for that of any insurance regulator. Id. ¶ 1. Rather, in their view, the plaintiffs are seeking to remedy the omission of material information necessary to make the partial disclosures adequate. Id. They emphasize that they are challenging only Genworth's failure to inform policyholders of its rate increase action plan and the need for even more increases.

10

Id. ¶ 109. At oral argument, the plaintiffs presented it this way:

> Again, we're not challenging the rate increases at all.
> We're not challenging the reason for the increases,
> whether they were fraudulently induced or not. We're
> only alleging that information about plans for future
> rate increases were not disclosed to the plaintiffs and
> that plaintiffs were not permitted enough information to
> make informed elections because of that.

July 12 Hearing Tr. (ECF No. 61) at 124:2-124:8.

Genworth filed a MOTION TO DISMISS THE AMENDED COMPLAINT (ECF No. 39) based on Fed. R. Civ. P. 12(b)(6) for failure to state a claim based on the filed-rate doctrine and based on the argument that Genworth had no duty to disclose its intention to seek future premium increases under the policy contracts or under any of plaintiffs' legal theories. See generally DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT (ECF No. 40).

DISCUSSION

### A.  Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), the Court accepts all well-pleaded allegations as true and views the complaint in the light most favorable to the plaintiff. Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). But the Court does not need to accept the plaintiff's legal conclusions drawn from those facts. Id. The Court can take judicial notice of matters of public record, and it can consider documents attached

to the complaint and motions to dismiss "so long as they are integral to the complaint and authentic." Id.

Fed. R. Civ. P. 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (ellipsis in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). A complaint attacked by a motion to dismiss under Rule 12(b)(6) does not require detailed factual allegations, but it does require "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

For fraud claims, Fed. R. Civ. P. 9(b) requires that "a party must state with particularity the circumstances constituting

12

fraud," except that "conditions of a person's mind may be alleged generally." Counts Two and Three are subject to this additional requirement.

The plaintiffs' policies are governed by the laws of the state in which they reside based on the contract, and Virginia law gives full effect to the contractual choice of law terms here. See Policy Agreement (ECF No. 36-1) at 19; Settlement Funding, LLC v. Con Neumann-Lillie, 645 S.E. 2d 436, 438-40 (Va. 2007). Thus, Pennsylvania law applies to the Skochins' claims, and Maryland law applies to Huber's claim.

**B. The Filed-Rate Doctrine**

Genworth first argues that the filed-rate doctrine bars the plaintiffs' claims, because, as Genworth sees it, they seek, as damages, the premiums that they paid for the policies, which were valid under state law. DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT (ECF No. 40) at 10. According to Genworth, the filed-rate doctrine is widely accepted and broadly applied as a federal and state common law doctrine to preclude lawsuits that challenge the payment of rates filed with a state or federal regulator and any wrongful conduct leading to or in connection with securing the filed rates from the regulator. Id. at 11. Genworth argues that this judicially created doctrine can prevent claims against insurance companies like the ones at issue here, relying on decisions from various

state and circuit courts. Id. at 11-13. In Genworth's view, the filed-rate doctrine bars all claims for monetary damages that effectively award plaintiffs a refund or rebate of those filed rates. Id. at 14. And, in their view, all causes of action are barred by the filed-rate doctrine, including claims for breach of contract and fraud as well as those under the UTPCPL.

First, Genworth cites the Maryland intermediate court's decision in Stillman & Dolan, Inc. v. Chesapeake & Potomac Tel. Co. of Md., 351 A.2d 172, 180 (Md. Ct. Spec. App. 1976). There, in a case involving a challenge to whether a telephone service's rate was reasonable, the court held that a state agency that controlled phone rates had complete jurisdiction over the case, so the court could not decide whether a rate was reasonable. Id. at 186-88. Thus, even though the words "filed rate" were not used in the opinion, the court applied the doctrine by finding that the court could not entertain a claim challenging the rate set by another agency. However, this case is entirely different. It involves a challenge to an insurer's practice of hiding material information from policyholders that was critical to electing one of the options being given by Genworth, rather than challenging a rate.[3]

---

[3] And, as discussed by the plaintiffs, one Maryland court has found that the filed-rate doctrine does not apply to the insurance context. See Benson v. State, No. 24-C-01-005799, 2004 Md. Cir. Ct. LEXIS 27, at *60 (Md. Cir. Ct. June 23, 2004).

Genworth also cites <u>Lombardi v. Allstate Ins. Co.</u>, Civ. A. No. 8-949, 2011 WL 294506, (W.D. Pa. Jan. 27, 2011), which was decided by a federal district court located in Pennsylvania. There, the court held that the filed-rate doctrine applied to claims that certain rates paid to an insurer were "unfair[]" and "excessive," because the plaintiff was challenging the Pennsylvania Insurance Commissioner's decision to approve higher rates. <u>Id.</u> at *7. That is not the case here. The plaintiffs are not challenging the rates; they challenge only Genworth's hiding material information that the plaintiffs say would have changed their decision of whether to continue paying for their premiums.

Genworth next points to <u>AT&T Co. v. Cent. Office Tel., Inc.</u>, 524 U.S. 214 (1998), but it completely misreads the case. Genworth cites <u>AT&T Co.</u> for the proposition that "the [f]iled [r]ate [d]octrine is a widely accepted and broadly applied federal . . . common law doctrine that precludes lawsuits that challenge in any way—directly or indirectly—the payment of rates filed with a state or federal regulation <i>and</i> any alleged wrongful conduct leading to or in connection with the filed rates." DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT (ECF No. 40) at 10. But that is not what the Supreme Court held. Instead, the Court, with Justice Scalia writing, applied the filed-rate doctrine in a federal case involving a federal claim against an FCC-regulated entity because the Court believed that was what

Congress wanted it to do as a matter of statutory interpretation. The Court examined the text of the statute at issue and said that the filed-rate doctrine applies to prevent unreasonable and discriminatory charges. 524 U.S. at 221-24. Nowhere in its opinion does the Supreme Court say that it is using the doctrine as a matter of judicial common law.

Next, Genworth cites Bryan v. BellSouth Commc'ns, Inc., 377 F.3d 424, 432 (4th Cir. 2004). In Bryan, the United States Court of Appeals for the Fourth Circuit held that state law claims were preempted by federal law, because the claims challenged a federal tariff that was approved by the Federal Communications Commission. Id. at 425, 428-29. Thus, because the filed-rate doctrine applied to all federal claims, the court similarly applied the doctrine to the state claims. Id. at 429. That is entirely different from a challenge to an insurer's alleged fraud and breach of contract where, as here, the rates themselves are not challenged.

Finally, Genworth asks the Court to adopt the decision of an unpublished decision from Illinois. See Di Rito v. Metropolitan Life Ins. Co., 2018 IL App (1st) 173202-U, 2018 WL 6769317 (App. Ct. of Ill. 1st Div. Dec. 24, 2018). The plaintiffs question whether the Court can even consider this case. They argue that the case should not be considered under Illinois Supreme Court Rule 23(e)(1), which says that unpublished orders are not precedential and "may not be cited by any party except to support

contentions of double jeopardy, res judicata, collateral estoppel, or law of the case." Genworth cites it as authority and argues that even though Illinois litigants cannot cite it as authority, it is common practice for federal litigants to cite such cases in federal court. The Court is unfamiliar with such a practice. And, if the decision has no precedential effect in Illinois, it is difficult to understand why it should be given credence here.

Wholly apart from whether the decision can be cited, the Court finds that Di Rito does not carry much persuasive weight. The appellate court in Di Rito did not engage whether the district court was correct to apply the filed-rate doctrine to the plaintiff's claims, and its analysis on what constitutes a "half-truth" is unpersuasive, because it adds a requirement that a latter statement must make the first statement "less true" rather than the common definition that the statement was made to mislead the plaintiff. See Half-Truth, Black's Law Dictionary (11th ed. 2019) (defining a half-truth as "[a] statement that is only partly true, made [usually] to mislead or to keep something secret"). Further, as argued by the plaintiffs, the Di Rito court understood the plaintiffs to be challenging the rate increases themselves. That is not the case here, because the alleged unlawful conduct is Genworth's failure to disclose information to the plaintiffs.

The plaintiffs argue that their claims are similar to those presented in Alston v. Countrywide Fin. Corp., 585 F.3d 753 (3d

Cir. 2009), in which the court held that, under the Real Estate Settlement Procedures Act ("RESPA"), the filed-rate doctrine did not apply to a challenge related to kickbacks. See id. at 763-65. Thus, in the plaintiffs' view, the doctrine similarly does not apply to a challenge related to material omissions by Genworth. The reasoning in Alston is informative here. The court held that it was "absolutely clear that the filed rate doctrine simply does not apply" because the plaintiffs challenged the defendant's "allegedly wrongful conduct, not the reasonableness or propriety of the rate that triggered that conduct." Id. at 765. It did so because the filed rate doctrine would essentially have precluded all legal remedies under RESPA. So too here. If the Court were to follow Genworth's theory, then no claims for withholding material information would be allowed against insurance companies as long as their customers paid the filed rates, even if the plaintiffs do not challenge the rates themselves. That argument proves too much and asks the filed-rate doctrine to carry far more than it can bear. Here, all the claims (for breach of contract, for fraud, and under the UTPCPL) are based on the theory that Genworth withheld material information from the plaintiffs. That is not a challenge to the reasonableness of the rate.

Because there is no Maryland or Pennsylvania supreme court decision on the filed-rate doctrine in the insurance context when a plaintiff challenges only an insurer's omission of material

18

information rather than the rate itself, the Court uses an Erie approach to decide whether it applies. See Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992) (holding that if state law is unclear federal courts must predict the decision of the state's highest court).

Here, it is entirely unclear that Maryland or Pennsylvania would apply the filed-rate doctrine to the facts and theories that are presented by the Amended Complaint. Genworth has provided no persuasive authority from either state pertaining to the issue. And, the Court declines the invitation to follow Di Rito, an unpublished case from Illinois. Further, the Court disagrees that asking for a refund as part of the remedy in a case necessarily means that the filed-rate doctrine applies. The court in Alston said that the filed-rate doctrine "simply d[id] not apply," even though the plaintiffs sought rescission as a remedy for the defendant's fraud and the plaintiffs "paid the same premiums they would have paid" absent the kickback scheme. 585 F.3d at 757, 765. Indeed, Genworth's argument essentially is that fraud by insurance companies cannot be remedied, because a refund is often the only remedy available for people who were defrauded. That argument lacks merit, and Genworth has provided no caselaw to support it. The Court thus finds that the filed-rate doctrine does not apply here.

## C.    Breach Of Contract Claims

Whether the Amended Complaint nonetheless states a claim for breach of contract remains for decision.    In Count One, the plaintiffs raise two theories for why there was a breach of contract by Genworth.    First, the plaintiffs claim that Genworth breached explicit provisions of its contracts with the plaintiffs. Second, the plaintiffs argue that Genworth breached its implied duty of good faith and fair dealing.    Neither argument is persuasive.

First, the plaintiffs claim in Count One of the Amended Complaint that Genworth breached: (1) a provision on Genworth's Rate Disclosure Forms that required Genworth to "provide a description of when premium rate or rate schedule adjustments will be effective on the next policy anniversary date," see LTC Insurance Personal Worksheet (ECF No. 36-4) at 5, 10; and (2) a provision on Genworth's rate disclosure forms that the plaintiffs call the "Election Rights Clause,"[4] which contains the options that

---

[4] That clause provides,

> **If you receive a premium rate or premium rate schedule increase in the future, you will be notified of the new premium amount and you will be able to exercise at least one of the following options:**
>> • Pay the increased premium and continue your policy in force as is
>> • Reduce your policy benefits to a level such that your premiums will not increase. (Subject to state law minimum standards)

the plaintiffs may elect if they decide to not pay a rate premium increase.  See id.  In the plaintiffs' view, these provisions required Genworth to disclose any information material to the elections "such as its current plans for future rate increases, its current reliance on those increases being approved in its financial reporting (such as its loss recognition and cash flow testing), the degree to which Genworth's financial stability depended on the future rate increases being enacted, and the frequency and magnitude of the future rate increases needed." Amended Complaint (ECF No. 36) ¶ 201.  However, nowhere in the cited provisions does the contract say that Genworth was required to make every possible factual disclosure that the plaintiffs would have liked.  Instead, Genworth's Rate Disclosure Forms merely state that Genworth must provide the plaintiffs with the amount that their premiums will cost after the rate increase at the time of the policy anniversary date.  The Amended Complaint actually alleges precisely that.  Therefore, as a matter of law, Genworth did not breach an explicit provision of the plaintiffs' contracts.

---

* Exercise your nonforfeiture option if purchased. (This option is available for purchase for an additional premium).
* Exercise your contingent nonforfeiture rights. (This option may be available if you do not purchase a separate nonforfeiture option.)

LTC Insurance Personal Worksheet (ECF No. 36-4) at 5, 10.

Second, the plaintiffs allege that there was a breach of the implied covenant of good faith and fair dealing. But, that argument similarly fails. First, Maryland has not recognized a separate cause of action for a breach of the implied duty of good faith and fair dealing, and the Court finds, on the basis of persuasive authority from the Maryland Court of Special Appeals, that there is no such claim under Maryland law. The Maryland Court of Special Appeals has said that the duty of the implied duty of good faith and fair dealing "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." Parker v. Columbia Bank, 604 A.2d 521, 531 (Md. App. 1992).

And, the same is true for Pennsylvania. The Supreme Court of Pennsylvania has held that the "obligation of good faith is tied specifically to and is not separate from the duties a contract imposes on the parties." Murphy v. Duquesne Univ. Of The Holy Ghost, 777 A.2d 418, 434 n.11 (Pa. 2001).

Further, the plaintiffs cannot impose new obligations in the contract through the implied covenant of good faith and fair dealing. As the Fourth Circuit explained, when discussing Maryland law, even if inclusion of a new obligation "is thought to be logical and wise," "the implied duty of good faith and fair dealing as recognized in Maryland . . . is not understood to impose new obligations about which the contract is silent." E. Shore Markets,

Inc. v. J.D. Assoc. Ltd. P'ship, 213 F.3d 175, 184 (4th Cir. 2000). In other words, "under the covenant of good faith and fair dealing, a party impliedly promises to refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." Id. (citing Automatic Laundry Serv., Inc. v. Demas, 141 A.2d 497, 500-01 (Md. 1958); Restatement (Second) of Contracts § 205 (1990); 13 Williston on Contracts § 38:15 (2000)). And, in Pennsylvania, even though "[t]he duty of an insurance company to deal with the insured fairly and in good faith includes the duty of full and complete disclosure as to all of the benefits and every coverage that is provided by the applicable policy or policies along with all requirements, including any time limitations for making a claim," Dercoli v. Pennsylvania Nat. Mut. Ins. Co., 554 A.2d 906, 909 (Pa. 1989), that duty does not extend to creating new terms under the contract.

Thus, for the foregoing reasons, the Court finds that Count One does not plead a legally sufficient breach of contract claim. Therefore, Count One of the Amended Complaint will be dismissed.

        D.    Fraud Claims

The plaintiffs further allege two fraud claims against Genworth, and they present a viable claim. In Count Two, the plaintiffs allege that Genworth fraudulently induced the plaintiffs to elect to continue coverage by telling them only that

premium increases were "likely" without explaining that increases were necessary for Genworth to survive and that significant future rate increases were planned. Therefore, in the plaintiffs' view, said premium increases were a certainty. In Count Three, the plaintiffs allege that Genworth fraudulent omitted information by not telling the plaintiffs that the future increases were necessary, nor explaining the significant financial issues that Genworth was facing. Both counts depend on Genworth's disclosures in its premium increase notices that said that it was "likely" that the plaintiffs' premium rate will increase again in the future, when, in fact, the premiums were certain to increase significantly in short order. As the plaintiffs conceded at oral argument on this Motion, the claims in Counts Two and Three are the same. See July 12 Hearing Tr. (ECF No. 61) at 99:14-99:23. Thus, the Court will proceed to address the two together under a theory of fraudulent omission (sometimes called a "fraudulent nondisclosure"), because the omission itself is what the plaintiffs say fraudulently induced them to elect to continue their coverage through half-truths.

Genworth argues that it did not have an affirmative duty to disclose and that its statement that premium increases were "likely" was fully truthful. See DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT (ECF No. 40) at 22-27. That argument lacks merit. Under Pennsylvania law,

"the deliberate nondisclosure of a material fact amounts to a
culpable misrepresentation no less than does an intentional
affirmation of a material falsity." Boardakan Rest. LLC v. Gordon
Grp. Holdings, LLC, No. CV 11-5676, 2016 WL 6213035, at *12 (E.D.
Pa. Oct. 24, 2016) (quoting Neuman v. Corn Exchange Nat'l Bank &
Trust Co., 51 A.2d 759, 764 (Pa. 1947)). And, "[a] defendant's
nondisclosure of information may amount to fraud when the plaintiff
relies upon the defendant's omission of a material fact to his
detriment." Id. (citing Neuman, 51 A.2d at 764). Further, "a
defendant's incomplete disclosure can result in misleading 'half-
truths,' where a material fact is not disclosed to the plaintiff."
Id. (citing Neuman, 51 A.2d at 764). "When this occurs, the
plaintiff may recover under a theory of nondisclosure." Id.; see
also Half-Truth, Black's Law Dictionary (11th ed. 2019) (defining
a half-truth as "[a] statement that is only partly true, made
[usually] to mislead or to keep something secret" or "[a] statement
that mixes truth with falsity in order to confuse or deceive");
Restatement (Second) of Torts § 529 cmts. a & b ("A statement
containing a half-truth may be as misleading as a statement wholly
false. . . . Whether or not a partial disclosure of the facts is
a fraudulent misrepresentation depends upon whether the person
making the statement knows or believes that the undisclosed facts
might affect the recipient's conduct in the transaction in hand.
It is immaterial that the defendant believes that the undisclosed

facts would not affect the value of the bargain which he is offering. The recipient is entitled to know the undisclosed facts in so far as they are material and to form his own opinion of their effect.").

Maryland, similarly, allows "a claim of intentional misrepresentation by concealment, or fraudulent concealment," if the following elements are proved: "(1) Defendant owed Plaintiff a duty to disclose a material fact; (2) Defendant failed to disclose that fact; (3) Defendant intended to defraud or deceive Plaintiff; (4) Plaintiff took action in justifiable reliance on the concealment; and (5) Plaintiff suffered damages as a result of Defendant's concealment." Odyssey Travel Ctr., Inc. v. RO Cruises, Inc., 262 F. Supp. 2d 618, 628–29 (D. Md. 2003) (citing Green v. H & R Block, Inc., 735 A.2d 1039, 1059 (Md. 1999). "In the context of a claim of intentional misrepresentation by concealment, a duty to disclose arises where the defendant makes an active misstatement of fact, or only a partial or fragmentary statement of fact, which misleads the plaintiff to its injury." Id. at 629; see also Walsh v. Edwards, 197 A.2d 424, 427 (Md. 1964) ("But where, as here, the seller, in addition to not disclosing the facts, made an active misstatement of fact, or only a partial or fragmentary statement of fact, which misled the purchaser to his injury, . . . there was imposed on [the seller] a duty to

disclose all that [the seller] knew as to the probability of the [injury]." ).

Here, the plaintiffs have alleged a claim for fraud based on Genworth's half-truths. The Amended Complaint alleges that Genworth spoke only half-truths to the plaintiffs in order to persuade them to keep their policies when the plaintiffs would not have done so otherwise. Genworth emphasized its financial stability when the plaintiffs began their plans, and Genworth continued to tout that stability. It did so even as it began to realize that it faced dire financial straits and well-knew that it would have to rely on substantial future premium increases to survive. And, instead of informing their policyholders of this information, it said only that premium rate increases were "likely" to occur in the future, a statement that was a half-truth. And, the plaintiffs allege that Genworth intentionally decided not to release this information so that policyholders would continue to pay into their policies, which then caused the plaintiffs financial detriment. That is enough to state a half-truth claim under either Maryland or Pennsylvania law. Further, this claim satisfies Fed. R. Civ. P. 9(b)'s particularity standard. However, because Counts Two and Three are admittedly the same cause of action, the

plaintiffs will be required to file a Second Amended Complaint ("SAC").[5]

Thus, the Motion to Dismiss Counts Two and Three will be denied.

### E.    The UTPCPL Claim

The Skochins further allege that Genworth violated the UTPCPL. A defendant violates the UTPCPL when it engages in an "unfair method[] of competition" or an "unfair or deceptive act[] or practice[]" as defined in 21 separate categories. Here, the plaintiffs allege that Genworth violated the UTPCPL by "[e]ngaging in [a] fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. Ann. § 201-2(4)(xxi). A plaintiff asserting a claim under the UTPCPL must prove the lesser standard of "deceptive conduct," rather than actual fraud. See Commonwealth of Penn. v. Manson, 903 A.2d 69, 73-74 (Commw. Ct. Pa. 2006) ("[T]he test for deceptive conduct is whether the conduct might be deceptive to the ordinary consumer, a lesser offense than fraudulent conduct."); Wilson v. Parisi, 549 F. Supp. 2d 637, 666 (M.D. Pa. 2008) (collecting cases from federal and state courts and finding that "courts have held that a showing of deceptive activity, as opposed to establishing the elements of

---

[5] The plaintiffs should not file in the SAC a claim for breach of contract (Count One) and the filing of a SAC without that claim will not be an abandonment of the breach of contract claim.

a common law fraud claim, is sufficient to impose liability"). "A deceptive act is 'the act of intentionally giving a false impression' or 'a tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it.'" In re Patterson, 263 B.R. 82, 94 (Bankr. E.D. Pa. 2001) (quoting Black's Law Dictionary at 413 (7th ed. 1999)); see also Deceptive Act, Black's Law Dictionary (11th ed. 2019) ("As defined by the Federal Trade Commission and most state statutes, conduct that is likely to deceive a consumer acting reasonably under similar circumstances.")

The parties agree that the statutory claim under the UTPCPL is based on the same facts as the fraud claim. See PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT (ECF No. 45) (stating about the facts underlying the fraudulent omission claim that "[j]ust as this claim adequately alleges a cause of action for intentional misrepresentation and intentional omission, it also states a claim under the catch-all provision of the UTPCPL"); DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS (ECF No. 48) ("Plaintiffs do not dispute that their statutory claim under the catch-all provision rises and falls with Counts 2 and 3."). Thus, because the Court has found that Counts Two and Three state a cause of action for fraudulent omission, and because the UTPCPL's standard of "deceptive conduct" is lower than the standard

for actual fraud, the Skochins have stated a claim under the UTPCPL.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss will be granted in part and denied in part.

                                    /s/            REP
                        _____

                        Robert E. Payne
                        Senior United States District Judge

Richmond, Virginia
Date:  August 29, 2019