# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

JEROME SKOCHIN, SUSAN SKOCHIN, and LARRY HUBER, individually, and on behalf of all others similarly situated,

       *Plaintiffs*,

v.

GENWORTH LIFE INSURANCE COMPANY and GENWORTH LIFE INSURANCE COMPANY OF NEW YORK,

       *Defendants*.

**Civil Action No.:  3:19-CV-49-REP**

**THIRD AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs Jerome Skochin, Susan Skochin and Larry Huber ("Plaintiffs") bring this Third Amended Class Action Complaint, individually and on behalf of the proposed Classes defined below, against Defendants Genworth Life Insurance Company ("GLIC") and Genworth Life Insurance Company of New York ("GLICNY") (collectively "Genworth" or "Defendants"). Plaintiffs allege the following based upon information and belief and the investigation of their undersigned counsel, except for those allegations that pertain to themselves, which are based on Plaintiffs' personal knowledge.

## INTRODUCTION

1.    Plaintiffs and the Class Members each have Choice I Long Term Care Insurance policies provided by Genworth.[1]  Since 2012, Genworth has steadily and substantially increased the premiums on these policies.  This case does not challenge Genworth's right to increase these premiums, or the need for premium increases given changes in certain of Genworth's actuarial assumptions. Nor does this case ask the Court to reconstitute any of the premium rates or otherwise substitute its judgment for that of any insurance regulator in approving the increased rates.  Rather, this case seeks to remedy the harm caused to Plaintiffs and the Class from Genworth's partial disclosures of material information when communicating the premium increases, and the omission of material information necessary to make those partial disclosures adequate.  Without this material information, Plaintiffs and the Class could not make informed decisions in response to the premium increases and ultimately made policy option renewal

---

[1] Genworth also refers to these policies as "PCS Series III," "PCS 3," and "Long Term Care Choice" policies.  The term "Choice I" as used herein also incorporates the term "PCS Series III." "PCS 3," and "Long Term Care Choice."

elections they never would have made had the Company adequately disclosed the staggering scope and magnitude of its internal rate increase action plans in the first place.

2.      Long Term Care is expensive.  So too is Long Term Care Insurance (hereinafter "LTC insurance").

3.      LTC insurance is intended to help defray the cost of home care, assisted living care, nursing home care, and other specialized skilled facility care required when an individual becomes unable to perform the basic activities of daily living (such as dressing, bathing, eating, toileting, continence, walking, or transferring – getting in and out of a bed or chair).  These costs are generally not covered by health insurance, Medicare or Medicaid.

4.      LTC insurance is private insurance purchased by individuals before they become physically or mentally infirm and require daily care, as a way to protect their life savings from the escalating costs of 24-hour health care at the end of their lives (when this is most likely to occur).

5.      When a consumer evaluates an LTC insurance policy, they compare the premium rates to the coverage options they are provided and chose a plan that is affordable while providing adequate future benefits.  Since the consumer is committing to make decades of premium payments before they ever plan to make a claim on the policy, it is important that the premiums they pay will continue to be affordable.  After all, under any policy that lacks a non-forfeiture provision, if a policy holder can no longer afford the premiums then they walk away from the policy with *nothing*; perhaps after paying tens of thousands of dollars in premiums.

6.      To keep premium levels lower, consumers generally begin shopping for LTC insurance in their 50's or 60s.  As noted by THE WALL STREET JOURNAL in 2014, "[f]or each year applicants in their 50s delay buying coverage, carriers typically raise premiums by 3% to

4%, simply because they are a year older … [but], for every year someone in their 60s waits, they can expect to pay an additional 6% or more." *Mistakes to Avoid When Shopping for Long-Term-Care Insurance*, THE WALL STREET JOURNAL (Apr. 13, 2014), available at https://www.wsj.com/articles/SB10001424052702304756104579449482245063704 (las t visited Feb. 27, 2017).

7.    Because LTC insurance is purchased decades before it might ever be used, policyholders experience a form of "lock-in" effect.  Once a policyholder has made years of payments on their current policy, they become less likely to walk away from the policy in the future, both because they have already paid significant premiums to maintain their benefits and because switching to another LTC policy later in life is considerably more expensive. In this way, LTC insurance payments are akin to investments.

8.    LTC insurance is also not like traditional health insurance in other ways.  For example, while it is advisable (if not necessary), for every individual to be covered by health insurance, LTC insurance is not a sensible expense for a large number of Americans.  That is because while people run the risk of illness or injury requiring expensive medical insurance at all times, the risk of needing LTC insurance is not nearly as prevalent.  As explained above, LTC insurance is generally purchased to protect an individual's estate from being depleting at the end of their life by the high costs of 24-hour health care after they become infirm.  The decision about whether to purchase or maintain LTC insurance is thus very different from whether to maintain health insurance.

9.    While LTC contracts are guaranteed renewable, most LTC contracts allow the provider to increase premiums if (1) the increases will be made across the entire policy class, and (2) those new rates are first approved by the policyholder's state insurance regulator.

10.     Although the decision to pay an increased rate can be characterized as a renewal of the existing contract, a rate increase actually restructures all the essential terms of the agreement. Facing a premium increase, a policyholder must evaluate anew whether the increased premiums are still affordable.  They must also decide again whether the higher premiums are justified expenses in exchange for the same level of benefits.  They must evaluate the likelihood of any future premium increases, the frequency of those increases, and the amount of those increases. These are all material data points that insureds first considered when they purchased their policy, and which they must reevaluate in light of the new premiums that will be charged.

11.     To allow policyholders to make informed decisions, any insurance company that raises premiums must inform their insureds of all material information in its possession regarding these important recalculations.  Only a full-disclosure of all these material data points will allow insureds to fairly evaluate the new policy terms in light of a rate increase.

### Genworth's LTC Policies and Experience

12.     Genworth, and its predecessor GE Capital Assurance ("GE"), provide LTC insurance. Operating then as GE, the Company issued its first LTC policies in 1974 and has been the country's largest provider of LTC insurance throughout the relevant time period.  In recent years, Genworth has sold approximately one-third of all stand-alone LTC policies in the United States, and according to its own marketing materials insures nearly 25% of all consumers who own an individual LTC policy.

13.     Over the past two decades, Genworth has repeatedly trumpeted its long track record with LTC insurance in marketing materials, advertising, on its website and through its sales agents.  Genworth has emphasized that its long track record with LTC insurance allows it to better price its policies, protecting its customers against the risk of future premium increases.

It has also touted the size and stability of its reserves to assure new and existing policy holders of its future viability and current fiscal stability.

**Plaintiffs' Experience with Their Genworth LTC Policies**

14.     Plaintiffs each purchased their policies between 2003 and 2004.  At this time, Genworth and its sales agents typically emphasized that the Company had never raised rates on its LTC policies over the decades it had been providing such insurance.  While these representations were not necessarily guarantees that rates would not increase in the future, they set the expectation that rates would not increase, or that any increases would be minimal.

15.     Plaintiffs had been paying stable premiums to Genworth for over a decade.  But by 2012, cracks in Genworth's stability began to show *inside* Genworth.  As part of "deep dive" into its LTC claim reserves, the Company acknowledged internally that it had a substantial shortfall in its LTC reserves, much larger than it ever anticipated.  While Genworth Life Insurance Company continued to pay dividends to its holding company parent, a hole in its claims reserves was growing exponentially.

16.     In 2014 Genworth completed an asset adequacy test and determined that its loss recognition testing margin,[2] an important indicator of insurer solvency, had shrunk from $3.2 billion at the end of 2013 to *negative $2.6 billion* by the end of 2014 (a deficit that exceeds its LTC premium revenue from that year).  According to Genworth, the decrease was "driven by

---

[2] Loss recognition testing is an impairment test, mandated by U.S. Generally Accepted Accounting Principles ("GAAP"), that requires insurance companies to recognize reserve deficiencies as they occur.  Loss recognition testing is the GAAP analog to statutory cash flow testing with the exception that, while the present value of future surplus is the key deficiency metric on a statutory basis, loss recognition is performed using a gross premium valuation method, which considers not the ending surplus, but the sum of the present value of liabilities throughout the projection period of the product being tested. The loss recognition testing margin is the deficiency metric for loss recognition testing and is equal to the sum of the present value of liabilities offset by the present value of any profits throughout the projection period of the product being tested – here, LTC insurance.

changes to assumptions and methodologies primarily impacting claim termination rates … and benefit utilization rates."

17.     To right the ship and plug the growing hole in its reserves, Genworth created an internal action plan (the "In-Force Management Project," and later "In-Force Rate Actions I, II and III") to seek significant premium rate increases systematically across its older policy classes. This case deals with one of those older policy classes, the Choice I plan.

18.     These future rate increases, however, would not be recognized in Genworth's asset adequacy testing until that increased revenue began flowing into its reserves over the next decade. So as to avoid reporting a current negative loss recognition testing margin, Genworth instead began to utilize in its actuarial testing assumptions for "significant anticipated (*but not yet filed*) future premium rate increases or benefit reductions" to increase its reported loss recognition testing margin by *$4.9 billion*. *See* GFI's Form 10-K for the period ending Dec. 31, 2014 at 61, 128 & 240 (emphasis added). To put that in perspective, Genworth's annual revenue from its entire long-term care insurance operation was only $3.5 billion in 2014.

19.     In other words, *Genworth relied almost entirely upon billions of dollars in anticipated future (but not yet filed) rate increases to plug this massive hole in its reserves*. And it was so confident in its ability to achieve these rate increases that it relied on them it its then current financial reporting.

20.     This material information about its plan for massive future rate increases, however, was never shared with Genworth's policyholders who would be required to pay the increases.

21.     Between 2014 and 2016, Genworth continued to adjust its assumptions to claim termination and benefit utilization rates resulting in continued decreases in its loss recognition

testing margin.  As of December 31, 2016, Genworth's assumptions for "significant anticipated (but not yet filed) future premium rate increases or benefit reductions" had exploded to a reported *$7.3 billion*.  This is the ever-escalating amount of future premium increases that would largely fall upon Plaintiffs and the Class.  Again, none of this material information was shared with Genworth's policyholders.

22.     Genworth began implementing its rate increase action plan in or around 2012 through a series of coordinated nationwide rate increase applications with state insurance departments across the country.  At that time, Genworth had planned to push through rate increases of 44-60% across the board as soon as possible, even though it could justify (and indeed needed) even more substantial premium increases.

23.     Where states approved lesser increases than requested, Genworth planned to (and did) seek successive rate increases to achieve the actuarial equivalent of a 44-60% rate increase in the first year.  For example, in Pennsylvania, the insurance commissioner initially approved only a 20% increase in 2013.  So Genworth sought and was approved for another 20% increase in 2014-15 and a third increase of 30% in 2015-16.

24.     None of the details of this massive rate increase plan, however, were shared with policy holders.  For example, in 2013 when Genworth informed those same Pennsylvania policyholders of the first 20% increase, they said only that "in accordance with the terms of your policy, we reserve the right to change premiums and it is likely that your premium rate will increase again in the future."  Although Genworth acknowledged future rate increases were "likely," it made no further attempt to inform policyholders that not only were they likely, they were part of the Company's Rate Increase Action Plan to raise rates sequentially until the equivalent of a 60% increase in 2013 was achieved.

25.     For a policyholder, deciding whether to pay a 20% increase is decidedly different than a 60% increase, especially because this increased rate will have to be absorbed into their financial planning for years or decades to come.  The nationwide Rate Increase Action Plan was material information about the future policy terms that Genworth withheld from its insureds in each premium increase notice they sent.

26.     The increases did not end when the first wave of nationwide increases were implemented though.  Even though substantially higher premiums were being paid for the same level of coverage across the country, Genworth's reserve hole continued to grow by staggering amounts.  Not only did the future viability of Genworth's LTC business rely heavily upon these rate increases, it also relied upon policyholders actually paying the increased rates rather than abandoning the policies.

27.     None of this critical information about Genworth's future in the LTC business, or the Company's plan for truly massive and unprecedented future rate increases was shared with Plaintiffs or the Class.  Rather, through a series of incomplete disclosures in successive rate increase announcements, Genworth slowly extracted from its insureds all the premium payments they could in a desperate attempt to rebuild its reserves.

28.     As this plan was unfolding inside the company, phase two of the massive wave of premium increases was being rolled out across the country beginning in 2014.  By 2018, Pennsylvania policy holders, for example, had received rate increase announcements in successive years of 20% in 2013, 20% in 2015, 30% in 2016 and yet another 20% in 2018.  At this point, a policyholder that had been paying $5,000 a year for its LTC coverage would be paying over $11,000 annually for the same level of coverage.

29.     For the first time, however, the 2018 increase announcement candidly disclosed that Genworth "*plan[s] to request at least 150% in additional premium increases over the next 6-8 years*."  Such an increase would raise annual premiums on a $5,000 policy to nearly $28,000 a year!

30.     To make matters worse, the disclosure of at least 150% increase over the next 6-8 years was not even a full disclosure.  At the same time Genworth made that announcement to policyholders, its internal projections demonstrated the need for an increase of more than 300% for the PSC Series III policies over the same period.   Such an increase would result in annual premiums of over $40,000 a year.  A truly absurd result.

31.     Genworth has known throughout the Class Period that it would need staggering and successive premium rate increases to remain in the LTC business.  It planned to push these rate increases through state insurance departments whenever and it could and for as much as possible.  Since the beginning of the relevant period, Genworth's actuarial testing demonstrated that increases of perhaps over 100% would be immediately required on all policies that are the subject of this lawsuit.  It never disclosed this material information to any of the Class Members.  The statements it did make about the likelihood of future rate increases were not adequate, omitted material information necessary to make the partial disclosures adequate, and resulted in the Class Members making policy renewal elections they never would have made.

32.      The Class seeks, among other relief, rescission of the policy renewal elections they made, an adequate, forthright and full disclosure of Genworth's current financial condition and plan for future rate increases, and an opportunity to decide, with the benefit of that information, what policy renewal options they will elect going forward.

## JURISDICTION AND VENUE

33.     This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").  Plaintiffs are citizens of Pennsylvania and Maryland. Defendant GLIC has its principal place of business in Virginia. Defendant GLICNY has its principal place of business in New York.  The amount in controversy exceeds $5,000,000, and there are more than 100 members in each of the Classes.

34.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant GLIC regularly conducts business in this District, has its administrative offices in this District, and a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

### A.     Plaintiffs

35.     **Plaintiffs Jerome and Susan Skochin** reside in Malvern, Pennsylvania.  On August 14, 2003, at ages 60 and 57 respectively, the Skochins purchased LTC insurance policies from GE (which became Genworth on January 1, 2006). The policies they purchased were part of Genworth's "Choice" series, referred to within Genworth as the Choice I policies offered on Form 7035 et al.   The Skochin's policies are both Lifetime benefit policies.

36.     **Plaintiff Larry Huber** resides in Westminster, Maryland.  On March 22, 2004, Mr. Huber purchased an LTC insurance policy from GE (which became Genworth on January 1, 2006).  This policy was part of Genworth's "Choice" series, referred to within Genworth as the Choice I policies offered on Form 7035 et al.   Mr. Huber's policy is a Limited benefit policy.

### B.     Defendants

37.     Defendants GLIC and GLICNY are related entities that issue Genworth long-term care insurance, including the Choice I policies at issue here.

38.     Genworth's business is divided into two divisions: Global Mortgage and U.S. Life Insurance.   The U.S. Life Insurance Division includes its LTC insurance business unit.   As Genworth's Chief Executive Officer acknowledged during a September 25, 2013 investor conference, "our core business is long-term care."   Genworth began selling LTC insurance in 1974, and today is the largest LTC insurance provider in the country.   Between 2010 and 2014, over 50% of Genworth's U.S. Life Insurance revenues came from its LTC insurance business unit.

39.     Genworth's corporate structure is set forth in the following graphic.



40.     Genworth's headquarters for LTC insurance is located in this District, in Richmond, Virginia.

41.     Defendant GLIC is an indirect subsidiary of Genworth Financial, Inc. and is organized under the laws of Delaware with its main administrative office in Richmond, Virginia. Among other products, GLIC issues LTC insurance policies nationwide.

42.     Defendant GLICNY is a subsidiary of GLIC.   GLICNY is organized under the laws of New York.   GLICNY issues insurance policies, including LTC insurance policies that are filed in and issued from New York, and most of its policyholders reside in New York. However, some of its policyholders currently reside in states other than New York.   For example,

GLICNY typically receives around $500,000 in annual LTC premiums from policyholders residing in Virginia.

43.     GLIC and GLICNY are referred to collectively throughout as "Defendants," "Genworth" or "the Company."

## FACTUAL BACKGROUND

A.     **LTC Insurance Background**

    1.     **LTC Insurance Basics**

44.     LTC insurance is a long duration insurance contract that insures the policyholder's against the costs of assisted living care in the event they become unable to perform the basic activities of daily living.  In such event, the LTC policy will reimburse the policyholder for costs incurred for care and treatment in assisted living facilities, nursing homes and/or in connection with home health assistance and related expenses.  Some LTC insurance contracts have daily, annual, or lifetime limits that cap the exposure of these costs.

45.     LTC insurance shares characteristics of both life insurance and property and casualty insurance.  Like life insurance, LTC insurance covers the insured over the course of a long time period making the financial health and security of the insurer a material concern for the policyholder.  However, like property and casualty insurance, LTC insurance covers a risk that is uncertain to occur.  Indeed, if a policyholder dies suddenly or otherwise never requires the type of care covered by their LTC insurance policy, no claim is ever made by the policyholder.

46.     Premiums for LTC insurance are based on underwriting factors as well as the age of the insured at the time the policy is issued.  The latter accounts for the fact that premiums paid in the early years of the policy funds claims incurred later.

47.     Purchasing LTC insurance at a younger age typically results in lower annual premiums.  This is because almost all LTC policies are intended to have level premiums payable for life, meaning that premiums do not increase because of the policyholders' increased age or changes in health condition.  Thus, claims are expected to be less than premiums paid in the early years and will exceed premiums in later years as depicted in the chart below.



48.     As the policyholder ages, the expected incurred claims will increase over and above the premium that would be paid by the policyholder if the LTC policy contract were entered into earlier in life.  Thus, individuals who delay purchase of a LTC policy, or who seek to change providers, typically have to pay a far higher premium than they would have been required to pay had they obtained LTC insurance earlier in life.  In other words, once obtained and after the policyholder pays premiums for a number of years, the likelihood that the policyholder would be able to find alternative insurance at a lower price than his or her existing policy trends to zero.

49.     As a result of this dynamic, reserves build in the early years of a block of business and release to claimants in later years.



50.     Over 95 percent of LTC policyholders in the United States are age 45 or older.

51.     According to a Genworth presentation dated February 11, 2015 (revised February 27, 2015) and titled "Long Term Care Insurance Annual Margin Testing", the average LTC policyholder in Genworth's blocks of business acquired their policy between 57 and 65 years of age, depending on the block.

> **2.      An Insurance Company's Financial Condition and Expertise in LTC Insurance Are Important Considerations for Insureds When Maintaining a Policy or to New Insureds Looking to Purchase a Policy**

52.     When purchasing LTC insurance, consumers place a large degree of trust in their insurance provider.

53.     In a LTC insurance contract, the insured is required to make modal payments with the expectation that the insurance provider will be there years down the road when an insured's claim might eventually accrue.

54.     Consumers of LTC insurance, like Plaintiffs, often purchase their policies years or decades before they anticipate making any claim on the policy.  LTC insurance is typically characterized by a long-term outlook such that policyholders pay premiums, on average, for 20 to 25 years before making a claim.  The typical LTC policyholder is issued the policy at 58 to 60 years of age and, if they make a claim at all, it is typically between the ages of 80 and 85.

55.     Due to this long time horizon, a primary consideration in choosing a LTC insurance provider is the insurer's financial condition and stability.

56.     In addition, while LTC insurance is intended to have level premiums, they are not guaranteed—*i.e.*, premiums can change over time based on insurer experience that deviates from previous assumptions but otherwise stays the same—consumers of LTC insurance, like Plaintiffs, consider the LTC insurance provider's purported expertise in devising accurate assumptions to accrue appropriate reserves and minimize shocks associated with rate increases on existing policies.

57.     The financial condition and stability of an insurer is reflected, in part, in a company's financial statements and in financial ratings, as issued by ratings agencies such as A.M. Best, Moody's Investor Services ("Moody's"), Standard & Poor's Ratings Services ("S&P"), or Fitch Ratings ("Fitch").

58.     State insurance commissioners, through their websites, specifically advise consumers to consider such financial information when choosing an insurance provider.

59.     For example, in its Guide to Consumers on LTC policies (*revised January, 2014*) the California Insurance Commissioner advises, "[a]n insurance company's financial standing and track record are important in choosing a long-term care insurance policy" and "[a]

company's size and ratings are important factors to take into consideration when making your long-term care insurance choice."

60.     The New York Insurance Commissioner offers similar advice, suggesting (http://www.dfs.ny.gov/consumer/ratings_stability.htm):

> **Insurance Company Ratings and Stability**
>
> When selecting an insurance policy, you are also selecting an insurance company and you may wish to know how stable that company is financially. Many firms rate the financial soundness of insurance companies … Each firm has a different rating scale and firms may differ in the conclusions they reach about a specific insurance company. Therefore, you may wish to check with more than one firm before selecting an insurance company.

61.     The NAIC is the United States standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories.

62.     In its publication *A Shopper's Guide to Long-Term Care Insurance*, the NAIC advises:

> **Check the financial stability of the insurance company.**
>
> Insurer ratings can show you how analysts see the financial health of individual insurance companies. Different rating agencies use different rating scales. Be sure to find out how the agency labels its highest ratings and the meaning of the ratings for the companies you're considering.

63.     In addition to the financial condition and stability of the insurance company, potential LTC policyholders consider an insurer's experience and expertise in setting premiums and accruing reserves.

64.     Insurance companies conduct periodic experience studies (examinations of their historical experience and how it compares to the assumptions the insurer used at pricing) to

evaluate its assumptions and make confident decisions in the development of future products and the underwriting of its business.

65.      Companies with more experience—i.e., with larger blocks of policies in force over longer time periods—have more data to use in creating more accurate assumptions.

66.      Consumers rightfully consider the breadth and duration of an insurer's experience in the LTC market as a material factor in selecting an LTC insurance carrier.

**B.**      **Genworth's Conduct with Regard to Its LTC Business**

    **1.**      **Genworth Marketed its Financial Strength, Sound Reserves and Breadth of Experience**

67.      Many of the Class Members purchased their policies from Genworth's Predecessor, General Electric Capital Assurance Company ("GE").

68.      Genworth, and its predecessor GE, marketed its experience and financial condition to induce new policyholders to purchase LTC policies and to keep its LTC policyholders renewing their policies.

69.      For example, in its 2004 marketing materials, GE asked "Why Choose General Electric Capital Assurance Company?"  The answer according to the pamphlet:

> Selecting a long term care insurance company is an important decision.  You need to find a company you can trust to help protect your assets and lifestyle as you grow older.  A company that's respected and recognized as a leader in quality service and products. A company with an innovative portfolio of plans that offer comprehensive benefits, and with a proven track record of paying its claims.
>
> General Electric Capital Assurance Company gives you all this and more.  Our Long Term Care Division pioneered the development of long term care insurance over 28 years ago and we've been an industry leader ever since.  Over the years we have continued to meet our customers' changing needs by improving and updating our policies and staying one step ahead in the long term care insurance industry.  We believe that our experience and expertise set us apart

from the rest and make us your best choice for helping to protect your future.

General Electric Capital Assurance Company is a member of the General Electric Company family.  We practice the principles that give GE its good name. You can depend on us to provide you with excellent service and quality long term care insurance plans.

70.     At around this time, General Electric Capital Assurance Company, including its long term care division, was being spun off to create Genworth Financial.  In an announcement to existing policyholders and consumers then shopping for insurance, Genworth introduced itself ensuring everyone knew the new company still adhered to all the things that made GE attractive to consumers.  It stated,

Genworth is a new public insurance holding company comprised of the businesses you know from GE Financial and GE Mortgage Insurance.  We are an established global company – and we are something new.

Over the years, as part of the GE family, we built financial strength, operational discipline and a reputation for integrity.  Now, as we become an independent company, we have the benefit of drawing on this heritage to make sure we are there for our customers throughout their lives, when they need us most.

While our name is changing, our commitments are clear.  We will honor our policies. We will continue to help protect our customers' lifestyles, to help them during difficult times and to help make their dreams come true.  And while we are in a complex industry, we will strive to make things clear and simple.

"Built on GE Heritage" clearly signals our strong foundation. As we begin to roll out our brand in the coming months, you will see the Genworth Financial name become more prominent in our marketing and communications.

**STRENGTH AND STABILITY**

We are among the largest U.S. Insurance companies, with an expanding global presence.   Built on a tradition of innovative products, customer services and an extensive distribution network, we

are dedicated to providing the best for our business partners and customers.

71.     In a 2012 brochure, Genworth boasted that "[t]here is no substitute for experience [and that] Genworth Life helped pioneer long term care insurance in **1974** and is an industry leader." (emphasis original).  Genworth also notes in its marketing materials that it's "years of experience have allowed [it] to design products and services to fit [its] customers' needs and a range of budgets."

72.     Genworth has also routinely touted of its financial health.  For example, in a March 2011 PowerPoint presentation for insurance brokers and agents, Genworth boasted that it had been "Setting Aside Assets to Pay Future Claims for 37 [y]ears" by putting reserve funds into: "investment grade bonds", "corporate securities", "treasury bonds, etc."  And represented a $17.91 billion reserve fund that it built while incurring only $6.7 billion in claims.



2.    **Genworth Claims to Buck Industry Trends and Sets Itself Apart From the Rest of the LTC Insurance Market**

73.    Between 1988 and 1998, "long-term care insurance ha[d] emerged as the fastest growing type of insurance coverage in the United States, with sales increasing at 20% to 25% a year."[3]  By the late 1990's over 100 carriers were aggressively competing for new policyholders in the LTC insurance market.

74.    By 2012, however, the LTC market had deteriorated and several large carriers had exited the market.   As a February 10, 2012 Fitch report explained, "[t]he long-term care insurance market continues to be plagued by adverse claims experience and poor overall results, which has led to rate instability, insurer solvency concerns, and market exits by several insurers." A July 2013 U.S. Dept. of Health and Human Services study of the LTC market noted that half of the companies who exited the market left after a "new evaluation/assessment of the risk of the product and market."

75.    In the midst of this market upheaval, Genworth consistently denounced any such effects on its own large book of LTC policies.  It attributed its success in the market to its vast experience with the product, and routinely cited its extensive actual claims experience to assure policyholders and potential new customers that its management of its LTC products was superior and not in distress.

76.    Genworth emphasized the importance of its own robust database covering over 40 years of actual claims experience – data which included information on the age and gender of policyholders, the rate of claims, the cause of claims, the duration of claims, the amount paid on claims, and so on.

---

[3] Evan Simoff, "LTC Goes Mainstream," Financial Planning (Sept. 1, 1998).

77. For example, in December 2013, Genworth stated it had "very credible experience" data, as a result of its having the "largest insured long-term care database and claims history in [the] industry [with] 190,000 claims processed, $9.8B benefits paid, [and] $5MM paid every business day." Similarly, in a March 20, 2014 Genworth presentation, its CEO boasted "we're the best in the business, we know more about the business, we have more data, and more experience, than anybody else."

78. Genworth essentially bragged that its depth of experience and large book of business continued to set it apart from other LTC insurance providers that were struggling to keep afloat in the face of changing claims experience.

## C. The Unraveling of Genworth's LTC Business and the Need for Substantial Future LTC Premium Increases

79. Despite public statements to the contrary, as early as 2012 Genworth had recognized that significant premium increases were need on its older blocks of LTC policies in order to shore up its reserves.

80. On October 30, 2013, Genworth held a press conference for investors and analysts to announce the Company's 3rd Quarter financial results. The market was anxious to hear how Genworth's flagging LTC business was faring. Genworth's CEO told his audience that the Company "had beg[u]n an intensive, very broad and deep review of all aspects of [our] long-term care business about 4 months ago," and that "[t]he first area of focus for us was our reserving." He explained, "we have been assessing our long-term care reserves under both GAAP and statutory reporting, and determining whether to make any changes" and that review "consider[ed] all important aspects" including "[t]he assumptions, best estimates and also a detailed review of our statutory reserves."

81.     By this time, Genworth had already instituted its first wave of substantial premium increases on the policies at issue in this litigation.

82.     On July 29, 2014, while still reporting a profit, Genworth announced to investors – but not its policyholders – that its operating income on its LTC insurance business was just $6 million.  Genworth noted that claims on its long-term care policies were more "severe", *i.e.* had a longer duration and were more expensive than reflected in its carefully monitored reserve calculations.

83.     On July 30, 2014, the Company shockingly admitted that, despite its earlier statements to the contrary, its reserves had "really been based on experience we had up through about 2010," experience that showed the average claim duration was only 2.2 years.  Even then though, as analysts were shocked that the "deep dive" into all aspects of the company's LTC business and reserves appeared to be a smokescreen, Genworth explained that everyone "seem[ed] to be missing a very big point:  This is an issue around our **claim reserve**," *i.e.,* not an issue with its **active life reserves** (which is the far larger reserve component).  Genworth's CEO later confirmed the upcoming reserve review would be focused only on the claim reserve and reiterated "the review would not impact the Company's assessment of its **active life reserves** or margins" and that "we have a much larger **active life reserve**, which is the reserve we hold for the bulk of the 1.2 million policyholders, and that reserve is about five times [larger than] the [disabled life reserves]".

84.     But by September 2014, Genworth began acknowledging publicly that the review of its disabled life claims reserve could "require a corresponding or related change" to the Company's active life reserves.

85.     On November 5, 2014, Genworth revealed that its post-2010 claims data showed the Company's **active life reserves** were materially under-reserved to the tune of **$531 million**. In its slide presentation explaining this new information, Genworth acknowledged that its new reserve calculations were based on updated data showing a claim duration of 2.9 years, as opposed to the 2.2 years that had previously been used to set reserves and determine operating income.

86.     As a result of this announcement, Genworth's consolidated RBC ratio fell from 490% at the end of the second quarter of 2014 to 445% at the end of the third quarter of 2014 and continued to fall to 370% at the end of the second quarter of 2016 to approximately 329% currently.

87.     Unbeknownst to Plaintiffs and the Class, this shortfall in reserves was going to be filled primarily from one source**, significant future rate increases on existing LTC policies**. As described hereafter, this reserve shortfall was only the tip of the iceberg.  As Genworth internally began recognizing the reserve shortfall continued to grow almost exponentially, those ever increasing shortfalls would require even more severe LTC rate increases.  None of this information, however, was shared ever with Genworth's LTC policyholders.

**3.     Facing a Growing Hole in Reserves, Genworth Initiates A Plan For Significant Rate Increases on its LTC Policies**

88.     The discovery of inaccurate claim duration assumptions revealed staggering projected losses in future years.  To account for this, Genworth instituted a plan to significantly increase premiums rates across all policies at issue in this litigation.

89.      In Genworth's Annual Report for 2012, filed with the SEC on Form 10-K on February 28, 2013, the Company disclosed that,

> **In the third quarter of 2012, we initiated another round of long-term care insurance in-force premium rate increases with the goal of**

**achieving an average premium increase in excess of 50% on the older generation policies** and an average premium increase in excess of 25% on an earlier series of new generation policies over the next five years. Subject to regulatory approval, this premium rate increase is expected to generate approximately $200 million to $300 million of additional annual premiums when fully implemented. **We also expect our reserve levels, and thus our expected profitability, to be impacted by policyholder behavior which could include taking reduced benefits or non-forfeiture options within their policy coverage.** The goal of these rate actions is to mitigate losses on the older generation products and help offset higher than priced-for loss ratios due to unfavorable business mix and lower lapse rates than expected on certain newer generation products. As of December 31, 2012, this round of rate action had been filed in 49 states and we have approvals representing approximately 20% of the expected additional annual premiums of $200 million to $300 million once fully implemented.

90.    In Genworth's Annual Report for 2013, filed with the Securities and Exchange Commission on Form 10-K on March 3, 2014, the Company again discussed its action plan for future rate increases, telling *investors*,

> In our U.S. Life Insurance business, **we are focused on the execution of our longterm care insurance strategy, which includes: obtaining significant premium rate increases on our older generation inforce blocks of longterm care insurance to improve profitability and reduce the strain on capital**; requesting smaller rate increases more proactively on newer inforce blocks of longterm care insurance as needed; and introducing new products with appropriate price benefits, using more conservative assumptions.

> \*        \*        \*

> **In the third quarter of 2012, we initiated a round of longterm care insurance inforce premium rate increases with the goal of achieving an average premium increase in excess of 50% on the older generation policies** and an average premium increase in excess of 25% on an earlier series of new generation policies. Subject to regulatory approval, this premium rate increase is expected to generate approximately $250 million to $300 million of additional annual premiums when fully implemented. **We also expect our reserve levels, and thus our expected profitability, to be impacted by policyholder behavior in cases where policyholders elect to take reduced benefits or nonforfeiture options within their policy coverage.** The goal of our rate actions is to mitigate losses on the older generation products and help offset higher than priced

for loss ratios due to unfavorable business mix and lower lapse rates than
expected on certain newer generation products which remain profitable
but with returns lower than in pricing assumptions. As of December 31,
2013, this round of rate actions had been approved in 41 states
representing approximately $195 million to $200 million of the targeted
premium increase when fully implemented in 2017.

(emphasis added).

91.     The company then reiterated this rate action plan in each annual report thereafter.

For example, in Genworth's Annual Report for 2016, filed with the Securities and Exchange

Commission on Form 10-K on February 27, 2017, the Company again discussed its future rate

increase plans, telling *investors*,

### In-force rate actions

**As part of our strategy for our long-term care insurance business, we
have been implementing, and will continue to pursue, significant
premium rate increases on our in-force blocks of business, as needed.
The goal of our rate actions already implemented, as well as future
rate actions, is to mitigate losses on our older generation policy series
and help offset higher than priced-for loss ratios and lower returns on
newer generation products**. Our approved premium rate actions may
cause fluctuations in our loss ratios during the period when reserves are
adjusted to reflect policyholders taking reduced benefits or non-
forfeiture options within their policy coverage. For all of these rate action
filings, we received 96 filing approvals from 25 states in 2016,
representing a weighted-average increase of 28% on approximately
$719 million in annualized in-force premiums. We also submitted 79 new
filings in 32 states in 2016 on approximately $834 million in
annualized in-force premiums.

(emphasis added).

92.     In Genworth's most recent Annual Report for 2017, filed with the Securities and

Exchange Commission on Form 10-K on February 28, 2018, the Company again described its

future rate increase plans, telling investors,

### In-force rate actions

> **As part of our strategy for our long-term care insurance business, we have been implementing, and expect to continue to pursue, significant premium rate increases on older generation blocks of business in order to bring those blocks closer to a break-even point over time and reduce the strain on earnings and capital**. We are also requesting premium rate increases on newer blocks of business, as needed, some of which may be significant, to help bring their loss ratios back towards their original pricing. Our approved premium rate actions may cause fluctuations in our loss ratios during the period when reserves are adjusted to reflect policyholders taking reduced benefits or non-forfeiture options within their policy coverage. For all of these rate action filings, we received 114 filing approvals from 36 states in 2017, representing a weighted-average increase of 28% on approximately $714 million in annualized in-force premiums. We also submitted 226 new filings in 45 states in 2017 on approximately $1.3 billion in annualized in-force premiums.

(emphasis added).

### 4. Genworth Internal Asset Adequacy and Cash Flow Testing Confirms the Need for Significant Future Rate Increases

93.     Genworth performed asset adequacy and cash flow tests on its LTC business in 2014 and 2016.

94.      As a result of those tests, claim termination rates were lowered in 2014 and again in 2016. As a result, Genworth was required to significantly strengthen its Disabled Life Reserves (DLR) on existing claimants. Strengthening the DLR resulted in a corresponding magnified effect on its projections, as claimants were increasingly expected to stay on claim for longer periods and therefore use more of their available benefits than Genworth had previously assumed. Genworth also continued to recognize that more policyholders were surviving to claim than was previously assumed. In other words, Genworth's internally projected future earned premiums based on exiting premium rates were not adequate to offset its revised projections for future incurred claims.

95.     In addition to the **44-60%** rate increases sought in 2012, Genworth's 2014 asset adequacy test showed the need for **additional** premium increases of more than **50%** for Choice I policies.

96.     By 2016-2017, Genworth was including assumptions in its Cash Flow Testing **for future rate increases of more 300-400%** on its Choice I policies, an astounding amount.

5.     **Genworth Relies Upon The Rate Increase Action Plan to Stabilize Its LTC Reserves**

97.     In Genworth's annual reports, the Company warned its investors, but not its policyholders, that "[t]he continued viability of our long-term care insurance business and GLIC and GLICNY **is based on our ability to obtain significant price increases or benefit reductions**, as warranted and actuarially justified. **The adequacy of our current long-term care insurance reserves also depends significantly on various assumptions and our ability to successfully execute our in-force management plan through increased premiums or reduced benefits as anticipated**." (Emphasis added)

98.     Those "assumptions," Genworth explained, rely heavily on "assumptions for significant anticipated (**but not yet filed**) future premium rate increases or benefit reductions." In other words, Genworth admitted to investors that it must obtain these significant rate increases or its LTC reserves, and indeed its LTC business, will be significantly imperiled.

99.     To illustrate the magnitude of Genworth's staggering rate increase action plan, one can look at the material impact Genworth estimated premium increases would have on the Company's LTC reserves.

100.     For example, in Genworth's Annual Report for 2014 the Company reported that its "loss recognition testing of our long-term care insurance reserves under U.S. GAAP and asset adequacy testing of our statutory long-term care insurance reserves" included "assumptions for

significant **anticipated (but not yet filed) future premium rate increases or benefit reductions**" and that the "assumption for future anticipated rate actions [] increased our margin by approximately **$4.9 billion**."

101.     In 2015, GFI reported that Genworth was in an even deeper hole.  At that point, the Company reported a Margin of $2.5 billion to $3.0 billion, but included an assumption of **$6.0 billion** in "**anticipated (but not yet filed) future premium rate increases or benefit reductions**."

102.     The Company's 2016 Form 10-K reports a further deepening hole.  GFI reported that Genworth had a Margin of only $800 million to $1.3 billion, but included a staggering assumption of **$7.3 billion** in to-be-filed premiums.

103.     The Company's 2017 Form 10-K reports shows no end in sight, reporting "[a]s of December 31, 2017, the assumption for future anticipated rate actions increased our U.S. GAAP long-term care insurance margin by approximately **$8.0 billion**."

104.     The ratio of the recognized value of the to-be-filed rate increases to the Margin has increased over time as well.  Indeed, that ratio was zero in 2013, 2.13 in 2014, between 2 and 2.4 in 2015 and between 5.6 and 9.13 in 2016.

105.     As the proverbial chickens return home to roost, the ratio will continue to increase almost exponentially in the future.  **In other words, Genworth has recognized that the only way out of this predicament is for it to rely upon even greater premium increases on policies that were already substantially increased.**

106.     Even accounting for the to-be-filed rate increases, Genworth's Margin has seen a staggering decline.  Since 2013, the reported Margin has declined by as much as 75%.



107.    As shown above, Genworth's reliance on to-be-filed rate increases has been used to backfill a massive decline in the future prospects of its LTC book of business.

108.    Genworth's rate increase action plan was not just aspirational.  The Company has admitted to its shareholders that executing this rate increase plan is a critical component of Genworth's future viability in the LTC insurance industry.  The Company's assumptions for future approvals of truly massive premium increases has been a material part of Genworth's asset adequacy testing and financial reporting since 2012.  Genworth has known throughout that period that it will either attain massive and successive premium increases, or it faces a material risk of not being able to support the policies its written.  None of this information has been shared with Plaintiffs or the Class Members.

109.    It bears repeating that Plaintiffs do not challenge Genworth's need for these rate increases.  They challenge Genworth's *failure to inform policyholders* of its rate increase action plan that calls for successive and substantial rate increases, and the need for even more increases

in the future.  Genworth has already pushed through massive LTC premium increases on the Classes.  They did so piecemeal and without ever informing Plaintiffs or the Class Members of the Company's reliance upon these increases and *future increases* just to rebuild adequate reserves.

110.    Full disclosures as early as 2012 of the massive reserve hole Genworth needed to fill with rate increases would have afforded policyholders material information about the first wave of increases, the need for more immediate increases, and the staggering size of the increases needed in the future.  Genworth also failed to warn policyholders of the effect not getting those increases approved might have on the future viability of their LTC insurer.

**D.     The Parable of Penn Treaty**

111.    One need not look far to find an example of the what looms in policyholders' future if they continue to pay staggering premium increases, but even those increases prove inadequate to shore up Genworth's reserves.

112.    On March 2, 2017, Commonwealth Court Judge Mary Hannah Leavitt in Pennsylvania ordered the liquidation of Penn Treaty Network America Insurance Company and American Network Insurance Company (together, "Penn Treaty"), insurance companies primarily in the business of issuing LTC insurance policies (more than 98% of Penn Treaty's policies were LTC policies).  Penn Treaty had 76,000 policyholders nationwide.  At its peak, in 2000, Penn Treaty had about 250,000 policies in force and $363 million in annual premium revenue.  But by October 2008, the company had ceased to sell new policies and was in dire financial straits, rather similar to Genworth's position today if its plan for staggering future rate increases is frustrated.

113.    In January 2009, the Commonwealth Court placed Penn Treaty into rehabilitation and appointed the Pennsylvania Insurance Department ("PID"), the regulator in Penn Treaty's

domiciliary state, as the rehabilitator.  Following various analyses, PID sought to liquidate Penn Treaty.  Immediately prior to the rehabilitation in 2008, Penn Treaty had $1.1 billion in admitted assets and $1.2 billion in liabilities.  By 2015, the company's assets had dwindled to $656 million and its liabilities had ballooned to $4.4 billion.  At liquidation in 2017, Penn Treaty had $500 million in assets to cover LTC claims projected to be $4.6 billion.

114.    By the time PID got involved, it was too late for Penn Treaty policyholders. Although signs of Penn Treaty's insolvency were apparent in the mid-2000s, the Pennsylvania regulators did not take action until 2009.

115.    Genworth's problems might run even deeper and affect a far larger group of policyholders.

116.    For its part, Genworth cites the Penn Treaty episode as support for regulators to approve pending and future rate increases.  In a November 2016 article, Genworth's CEO chided regulators for failing to approve premium increases that would assist in keeping insurers solvent, citing the Penn Treaty issues.  *Genworth says higher LTCI rates beat liquidation*, LifeHealthPro.com (Nov. 4, 2016), *available at* http://www.lifehealthpro.com/2016/11/04/genworth-says-higher-ltci-rates-beat-liquidation.

117.    Premium increases can be warranted when actuarial experience justifies them and regulators approve them.  Again, this case does not challenge Genworth's LTC premiums. A problem arises, though, when policyholders elect to renew their policies for years at substantially increased premiums rates, only to see the insurer still fold.  In that instance, the policyholders are merely throwing good money after bad.  Genworth owes its insureds a candid and full disclosure of its current financial condition, the role future premium increases play in achieving financial

stability, and the magnitude of future increases necessary to ensure that stability. Genworth has offered none of this to Plaintiffs and the Classes.

**E.      At First, Genworth Internally Recognizes the Need to be Transparent with its Rate Increase Plan**

118.    In an internal PowerPoint presentation, Genworth described the need for rate increases across several of its major LTC policy classes, including those at issue here. In line with what it told investors, Genworth explained that its "actuaries lead a team to perform in-depth review of our in-force long term care insurance business." The Company summarized its findings as follows:

> We continue to see higher than expected persistency among the older blocks of our in-force long term care insurance products. While this demonstrates that policyholders value their coverage, it is one of our pricing challenges. Because more people than expected are retaining coverage, we are seeing a higher number of claims than expected when the product was priced. Prior rate increases partially mitigated these impacts. We have adjusted for this persistence with our newer products, priced with updated lapse rates assumptions of 1% or less.

119.    Genworth then laid out its plan to address these findings,

> In conjunction with this ongoing review process, Genworth has adopted a more proactive strategy in managing our long term care business. **First, we will continue to work closely with regulators to implement rate increases on certain older blocks of long term care business in an attempt to bring these blocks closer to break even going forward.** Second, we will continue to evaluate the experience of our newer blocks of long term care insurance business. If the actual or projected experience warrants, we will seek a premium rate increase earlier in the product lifecycle. And third, we will continue to leverage our more than 40 years of experience to develop new products that are both innovative and incorporate our most current pricing assumptions.

(emphasis added).

120.    Genworth then further described the inforce rate action plans, several of which are the subject of this lawsuit (those covering the "Choice I" policies) as follows:

**In-Force Management Project (IFMP)**

In 2007, after identifying a higher than anticipated persistency rate, Genworth implemented a rate increase of 8-12% on 3-Day, PrePCS, PCS I and PCS II policies.

**In-Force Rate Action I (IFA I)**

In 2010, Genworth applied an 18% increase on PCS I and PCS II policies.

**In-Force Rate Action II (IFA II)**

In 2012, Genworth applied rate increases on Pre-PCS, PCS I, PCS II and Choice I policies. During IFA II we applied larger increases to policies with lifetime benefit periods.  Among other things, this is because lifetime benefits can correlate to longer claim durations.  The average claim on a policy with lifetime benefits lasts 45% longer than the average limited duration policy claim.   Lifetime policies represent a greater, less predictable risk because the maximum benefit is uncapped.

**In-Force Rate Action III (IFA III)**

In the third quarter of 2013, Genworth began filing rate increases on Privileged Choice and Classic Select policies. **Our intent is to intervene earlier in the life of the products to avoid larger increases in the future and provide greater transparency to our policyholders and distribution partners.**

(emphasis added).

121.    Genworth also included the following slide outlining then extent of its various rate increase actions:

| Policy Series (Years Sold) | Requested Rate Increase Amount (Year Increase Requested) | | | | |
|---|---|---|---|---|---|
| | FMP (2007) | IFA I (2010) | IFA II Limited (2012 Benefit Period) | IFA II Lifetime (2012 Benefit Period) | IFA III (2013) |
| 3-Day (1974 - 1988) | 8% | - | - | - | |
| Pre-PCS (1988 - 2003) | 9% | - | 35% | 88% | |
| PCS I (1993 - 2005) | 12% | 18% | 60% | 95% | - |

33

| | | | | | |
|---|---|---|---|---|---|
| PCS II (1997 - 2005) | 11% | 18% | 63% | 78% | - |
| Choice I (2001 - 2008) | - | - | 44% | 60% | - |
| Classic Select (2003 - 2013) | - | - | - | - | 5% - 12.8% |
| Privileged Choice (2003 - 2013) | - | - | - | - | 5% - 12.8% |

122.   In subsequent slides, Genworth explained,

Our understanding of policyholder behavior has deepened considerably since our first rate increase in 2007. Specifically, very few policyholders lapse their policies in connection with a rate increase. This demonstrates that policyholders value their coverage.

**However, we recognize that policyholders are increasingly frustrated by the potential lack of transparency into possible future increases. For this reason, Genworth adopted a different approach in connection with IFA II, specifically for rate actions requested in 2012.**

**In situations where the state approves the entire amount requested, whether implemented completely in the first year or over a multi-year period, we intend to not seek additional increases for at least five years from the time a state approves the premium rate increase.**

**We believe this approach allows our policyholders to plan and gives them the time and information necessary to understand and fully consider options**.

(emphasis added).

123.   Addressing the admitted need for transparent communication of its rate increases

to policyholders, Genworth stated,

We recognize the impact rate actions have on our policyholders and distribution partners, and we are committed to providing dedicated support throughout the process. As states approve requested rate increases, we communicate by:

\*       \*       \*

34

3. Mailing initial notices to impacted policyholders at least 60 days before their anniversary billing dates.

124.    Genworth also fully appreciated the conundrum significant rate increases foist upon policyholders,

> Although policies with increased premiums still provide considerable value in light of the significant benefits they provide, **some clients may not be in a financial position, or be willing, to pay for the same level of coverage at the new rates.** There are several options available to clients who want to maximize the value of their coverage while keeping premiums at approximately the same level. Many of these options may be used together to balance policyholders' coverage needs with their budgets. Policyholders have 60 days from the date Genworth receives their benefit change confirmation to return to their original benefits, should they change their minds.

125.    Of course, for policyholders to make informed decisions about which of these various options to choose in light of the rate increases, they need a complete picture of Genworth's reserves on these policies and what future rate increases will be required.

126.    Genworth then noted, "**We continue to make tough but smart decisions designed to give our policyholders transparency into rate increases, coverage options and greater predictability of premiums**."

127.    Unfortunately, critical information about Genworth's plans for future rate increases was *not* included in letters sent to Plaintiffs or Class Members until 2018.   As illustrated in the Plaintiffs' experiences below, none of them were provided material information that would have afforded them the necessary transparency into Genworth's future rate increase plans that would have, in turn, allowed them to make informed decisions.  The omission of this material information is central to their claims.

**F.**   **The Effected Policy Forms**

128.   As described above, Genworth's rate increase action plan affected older policies far more drastically than it did newer policies.  Perhaps the most affected policy class is the subject of this litigation- the Choice I policy class.

**Choice I**

129.   The Choice I policy class includes policies written on GLIC Forms 7035 at al, and GLICNY Forms 51050 et al.

130.   Each of these policies were originally sold by GE and acquired by Genworth in 2006.  The policies offer the choice between limited or lifetime benefits.  These policies were sold nationwide generally between 2001 and 2008.  They are no longer being sold in any state.

131.   In 2013, there were 273,696 policyholders with either limited or lifetime benefits in this policy class.  By 2017, the number of policyholders on these forms had dropped to 231,867.

132.   For the Choice I policies, Genworth began pursuing a nationwide rate increase of 60% for all policies with lifetime benefit periods and 44% for all policies with limited benefit periods in 2012.

133.   Where those rate increase requests were not fully approved, Genworth went back with nearly annual follow-up requests for successive rate increases intended to achieve the actuarial equivalent of rate increases originally requested in 2012.

134.   By 2014, in connection with its updated internal projections, Genworth began seeking a second wave of rate increases on all Choice I policies.  These rate increases were not only needed to continue the work of the first wave of partially approved increases, but also to account for updated projections that signaled the need for even steeper increases on this entire policy class.

135.    Genworth's Cash Flow Test for 2017 assumed cumulative future premium increases of more than **350% in the next 6-9 years** on this policy class.

136.    None of this material information was shared with policyholders.

137.    To announce the new rates, Genworth sent each effected Choice I policyholder a rate increase announcement letter that included one of the following disclosures: "please note that in accordance with the terms of your policy, we reserve the right to change premiums and it is *likely* that your premium will increase again in the future" or "please note that in accordance with the terms of your policy, we reserve the right to change premiums and it is *possible* that your premium will increase again in the future." (emphasis added).

138.    While this disclosure reiterates Genworth's "right" to increase premiums and notes future premiums are either "possible" or "likely," this disclosure does not begin to afford policyholders material information about the "possible" or "likely" future increases.  First, it fails to inform policyholders that Genworth initially requested approval for significantly higher increases, and having only a partial increase approved all but ensured successive rate increases in the very near future as the initial increase requested was "phased-in."  Second, it fails to inform policyholders of the sheer magnitude of the first rate increase request and the staggering increases that were to come.  Third, it fails to disclose to policyholders that Genworth's internal testing supported, and continued to require, rate increase action plans that called for doubling, tripling, or even quadrupling the current premium rates at certain points in the near future.  Fourth, it fails to inform policyholders that Genworth's asset adequacy testing and financial reporting depended upon these massive rate increases to ensure reserves were adequate to pay future claims.

139.    Genworth even included a form Frequently Asked Questions insert with the rate increase announcement letters, but even this document failed to provide the material information noted above.  In the FAQ insert, Genworth asked,

> **Q: The letter states that Genworth "reserves the right to change premiums and it is likely that you premium rate will increase again in the future."  What does that mean?**
>
> A: Your policy form gives us the right to increase your premium on a class-wide basis.  Therefore, we reserve the right to change premiums again in the future, on a class-wide basis, if our claims experience warrants an increase.  We routinely send you a brochure entitled *Important Information About Long Term Care Insurance Premiums*, reminding policyholders that premiums can be increased on a class-wide basis.  Since the estimated claims over the life of your policy form are significantly higher today than we originally anticipated when it was priced, it is likely that your premium rate will increase again in the future.

140.    Again, this statement omits material and specific information about the magnitude, frequency and necessity of future rate increases Genworth had planned for the near-term.

141.    When Genworth sold these policies to Plaintiffs and the Class Members in the early 2000s, they emphasized the Company's long track record with LTC insurance and highlighted the fact that Genworth had never before raised rates.  When policyholders started receiving the first rate increase letters, they could have never imagined that successive increases of comparable amounts would still be coming in the next several years.  They could also never have predicted that after those massive increases were pushed through, that Genworth would still need additional future increase **of more than 300%** in the next 6-9 years.

142.    Genworth, though, possessed this material information when it sent the increase announcements to its policyholders.  Informing them that future increases were "possible" or "likely" does not begin to afford its insureds all material information needed to make informed decisions.

143. Each time a policyholder received an increase announcement, they were forced to make an election of various options that included paying the increased premiums to retain their current benefits, reducing benefits for a lesser premium, or walking away from the policy and retaining a "paid-up" benefit. It essentially required the policyholders to purchase the insurance anew. Most of their elections would be permanent. For a policyholder that had already made a decade's worth of premiums payments, essentially investments in future benefits, these were not easy decisions. Without the benefit of full information, policyholders simply could not make an informed decision.

144. While the rate increases approved by each state varies, the series of rate increases and need for future rate increases generated the same conundrum for each Class Member. Namely, during the Class Period each received a series of rate increase letters and had to decide whether to act on each one without full "transparency" into Genworth's plan for more and more significant rate increases.

145. Genworth's need for these rate increases is consistent across the entire policy class. Genworth's reserves for this class are not individual to any state, but are collective. These policyholders also received the same form letters announcing the price increases and were shielded from the same material information about the need for significant and successive future rate increases.

146. The illustrations of the Plaintiffs' experiences below add context to their claims and demonstrate how Genworth's decision to shield material information from policyholders placed them in an untenable situation.

**G.    Plaintiffs Experiences with Their Genworth LTC Policies**

**Choice I– Jerome and Susan Skochin**

147.    In 2003, Jerome Skochin and his wife Susan started shopping for LTC insurance. They were 60 and 57 at the time.

148.    After discussing options with their broker, the Skochin's purchased LTC insurance from GE (which later became Genworth) in August 2003.  The policy they purchased was part of Genworth's "Choice" series, referred to within Genworth as the Choice I policies offered on Form 7035 et al.   The Skochins' annual premiums were $3,558.75 and $3,637.50, respectively.  They paid this same level premium for the first 10 years of the policy.

149.     In 2013, however, the Skochin's received notice from Genworth of their first premium increase.  In moderately personalized form letters dated June 11, 2013, Genworth notified the Skochins it was raising the rates on both their policies by 20%.  The letter noted this increase was being imposed on the entire class of policies.  Genworth also reminded the Skochins that "in accordance with the terms of your policy, we reserve the right to change premiums and it is likely that your premium rate will increase again in the future."

150.     In connection with this premium increase, Genworth offered policyholders three options: (1) pay the increased premiums to preserve the current level of benefits, (2) maintain the current premium level in exchange for lesser benefits; or (3) walk away from the policy and retain a "paid-up" contingent non-forfeiture benefit, which meant that *if* the Skochins ever did meet the criteria to claim on the policies in the future, then they could up to the amount of premiums that had already paid to Genworth.  In other words, the "paid-up benefit" represented an interest free loan to Genworth, to be repaid *only if* the conditions precedent for claiming LTC benefits came to pass in the future *and* Genworth is still a going concern at that point.

151.    Now, faced with the first premium increase, the Skochins were forced to decide anew whether the policy at new premium rates still met their budget and their future wealth preservation planning and LTC needs.

152.    The premium increase announcement was essentially a renegotiation of the Skochins' policies.  The only information they were given upon which to make that decision was Genworth's statement that it would "likely" increase their rates at some time in the future. Genworth made no attempt to inform the Skochins how soon in the future their rates were likely to increase again, how often the increases might come, or how much the rates would be increased; all material information that Genworth possessed when it sent the increase announcement.  Likewise, Genworth made no mention of its nationwide price increase action plan.

153.    Unbeknownst to the Skochins by 2012 Genworth had already begun pursuing a nationwide premium rate increase of **60%** on the same policy class.  On information and belief, the Pennsylvania Insurance Department approved a 20% rate increase and signaled that successive 20% annual increases would be approved in a phased manner.

154.    The Skochins were entitled to know that not only were some unspecified future increases "likely," but that Genworth **planned** to submit sequential increases **each year** to achieve the equivalent of a **60%** rate increase in 2013. That information was material to the Skochins' decision about what option to select in response to the increase announcement. Without the benefit of this information, the Skochins agreed to pay the increase and maintain their current level of benefits.  After this increase the Skochins' premiums rose to $4,270.50 and $4,365.00 respectively.

155.    On June 15, 2015, the Skochins received notice of another 20% increase.  Again, nothing about Genworth's plan to increase future rates until its initially requested 60% rate increase were enacted in full, nor was warning about the need for even more increases in the near future based on further deterioration in actuarial experience ever shared with its policyholders.

156.    The Skochins again agreed to pay the full premium increase to maintain their current level of benefits.  After this increase the Skochins' premiums rose to $5,124.60 and $5,238.00 respectively.

157.    In 2016, the Skochins received yet another rate increase notification from Genworth, this time for a 30% increase.  Once again, none of the material information about Genworth's future rate increases were shared with Genworth's policyholders and again the Skochins elected to pay the full increase to maintain their current level of benefits.  After the Round 3 increase, the Skochins' premiums had risen to $6,661.98 and $6,809.00 respectively, almost double what they paid prior to the increases.

158.    In 2017, feeling stretched by the high premiums the Skochins decided to drop the valuable 5% Compound Inflation Protection from their policies in exchange for a reduction in premiums.  Their new premiums were reduced to $3,545.10 and $3,528.72.

159.    On June 8, 2018, they received notice of yet another rate increase of 20%.  That increase would bring their annual premiums back up to $4,254.00 and $4,234.42.  This time, however, the form increase announcement the Skochins received informed them pointedly that Genworth "**plan[s] to request at least 150% in additional premium increases over the next 6-8 years.**"  This is precisely the type of "transparent" disclosure Genworth once contemplated offering policyholders in its draft form letter (see supra at ¶ 126), and the type Plaintiffs and the Class Members allege should have been offered in the very first increase announcements.

160.    With this more transparent disclosure, the Skochins elected to take the contingent non-forfeiture benefit option and pay no further premiums.  The Skochins would have made this same election in 2013, and not have paid any of the premium increases, had they been given a comparable "transparent" disclosure of Genworth's rate increase plans in the first instance.

161.    There is one final note to the Skochin's story.  At first glance, this last increase announcement appears to finally afford the Skochins an adequate disclosure of Genworth's future rate increase plans, information they needed to properly evaluate their policy options.  But shockingly, even this disclosure was incomplete and misleading when compared to Genworth's internal testing and projections.

162.    As noted above, by 2017 Genworth's Cash Flow Testing assumed cumulative future premium increases for Choice I policyholders of **more than 350% over the next six to nine years**.

163.    The candid acknowledgement that Genworth was planning to more than double the already significantly increased premiums over the next 6-8 years was enough to encourage the Skochin's to walk away from their policies.  But the need to increase premiums by at least **350%** on their policies is truly frightening.  As it is, the Skochins have paid more than $48,000 in premiums since they received the first increase in 2013.  At best, that money is now operating like an interest free loan to Genworth until the Skochins start claiming on the policy, *if they ever actually do qualify for benefits*.

### Choice I – Larry Huber

164.    In 2004, Larry Huber began shopping for LTC coverage.  After comparing several plans, he chose a Genworth policy on March 22, 2004.  This policy was part of Genworth's "Choice" series, referred to within Genworth as the Choice I policies offered on Form 7035 et al.

This was a limited benefit policy with a daily maximum of $200.00 and a lifetime maximum benefit of $292,000.00. His annual premium was $1,446.64.

165.     Mr. Huber paid this same level premium for the first 10 years of the policy.

166.     In January 2014, Mr. Huber received his first premium increase announcement. In a moderately personalized form letter, Genworth informed Mr. Huber that his premiums were increasing by 15%, from $1,446.64 per year to $1,663.64 per year.   The letter noted "in accordance with the terms of your policy, we reserve the right to change premiums and it is likely that your premium will increase again in the future."

167.     Unbeknownst to Mr. Huber, however, Genworth had actually applied for a **60%** increase on policies with Lifetime Benefits and a **44%** increase on policies with Limited Benefits.

168.     When only a fraction of Genworth's initial increase request was approved, it all but ensured Genworth would make a successive rate increase request of *at least* 15% in short order.   After all, Genworth had recognized a serious shortfall in its LTC claim reserves by 2013 and planned to fortify these reserves through a rate increase action plan that included significant premium increases on Mr. Huber's policy and others like it throughout the country.

169.     When it sent the first premium increase letter in 2014, Genworth knew that future premium increases on Mr. Huber's policy were not only "likely," they were necessary to ensure Genworth could rebuild adequate reserves.   None of this information, however, was shared with Mr. Huber, or any other policyholders.   Without the benefit of this complete picture, Mr. Huber determined to pay the increased rates and renew his policy.

170.     On January 15, 2016, Mr. Huber received a second increase announcement, this time for another 15%.   Again, unbeknownst to Mr. Huber this second increase was part of

Genworth's plan to institute successive rate increases on all policy holders in this policy class until the actuarial equivalent of its initially requested 44-60% increase was obtained.

171.    None of this material information about both the need for, and plan for, future rate increases was ever shared with Mr. Huber or other policyholders in this class.

172.     The very next year Mr. Huber received a third increase letter on January 14, 2017, this time for another 15%.  At this point, Mr. Huber's annual premiums had risen to $2,200.17, compared to the $1,446.64 he was paying for the first 10 years of his policy.

173.    As noted above, by 2017 Genworth's Cash Flow Testing assumed cumulative future premium increases for Choice I policyholders of **more than 350% over the next six to nine years**.

174.    Genworth, however, has not shared any of this material information with the Mr. Huber, or any other Genworth policyholders.

## **CLASS ACTION ALLEGATIONS**

175.    Plaintiffs Jerome Skochin, Susan Skochin and Larry Huber bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of themselves and the following Class consisting of:

> All persons residing in the United States who renewed their Choice I long-term care insurance policies with Genworth since January 1, 2012.

176.    Excluded from the Class are: (1) those Choice I policyholders whose policies either went into Non-forfeiture status prior to January 1, 2014, or whose policies lapsed or have otherwise been terminated and have not since been reinstated at any time between January 1, 2012 and the date Class Notice is mailed; (2) Genworth's current officers, directors, and

employees as of the date Class Notice is mailed; and (3) the Judge and the Judge's immediate family and staff.

177.     Plaintiffs Jerome and Susan Skochin also bring this suit as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of themselves and the following Subclass:

> All persons residing in the Commonwealth of Pennsylvania who renewed their long-term care insurance policies, including those that selected a non-forfeiture option, with Genworth on Policy Form 7035 et al. since 2012.

178.     Excluded from the Class are: (1) those Choice I policyholders whose policies either went into Non-forfeiture status prior to January 1, 2014, or whose policies lapsed or have otherwise been terminated and have not since been reinstated at any time between January 1, 2012 and the date Class Notice is mailed; (2) Genworth's current officers, directors, and employees as of the date Class Notice is mailed; and (3) the Judge and the Judge's immediate family and staff.

179.     The Class and Pennsylvania Subclass are referred to collectively as the "Classes."

180.     The Classes satisfy the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23(a) and (b)(3).

181.     The members of each Class contain thousands of Class Members and are thus so numerous that joinder of all members is impracticable.  For example, there are more than 14,000 Choice I policyholders in Pennsylvania.  There are nearly 270,000 Choice I policyholders nationwide.

182.     Plaintiffs and each of the Class Members have renewed their LTC policies with Genworth Life Insurance Company since 2012 and were damaged by Defendants' failure to adequately inform them of material information necessary to make important decisions about

what policy options to elect at that time.  Plaintiffs are each members of their respective Classes, and their claims are typical of the claims of the members of the Classes.  The harm suffered by Plaintiffs and all other Class Members was, and is, caused by the same misconduct by Genworth.

183.    Common questions of law and fact exist as to all members of the Classes, which predominate over any questions that may affect individual Class Members.  Among the many questions of law and fact common to the Classes are the following:

>    whether Genworth omitted material information from the rate increase letters;
>
>    whether by failing to provide certain information Genworth breached the duty of good faith and fair dealing;
>
>    whether Genworth also violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law;
>
>    whether Genworth should be enjoined from further misconduct; and
>
>    the appropriate measure of damages or other relief to which Plaintiffs and the Class Members are entitled.

184.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes.  Plaintiffs do not have any interest antagonistic to, or in conflict with, the Classes.

185.    Plaintiffs have retained competent counsel, who are experienced in consumer and commercial class action litigation, to further ensure such protection and who intend to prosecute this action vigorously.

186.    Class action status is warranted under Rule 23(b)(1) because the prosecution of separate actions by or against individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants, or because the prosecution of separate actions by or against individual Class members would create the risk of adjudication with respect to individual members of the Classes which would, as a practical matter, be

dispositive of the interests of the other Choice I policyholders that are not members parties to the adjudications or substantially impair or impede their ability to protect their interests.

187.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

188.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the Classes predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class Members are relatively small in comparison to the expense of this litigation, those expenses and the burden of individual litigation make it impractical for individual Class Members to seek redress for the wrongful conduct asserted herein.  If class treatment of these claims were not available, Defendants would likely continue their wrongful conduct, would unjustly retain improperly obtained revenues, and/or would otherwise escape liability for their wrongdoing as asserted herein.

189.    Information relating to Defendants' alleged misconduct and the identity of the various Class and Subclass members is available from Defendants' books and records, including, but not limited to, their policyholder records, financial statements, and other records and reports filed with the United States Securities and Exchange Commission as well as financial statements, actuarial reports and memorandum, and correspondence filed with various state Insurance Commissions or Departments.

190.     Plaintiffs are not aware of any difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

191.     The prosecution of separate actions by individual Class Members would run the risk of inconsistent or varying adjudications, which might establish incompatible standards of conduct for Defendants.  Prosecution as a class action will eliminate the possibility of repetitious or inconsistent litigation.

192.     Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT ONE:[4]  FRAUDULENT INDUCEMENT BY OMISSION
### (By Plaintiffs On Behalf of the Class Against Defendants GLIC and GLICNY)

193.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

194.     Plaintiffs and the Class Members each purchased guaranteed renewable Choice I LTC Insurance contracts from Genworth.

195.     The fact that the policies are "guaranteed renewable" means the policies renew annually, and Genworth cannot cancel the policies or change benefits due under the policies if the policyholder pays the full premium each year.

196.     Each time Genworth announced a premium rate increase in connection with a renewal, it materially restructured the terms of the contract to be renewed.  In each instance, it

---

[4] Pursuant to the Court's Order of August 29, 2019 [ECF No. 78], Plaintiffs have omitted the Original Count 1, which alleged claims for Breach of Contract.  *See* ECF No. 78 at 28 n. 5. Plaintiffs have not waived or abandoned this claim and reserve all rights to appeal its dismissal.

offered Plaintiffs and the Class Members three choices for renewal: (1) pay the increased premiums to maintain the same level of benefits; (2) pay a lower premium for decreased benefits; or (3) elect the limited "non-forfeiture" option and pay no further premiums.

197.    When a policyholder decides whether to renew their LTC policy, the premium rate is a material term of the renewal.  Whether the insurer plans to increase rates in the future, the frequency of those planned increases, and the amount of future increase needed by the insurer to remain financial stable are also material to all policyholders.

198.    While Genworth informed policyholders that future increases were "possible" or "likely," and defined the word "likely" to mean "*if* [Genworth's] claims experience warrants an increase," it withheld from them material information about the frequency and amount of future increases it had already planned to seek, including the fact that Genworth knew with certainty at the time those statements were made that its claims experience *already warranted* additional increases and that Genworth *would be* seeking (or had *already sought*) additional future rate increases.

199.    By offering a partial statement about future rate increases, Genworth assumed a duty to provide a full and complete statement.  Considering the staggering premium increases Genworth planned to seek in the immediate future, and its reliance on these and other future rate increases on LTC policies to remain financially stable, this information was highly material to Plaintiffs and the Class Members' renewal decisions, and its disclosure was necessary to complete a full disclosure about the "possibility" or "likelihood" of future rate increases.

200.    Genworth acknowledged internally that all this information was material, and that it needed to be "transparent" with policyholders about the future increases.  In the end, however,

the Company intentionally withheld this material information from Plaintiffs and the Class

Members.

201.     Other LTC providers provide information to policyholders about future rate

increase requests, recognizing this information must be provided to allow policyholders to

adequately consider their election options in response to each rate increase and thus avoid

frustrating their ability to make informed elections.

202.     For example, in a letter informing its policyholders of a recently approved 10%

rate increase, John Hancock explained

> We do want you to know that, based on our analysis, *we had determined
> there was a need for a 46.54% increase and this was the amount we filed
> with the New York Insurance Department*.  However, the rate increase we
> are able to implement at this time is 10%.  *As a result, we anticipate that
> we will be requesting further premium increases in the future, and your
> premiums may be affected.   Please note that due to the delayed
> implementation of the full rate increase, the total future increase amount
> that we request may change.*

Ex. G, p. 3 (emphasis added).

203.     That information explained to John Hancock's policyholders the extent of the

increase it had initially sought and that having only a small portion of the increase approved

meant that future rate increase requests would be forthcoming.   It also informed policyholders

that since the full request had not been approved and would need to be phased in, that future rate

increase requests might be even larger than initially requested.

204.     But John Hancock made a further disclosure.  On page 2 of the same letter, John

Hancock also included the following "**Important Notice**",

> Following a more recent analysis of our business in 2016, we have
> determined a need for a premium rate increase in addition to the
> remaining balance of the current increase described on page 1.   The
> additional rate increase has been or will be filed.  Although the final
> amount and timing of the additional rate increase to be implemented is not

known at this time, we are requesting an average increase of approximately 30% across all of our policy series, which is in addition to the remaining balance of the current increase described on page 1.

Ex. G, p. 4 (emphasis added).

205.    This disclosure further informed policyholders that John Hancock's recent internal analysis determined the need for even greater increases than had been initially requested. This is the same information that Genworth possessed but withheld from its policyholders.

206.    When John Hancock then sent the next increase announcement, it informed policyholders that "[w]e do want you to know that this premium rate increase *only represents a portion of the total requested rate increase we filed with the applicable Insurance Department*. As a result, we *will be* requesting further premium increases in the future, and your premiums may be affected." Ex. G, p. 1 (emphasis added).   These are precisely the type of disclosures Genworth had a duty to make.

207.    By failing to adequately disclose material information about Genworth's rate increase action plans, current reliance on its planned future increases actually being approved, and the risks to Genworth's solvency if such increases were not approved, Genworth withheld material information from Plaintiffs and the Class.

208.    Genworth intended that Plaintiffs and the Class Members rely upon the incomplete information it did provide in the hope they would pay the increased rates.

209.    Plaintiffs and the Class Members were unaware of the scope and magnitude of Genworth's entire rate increase action plan when they made their renewal elections.  They were also unaware of Genworth's reliance on this rate action plan, which also included significant increases on other LTC policies, to build adequate reserves to pay their future claims.

210.   Without a complete picture of Genworth's massive rate increase plan, Plaintiffs and the Class Members elected to renew their contracts.  Had they known the full scope and magnitude of Genworth's rate action plans, and the Company's reliance on massive rate increases in the future to remain viable, they would have made different policy option elections.

211.   As a direct, proximate, and legal result of the aforementioned conduct, Plaintiff and the Class members have suffered damages and are entitled to relief.

212.   Plaintiffs and the Class seek the following relief:

    a.   declaratory relief in the form of a declaration that Genworth withheld material information from Plaintiffs and the Class regarding its plans for future rate increases and its reliance upon obtaining at least some portion of future rate increases on its LTC policies to be able to pay future claims;

    b.   injunctive relief in the form of an adequate and corrective disclosure to Plaintiffs and the Class that reveals the omitted information, and the right to make new policy renewal elections in light of the new disclosures;

    c.   if Genworth is found to have omitted material information, then rescission of their policy renewals each year since Genworth first made those omissions; and

    d.   return of premiums paid for each year a renewal of the policy was rescinded.

213.   To avoid doubt, if the above relief is obtained, Plaintiffs seek to be placed in the same position they were in before Genworth made the aforementioned omissions, meaning they would still have the same guaranteed renewable Choice I LTC policy they had prior to the

omissions, and must then decide whether to maintain that policy in light of the current premiums that would be due.

## COUNT TWO: VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (By Plaintiffs Jerome And Susan Skochin On Behalf Of The Pennsylvania Subclass Against Defendants GLIC and GLICNY)

214. Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

215. Plaintiffs, the Pennsylvania Subclass, and Defendants are "persons" within the meaning of 73 Pa. Cons. Stat. Ann. §201-2(2).

216. Plaintiffs and the Subclass purchased LTC insurance primarily for personal, family, or household purposes within the meaning of 73 Pa. Cons. Stat. Ann. §201-9.2.

217. All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 Pa. Cons. Stat. Ann. §201-2(3).

218. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, . . . that they do not have"; (ii) "Advertising goods or services with intent not to sell them as advertised"; and (III) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 Pa. Cons. Stat. Ann. §201-2(4).

219. In the course of their business, Defendants violated the Pennsylvania CPL by knowingly misrepresenting and intentionally concealing material facts regarding its plan to systematically, sequentially and substantially raise premium rates across the Choice I policy class, Defendants' reliance on these premium increases to build adequate reserves to pay the

future claims of the Class and Subclass members, and the frequency and magnitude of future rate increases necessary to ensure that stability.

220. Specifically, in connection with its efforts to induce Class members to renew their LTC insurance policies at increased rates, Defendants engaged in a piecemeal disclosure scheme that intentionally misrepresented and/or failed to disclose the frequency and magnitude of future rate increases that it knew were necessary to ensure the Company's reserves were adequate to pay future claims. Specifically, in letters to Plaintiffs and the Subclass members announcing that their rates would be increased, Defendants represented that future rate increases were merely "likely" or "possible" when, in fact, it well knew that future rate increase were planned as part of Genworth's unprecedented nationwide price increase action plan that required systematic annual rate increases on the scale of 60% in 2013, another 60% in or after 2014 and more 350% over the next 6-9 years.

221. The facts that Defendants misrepresented and/or omitted were material to Plaintiffs and the Subclass members, and Defendants' misrepresentations and omissions were knowingly and intentionally made so that they would rely on the misrepresentations and omissions when deciding whether to renew their LTC policies at increased rates. The Class members did, in fact, rely upon Defendants' misrepresentations and omissions when renewing their policies. Had they known the truth, Plaintiffs and the Subclass members would have made different elections in response to the rate increase letters.

222. Defendants owed Plaintiff and the Subclass members a duty to disclose all material facts concerning the financial condition of the Company and the frequency and magnitude of planned future rate increases because it possessed internal knowledge of those facts, intentionally concealed those facts from the Class members, and/or made

misrepresentations that were rendered misleading because they were incomplete in light of the omitted facts.

223.    The Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and/or omissions of material information.

224.    Pursuant to 73 Pa. Cons. Stat. Ann. §201-9.2(a), the Class members seek an order awarding declaratory and injunctive relief, damages, treble damages, costs of the litigation, attorneys fees, and any other just and proper relief available under the Pennsylvania CPL.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Classes and award the following relief:

A.    That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B.    That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.    That Plaintiffs and the Classes they represent be awarded compensatory, consequential, and general damages in an amount to be determined at trial;

D.    That Plaintiffs Jerome and Susan Skochin and the Pennsylvania Subclass they represent be awarded statutory damages pursuant to Count Four;

E.    Injunctive relief as is warranted;

F.    Costs and disbursements of the action;

G.    Pre-and post-judgment interest;

H.    Reasonable attorneys' fees; and

I.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.


Dated: November 22, 2019                    Respectfully submitted,

                                                     Brielle M. Hunt, Esq.
Brielle M. Hunt, Esq. VSB No. 87652
Michael G. Phelan, Esq. VSB No. 29725
Jonathan M. Petty, Esq. VSB No. 43100
PHELAN PETTY LLC
6641 W. Broad Street, Ste. 406
Richmond, VA 23230
(804) 980-7100 (telephone)
(804) 767-4601 (fax)
bhunt@phelanpetty.com
mphelan@phelanpetty.com
jpetty@phelanpetty.com

Brian Douglas Penny*
GOLDMAN SCARLATO & PENNY, P.C.
Eight Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Tel. 484-342-0700
Fax 484-580-8747
penny@lawgsp.com

Stuart A. Davidson*
Christopher Gold*
Bradley Beall*
Ricardo Marenco*
ROBBINS GELLER RUDMAN
& DOWD LLP
120 E Palmetto Park Road
Boca Raton, FL 33432
Telephone: (561) 750-3000
sdavidson@rgrdlaw.com
cgold@rgrdlaw.com
bbeall@rgrdlaw.com
rmarenco@rgrdlaw.com

Shanon J. Carson*
Glen L. Abramson*
BERGER MONTAGUE PC

1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
scarson@bm.net
gabramson@bm.net

*Counsel for Plaintiffs and the Proposed Classes*

\*Admitted *Pro Hac Vice*