UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division



| | |
|---|---|
| JEROME SKOCHIN, SUSAN SKOCHIN, and LARRY HUBER,<br><br>individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GENWORTH LIFE INSURANCE COMPANY and GENWORTH LIFE INSURANCE COMPANY OF NEW YORK,<br><br>Defendants. | Civil Action No.: 3:19-CV-49-REP |

## RALPH C. FERRARA STATEMENT OF OBJECTIONS

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1
BACKGROUND FACTS MATERIAL TO OBJECTION ............................................................ 2
STATEMENT OF OBJECTION .................................................................................................. 8
CONCLUSION ........................................................................................................................... 14

## TABLE OF AUTHORITIES

Page(s)

CASES

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997) ............................................................................................................ 9, 13

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) ................................................................................................ 1, 9

*In re A.H. Robins Co.*,
   880 F.2d 709 (4th Cir. 1989) .................................................................................................... 8

*In re Am. Med. Sys., Inc.*,
   75 F.3d 1069 (6th Cir. 1996) .................................................................................................. 11

*In re Honda Am. Motor Co. Dealership Relations Litig.*,
   979 F. Supp. 365 (D. Md. 1997) ............................................................................................ 11

*In re Hyundai & Kia Fuel Econ. Litig.*,
   926 F.3d 539 (9th Cir. 2019) .................................................................................................. 10

*In re Ins. Brokerage Antitrust Litig.*,
   579 F.3d 241 (3d Cir. 2009) ................................................................................................... 12

*In re Jiffy Lube Securities Litigation*,
   927 F.2d 155 (4th Cir. 1991) .................................................................................................. 15

*In re Mills Corp. Sec. Litig.*
   265 F.R.D. 246 (E.D. Va. 2009) ............................................................................................ 15

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ............................................................................................................... 13

*Randleman v. Fid. Nat'l Title Ins. Co.*,
   646 F.3d 347 (6th Cir. 2011) .................................................................................................. 12

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
   445 F.3d 311 (4th Cir. 2006) .................................................................................................. 10

*Williams v. Mohawk Indus., Inc.*,
   568 F.3d 1350 (11th Cir.2009) ............................................................................................... 12

**OTHER AUTHORITIES**

American Association for Long-Term Care Insurance, *Long-Term Care Insurance Facts – Data – Statistics – 2019 Report*, https://www.aaltci.org/long-term-care-insurance/learning-center/ltcfacts-2019.php#2019buyers ...........................................4, 5

Elizabeth Arias & Jiaquan Xu, *United States Life Tables, 2017*, 68 National Vital Statistics Reports 7 (2019) ..................................................................................................3

Fed. R. Civ. P. 23 .................................................................................................... passim

5 J.W. Moore et al., *Moore's Federal Practice* § 23.02 (3d ed. 1999) ...........................................8

Scott Dodson, *Subclassing*, 27 Cardozo L. Rev. 2351, 2352 (2006) .........................................13, 14

## PRELIMINARY STATEMENT

Ralph C. Ferrara, ("Objector") an insured under GE Capital Long-Term Care Policy No. ▉▉▉▉▉▉▉▉ (the "Policy"):

1. Objects, for himself and a similarly situated subclass of class members, to the proposed settlement of the above-captioned litigation for failing to comply with the following provisions of Fed. R. Civ. P. 23 (the "Rule"): (i) Rule 23(b)(3) (predominance/superiority); (ii) Rule 23(c)(5) (subclasses); (iii) Rule 23(e)(2)(A) (adequacy of class representation in settlements); and (iv) Rule 23(g)(4) (duty of class counsel);

2. Does not object to compliance with: (i) Rule 23(a)(1) (numerosity); (ii) Rule 23(a)(2) (commonality); (iii) Rule 23(a)(3) (typicality); (iv) Rule 23(a)(4) (adequacy), except to the extent that the (a) named plaintiff does not have the same interest and suffer the same injury as the rest of the class, and providing that the named plaintiff is in compliance with Rule 23(e)(2)(A) (*Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006)), and, (b) the far more demanding Rule 23(b)(3) requires that those provisions demonstrate that the class is sufficiently cohesive to warrant adjudication by representation, and is superior to other available methods for the fair and efficient adjudication of the Plaintiffs' claims; and

3. Urges this court to deny the parties' request for approval of the proposed settlement for the reasons stated herein, including for lacking a subclass pursuant to Fed. R. Civ. P. 23(c)(5), that is represented by independent counsel to negotiate with the parties on behalf of the subclass. That subclass should consist of all persons residing in the United States who renewed their Choice 1 Long-Term

Care Insurance Policies with Genworth since January 21, 2012 providing daily inflation benefit, compounding at 5% per year, unlimited benefit period and unlimited total lifetime benefit (subject to the exclusions identified in paragraph 176 of the Plaintiffs' Third Amended Class Action Complaint) and who: (i) are 75 years of age as of June 30, 2020; (ii) have been insureds under their Choice 1 Policies for at least 15 years; and (iii) have not been provided a waiver of premium status by Genworth.

## BACKGROUND FACTS MATERIAL TO OBJECTION

Objector has been an insured under the Policy since April 17, 2003, at which time he was 57 years of age. Under the terms of the Policy, Objector was assured by GE Capital Insurance Company (the "Company") that the Policy provided valuable benefits including: privileged care coordination services, home care benefit, respite care benefit, caregiver training benefit, equipment benefit, long-term care facility benefit, bed reservation benefit, supplementary care benefit, waiver of premium benefit and survivorship benefit.

Objector was also entitled to a maximum daily benefit of $200, to be increased by 5% annually upon the anniversary of the effective date of the Policy as provided by the terms of a purchased inflation benefit option. The first benefit increase was to be equal to 5% of the original amount, and each benefit increase thereafter would be equal to 5% of the increased amount that existed on the date of the prior increase. These benefit increases were not to be affected by any benefit payments.

The Policy provided a 100-day elimination period for the long-term care facility benefit (essentially a self-retained risk), an unlimited benefit period and an unlimited lifetime benefit –

that is, there was no cap on how long the Objector could receive benefits under the Policy and how much in benefits he could receive.

Objector purchased the Policy knowing that a long-term care insurance policy, with benefits comparable to what GE Capital was offering at the time, would be more difficult to procure at a more advanced age when his need for such policy benefits would become more critical. Objector, however, was also concerned with whether the premium for the Policy upon its inception would increase over time. While Policy marketing materials contained boilerplate provisions stating that rates could rise, and likely would rise over time, the Objector was provided with a Company Policy illustration that clearly stated that the yearly payment total was $2,910 and that the Company had "never [raised future premiums for all policy holders] since it pioneered long term care insurance more than 25 years ago." Genworth, *Long Term Care Insurance Policy Form Series 7035*.

From 2003 to 2013, the Objector's Policy premium of $2,522 did not increase. In 2014 and 2015, the premium increased to $2,774. In 2016, the premium increased once again to $3,052 and further increased in 2017 and 2018 to $3,057. In 2019, the premium jumped again to $3,692. And, for 2020, $4,062. The Objector was compelled to pay these increasing premium amounts because, as his age advanced and his health became increasingly compromised, he became functionally uninsurable as a practical matter.

This is not simple speculation on behalf of the Objector. The subclass Objector proposes is especially vulnerable. In its expectation of life statistics, the National Vital Statistics Reports observed that those individuals 75 years old on average live only 12.3 more years, whereas a person in his or her mid-50s would have approximately 27 years to live and to make up for lost coverage at lower rates. Elizabeth Arias & Jiaquan Xu, *United States Life Tables, 2017*, 68

National Vital Statistics Reports 7 (2019). Indeed, age – especially at 70 years and above – is a material defining and distinguishing criterion in many contexts other than access to long-term care insurance.

Internal Revenue Service ("IRS") rules draw a distinction between those aged 70-71 and those who are younger. For example, IRS rules have *required* that individuals begin receiving/withdrawing retirement benefits from a pension plan, 401(k) plan, or IRA by April 1 following the date on which the participant reaches age 70 and a half (this is referred to as a "required minimum distribution"). The policy behind the requirement appears to be that the IRS wants to prevent those entitled to benefits from using their retirement plans as tax-deferred savings vehicles. Instead, the IRS compels those entitled to benefits to withdraw at least some of their retirement savings (and to pay taxes on those amounts) before they die, instead of accumulating those amounts (and the taxes owed) for children and beneficiaries. In short, age matters – particularly, if one is over 70 years old.

Similarly, the Social Security Administration ("SSA") generally allows individuals to begin receiving social security retirement benefits at age 62. If, however, an applicant delays taking social security benefits past full retirement age, those benefits will be increased via a "delayed retirement credit," up until age 70. Delaying benefits past age 70 does not increase such benefits any further. Again, age over 70 matters and is distinguishable from the optionality of deploying benefit strategies to those under age 70.

According to the American Association for Long-Term Care Insurance ("AALTCI") 2019 report, over a whopping 51% of long-term care insurance applicants 75 years of age and older are declined coverage, as opposed to just 21% of those seeking a long-term care policy at age 57 – that is, the age at which Objector purchased his policy. American Association for

4

Long-Term Care Insurance, *Long-Term Care Insurance Facts – Data – Statistics – 2019 Report*, https://www.aaltci.org/long-term-care-insurance/learning-center/ltcfacts-2019.php#2019buyers. Indeed, according to the AALTCI, in 2019 over 76% of new long-term care insurance buyers were between the ages of 50 and 69, and only 12.3% were between the ages of 65 and 69. *Id.* The AALTCI does not provide statistics for the number of purchasers over the age of 69 (presumably because it is such a miniscule group), but notes "after 69 it becomes harder to health qualify for new coverage." *Id.*

To further highlight why 75+ year old insureds under Choice 1 would suffer substantial and unique injury – that is, out of scale with younger members of the class – through the termination of their long-term care policies when premiums begin to escalate, the AALTCI reports that over 86% of long-term care insurance *claims* begin at age 75. *Id.* So, buying young and hanging on to life is essential to recouping value from long-term care insurance.

Equally important, the AALTCI states that approximately 50% of claims are for assisted living and nursing home relief – and the nation's recent experience with the coronavirus indicates why preserving competent long-term care is not only a convenience, but may also be essential for survival. *Id.* Indeed, according to AALTCI, 14 million long-term care insureds are either community residents or nursing home residents, and, of that cohort, nearly 8 million are above 65 years of age. *Id.* Finally, association statistics show that 59% of all adults projected to have needs for long-term care services are 75 years of age or older. *Id.* These statistics demonstrate why a subclass of insureds 75 years of age and older as of June 30, 2020 are in need of separate representation and relief that distinguishes them from younger class members who have a more favorable opportunity to replace what they are losing in this settlement.

The statistics demonstrate that distinctions between members of the class not only exist, but are critical. There simply is not homogeneity of core interests between class members over 75 years of age and younger class members. The weight of the data is further magnified where class members were fraudulently deceived into maintaining their policies during periods when affordable alternatives might have been in reach. And this deception was profound. Notwithstanding the Company's boilerplate admonitions, Objector was never told that in 2014 that Genworth (the Company's successor) had created an internal action plan (the "Enforced-Management Project") and later "Enforce Rate Actions I, II, and III" to systematically seek significant premium rate increases across its older policy classes – including the Policy. As correctly observed in the Plaintiffs' Third Amended Class Action Complaint, "*Genworth relied almost entirely upon billions of dollars in anticipated future (but not yet filed) rate increases to plug [a] massive hole in its reserves*. And it was so confident in its ability to achieve these rate increases that it relied on them in its then current financial reporting." ECF No. 90 ¶ 19 (emphasis in original).

That brazen confidence was a product of the fact that the Company knew that a substantial subclass of the members as defined in this case – that is, "[a]ll persons residing in the United States who renewed their [policies] with Genworth since January 1, 2012" – were now aged 75 and older and, as such, had become prisoners of their policies. *Id.* at ¶ 175. Regrettably, however, these class members were never told the truth.

As this Court determined in its August 29, 2019 Memorandum Opinion, Plaintiffs survived a motion to dismiss the allegations that the Company and its successor Genworth had "fraudulently induced the Plaintiffs to elect to continue coverage by telling them only that premium increases were 'likely' without explaining that increases were necessary for Genworth

6

to survive and that significant future rate increases were planned." ECF No. 78 at 23-24. In short, Genworth was left to defend a fraud upon the class. Had this case gone to trial, and had Plaintiffs succeeded on their claims, the Plaintiff class could have received the benefit of its bargain – that is, the Policy benefits described above, without premium rate increases as assured in the Company's illustrations, or alternatively, damages sufficient to procure a long-term care insurance policy with terms comparable to the Policy.

Rather than litigate this case, the representative Plaintiffs and their counsel have decided to settle – but on terms that are crippling to that older subclass of insureds under the Policy who are virtually uninsurable for long-term care. Should that subclass determine to keep the Policy, the subclass will be subjected to abusive accumulative rate increases of as much as approximately 203% on policies with lifetime benefits. Indeed, keeping the policy on those terms could never be characterized as maintaining "the benefit of the bargain."

To avoid these crippling premium increases, the subclass is invited by the settlement agreement to elect any one of four alternatives to maintaining the Policy's original terms. But, in doing so, the subclass must sacrifice either one or two of the Policy's principal and most valued provisions. Those provisions are (*i*) an inflation benefit, compounding the maximum daily benefit under the Policy at 5% per year, and (*ii*) the original Policy's unlimited total lifetime benefit (except if the subclass member agrees to sacrifice the Policy's unlimited benefit period with a six-year cap). In three of the four alternative coverage packages, some cash is paid to the insured – but nowhere near enough to compensate for compromising the Policy's package of benefits. Indeed, if the Objector qualified for Policy benefits today with a life expectancy of 12.3 years (pursuant to National Vital Statistics reports of Expectation of Life by age), he would be entitled to a Daily Benefit of $343.80 under the Policy's terms, with total long-term care

benefits valued at over $1.5 million. Nothing in the options offered to the Objector's subclass remotely, over time, reaches this level.

## STATEMENT OF OBJECTION

Class actions must meet several criteria. First, the class must comply with the four prerequisites established in Rule 23(a): (1) numerosity of class members; (2) commonality of factual or legal issues; (3) typicality of claims of class representatives and class members; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). Second, the class action must fall within one of the three categories enumerated in Rule 23(b). Here, Plaintiffs seek to proceed under Rule 23(b)(3), which requires that common issues predominate over individual ones and that a class action be superior to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3).

If a class meets these requirements, certification of a lawsuit as a class action serves important public purposes. In addition to promoting judicial economy and efficiency, class actions also "afford aggrieved persons a remedy if it is not economically feasible to obtain relief through the traditional framework of multiple individual damage actions." 5 J.W. Moore et al., *Moore's Federal Practice* § 23.02 (3d ed. 1999). Thus, federal courts should "give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case 'best serve the ends of justice for the affected parties and . . . promote judicial efficiency.'" *In re A.H. Robins Co.*, 880 F.2d 709, 740 (4th Cir. 1989) (citing *Weinberger v. Kendrick*, 698 F.2d 61, 72–73 (2d Cir.1982)), *abrogated on other grounds*, *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 619 (1997).

To be sure, Rule 23(b)(3) class actions must meet predominance and superiority requirements not imposed on other kinds of class actions. This is because these suits involve situations where "class[ ]action treatment is not as clearly called for." Fed. R. Civ. P. 23

8

Advisory Committee's Note (1966 Amendment, Subdivision (b)(3)). However, as the Supreme Court has noted, the predominance and superiority requirements in Rule 23(b)(3) do not foreclose the possibility of mass tort class actions, but merely ensure that class certification in such cases "achieve[s] economies of time, effort, and expense, and promote[s] . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting *Adv. Comm. Notes*, 28 U.S.C. App. at 697).

As observed above, Objector, for himself and a similarly situated subclass of class members, objects to the proposed settlement of the above-captioned litigation for failing to comply with certain aspects of Rule 23, namely: (i) Rule 23(b)(3) (predominance/superiority); (ii) Rule 23(c)(5) (subclasses); (iii) Rule 23(e)(2)(A) (adequacy of class representation); and (iv) Rule 23(g)(4) (duty of class counsel) (collectively, the "Objections"). Objector does not contest: (i) Rule 23(a)(1) (numerosity); (ii) Rule 23(a)(2) (commonality); (iii) Rule 23(a)(3) (typicality); and (iv) Rule 23(a)(4) (adequacy), except to the extent that the named plaintiff is found not to have the same interest and suffer the same injury as the rest of the class, and providing that the named plaintiff is in compliance with Rule 23(e)(2)(A). *See Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Circuit 2006). That is, the named Plaintiffs' prosecution of the suit must advance the interest of the remaining class members. And the proposed class must meet the far more demanding Rule 23(b)(3) requirements, which include that the class is sufficiently cohesive to warrant adjudication by representation and is superior to other available methods for the fair and efficient adjudication of the Plaintiffs' claims.

Rule 23(b)(3)'s predominance requirement is intended to ensure that the class will be certified *only* when it will achieve economies of time, effort, and expense, and promote

uniformity of decision as to persons similarly situated without sacrificing procedural fairness. Most courts agree that the main concern of the predominance inquiry under Rule 23(b)(3) is the right balance between the individual and common questions raised by the proposed class action. *See, e.g., In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 560 (9th Cir. 2019) (citations omitted).

Accordingly, Objector now addresses why the proposed class fails to meet Rule 23(b)(3)'s requirements. As observed above, the predominance requirement under Rule 23(b)(3) "is similar to but 'more stringent' than the commonality requirement of Rule 23(a)." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (citing *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001)). "Whereas commonality requires little more than the presence of common questions of law and fact, Rule 23(b)(3) requires that 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members.'" *Id.* (internal citations omitted). In short, as noted above, the predominance requirement tests whether the class is sufficiently cohesive to warrant adjudication by representation. *Id.*

To be sure, Plaintiffs will urge that, because they have pled a fraud case, the legal issue shared by all class members rests on the elements of a fraud case. Similarly, it is likely Plaintiffs will argue that all class members suffered the common fact that all were misled by Genworth's deceptive statements. Finally, Objector expects Plaintiffs will assert that Objector identifies differences between class members respecting only class-member-idiosyncratic "damages," which courts are supposed to consider in assessing compliance with Rule 23(b)(3) when asked to bless a class action settlement, but which do not necessarily defeat class certification.

As one court explained: "Quantitatively, almost by definition there will always be more individual damages issues than common liability issues . . . . Qualitatively, however . . . liability issues" may "far exceed in complexity the more mundane individual damages issues." *In re Honda Am. Motor Co. Dealership Relations Litig.*, 979 F. Supp. 365, 367 (D. Md. 1997); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996) (stating that commonality test is "qualitative rather than quantitative" (*citation omitted*)). So it is here.

The relief proposed by the Plaintiffs in this case has only limited provisions for *quantitative* monetary damages. Rather, as more fully described in Objector's Background Facts Material to Objection, the relief offered to the class presumes a degree of homogeneity of interest among all class members – a homogeneity that simply does not exist and Rule 23(b)(3) requires.

Indeed, the essence of a fraud case is that the deceptive statement or omission was *material* to the victim. In this case, the materiality of Genworth's fraudulent conduct differs dramatically depending upon the age of the individual class member. There is no homogeneity among class members on the core issue of materiality, and the proposed settlement thus does not comply with Rule 23. The materiality of the deception is significantly more impactful on the subclass of persons over 75 years of age than on those class members who are younger. The fault in Plaintiffs' settlement proposal is "qualitative," not "quantitative," in measure. Indeed, there may be a need for more than one subclass – although Objector in this Statement makes the case only for the subclass as defined above.

Objector's ability to properly assess the materiality of the misstatements and omissions alleged by the plaintiff has been frustrated, indeed precluded, by Plaintiffs' failure to provide Objector with materials referred to in Plaintiffs' Third Amended Complaint and documents and other materials obtained from the defendants by Plaintiffs' counsel during the course of these

proceedings – including any confirmatory discovery conducted by the named Plaintiffs' counsel during the course of settlement negotiations. Objector requested these documents and other materials and indicated he would commit to a confidentiality agreement providing that Objector would only use those materials in connection with these proceedings. Plaintiffs' counsel failed to respond to these requests, frustrating Objector's assessment of Plaintiffs' compliance with Rule 23(b)(3).

But the proposed settlement is potentially salvageable: Rule 23(c)(5) authorizes a court to divide a class into subclasses that are each treated as a separate class for purposes of a class action. Splitting a proposed class into subclasses is appropriate, for example, "to prevent conflicts of interest" between subgroups of class members where those conflicts might otherwise preclude class certification on predominance, adequacy, or both. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir. 2009) (internal citation omitted). Moreover, district courts have broad discretion in determining whether to divide a class action into subclasses. *Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 355 (6th Cir. 2011); *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir.2009); *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009).

Significantly, courts have utilized subclassing where essential for manageability of a complex class action. "Where appropriate, a class may be divided into subclasses that are each treated as a class under [Rule 23]." Fed. R. Civ. P. 23(c)(4). As here, "[s]ettlement review also may provide an occasion to review the cogency of the initial class definition. The terms of the settlement themselves, or objections, may reveal divergent interests of class members and demonstrate the need to redefine the class or to designate subclasses." Fed. R. Civ. P. 23 Advisory Committee's Note (2003 Amendment, Subdivision (e)(1)(C)). After that, the

provisions of Rule 23 – such as the predominance requirement of Rule 23(b)(3) – shall be construed and applied. *See* Scott Dodson, *Subclassing*, 27 Cardozo L. Rev. 2351, 2352 (2006). (Of course, manageability loses its significance in the context of a settlement – but that fact does not dilute the need for predominance of law and facts at least for settlement purposes, or for adequacy of representation.)

In *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999), the Supreme Court suggested that a district judge could initially act pursuant to subsection Rule 23(c)(5) to create subclasses so as to satisfy the previously listed requirements of subsection Rule 23(a)(4). Indeed, the *Ortiz* court pointed out this result noting that "it is obvious after *Amchem* that a class divided between [nonhomogeneous class members] . . . requires division into homogeneous subclasses under [Rule 23(c)(5)], with separate representation to eliminate conflicting interests of counsel." *Id.* (discussing *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 627 (1997) (holding class settlements must provide "structural assurance of fair and adequate representation for the diverse groups and individuals affected.")).

Trial courts may employ Rule 23(c)(5) to divide plaintiffs into homogeneous subclasses "to eliminate conflicting interests of counsel." *Id.* Indeed, in a case such as this, where class members' interests, and the materiality of their deception, vary so dramatically by age, subclassing and separate representation are necessary to satisfy Rule 23(e)(2)(A)'s mandate that "class counsel [in the context of a settlement] have adequately represented the class" in the settlement of a class action.

As Professor Scott Dodson observed in his Hastings College of Law article on subclassing, the drafters of the Federal Rules spoke little of the subclassing section:

> In the most prominent discussion of [Rule 23(c)(5)], Professor Charles Alan Wright wrote to Reporter Benjamin Kaplan, complaining that [Rule 23(c)(5)] "seems to me the

13

kind of picky detail which does not require statement in the rule" and questioning whether the provision was in accordance with the law, although he did not elaborate as to why. Responding, Kaplan and Committee Member Albert M. Sacks wrote: "Certainly it is the law: . . . the reality of the class-subclass situation is manifested when courts, speaking of inadequacy of representation, observe that besides the interests shared by all members of the class, there are special interests shared only by particular groupings within the class. We think [the subclassing provision], although making obvious points, is useful for the sake of clarity and completeness." Upon receiving that response, Professor Wright withdrew his objection and accepted Kaplan's assertion that the subclassing provision language accurately reflected existing law, although he noted that he still harbored lingering (if unexplained) doubts.

Scott Dodson, *Subclassing*, 27 Cardozo L. Rev. 2351, 2382 (2006) (footnote omitted).

## CONCLUSION

Subclassing the settlement before this Court is far from deploying a "picky detail" from the Federal Rules of Civil Procedure. Rather, doing so rescues a vulnerable subclass from further injury induced by failing to distinguish those in the proposed subclass from the remainder of the class, thus remedying the conflicted class the parties seek to certify.

Accordingly, Objector urges this court to deny the parties' request for approval of the proposed settlement for the reasons expressed herein, including, because, in its current form, it fails to comply with Rule 23(b)(3)'s predominance requirement, lacks a subclass pursuant to Rule 23(c)(5), represented by independent counsel to negotiate with the parties on behalf of the subclass, and fails to meet the requirements of Rule 23(e)(2)(A) (adequate representation) and Rule 23(g)(4) (duty of class counsel). That subclass should consist of all persons residing in the United States who renewed their Choice 1 Long-Term Care Insurance Policies with Genworth since January 21, 2012, providing daily inflation benefit compounding at 5% per year, unlimited benefit period and unlimited total lifetime benefit (subject to the exclusions identified in paragraph 176 of the Plaintiffs' Third Amended Class Action Complaint) and who: (*i*) are 75

years of age as of June 30, 2020; (*ii*) have been insureds under their Choice 1 policies for at least 15 years; and (*iii*) have not been provided a waiver of premium status by Genworth.

Objector has reviewed the objections of others to this settlement, particularly those of Mark Ostrich and Donna Wright which, in substance, urge that the proposed settlement is not fair, reasonable or adequate as required by Rule 23(e)(2). It appears that Mr. Ostrich and Ms. Wright's objection have merit and defeat confirmation of the proposed settlement. Objector sought to have sufficient access to documents and materials obtained by the Plaintiffs in connection with discovery in this case and negotiations leading to its proposed settlement – but, as noted above, Plaintiffs' counsel never responded to Objector's request. Accordingly, Objector has not been able to separately analyze and offer comment upon whether the proposed settlement is in compliance with Rule 23(e)(2)(A)-(D) and Fourth Circuit and Eastern District of Virginia authorities for determining the fairness, reasonableness and adequacy of the class action settlement. *See, e.g. In re Mills Corp. Sec. Litig.* 265 F.R.D. 246, 254 (E.D. Va. 2009) (discussing the Fourth Circuit's two-level analysis applicable in evaluating a settlement's "fairness" and "adequacy"); *see also In re Jiffy Lube Securities Litigation,* 927 F.2d 155, 158 (4th Cir. 1991) (same). For this reason alone, this proposed settlement should be rejected.

Objector intends to appear at the Final Approval Hearing.

Submitted by:

*/s/ Ralph C. Ferrara*

Ralph C. Ferrara
2818 McGill Terrace, NW
Washington, DC 20008
rcferrara1@gmail.com
(202) 365-0900

## CERTIFICATE OF SERVICE

I, Ralph C. Ferrara, hereby certify as follows:

I am an attorney at Proskauer Rose LLP, located at 1001 Pennsylvania Avenue, NW, Suite 600 South, Washington, DC 20004-2533. I am appearing *pro se* as a member of the proposed Genworth settlement class. On June 12, 2020, I filed a written Objection with the Clerk of United States District Court for the Eastern District of Virginia, located at 701 East Broad Street, Richmond, VA 23219, and I served a copy of the written Objection on the Settlement Administrator at the following address: *Skochin v. Genworth* Settlement Administrator, PO Box 4230, Portland, OR 97208-4230.

Dated: June 12, 2020
       Washington, DC

/s/ Ralph C. Ferrara

16