UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Richmond Division)

| | |
|---|---|
| JEROME SKOCHIN, SUSAN SKOCHIN and LARRY HUBER, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>  vs.<br><br>GENWORTH LIFE INSURANCE COMPANY and GENWORTH LIFE INSURANCE COMPANY OF NEW YORK,<br><br>     Defendants. | Civil Action No. 3:19-cv-00049-REP<br><br><u>CLASS ACTION</u> |

**PLAINTIFFS' REPLY IN SUPPORT OF (1) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND (2) CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND SERVICE AWARDS TO THE NAMED PLAINTIFFS**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................1

II. ARGUMENT ........................................................................................................3

    A.  Standards for Reviewing Objections to Class Settlements .......................................3

    B.  The Objections to the Settlement Should Be Overruled ..........................................4

            a.  Objections to the Notice Should Be Overruled As The Notice Effectively Communicates the Terms of the Settlement .............................................................................4

            b.  Having to Decide Whether to Opt-Out Without Knowing the Exact Calculation of Premiums or Benefits Under the Special Election Options or the Availability of all Options Is Not Unusual in a Class Action Settlement.......................................8

        2.  The Settlement Provides Substantial Relief.................................................14

        3.  This Case Does Not (and Could Not) Challenge the Rate Increases Themselves ...............................................................................................19

        4.  Payments Under The Settlement Will Not Be Used By Genworth To Justify Future Rate Increase Requests .......................................................23

        5.  Objections to the Attorneys Fees and Service Awards Requested Should Be Overruled...................................................................................24

        6.  Subclasses Are Unnecessary Where Every Class Member Stands in an Identical Position with Respect to Genworth's Alleged Nondisclosures and Will Receive Individually Tailored Benefits Under the Settlement...................................................................................28

        7.  Other Objections .......................................................................................34

    C.  The California Department of Insurance's Statement Does Not Undermine Approval of the Settlement .................................................................................37

III. CONCLUSION...................................................................................................40

# TABLE OF AUTHORITIES

**CASES** **Page**

*Amchem Prod., Inc. v. Windsor,*
521 U.S. 591 (1997)................................................................3

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,*
568 U.S. 455 (2013)..............................................................30

*Behrend v. Comcast Corp.,*
No. 03-6604, 2012 WL 4459582 (E.D. Pa Sept. 25, 2012)....................13

*Berrien v. New Raintree Resorts Int'l, LLC,*
276 F.R.D. 355 (N.D. Cal. 2011)............................................31

*Berry v. Schulman,*
807 F.3d 600 (4th Cir. 2015) ...........................................12, 15, 18, 27

*Cullen v. Whitman Med. Corp.,*
197 F.R.D. 136 (E.D. Pa. 2000)...........................................16

*Flinn v. FMC Corp.,*
528 F.2d 1169 (4th Cir. 1975) ..............................................3

*Flint v. MetLife Ins. Co. Connecticut,*
460 F. App'x 483 (6th Cir. 2011) .......................................19, 22

*Gunnells v. Healthplan Servs., Inc.,*
348 F.3d 417 (4th Cir. 2003) ..............................................31

*In re Anthem, Inc. Data Breach Litig.,*
327 F.R.D. 299 (N.D. Cal. 2018)...........................................10

*In re Currency Conversion Fee Antitrust Litig.,*
263 F.R.D. 110 (S.D.N.Y. 2009), *aff'd sub nom. Priceline.com, Inc. v.*
*Silberman,* 405 F. App'x 532 (2d Cir. 2010).............................15

*In re Equifax Inc. Customer Data Sec. Breach Litig.,*
No. 1:17-MD-2800-TWT, 2020 WL 256132 (N.D. Ga. Jan. 13, 2020)............10

*In re Genworth Fin. Sec. Litig.,*
210 F. Supp. 3d 837 (E.D. Va. 2016) .......................................2

*In re Google Referrer Header Privacy Litig.,*
87 F. Supp. 3d 1122 (N.D. Cal. 2015) ......................................4

**Page**

*In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Practices & Prod. Liab. Litig.*,
  952 F.3d 471 (4th Cir. 2020) ............................................................................3, 9, 27

*In re The Mills Corp. Sec. Litig.*,
  265 F.R.D. 246 (E.D. Va. 2009) .........................................................................................3

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998).............................................................................................10

*In re The Prudential Ins. Co. of Am. Sales Practices Litig.*,
  177 F.R.D. 216 (D.N.J. 1997)............................................................................................5

*In re Quaker Oats Labeling Litig.*,
  No. C 10-0502 RS, 2014 WL 12616763 (N.D. Cal. July 29, 2014).................................16

*In re VMS Ltd. P'ship Sec. Litig.*,
  No. 90-C-2412, 1995 WL 355722 (N.D. Ill. June 12, 1995).............................................5

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
  MDL No. 2672 CRB (JSC), 2017 WL 2212783 (N.D. Cal. May 17, 2017) .........................16

*Keil v. Lopez*,
  862 F.3d 685 (8th Cir. 2017) .........................................................................................10

*Lilly v. Jamba Juice Co.*,
  308 F.R.D. 231 (N.D. Cal. 2014)......................................................................................30

*Lyons v. CoxCom, Inc.*,
  No. 08-CV-2047-H(CAB), 2010 WL 11249482 (S.D. Cal. Aug. 23, 2010).........................16

*Mongeluzzi v. Pansini & Lessin*,
  61 Pa. D. & C. 4th 52 (Pa. Ct. Com. Pl. 2001) ...............................................................13

*Riker v. Gibbons*,
  No. 3:08-cv-00115-LRH-VPC, 2010 WL 4366012 (D. Nev. Oct. 28, 2010) .....................15

*Robinson v. Carolina First Bank NA*,
  No. 7:18-cv-02927-JDA, 2019 WL 2591153 (D.S.C. June 21, 2019) ...............................3

*Robinson v. Carolina First Bank NA*,
  No. 7:18-cv-02927-JDA, 2019 WL 719031 (D.S.C. Feb. 14, 2019)...................................3

*Rodriguez v. West Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ..........................................................................................32

Page

*Schechter v. Crown Life Ins. Co.*,
    No. 2:13-cv-05596 CAS(AJWx), 2014 WL 2094323
    (C.D. Cal. May 19, 2014) ..................................................................................4

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011)...........................................................................10

*Trowbridge v. McCaigue*,
    992 A.2d 199 (Pa. 2010) ................................................................................13

*Turner v. Murphy Oil USA, Inc.*,
    472 F. Supp. 2d 830 (E.D. La. 2007) ............................................................14

*United States v. Oregon*,
    913 F.2d 576 (9th Cir. 1990) ...........................................................................4

*Va. Power Energy Mktg., Inc. v. EQT Energy LLC*,
    No. 3:11-cv-630, 2012 WL 2905110 (E.D. Va. July 16, 2012)......................13

## STATUTES, RULES AND REGULATIONS

28 U.S.C.
    §1715(b) ...............................................................................................1, 19, 37

Federal Rules of Civil Procedure
    Rule 23 ...............................................................................................................5
    Rule 23(b)(2) ..............................................................................................15, 16
    Rule 23(b)(3) ....................................................................................................13
    Rule 23(e).............................................................................................3, 13, 14
    Rule 23(e)(5) .....................................................................................................37

## SECONDARY AUTHORITIES

Restatement (Second) of Contracts §162(2) .................................................30

Restatement (Second) of Torts §538.............................................................30

Pursuant to the Court's Order Granting Preliminary Approval of Settlement and Directing Notice to Class [ECF No. 98], and in further support of (1) Plaintiffs' Motion for Final Approval of Class Action Settlement [ECF No. 135], and (2) Class Counsel's Motion for an Award of Attorneys' Fees and Expenses and Service Awards to the Named Plaintiffs [ECF No. 142], Class Counsel and the Named Plaintiffs respectfully submit this Reply in opposition to each objection to the Settlement.  Along with the Declaration of Brian D. Penny in Support of Plaintiffs' Reply ("Penny Decl.") (**Exhibit 1**, hereto), Named Plaintiffs and Class Counsel state the following:

## I.   INTRODUCTION

This Settlement has sparked a level of engagement that most class actions generally do not evoke.  Over the past 60 days, Class Counsel has spoken to more than 4,000 policyholders who called with questions about the Settlement.  The *vast* majority of those Class members have embraced the Settlement.  In the end, only 191 policyholders opted out of the Settlement and there are 26 objections filed by 35 Class members to some aspect of it.[1]  Those opt-outs and objections together represent *less than one-tenth of one percent* of the total Class of more than 207,000 Genworth policyholders.  Moreover, each state's insurance regulator received statutory notice of the proposed Settlement under the Class Action Fairness Act, 28 U.S.C. §1715(b).[2]  None have objected to the Settlement, and the California Department of Insurance ("CDI") filed a statement concerning the Settlement that is largely supportive.  Its concerns are also addressed herein.

---

[1]   32 objections were filed by 43 Class members.  Five objections filed by seven Class members have since been withdrawn.  *See* Penny Decl. at ¶¶3-5.  Two objections that were not filed with the Court in violation of the Order Granting Preliminary Approval of Settlement and Directing Notice to the Class ("Prel. App. Order") [ECF No. 98, ¶21] are also attached to the Penny Declaration as Exhibit A.

[2]   Citations, internal quotations, and footnotes omitted and emphasis added unless otherwise noted.

Many of the objections submitted by Class members pull in different directions and represent disparate assessments of the Settlement.  For example, some objectors believe the Settlement offers the Class insignificant monetary value, while others are concerned the Settlement payments are so substantial that they may stress Genworth's financial condition.  Some think the Settlement's different options make it overly complex, while others aver it is not broad enough to account for everyone's potential situation.  These divergent opinions reflect a Settlement that fairly and adequately threads the needle of compromise, offering something to everyone.

In the end, the question is not whether everyone in the Settlement is completely satisfied, but whether the settlement is a fair, adequate, and reasonable resolution of the claims asserted.  *See*, *e.g.*, *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 839 (E.D. Va. 2016) (Gibney, J.) (granting final approval).  This Settlement strictly tracks the claims Plaintiffs brought.  It provides the Disclosures[3] that were sought from the outset of this case, and then provides a series of valuable Special Election Options or other monetary relief to every member of the Class.  As the Court recognized in its recent Memorandum Opinion, "the settlement provides substantial monetary and other benefits to the class members, and it is important that class members be able to partake in those benefits as promptly as possible, if they so desire.  The litigation here has been drawn out, but an effective and important settlement has been reached." ECF No. 151 at 8.  Indeed, the CDI echoed this in its closing remarks:

> To its credit, the proposed settlement provides disclosures which will help class members to make informed decisions about their policies.  It also appears to include cash payments that would be sufficient to return additional premiums paid by class members who would have been inclined to restructure their policy if fully informed of Genworth's intentions.  And the Department is supportive of options that would allow long-term care

---

3    All capitalized words herein are defined in the Parties' Settlement Agreement unless otherwise noted.

policyholders to make informed decisions about their coverage and to adjust policy coverage levels.

CDI Statement at 7.

That is precisely what this lawsuit was about and what this Settlement seeks to achieve. Named Plaintiffs and Class Counsel therefore respectfully urge the Court to overrule the objections and approve the Settlement.

## II.   ARGUMENT

### A.   Standards for Reviewing Objections to Class Settlements

"The [Court's] inquiry . . . under Rule 23(e) . . . protects unnamed class members from unjust or unfair settlements affecting their rights[,]" *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997), while also accounting for the "strong judicial policy in favor of settlement to conserve scarce resources that would otherwise be devoted to protracted litigation." *Robinson v. Carolina First Bank NA*, No. 7:18-cv-02927-JDA, 2019 WL 719031, at *8 (D.S.C. Feb. 14, 2019); final approval granted at *Robinson v. Carolina First Bank NA*, No. 7:18-cv-02927-JDA, 2019 WL 2591153 (D.S.C. June 21, 2019).

Courts generally view a relatively low number of objections and opt-outs to a class action settlement as additional indicia of the settlement's fairness. *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 257 (E.D. Va. 2009). Indeed, as the Fourth Circuit recently explained, where "only 94 of the 178,859 class members who responded to the class-action settlement notice opted out of the settlement (about 0.05%), and 12 class members objected thereto (about 0.006%)[,] [t]hose figures provide further support for the settlement's adequacy." *In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Practices & Prod. Liab. Litig.*, 952 F.3d 471,

485 (4th Cir. 2020).   The objection and opt-outs to this Settlement are similarly low, with approximately 0.014% of the Class objecting and only 0.097% opting out.[4]

Objectors to a class settlement "bear the burden of proving any assertions they raise challenging the reasonableness of a class action settlement."   *In re Google Referrer Header Privacy Litig.*, 87 F. Supp. 3d 1122, 1137 (N.D. Cal. 2015) (citing *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990)); *see also Schechter v. Crown Life Ins. Co.*, No. 2:13-cv-05596 CAS(AJWx), 2014 WL 2094323, at *2 (C.D. Cal. May 19, 2014) (objector bears burden of showing that settlement approval would contravene its equitable objectives).

### B.      The Objections to the Settlement Should Be Overruled

Most of the objections to the Settlement fall into six categories: (1) challenges to the adequacy of the Court-approved Notice; (2) misperception that the Settlement offers no concrete benefits; (3) misperception that this case did (or could) challenge the rate increases themselves; (4) concerns that the payment of Settlement benefits and/or attorneys' fees will impair Genworth's ability to pay future claims or result in additional rate increases; (5) challenges to the amount of attorneys' fees or service payments; and (6) a contention that subclasses are warranted.   Plaintiffs address each of these objections in turn.   Several objections that did not fall into these categories are then addressed separately thereafter.

#### a.      Objections to the Notice Should Be Overruled As The Notice Effectively Communicates the Terms of the Settlement

Several Class members object that the Court-approved Notice did not clearly describe the Settlement's benefits to the Class.   For example, **Jon Richards** complains that the benefits are so

---

[4]     Even if a large percentage of the class had objected, "a settlement is not unfair or unreasonable simply because a large number of class members oppose it."   *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)

vaguely described that there might be no benefit from the Settlement at all.  ECF No. 119 at 2.
**William and Roberta Saville** aver the proposed Settlement terms were "hopelessly and
unreasonably vague, and contain[ed] so many undisclosed conditions and possible outcomes that
it cannot reasonably be evaluated by any class member, nor for that matter, by the Court."  ECF
No. 132 at ¶4.  **John and Mary Sweeney** state they were "not able to see what the Policy Holders
settlement was."  ECF No. 133.  **Ronald and Toby Agulnick** object that the Settlement is
"unnecessarily complex" and "confusing," in part because by placing the Special Election Options
in the Appendix to the Settlement Agreement rather than the body of the agreement itself, the
Parties have not "met their obligation to lay out for the Court in a clear way what the benefit is for
each of those scenarios or how these calculations and options were derived as the base way to
provide benefit."[5]  ECF No. 162 at 3-4.

 This Settlement is no doubt complex, but the Notice adequately described its benefits,
especially when considering the information also made available to Class members on the
settlement website and the option to call Class Counsel directly with questions.  Of course, before
the Notice was sent, the Court carefully reviewed and approved it, and suggested several changes
included emphasizing certain language.  *See* January 15, 2020 Hearing Transcript at 42:5-43:23.
The Parties implemented all of the Court's suggestions and otherwise complied with the Court-
approved notice program.  *See e.g.*, *In re VMS Ltd. P'ship Sec. Litig.*, No. 90-C-2412, 1995 WL
355722 at *1 (N.D. Ill. June 12, 1995) ("Due process and Rule 23 merely require good faith
compliance with the presumptively valid notice procedures ordered by the court.  As a result of
the court's role in setting notice procedures, compliance with the procedure so ordered is all that

---

[5] It bears noting that despite this critique, the Agulnicks then (in their objection) set forth a rather
clear understanding of each those benefits and how they are calculated.  ECF No. 162 at 4-6.

is ordinarily expected of the class counsel."); *In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 232 (D.N.J. 1997) (finding compliance with prior class notice order satisfied Rule 23 and due process).

Under the bolded heading "**Summary of Proposed Settlement Terms**," the Notice explained that if the Settlement is approved, a Special Election Letter will be sent to all Class members that will contain the two forms of relief provided to Class members:

> (a) Disclosure of certain information about GLIC's and/or GLICNY's future rate increase plans and need for future rate increases (the "Disclosures"); and
> (b) Settlement Class members' right to make an election of either (1) maintaining current benefits at existing filed rates (subject to the future approved rate increases), or (2) electing from a selection of reduced paid-up benefit options or reduced benefit options (the "Special Election Options"), subject to the availability of those options depending on each Settlement Class members' current policy terms and benefits and any state limitations concerning Partnership Plan ("Partnership Plan") requirements. Special Election Options that may be available could increase the amount of your current non-forfeiture paid-up benefit or entitle you to cash damages pay-outs. The actual Special Election Options available to you will depend upon many factors including, but not limited to, your current policy status and benefits, final court approval, and state regulatory review and comment.

In addition to all of the other documents relating to the Settlement, the settlement website also included Appendix C to the Settlement Agreement (which describes each of the Special Election Options and how the cash damages payments and enhanced benefits under each Option are calculated) and Appendix D (which is an example of the Special Election Letter). As of June 25, 2020, at least 12,790 people had viewed the website, and 6,119 people called the Administrator's toll-free number for more information. *See* Second Supplemental Declaration of Cameron R. Azari, Esq. on Implementation of Settlement Notice Plan ("Azari Suppl. Decl.") at ¶¶11-12. Class members who wanted more information about the Settlement's benefits also had the option to call Class Counsel directly. More than 4,000 Class members did just that and had

their specific inquires addressed.  *See* Penny Decl. at ¶7.  For 99.99% of the Class, the Notice and Class member support was more than adequate.

The **Savilles**' objection that the description of the Settlement's benefits included too many conditions and possible outcomes overlooks the fact that a key component of the Settlement is the *multiple* options that may be provided to Class members following the additional Disclosures from Genworth.  The Parties went to great lengths to ensure that multiple Special Election Options could be offered to all Class members.  However, it would have been incorrect to state in the Notice that every Option and Disclosure necessarily ***would*** be made to all Class members or necessarily ***could*** be made to all Class members.  This is, in part, because state insurance regulators might require changes to certain Disclosures or Special Election Options, and, in part, because some Class members may receive different Options depending on their policy's status ***at the time they elect a Special Election Option***, for example, to preserve their Partnership Plan status or because they have chosen to elect a Non-Forfeiture or reduced benefit option outside of the Settlement (which they are of course free to do).  Rather than leave anyone behind, the Settlement accounts for the entire Class of Choice 1 policyholders who all allegedly suffered from the same alleged lack of adequate disclosures, and provides choices so they can tailor their Settlement election to their individual financial and health situations.  Thus, the description of the Settlement benefits in the Notice needed some conditional language to fully inform Class members.

There was no short cut to obtaining meaningful relief for the Class.  This case was complex, and it is not only necessary, but commendable, that Class Counsel and Genworth endeavored to offer a menu of settlement options that took into account all Class members and their individual circumstances.  For example, simply negotiating a static payment to all Class members would not account for the fact that some Class members will not want to make any changes to their policies

even in light of the Disclosures being made by Genworth as part of the Settlement.  For those Class members, cash payments would not be appropriate, because by electing to continue to pay the increased premiums *following* the Disclosures, they have essentially conceded they were not damaged monetarily by having not received the Disclosures.  All of these issues were considered by Class Counsel, and the result is a Settlement that is fair and reasonable for all – not in spite of its complexity, but because of its completeness.

    **b.**   **Having to Decide Whether to Opt-Out Without Knowing the Exact Calculation of Premiums or Benefits Under the Special Election Options or the Availability of all Options Is Not Unusual in a Class Action Settlement**

    Several Class members object to having to opt-out of the Settlement before knowing exactly which Special Election Options or other relief will be afforded them, the exact calculations of premiums or benefits resulting from the exercise of those options, or what the actual Cash Damages payments will be for those Options.  For example, **Sanford Goldberg** complains that "[t]he terms of settlement are not specifically defined at this time based upon the status of the existing policy and other benefits."  ECF No. 156.  **Saul and Harriet Jacobs** contend it is unfair to have to "vote" on a settlement without knowing what the actual settlement options and cash damages payments will be.  ECF No. 159 at 2.  **Ronald and Pamela Simpson** complain that "[t]he Notice of Pendency is silent as to what consideration flows to the members of the Class."  ECF No. 121 at 1.  **Mark Ostrich** objects that "[t]here should be some way for class members to understand financially the choices presented to them in the proposed settlement."  ECF No. 123 at ¶12.  The **Agulnicks** claim the Settlement "[c]ontains [u]ndefined and [i]ncomplete [t]erms" and object to affording Genworth a release "without knowing all of the details of the settlement to which they are agreeing."  *See* ECF No. 162 at 2.  They allege this is an unenforceable "agreement to agree," citing several cases, none of which is even remotely relevant.  *Id.* at 2-3.  **Donna Wright**

objects that the Settlement authorizes "inverted or implied informed consent," by which she means that "the failure to object implies informed consent to the terms of the Settlement."  ECF No. 161 at 9.  These objections lack merit for several reasons.

**First**, these objections all presume that class members typically know **exactly** what settlement benefits they will receive before they must decide whether to **opt out** of a class action settlement.  But that is simply not the case.  It is common for a class member's actual payment or benefits in a class settlement to depend upon a number of factors unknown to them when they have to opt-out and even file their claim.  Such settlements are routinely approved, notwithstanding that settlement payments to class members are variable and may ultimately be **reduced *pro rata***.

For example, in *Lumber Liquidators*, a settlement recently approved in this District and affirmed by the Fourth Circuit, the class members were offered either a cash payment or a voucher. 952 F.3d at 478-79.  These class members were told that the cash payment would likely be worth between 20 and 56% of their flooring's purchase price, and the vouchers would likely be worth between 38 and 104% of the purchase price.  *Id.*  These class members had to make their election of remedies **and** file their claims **before** the settlement was approved.  *Id.*  Due to a higher-than-expected rate of claims (which was still less than 25% of the class), the cash awards will actually be worth substantially less - around five percent of the purchase price - and the vouchers will be worth about 60%.  *Id.* at 480.  Despite this uncertainty and the ultimate *reduction* in class member benefits, the settlement was approved, and that approval was upheld on appeal.  *Id.* at 492.

Moreover, many settlements, like *Lumber Liquidators*, require class members to elect one form of remedy offered by the settlement (such as cash payments versus vouchers) **prior** to final approval, even though the value of their claim elections are completely unknown at that time.  For example, a common feature of a number of data breach class action settlements requires the class

members to elect *either* credit monitoring *or* a cash payment before final approval, even though the amount of the cash payment will be contingent on how many other class members elect that option or whether the administrator will even validate the class member's claim for money damages. *See e.g.*, *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *2-3 (N.D. Ga. Jan. 13, 2020); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 331-32 (N.D. Cal. 2018); *see also  In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 328 (3d Cir. 1998) (approving settlement that provided Class members with an alternative dispute resolution process for remediating claims "rather than offering [class members] a small refund or a coupon towards the purchase of other policies" because "the ADR process responds to the individual claims of the class and provides compensation based on the harm they have suffered.")

It is also common for defendants to obtain a class-wide release even where a very small percentage of the Class has actually filed a claim and will receive the monetary benefits of the settlement. *See e.g.*, *Keil v. Lopez*, 862 F.3d 685, 696–97 (8th Cir. 2017) (noting that "a claim rate as low as 3 percent is hardly unusual in consumer class actions and does not suggest unfairness); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (citing evidence suggesting that "consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns). This is because the ***availability*** of options, ***in and of itself***, is of sufficient value to support a settlement and to provide notice as required by Due Process, even if those options are not exercised by the vast majority of class members. *Id.*

Here, several points bear emphasis. All Class members will receive the permitted Disclosures and Special Election Options ***without having to file a claim***, and this case always has been about providing Class members additional ***information***. The Cash Damages payments for

- 10 -

Class members who elect those Options are ***uncapped***.  None of the Special Election Option benefits – such as the Cash Damages payments or the ***doubling*** of electing Class members' Paid-Up benefits – will be reduced based on the number or types of elections of the rest of the Class.

> ***Second***, no Class member will be asked to decide which Special Election Option (if any) they will choose until ***after*** (i) the Settlement is approved, (ii) state regulators have had the opportunity to weigh in, and (iii) the Class member is told exactly what each Option entails for him or her – including the precise reduced premiums, adjusted benefits, and/or Cash Damages payment for each Option.  Importantly, by remaining in the Settlement, Class members are not subjecting themselves to ***any*** compulsory changes in their policies.  Before the opt-out deadline, Class members knew that if they remain in the Class, they may receive a Special Election Letter with Disclosures and Special Election Options or other relief triggered by the Settlement.  That Notice complies with Due Process.

> ***Third***, it would not be practical for Genworth to produce the final Special Election Letters for each of the more than 207,000 Class members ***before*** the Settlement is approved and any input of a state regulator is taken into account.  In order to prepare each Class member's individual Special Election Options, several Genworth business teams will have to coordinate, including with respect to matters of policyholder administration, customer service, and accounting, and Genworth will need sufficient time to program, build, and test new systems.  It would be unreasonable to expect Genworth to undertake these time-consuming and costly tasks before the Settlement is approved, in no small part because Genworth cannot fully implement these operational changes until it knows that state insurance regulators have not modified the Disclosures or the Special Election Options, and also because the Special Election Options available to each Class member depends on his/her policy status ***at the time*** his or her Special Election Options are processed.

This is also why the Settlement Agreement provides that Genworth (i) will send the Special Election Letters after it has "had sufficient time to properly prepare [its] administration systems for the mailing, processing, and servicing of Special Election Letters, and after the Final Settlement Date," and (ii) Genworth may send Special Election Letters six to nine months prior to a Settlement Class member's policy anniversary date.  (Settlement Agreement at ¶44(c)(d).  On the latter point, in the ordinary course of business, Genworth sends rate-action letters to policyholders throughout the year, based on policy anniversary dates, as is necessary to ensure consistent and accurate communications, and has planned for the same level of execution of this Settlement.

*Fourth*, this Settlement, and Class members' decisions whether to opt-out of it, is not an "agreement to agree" as the **Agulnicks** allege.  Likewise, **Sanford Goldberg** is incorrect when he asserts "[t]he terms of settlement are not specifically defined at this time based upon the status of the existing policy and other benefits."  ECF No. 156.  There are no undefined terms in the Settlement, and the Settlement does not require or contemplate any terms be further negotiated in the future.  The Disclosures, Special Election Options, and other relief under the Settlement are each specifically defined in the Settlement Agreement including at Appendices B and C.  None of those benefits is *contingent* on regulators' "approval," but Class Counsel and Genworth recognize that regulators *may* wish to provide input on either the Disclosures or the Settlement Election Options.  It would not be unprecedented (and indeed has been approved by the Fourth Circuit) for a class action settlement to provide relief whose precise contours and specifics will not be finalized or even designed until after the settlement has been approved by the court.  *See e.g.*, *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015) (affirming injunctive-only settlement that permitted

the defendant to, in the future, redesign a consumer research and report platform that was alleged to have violated the FCRA, and bounded only by the guidelines of the settlement agreement).[6]

The cases cited by the **Agulnicks** are inapposite.  This Settlement is not a (i) "Letter of Intent," as in *Va. Power Energy Mktg., Inc. v. EQT Energy LLC*, No. 3:11-cv-630, 2012 WL 2905110 (E.D. Va. July 16, 2012) (REP), (ii) a "Term Sheet," as in *Behrend v. Comcast Corp.*, No. 03-6604, 2012 WL 4459582 (E.D. Pa Sept. 25, 2012), (iii) a "Purchase Offer," as in *Trowbridge v. McCaigue,* 992 A.2d 199, 202 (Pa. 2010); or (iv) an "oral agreement," as in *Mongeluzzi v. Pansini & Lessin*, 61 Pa. D. & C. 4th 52, 71 (Pa. Ct. Com. Pl. 2001), all of which were merely "agreements to agree" that fell woefully short of an enforceable "contract."  Notably, none of these cases deal with a class member's decision to opt-out of or object to a proposed settlement before knowing the exact terms of the relief.  As explained above, this case is no different than most class action settlements under Rule 23(b)(3) of the Federal Rules of Civil Procedure in which the class members must decide whether to opt-out ***before*** knowing the actual amount of payments or other relief they will receive.  In fact, it is better than most, because Class members will not be asked to choose from among the various Options until they have ***all*** the relevant information to make informed choices.  In short, the Notice adequately informed Class members that unless they opted out, if the Settlement is approved, they will release their claims against Genworth and will receive the Disclosures and the Special Election Options as permitted by their state insurance regulator.  Nothing more was required prior to the opt-out deadline.

***Finally***, for many of the same reasons above, the Settlement does not present some issue of "inverted or implied informed consent" as **Ms. Wright** alleges.  ECF No. 161 at 9.  There is no

---

[6]   Indeed, that the Disclosure and Special Election Options under this Settlement have the additional "check" of state regulator input further ensures the fairness of the relief being provided to the Class.

specific requirement for "informed consent" to a settlement under Rule 23(e), and class members are *always* understood to have released their claims in a settlement (and thus "consent" to it) if they do not opt-out after adequate notice.  **Ms. Wright** acknowledges as much when she admits she has found "no decisions in the Virginia District Court or the Fourth Circuit that defines the required informed consent needed to have a class affirmatively consent to a proposed settlement before it is approved," and that "there are no rigid rules to determine whether a settlement notice to class members satisfies constitutional and Rule 23(e) requirements." *Id.*

The issue properly framed is whether the class notice program was adequate, because if it is, then all Class members are bound by the settlement release.  As explained in the *Turner* case **Ms. Wright** cites, "the question is . . . not whether some individual . . . got adequate notice, but whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 839-40 (E.D. La. 2007).

The Court-approved Notice is not vague, and the Notice program included sending individual Notices directly to all members of the Class, as well as providing a website populated with all the relevant materials, a telephone hotline, and the ability to call Class Counsel directly with any questions about the Settlement.  These resources offered the Class all the information necessary to determine whether to opt-out or object to the Settlement.  Moreover, this Notice program was far better than most, as the direct mailings alone have reached *99.8%* of the Class.  Azari Supp. Decl. at ¶18.  Objections to the adequacy of the Notice should be overruled.

### 2.    The Settlement Provides Substantial Relief

This Settlement obtains the Disclosures that were the foundation of Plaintiffs' case.  It then offers Class members effectively a "do over" of their prior policy elections in the face of increasing rates with the benefit of those Disclosures.  The Settlement also provides new election Options

with features not previously available to Class members, including substantial Cash Damages payments and enhanced Non-Forfeiture benefits designed to compensate Class members for any financial harm caused by the alleged non-disclosures.

Nevertheless, several Class members have objected to the Settlement because they believe it offers nothing new or nothing of value to the Class.  For example, **David Frame** avers the Settlement does not appear to have any "appreciable or beneficial value."  ECF No. 149 at 1.  He mistakenly concludes the Settlement just affords policyholders the same options to reduce their benefits that they had in the past.  *Id.*  Similarly, **Ronald and Pamela Simpson** argue that the Settlement will not afford them any benefits.  ECF No. 121.  **Mark Ostrich** also claims there are no new benefits to the Settlement, arguing the reduced benefit options and non-forfeiture options are all the same as those offered before.  *Id.* at ¶¶3-4, 8-9.  He even states the Disclosures are nothing new because according to him "it has been long known that rates are going up—from both Genworth and my agent."  *Id.* at ¶6.  Likewise, the **Agulnicks** allege the options here are merely "retreads" of prior options offered the Class.  ECF No 162 at 7.

These objectors are plainly mistaken.  The Settlement affords Class members considerable benefits to which they would not otherwise be entitled.  ***First***, Plaintiffs obtained significant Disclosures in the Settlement about (i) anticipated future rate increases, (ii) Genworth's current financial condition, and (iii) Genworth's need for the anticipated future rate increases to remain solvent and pay future claims.  Indeed, this injunctive relief ***alone*** could support approval of the Settlement.  *See e.g.*, *Berry*, 807 F.3d at 612-13, 615 (affirming final approval of settlement of a *mandatory injunctive only relief* class under Rule 23(b)(2) in which the class members *waived potential statutory damages claims under the FCRA*); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 124 (S.D.N.Y. 2009) (finding the injunctive relief was among the factors

- 15 -

that "weigh[ed] strongly in favor of approval"), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010); *Riker v. Gibbons*, No. 3:08-cv-00115-LRH-VPC, 2010 WL 4366012, at *4 (D. Nev. Oct. 28, 2010) (approving a settlement for injunctive and declaratory relief, finding that it "achieve[d] the goals of the lawsuit"); *Lyons v. CoxCom, Inc.*, No. 08-CV-2047-H(CAB), 2010 WL 11249482 (S.D. Cal. Aug. 23, 2010) (granting final approval of Rule 23(b)(2) settlement where class members did not receive a direct monetary benefit but were required to release monetary claims); *In re Quaker Oats Labeling Litig.*, No. C 10-0502 RS, 2014 WL 12616763, at *1 (N.D. Cal. July 29, 2014) ("The parties have shown . . . that a settlement providing only injunctive relief is appropriate here given the value of that relief and the limited possibility of recovering damages and distributing them in an economically-feasible manner.")

All Class members will benefit from the information contained in the Disclosures, as it will help inform not only their elections under the Settlement but also how they manage their long-term care insurance policies in the future. These Disclosures are precisely what was sought in this litigation and they are significant. *See e.g.*, *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000) (granting final approval and noting that "[i]t achieves an immediate recovery for the members of the class that substantially exceeds the likely recovery to the class had the case proceeded to judgment, while avoiding the considerable risks and expenses inherent in trial"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 2212783, at *15 (N.D. Cal. May 17, 2017) (granting final approval to consumer class action settlement where recovery "likely exceeds the 'TDI premium' that Class Members paid to purchase a vehicle with clean diesel technology.")

*Next*, while the reduced benefit and paid-up Options offered in the Settlement share some similar nomenclature with options Genworth policyholders currently have to adjust their coverage

and premiums, the Special Election Options *also* include *Cash Damages payments* and/or *enhanced* paid-up benefits.  These benefits are not only substantial but also distinguish the Special Election Options from any options Class members had in response to prior rate actions.  Indeed, as Named Plaintiffs and Class Counsel explained in their Motion for Final Approval, Class Counsel estimates the Cash Damages payments alone could approach or exceed $100 million, a figure that does not even account for the likely thousands of Class members who will see their paid-up benefits *double* because of the Settlement.  ECF No. 136 at 6.

**Steven Gratz** states the amounts Genworth will pay in this Settlement are "peanuts" compared to their profits and resources.  ECF No. 153 at 3.  He asks, "What will each of us in the 'class' receive since we are the ones who have been substantially and permanently harmed?  Nothing is described in any of the paperwork so we have no clue.  How can a couple of dollars ever compensate us for the long term reduction in our benefits?"  *Id*.  **Mr. Gratz**, however, does not appear to appreciate the amount of Cash Damages payments and enhanced non-forfeiture paid-up benefits available to the Class through this Settlement, the former of which are estimated to meet or exceed $100 million alone.  Nor does he acknowledge the benefits of the Disclosures obtained.

The **Agulnicks** also object that Class Counsel has not demonstrated there is "[m]eaningful [b]enefit [to the Class] [w]hen [c]ompared to the [a]lleged [d]amages and [r]isk of [l]osing."  ECF No. 162 at 6-7.  And they discount Class Counsel's estimate that the Settlement will provide $100 million or more in damages payments because they say that estimate does not account for all the different categories of options provided.  *Id.*

Class Counsel's estimate of the Cash Damages payments resulting from the Settlement are well founded.  They are based on policyholders' historic elections of options that were offered to

them with prior rate increases, including as reflected in documents Genworth produced in discovery in this litigation.  While that estimate as applied to the Settlement Class is simply a projection (as are all estimates), Class Counsel believes the estimate is, if anything, conservative because it assumes Class members will make these Settlement Elections at only *half* the rate of prior elections in response to rate increases.  Notably, it does not appear that even the **Agulnicks** would suggest that aggregate cash payments of $100 million would be inadequate compensation (which, again, does not even take into account the other relief that Class members will be provided, including enhanced paid-up benefits, the ability to reduce premiums, and the Disclosures).

Finally, the **Agulnicks** allege a $100 credit to any class members whose state insurance regulator does not permit *any* of the Disclosures *or* Special Election Options is inadequate.  But if any state regulators entirely ***prohibit*** both the Disclosures and Special Election Options, this relief is fair because it would be commensurate with the relative strength of such Class members' legal claims.  As a practical matter, if the Disclosures and the other relief obtained for Class members in a particular state are blocked by that state's insurance regulator (*e.g.*, because that regulator does not believe that providing policyholders with additional information about Genworth's financial condition would be helpful), then it logically follows that those Class members could not have received those Disclosures in the first instance—meaning they would not have a strong, if any, legal claim for fraud, omission, or lack of disclosure.  Nevertheless, these Class members (again, if any) are still afforded a $100 credit under the Settlement.  *See, e.g.*, *Berry*, 807 F.3d at 608 (affirming approval of injunctive relief-only settlement in lieu of *any* financial damages and noting that the "relative strength of the parties claims and defenses" was the most important consideration and reasoning "that the Objectors' prospects of recovering statutory damages for a willful violation were speculative at best, making release of those claims in exchange for substantial injunctive

relief demonstrably fair and adequate.")   Importantly, the Settlement itself contemplates that policyholders are afforded all of the Disclosures and all of the Options to which they are entitled. The $100 merely accounts for the possibility that a state entirely prohibits the relief agreed to.

In any event, Class Counsel has been informed by Genworth that it has spoken to a number of state insurance regulators and has obtained positive feedback about the Settlement from most, including in response to the multiple CAFA notices and in Genworth's direct outreach and engagement with the regulators.

### 3. This Case Does Not (and Could Not) Challenge the Rate Increases Themselves

Plaintiffs' Complaints and other filings in this case have all been very clear that the rate increases themselves (past, present, or future) are not at issue in this litigation.[7]  Plaintiffs have also made this point clearly to several of the objectors.  Nevertheless, some maintain objections based on an apparent misconception of Plaintiffs' claims.  For example, **Saul and Harriet Jacobs** object that the Settlement does not afford them meaningful relief, but what the **Jacobs** really want is to keep *all* their current policy terms and benefits while also either paying *less* for them or getting cash damages payments from Genworth.  ECF No. 159.  That mix of remedies could not be obtained in this lawsuit, or any lawsuit, as this Court has already noted the filed-rate doctrine prevents judicial challenges to increased premiums.  *See e.g*, ECF No 78 at 13-19; *Flint v. MetLife Ins. Co. Connecticut*, 460 F. App'x 483, 485 (6th Cir. 2011) (affirming district court's dismissal of plaintiff's claims challenging rate increases on his long term care insurance policy and holding "[plaintiff]'s attempt to collaterally attack the increase, as well as his argument that MetLife

---

[7]   *See, e.g.*, Complaint, ECF No. 1, at ¶1; Amended Complaint, ECF No. 36, at ¶1; Second Amended Complaint, ECF No. 84, at ¶1; Third Amended Complaint, ECF No 90, at ¶1; Memorandum Opinion, ECF No. 78, at 10-11; and Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement, ECF No. 136, at 1.

fraudulently obtained the rate increase, are barred by the filed-rate doctrine.")  That is why there is no "fourth choice" in the Settlement for what the **Jacobs** apparently want – to keep the same benefits while paying lower premiums or getting a premium rebate.  By definition, the Settlement is not unfair or objectionable because it did not achieve something that was not possible to recover and does not address a claim that was even alleged in the lawsuit.  Again, as the basis of this lawsuit was nondisclosure, anyone who elects to maintain their current benefits *after having been afforded the enhanced Disclosures* has indicated they were not financially harmed by the lack of those Disclosures in the past.[8]

Nevertheless, the **Jacobs** attack Class Counsel and the Named Plaintiffs as having "sold our group down the proverbial river" in an effort to "MAKE A DEAL."  *Id.* at 1.  Nothing could be further from the truth.  Class Counsel and the Named Plaintiffs operated with the utmost good faith in steadfastly pursuing this litigation and obtaining a settlement that is fair and equitable to *all* Class members.  This fact was confirmed by the mediator who oversaw virtually all settlement negotiations in this case.  *See* Declaration of Rodney A. Max, ECF No. 93-2 at ¶25.

The **Jacobs** further allege that had they known the full scope of Genworth's rate action plans in 2014, they "would have looked into other companies offering alternative policies. Companies that could be more well suited and competitive than Genworth."  ECF No. 159 at 1. First, a settlement does not need to address every potential alleged theory of damages to be fair and reasonable.  Moreover, the **Jacobs** have not identified *any* potential long-term care insurer that would have offered them a more "competitive" policy in 2014 (or today).  Regardless, the fact

---

[8]   Class members who choose to continue to pay increased premiums in order to keep the same benefits following the Disclosures are not harmed financially because they are essentially saying, "I didn't know premiums were going to be raised so much or why they need to be raised so much, but now that I know, I still want to continue to pay the increasing premiums to keep my same benefits."

that state regulators have routinely approved rate increases on the **Jacobs'** policies demonstrates that they were ***underpriced*** in 2014.  The notion that the **Jacobs** were somehow damaged by not shopping for new policies with identical benefits to their Genworth policies is pure speculation.[9]

The **Jacobs** also propose adding a new benefit to the Settlement that would "include creating a new policy for our subclass," which "[p]ricing and offering should be based on competitive company policies offered in 2014" with "[y]early increases [that] could apply dating back to 2014 that parallels competitor rate increases until the present day." *Id.* at 1-2.  In addition to the discussion above, this is simply not a remedy that could be offered in this case as it flies in the face of the filed-rate and primary jurisdiction doctrines.  The creation of a new policy and its pricing obviously is a matter for state insurance regulators, not for private litigants negotiating a settlement, nor the Court reviewing and approving it.

Likewise, **Ralph Ferrara's** objection seeks relief for a breach of contract claim that was not (and could not have been) asserted in this case.  ECF No. 170.  He argues that he bought his policy at a younger age with the expectation that it would be more affordable than it is now.  *Id.* at 7.  He notes that although the policy he bought and the materials provided to him at the time of purchase all disclosed Genworth's ability to raise premiums in the future, he nevertheless believed his policy rates would ***never*** increase.  *Id.*  He then explains that after not receiving any rate increases for ten years, his premiums increased from $2,522 to $4,062 between 2014 and 2020. *Id.*  **Mr. Ferrara**, an experienced class action attorney, does not explain why he never took ***any***

---

[9]    If the **Jacobs'** position is that they would have attempted to obtain new policies with new (lower) benefits in 2014 had they known the full extent of Genworth's plans for future rate increases, the Settlement offers them an appropriate option: election of reduced benefits now and a Cash Damages Payment to compensate them for the alleged financial harm of having paid premiums for higher benefits for the last six years.

action of his own in the past six years to enforce what he (mistakenly) thought was a guaranteed level premium.

**Mr. Ferrara's** objection then betrays a critical misapprehension about this case.  He states that "[h]ad this case gone to trial, and had Plaintiffs succeeded on their claims, the Plaintiff class could have received the benefit of its bargain – that is, the Policy benefits described above, ***without premium rate increases as assured in the Company's illustrations***, or alternatively, ***damages sufficient to procure a long-term care insurance policy with terms comparable to the Policy***." *Id*. at 7 (emphasis added).  He concludes that keeping a policy that is still subject to possibly significant future rate increases "could never be characterized as maintaining the 'benefit of the bargain.'"  *Id*.

As Class Counsel explained numerous times to **Mr. Ferrara** over the past two months, the relief he describes was never the relief Plaintiffs sought in this case, nor could it have been.  The filed-rate doctrine largely prevented Plaintiffs from bringing ***any*** claim that would have challenged the several rate increases for Mr. Ferrara's policy, or from seeking any relief that would have curtailed a regulator's authority to approve future rates or rate increases.  *See*, *e.g.*, *Flint*, 460 F. App'x at 485.  Moreover, **Mr. Ferrara's** fundamental objection that he was guaranteed a level premium for life is baseless, and belied by the policy itself, which clearly and in bold letters indicated Genworth's right to seek future rate increases.  His complaint that having a policy that is still subject to future rate increases does not maintain "the benefit of his bargain" is similarly misplaced.  He bought a long-term care policy that was explicitly subject to future rate increases.  That he may regret that bargain now is not the basis for an objection to this Settlement.

**Mr. Gratz** also objects primarily to the propriety of the rate increases themselves.  ECF No. 153 at 2-3.  His proposed remedy is to "return everyone in the 'class' to [their] original

contracts (premiums and benefit levels) and going forth, members of the 'class' should get Genworth to promise no changes in premiums and benefits from the original amounts for the next five years." *Id.* at 3.  Again, this case does not challenge the propriety of the regulator-approved increases themselves, and freezing or reducing premium rates is relief that would run headlong into the filed-rate and primary jurisdiction doctrines.[10]

### 4. Payments Under The Settlement Will Not Be Used By Genworth To Justify Future Rate Increase Requests

Several Class members, including **Lana Olsson** [ECF No. 116], **Jon Richards** [ECF No. 119], **Thomas Luck** [ECF No. 122], **Larry and Sharon Johnson** [ECF No. 120], **Rian and Michael Keller** [ECF Nos. 127 and 128], **John and Mary Sweeney** [ECF No. 133], **Paul Junius** [ECF No. 166], and **George and Jeanne Brehmer** [ECF No. 172], are concerned that Cash Damages payments and/or payments of the requested attorneys' fees and service awards will financially stress Genworth and will be used as justification to seek  higher premiums.  These concerns, however, are unfounded.

Initially, Genworth has represented to Class Counsel that it will be able to pay the attorneys' fees and expenses negotiated under the Settlement, as well as the Cash Damages payments elected by Settlement Class members.  As for objectors' concerns about the impact of these payments on Genworth's "financial condition," Class Counsel notes that to the extent that Class members elect Special Election Options that reduce their coverage, it logically and mathematically follows that Genworth's overall claims liability will be reduced correspondingly, which may *improve* Genworth's "financial condition" and ability to pay future claims.

---

[10]   **Karel Buckley** also filed an "objection" to the Settlement that, while non-specific, concerns whether Genworth should be able to raise her premiums.  ECF No. 164.  As stated herein, the propriety of future premium rate increases cannot be addressed in this suit or Settlement.

Genworth also has represented to Class Counsel that the attorneys' fees, service awards, and Cash Damages Payments expenses of the Settlement will not be used as actuarial justification by Genworth in seeking additional future rate increases.  Requested rate increases must be filed with and approved by state insurance regulators, who require that such increases be justified based on the actuarial experience of the policies at issue.

### 5.    Objections to the Attorneys Fees and Service Awards Requested Should Be Overruled

Several Class members, including **Lana Olsson** [ECF No. 116] **Jon Richards** [ECF No. 119], **Thomas Luck** [ECF No. 122], **Larry and Sharon Johnson** [ECF No. 120], **Ronald and Pamela Simpson** [ECF No. 121], **Saul and Harriet Jacobs** [ECF No. 159], **David Frame** [ECF No. 149], and **Mark Ostrich** [ECF No. 123] believe the fees requested are out of balance with the financial relief obtained for the Class, though one objector, **Steven Gratz**, actually endorsed those requests, saying "[Class Counsel] did the work and deserve to make as much as they can." ECF No. 153 at 3.  The **Johnsons** complain the fees requested are too high and ask the Court to reduce them to a number that is "reasonable given the modest results achieved for policyholders and the relatively low risk taken by Class Counsel in pursuing this action."  ECF No. 120.  **Mr. Luck** objects that "[t]here has been no substantiation of any monetary benefit to the Class Members, upon which an award of Attorneys Fees and Litigation Expenses could reasonably be determined." ECF No. 122.  The **Simpsons** posit that the fees "should represent some fraction of the total compensation flowing to the Class."  ECF No. 121 at 2.  **David Frame** avers that "[s]ince there doesn't appear to be a benefit to policy holders, [he] object[s] to the amount of fees proposed." ECF No. 149 at 2.  **Mark Ostrich** objects that "[c]ontingency lawyers only get paid when they win something for their clients," but he thinks Class Counsel "got nothing for the class members." ECF No. 123 at 10.

This litigation presented considerable risk and required extensive effort to obtain the Settlement and the Court is aware of the substantial benefits obtained for the Class. As the Court recognized in its recent Memorandum Opinion denying the Indiana Department of Insurance's motion to stay, "the settlement provides substantial monetary and other benefits to the class members, and it is important that class members be able to partake in those benefits as promptly as possible, if they so desire. The litigation here has been complex and drawn out, but an effective and important settlement has been reached." [ECF 151 at 8]

Moreover, one of the laudable features of the Settlement is that the bulk of the attorney's fees requested are based on the actual amount of financial benefits the Class obtains, as the contingent fees requested will be 15% of the Cash Damages Payments. Thus, rather than being out of balance with the benefits obtained, Class Counsel's fees will be ***tied directly to them***, ratcheting up or down (within the negotiated range) depending on the monetary benefits actually paid to the Class. The floor of this range is met when financial benefits to the Class triggering contingency payments reaches approximately $67,000,000. As noted above, Class Counsel is confident this threshold will be met. And if such benefits to the Class exceed $163,000,000, then the percentage of attorneys' fees will actually be ***less*** than 15%. These amounts are well in line (if not well below) percentages of attorney's fees awarded in similar cases. And importantly, ***none*** of these fees will reduce the Class members' payments or benefits.

The **Brehmers** also ask the Court to "[r]ule that attorney's fees be paid after the amounts to be paid to the Settlement Class or simultaneously therewith." ECF No. 172 at 4. But as set forth in the Settlement Agreement (¶52(d)), the contingent fee payments will all be paid on a rolling basis as payments triggering those fees are also made to Class members. Thus, the **Brehmers'** request has already been met.

- 25 -

**Mark Ostrich** also objected to what he called a "conflict of interest of the Class lawyers in allocating all of the settlement funds to attorneys fees."  ECF No. 123 at ¶14.  This objection rests primarily on his misapprehension that the only money paid in the Settlement will be the attorneys' fees.  As explained above, there will be substantial payments to the Class in this Settlement, and those payments will not be capped, nor will they be reduced in any way by Genworth's payment of attorneys' fees.  Since the Cash Damages payments are not capped to begin with, there is no mechanism by which to "increase" those payments if the attorneys' fees are reduced.  This is not a common fund case in which fees could simply be moved from one pot to another.  Reducing attorneys' fees will only benefit Genworth.  It will have no impact on Class members or their benefits in this Settlement.  **Mr. Ostrich** essentially asks the Court to take all the attorney's fees requested and allocate them as credits for all Class members.  *Id.* at ¶16.  But if the Court, for example, reduced the contingent fees requested by $5,000,000, that would result in credits of less than $25.00 per Class member.  Even if the Court allocated *every penny* of the requested fees (if they are all triggered by the financial benefits to the Class) to the more than 207,000 Class members that would result in credits of just $128.00 to each.  Considering the substantial benefits obtained for the Class, including the valuable Disclosures and enhanced non-forfeiture benefits, this would be entirely unjust, particularly since Class members pay Class Counsel *nothing* under the current Settlement.

**Ms. Wright** objects that the fees associated with obtaining the Disclosures are unwarranted because "[t]he docket sheet reflects the entry of no injunction."  ECF No. 161 at 13.  This objection fails to appreciate that the Disclosures obtained in the Settlement, which will be part of the Special Election Letter, *is* the injunctive relief sought in this case and it has been obtained for the benefit of all Class members.  She also objects that "[n]o affidavit or supporting time records (redacted or

otherwise) have been submitted in support of the fee request[.]" *Id.* She apparently has overlooked the documents Class Counsel filed on May 25, 2020, which include sworn declarations from all Class Counsel and the Named Plaintiffs justifying their requests. *See* ECF Nos. 138-140, 142-143, 144-147. She further objects that attorneys' fees are unwarranted because she thinks Class members do not benefit from the Settlement, in part because she says the Class members will be subject to future rate increases after the Settlement. ECF No. 161 at 14. As explained several times, this case was not (and could not have been) about preventing future rate increases. In light of the claims alleged, the Settlement provides substantial benefits. **Ms. Wright** also believes the fee request to be unwarranted because she thinks not much work was done on this case, especially when compared to another case, *Lumber Liquidators*, that obtained a settlement worth $22 million in cash and $14 million in vouchers after three years of litigation. *Id.* at 15. With all due respect, the results obtained here are far superior to those obtained in *Lumber Liquidators*, and the substantial amount of work Class Counsel performed is reflected in their supporting declarations.

Finally, **Ms. Wright** objects to the requests for service awards to the Named Plaintiffs because there allegedly is no factual basis for those awards. *Id.* at 15. She again fails to acknowledge the declarations submitted by each of the Named Plaintiffs explaining the extensive work each performed on behalf of the Class, including the production of highly sensitive medical and financial information. ECF Nos. 138-40. **Ms. Wright** also suggests these service awards *might be* an impermissible "incentive award." *Id.* But service awards are common in class action settlements to acknowledge and compensate the representatives for their work and attention to the case and the contribution of those substantial efforts to the benefits obtained for the Class. *See e.g.*, *Berry*, 807 F.3d at 6113 (approving "incentive awards" to the class representatives and noting, "incentive awards are intended to compensate class representatives for work done on behalf of the

class, to make up for financial or reputational risk undertaken in bringing the action" and are "fairly typical in class action cases"). The Named Plaintiffs' work on this case has never been contingent on any payments, and they undertook this litigation with considerable personal effort. Their service awards have been earned and are warranted.

> **6.      Subclasses Are Unnecessary Where Every Class Member Stands in an Identical Position with Respect to Genworth's Alleged Nondisclosures and Will Receive Individually Tailored Benefits Under the Settlement**

This Settlement goes to great lengths to ensure the interests of ***all*** of Genworth's Choice 1 policyholders are represented equitably relative to one another. The fact that Class members with the same policy form have different premiums or different benefit packages does not create interclass conflicts. In fact, the Settlement ***embraces*** these differences by offering a number of Special Election Options to choose from after each Class member receives the Disclosures. Those Options are tailored to meet the Class members where they each are in light of their current health, current financial condition, confidence in Genworth as a company, and assessment of their future insurance needs. And the fact that the Settlement's benefits are not capped or otherwise affected in any way by any other Class member's election prevents ***any*** conflicts that may have otherwise arisen. Nevertheless, a few objectors, including the **Jacobs** [ECF No. 159], **Mr. Ferrara** [ECF No. 170], the **Agulnicks** [ECF No. 162], and **Mr. Goldberg** [ECF No. 156] suggest that subclasses are needed.

The **Jacobs** believe there should be a separate sub-class for what they call "gold class" policies that have unlimited benefit periods and are protected by 5% inflation riders. ECF No. 159 at 1. This objection is really based on the **Jacobs'** desire ***not*** to change ***any*** of their policy terms in light of the Disclosures, but still obtain some monetary benefits or lower premiums. They also seem to presume that ***all*** other so-called "gold class" members will not elect ***any*** of the Special

Election Options that would afford them Cash Damages Payments or enhanced paid-up benefits. Similarly, **Ralph Ferrara** objects that a special subclass should be created for him that would be limited to those who (a) are 75 years of age as of June 30, 2020; (b) have been insured under a Choice 1 policy for at least 15 years; (c) have policies with unlimited benefit terms and have 5% compound interest riders; and (d) otherwise meet the Class definition.  ECF No. 170 at 5-6.  He too wants this subclass created to pursue some form of relief that is different from the many forms already negotiated and preliminarily approved and, in any event, does not match the claims alleged in this case.

There is no basis to create a sub-class for the **Jacobs** or **Mr. Ferrara**.  Everyone in the Class has a Choice 1 Genworth LTC policy.  Every one of those policies has been and is subject to the rates and rate increases approved by their respective state's insurance regulator.  All Class members were allegedly deprived of the same allegedly material information by Genworth in connection with their rate increases.   The Settlement affords all Class members the new Disclosures to cure those alleged deficiencies, and then offers them a ***menu*** of up to six options to keep their benefits where they are or to modify their contracts in light of those Disclosures.  For those who choose to modify their contracts in the Settlement, there are Cash Damages Payments or enhanced paid-up benefits that will be paid by Genworth.  Class Counsel have no doubt that some, or even many, "gold class" members will elect these Options.  What both the **Jacobs** and **Mr. Ferrara** want for their "subclass" is not only different relief but relief that could not be obtained in this case:  keeping the same level of benefits while reducing premiums or eliminating future rate increases; or creating entirely new policies with rates they prefer.  There is no point in creating subclasses to pursue complaints and relief this case could not address or provide.

To the extent that **Mr. Ferrara** believes the Class does not meet the predominance requirement, he is also mistaken.  He incorrectly argues that "the relief offered to the class presumes a degree of homogeneity of interest among all class members[,]" and he asserts the materiality of the alleged misstatements is not common to the Class.  *Id.* at 11.  But the Disclosures are equally material to all Class members, as they will change the total mix of information for each Class member alike when considering how to assess their Special Election Options in the Settlement, or how to deal with future rate increases.  The fact that Class members will choose different Options based on their individual long-term care insurance needs and the affordability of the premiums does not make the ***Disclosures*** more or less material to one policyholder versus another, even though their response to that information may be different.  That is why materiality is measured objectively, while damages are calculated more subjectively.[11] [12]

The **Agulnicks** also aver that subclasses are warranted, but unlike the **Jacobs** and **Mr. Ferrara**, they do not actually propose any particular subclasses.  They object generally that the Settlement creates unnamed conflicts between members of the Class.  *Id.* at 8-9.  As noted above,

---

[11]   *See e.g.*, *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 242 (N.D. Cal. 2014) ("materiality is judged by an objective standard rather than any understandings specific to the individual consumer"); Restatement (Second) of Contracts §162(2) (A misrepresentation is "material if it would be likely to induce a reasonable person to manifest his [or her] assent" to enter a contract); Restatement (Second) of Torts §538. (a "matter is material if…a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction") *Cf Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) ("Because materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class Connecticut Retirement would represent").

[12]   **Mr. Ferrara** also complains that Class Counsel did not honor his request to produce to him all the discovery produced by Genworth in this case.  But he does not explain how Class Counsel's refusal to provide him with all of the discovery obtained and reviewed by Cass Counsel over many months in this litigation bears on the fairness, reasonableness, or adequacy of this Settlement.  Nor does he even try to explain what information *might* have been relevant to his objections in the first place.

because the benefits of this Settlement are available to all Class members and are not monetarily capped, there are no intra-class conflicts.  The **Agulnicks** point to the chart of the sixty Choice 1 policy forms included in the Class and the various Special Election options to suggest there are conflicts on that basis alone – but with no support or evidence.  *Id.* at 8.  They also baselessly assert that there are conflicts between those who have already elected non-forfeiture options and those who have not; those who are in fully paid-up status, those who have lapsed, and those who "will chose not to continue their policies."  *Id*.  But they do not articulate ***what*** those conflicts would be. They also believe Pennsylvania Class members should be entitled to greater relief resulting from the Pennsylvania UTPCPL claims, and that, too, creates a conflict.  *Id*.

Simply pointing to differences among the Class members' policies is not the same as identifying actual conflicts.  *See e.g.*, *Gunnells v. Healthplan Servs., Inc*., 348 F.3d 417, 430 (4th Cir. 2003).  ("To defeat the adequacy requirement of Rule 23, a conflict "must be more than merely speculative or hypothetical."); *Berrien v. New Raintree Resorts Int'l, LLC*, 276 F.R.D. 355, 359 (N.D. Cal. 2011) (collecting cases, finding no actual conflicts stating, "the mere potential for a conflict of interest is not sufficient to defeat class certification; the conflict must be actual, not hypothetical").  In any event, none of the differences the **Agulnicks** purport to identify presents a conflict here.

First, the list of 60 Choice 1 policy forms only verifies which policies are included in the Settlement Class, as there are multiple Genworth long-term care policy forms that have been issued in each state, and not all of those are Choice 1 policies.  While there are many different "form" numbers for Choice 1 policies (largely connected to the state of issuance), all Settlement Class members have Genworth Choice 1 policies.

Second, the Settlement offers multiple Special Election Options to *avoid* potential conflicts. As stated several times herein, every Class member will get the Disclosures that were the crux of this lawsuit. Every Class member who wants to make changes to their policies in light of these Disclosures, including to lower their premiums, will be afforded the ability to do so and *also* receive either (a) Cash Damages or (b) enhanced paid-up benefits. Every Class member who wants to keep their current benefits even after receiving additional Disclosures will be entitled to do so. ***That is what this lawsuit has always been about***.

As for Pennsylvania insureds, the UTPCPL claims could have afforded attorney's fees and costs as well as treble damages. But the Settlement already requires Genworth to pay all costs and fees separately from the Class relief. To that extent, the Pennsylvania Class members are treated equitably when compared to all other Class members. Moreover, the UTPCPL claim was by far the hardest claim to certify as a class claim. Due to the challenges faced in pursuing that claim on a classwide basis, it was not worth "more" than the claims that were settled. Even if it were, a class action settlement need not provide relief for every single remedy that class members *might* have obtained. *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009) (rejecting objection to class action settlement on the basis that the settlement did not consider treble damages because "doing so would presuppose that plaintiffs prevail at the end of trial (thus undercutting the point of a negotiated resolution where defendants do not admit liability," such relief " would be speculative," and "courts do not traditionally factor treble damages into the calculus for determining a reasonable settlement value").

The **Agulnicks** also complain that the Settlement does not offer any options for a Class member who "chooses not to do business with Defendants and wants to walk away completely from their current policies. Yet, the proposed Settlement would have them release their claims."

*Id.* at 6.  In fact, the Settlement *does* offer two excellent benefits for Class members who no longer wish to pay premiums on their policy.  Either they can get *double* paid-up benefits, or they can get a payment equal to the premiums they paid Genworth between 2016 and 2019 – and still maintain a paid-up benefit equal to the balance of premiums paid.  This is more than adequate and, indeed, excellent compensation in exchange for a release.

Finally, **Mr. Goldberg** objected to the Settlement claiming it "DOES NOT DEFINE HOW IT WILL TAKE INTO ACCOUNT THE LENGTH OF TIME EACH POLICY HOLDER HAS PAID PREMIUMS AND TOTAL AMOUNT PAID, WHICH DIRECTLY EFFECTS EACH INSURED POLICY HOLDER DIFFERENTLY INCLUDING BUT NOT LIMITED TO THE SCOPE OF COVERAGE."  ECF No. 156.  Although it is not entirely clear to Class Counsel what Mr. Sanford's complaint is, this could be construed as a suggestion that subclasses were warranted.  If that is the case, the Settlement *does* take into consideration each Class member's individual circumstances, including policy coverage options and premiums paid, in several ways.  For example, the reduced benefit Options take into account each Class member's individual benefit levels and will offer options to reduce the daily benefit maximums, benefit periods, and/or inflation protections in accord with each policy's current terms.  Moreover, the Cash Damages Payments for reduced benefit options are calculated as *four times* the amount of the reduction in premium and are thus tied directly to the amount of premiums each Class member pays (and can reduce through the Settlement).  And the paid-up benefits either *double* the paid-up value of each policy (meaning it directly adjusts for the amount of premiums paid over the entire length of the policy) or pay Cash Damages equal to 100% of the premiums paid between 2016 and 2019– again directly reflecting the amount of premiums each Class member has paid.  Mr. Sanford's objection is

unfounded.  In all, there are simply no conflicts among the Class that merit the creation of subclasses, or that should prevent the final approval of this Settlement.

### 7.      Other Objections

Several Class members submitted objections that do not fit into the above categories.  They are each addressed separately herein.[13]

**Cheryl Runser** states that she has already elected a non-forfeiture option and has a paid-up benefit of $32,948.52.  ECF No. 148.  She objected to the Settlement averring that Genworth should be required to refund ***all*** of her premiums with interest.  *Id.*  Likewise, objector **Alan Kurtz** states that he too already elected a non-forfeiture option.  ECF No. 154 at 1.  And like **Ms. Runser**, he wants an option added to the Settlement that would allow him to "surrender" his policy for a full refund of premiums paid.  *Id.*  He also avers "the entire package of settlement options should be reevaluated in light of the disclosed plans for significant future rate increases and GLIC's financial weakness."  *Id.* at 2.  While Class Counsel can appreciate these Class members' desire for full refunds of prior premiums paid, it is not relief that is reasonable given the claims advanced in this lawsuit, for the reasons stated above.

---

[13]   **Edward Petruzzello** and **Dwight and Sandra Smith** sent their "objections" to the Claims Administrator, but not to the Court.  *See* Penny Decl., Ex. A.  The Prel. App. Order [ECF. No 98, ¶21] and the Notice clearly explained that any objections to the Settlement must be sent to the Claims Administrator ***and*** filed with the Court.  Neither of these objections complies with that requirement and thus both can be overruled on that basis alone.  Even if the Court entertains the objections, neither has merit.  **Mr. Petruzzello** objects that: (1) the Settlement does not include "financial terms"; (2) there are "[n]o monetary effects delineated for changing policy terms;" (3) there are "[n]o financial disclosures as to the effect on daily care reimbursements if premiums left unchanged; (4) there are "[n]o financial disclosures with regard to termination of cost-of-living allowances"; and (5) the "[f]ailure to include all parties in [the] initial lawsuit and failure to provide all parties with up front payments of $25,000."  These objections have either been addressed above, call for disclosures not related to this suit or Settlement, or are founded on a misapprehension of how class action lawsuits operate, including their efficiencies.  The **Smiths'** objection appears to be a complaint about rate increases themselves.  They stated, "Count me in on the objection about raising the premiums.  Don't like it a 'bit.'"  *Id.*  The Smiths have not raised any specific objection about the Settlement itself.

As for their specific individual circumstances, if the Settlement is approved, **Ms. Runser** will have the option of receiving a Cash Damages payment of $1,000.00, or to have the value of her paid-up policy benefit ***doubled*** to $65,897.04.  **Mr. Kurtz** also will have those options.  This is an excellent result for a claim based on a lack of adequate disclosures, especially considering that these Class members, like others who previously have elected a non-forfeiture option, ***already*** decided based on the information provided to date to stop paying their premiums.  If **Ms. Runser** and **Mr. Kurtz** are not satisfied with the relief Class Counsel obtained for them, then the better course of action would have been to exclude themselves from this Settlement and bring their own claims against Genworth.  They both had that option but apparently rejected it.

**George and Jeanne Brehmer** ask the Court to "[r]eevalute the Settlement Agreement in light of the changes in the financial conditions that have occurred since January 15, 2020 with the interests of the Settlement Class in mind."  ECF No. at  172 at 4.  The **Brehmers** contend that the financial condition of Genworth has changed since the COVID-19 pandemic, but they do not explain how they think it has changed.  Moreover, this Court has correctly noted that getting the relief this Settlement provides to policyholders "as promptly as possible" is the right result in light of current conditions.  *See* ECF No. 151 at 8.

**William Van Dam Jr.** objects suggesting that the Settlement options should also include a new option that would expand the elimination period to 12-24 months.  ECF No. 171 at 1-2. (The elimination period is like a deductible, during which Genworth is not obligated to pay benefits.)  While expanding the elimination period may be appealing to **Mr. Van Dam**, it is likely considerably less appealing to others– particularly since the average claim duration is under 3 years.  Moreover, unlike other Special Election Options offered in the Settlement, **Mr. Van Dam's** proposed option is not based on ones previously used in all states.  In the end, this Settlement is a

compromise, but it includes a ***robust*** set of options created to provide options for ***all*** policyholders. This objection does not taint an otherwise fair and reasonable settlement for the Class.

**Thomas and Pamela Spitznagle** ask the Court to "insure that the final, court-approved settlement agreement includes financial consideration not just for the premiums that policyholders have paid over the life of their long term care insurance policies but also includes financial consideration for…[t]he loss of some or all of the accumulated potential lifetime long term care insurance benefits (in our case amounting to over $800,000"),[14] and "[t]he damage to the financial plans and financial well being of policyholders[.]"   ECF No. 169.  While some Class members have been forced to reduce their coverage in order to afford their premiums following rate increases by Genworth, those reduced benefits are not something this litigation could address.  The issue of what premiums can be charged for different benefit designs is the province of state regulators and not this lawsuit.

Finally, **James Heckmann** opted-out of the Settlement, yet purported to file an "objection" too.  ECF No. 158.  Since he is not a Class member, **Mr. Heckmann** does not have standing to object.  Recognizing this, he purports to offer his objections as an "*amicus curiae*."  *Id*. at ¶1.  To the extent the Court would entertain his objections, they have already been addressed.  First, **Mr. Heckmann** complains that the Notice was unclear and that he was only able to understand it after finding the Complaint on PACER.  *Id*. at ¶3.  As explained above, the Notice was clear.  Moreover, the Third Amended Complaint is the first document available on the settlement website.  Next, **Mr. Heckmann** believes that "except for compelling Genworth to be more transparent about future planned premium increases, it appears there is no benefit to any particular policyholder as

---

[14]   Class Counsel assumes this is a reference to reductions in benefits the **Spitznagles** have taken in response to past rate increases.

a consequence of this Proposed Settlement Agreement that isn't already available to policyholders."  *Id*. at ¶4.  That objection is addressed above.  Finally, while **Mr. Heckmann** agrees that the Disclosures "[are] a worthy resolution and some attorney fee award relating to that injunctive relief set forth in Section 3(a) is warranted, provided that the fees are paid by Defendants given that future disclosures apply to all Genworth policy holders and not just to the class members," he does not think there is any substantiation of the connection between the fees sought and the effort expended.  *Id*. at ¶6.  That objection has also been addressed above.

### C. The California Department of Insurance's Statement Does Not Undermine Approval of the Settlement

In response to the CAFA Notice, the "CDI" sent a "statement" letter to all Parties and the Court dated June 12, 2020.[15]  The CDI summed up its statement as follows:

> To its credit, the proposed settlement provides disclosures which will help class members to make informed decisions about their policies.  It also appears to include cash payments that would be sufficient to return additional premiums paid by class members who would have been inclined to restructure their policy if fully informed of Genworth's intentions.  And the Department is supportive of options that would allow long-term care policyholders to make informed decisions about their coverage and to adjust policy coverage levels.  However, class members should not be asked to take reductions to their policy benefits that are disproportionate to the proposed cost-savings and settlement compensation.[16]

CDI Statement at 7.  The CDI is concerned that "Plaintiffs do not provide an assessment of the value of the benefits that class members must forfeit pursuant to any Special Election Option, and do not weigh the value of those forfeited benefits against the value of the reductions in premium, damages payments, or enhanced paid-up benefits that class members would receive."  Ultimately,

---

[15]   The CDI clarified in its letter that it "does not assert standing in this matter, and does not maintain that this submission is a Class-Member Objection under Federal Rule of Procedure 23(e)(5)."  CDI Statement at 1.

[16]   It is notable that the largest insurance regulator in the Country apparently agrees that the Disclosures and the Cash Damages are important and sufficient – in contrast to several objectors.

"the [CDI] is concerned that the proposed settlement may induce policyholders to forfeit policy benefits that are worth substantially more than the compensation they would receive and, conversely, that the settlement could provide Genworth with a windfall if reductions to future claim and reserve obligations greatly exceed damages paid." *Id.* at 1-2.

Class Counsel appreciates these concerns, and as the Settlement expressly contemplates, Genworth will be engaging with the CDI in its regulatory capacity to address any questions about the Settlement, including the Special Election Options being provided to California's Settlement Class members.

Initially, it is important to underscore that the reduced benefit and paid-up options offered in the Settlement are the types of options that are routinely offered and approved by state insurance commissioners nationwide in connection with ordinary course rate increases.[17]  Class Counsel and Genworth worked within this universe of options to ensure that the underpinnings of the Special Election Options likewise will be sound and acceptable to regulators.

It also is important to recognize that prior rate increase letters from Genworth describing "ordinary course" options did *not* include the information suggested by the CDI about the aggregate value of the difference in benefits, or whether the policyholder was forfeiting policy benefits that were substantially more "valuable" than the new reduced benefits.  Those prior letters to policyholders each set forth reduced benefit options in a table that showed the new benefits and the resulting new premiums for each option.

---

[17]  As noted throughout, the Special Election Options actually provide enhancements over the premium and benefit reduction tools available to policyholders in the "ordinary course," including the Cash Damages payments and doubled paid-up benefits.

The purpose of this lawsuit was not to provide the types of "equivalency" disclosures that the CDI suggests should be provided.[18]  Instead, the purpose of the suit was to afford more robust disclosures about future rate increases, and then afford Class members the opportunity to make new elections in light of the additional information.  A primary – and likely *the* primary – motivation for Class members to elect reduced benefit options will be to reduce or eliminate their premium payments, whether because of individual financial or health circumstances, confidence in Genworth, or other reasons.  Policyholders who have made those decisions in the "ordinary course" traded substantial policy coverage "value" in exchange for lower or level premiums, and Class members will have the opportunity to do the same.  Class members will do so not by weighing some assessment of the "value" of reduced benefits versus the "value" of current benefits, but rather by weighing the reduced benefits *themselves* against the *new premiums*.  And while Class members previously had to make these difficult decisions without the benefit of the Disclosures obtained here, and without the added benefit of Cash Damages payments or enhanced paid-up benefits, now they do.  *Those* are the benefits of the Settlement that, respectfully, should be the focus of the Court's evaluation of its adequacy and fairness.

Finally, Class Counsel note that Genworth cannot predict how the Settlement will affect claims liabilities, reserves, or loss ratios. Any financial impact will depend on how many Class members select a Special Election Option, the types of Special Election Options selected, as well as other contingencies. However, to the extent there is a financial benefit under the Settlement, it would not be a "windfall" to Genworth. Rather, any realized financial benefit under the settlement would only be used to increase the Genworth insurance company's statutory capital, for the

---

[18]   As far as Class Counsel is aware, no state insurance regulator, including CDI, has ever required such equivalency disclosures.

prudent management of its in-force block, to satisfy its policyholder obligations, or for a combination of these purposes. Such a benefit, too, would inure to all Class members.

## III.    CONCLUSION

For the foregoing reasons, Named Plaintiffs and Class Counsel respectfully request that the Court overrule each of the objections to the Settlement and, as stated in Plaintiffs' Motion for Final Approval, grant final approval of the Settlement.

DATED: June 26, 2020                              PHELAN PETTY PLC


                                                  /s/ Jonathan M. Petty
                                                  MICHAEL G. PHELAN (VSB No. 29725)
                                                  JONATHAN M. PETTY (VSB No. 43100)
                                                  6641 West Broad Street, Suite 406
                                                  Richmond, VA  23230
                                                  Telephone:  804/980-7100
                                                  804/767-4601 (fax)
                                                  mphelan@phelanpetty.com
                                                  jpetty@phelanpetty.com

                                                  GOLDMAN SCARLATO & PENNY, P.C.
                                                  BRIAN DOUGLAS PENNY
                                                  Eight Tower Bridge, Suite 1025
                                                  161 Washington Street
                                                  Conshohocken, PA  19428
                                                  Telephone:  484/342-0700
                                                  484/342-0701 (fax)
                                                  penny@lawgsp.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON (*pro hac vice*)
CHRISTOPHER C. GOLD (*pro hac vice*)
BRADLEY M. BEALL (*pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
cgold@rgrdlaw.com
bbeall@rgrdlaw.com

BERGER MONTAGUE PC
SHANON J. CARSON
GLEN L. ABRAMSON
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone:  215/875-3000
215/875-4604 (fax)
scarson@bm.net
gabramson@bm.net

*Class Counsel*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 26, 2020, I filed the foregoing pleading or paper through the

Court's CM/ECF system, which sent a notice of electronic filing to all registered users.


/s/ Jonathan M. Petty
Jonathan M. Petty (VSB No. 43100)

PHELAN PETTY, PLC
3315 West Broad Street
Richmond, VA  23230
Telephone:  804/980-7100
804/767-4601 (fax)
jpetty@phelanpetty.com

*Counsel for Plaintiffs*