1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                    RICHMOND DIVISION

4

5    ---------------------------------------
                                          :
6    JEROME SKOCHIN, individually, and    :
     on behalf of all others similarly    :   Civil Action No.
7    situated                             :   3:19CV49
                                          :
8    vs.                                  :
                                          :   July 14, 2020
9    GENWORTH LIFE INSURANCE COMPANY      :
                                          :
10   ---------------------------------------

11

12         COMPLETE TRANSCRIPT OF THE MOTIONS HEARING

13         BEFORE THE HONORABLE ROBERT E. PAYNE

14              UNITED STATES DISTRICT JUDGE

15
     APPEARANCES:
16
     Brian D. Penny, Esquire
17   Goldman Scarlato & Penny, PC
     Eight Tower Bridge
18   161 Washington Avenue - Suite 1025
     Conshohocken, Pennsylvania  19428
19                                            **VOLUME  2**
     Jonathan M. Petty, Esquire
20   Phelan Petty, PLC
     6641 West Broad Street
21   Suite 406
     Richmond, Virginia  23230
22

23

24              Peppy Peterson, RPR
                Official Court Reporter
25            United States District Court

```
 1    APPEARANCES:  (cont'g)

 2    Stuart A. Davidson, Esquire
      Robbins, Geller, Rudman & Dowd, LLP
 3    120 East Palmetto Park Road
      Suite 500
 4    Boca Raton, Florida  33432
      Counsel for the plaintiffs
 5

 6
      Michael J. Duvall, Esquire
 7    Dentons US, LLP
      601 S. Figueroa Street
 8    Suite 2500
      Los Angeles, California  90017
 9
      Drew W. Marrocco, Esquire
10    Dentons US, LLP
      1900 K Street NW
11    Washington, D.C.  20006

12    Catharine Luo, Esquire
      Dentons US, LLP
13    1221 Avenue of the Americas
      New York, New York  10020
14
      Heidi E. Siegmund, Esquire
15    Brian E. Pumphrey, Esquire
      McGuireWoods, LLP
16    Gateway Plaza
      800 East Canal Street
17    Richmond, Virginia  23219
      Counsel for the defendant
18

19
      Jeffrey A. Dailey, Esquire
20    Dailey, LLP
      1650 Market Street
21    Suite 3600
      Philadelphia, Pennsylvania  19063
22
      Elizabeth S. Turner, Esquire
23    O'Hagan Meyer, PLLC
      411 East Franklin Street - Suite 500
24    Richmond, Virginia  23219
      Counsel for interested parties Ronald M. Agulnick and Toby
25    H. Agulnick
```

1               P R O C E E D I N G S

2

3          THE CLERK:  Case number 3:19CV49, Jerome Skochin, et

4    al., versus Genworth Life Insurance Company, et al.  The

5    plaintiffs are represented by Brian Penny, Jonathan Petty, and

6    Stuart Davidson.  The defendants are represented by Michael

7    Duvall, Catharine Luo, and Heidi Siegmund.  The interested

8    parties Ronald M. Agulnick and Toby H. Agulnick are represented

9    by Jeffrey Dailey and Elizabeth Turner.  Are counsel ready to

10   proceed?

11          MR. PENNY:  We are, Your Honor.

12          MR. DUVALL:  Yes.

13          THE COURT:  Who is on the telephone, on the Zoom?  Is

14   anybody on?

15          THE CLERK:  Yes, Your Honor.

16          THE COURT:  We had a number of people who were on

17   before.

18          MR. FERRARA:  Your Honor, this is Ralph Ferrara.  I'm

19   participating by telephone only.  I'm an objector.

20          THE COURT:  I have the following:  Ann Ashton who is

21   a colleague of one of the objectors.  Who is that?

22          THE CLERK:  Ralph Ferrara, sir.

23          THE COURT:  Ann Ashton is a colleague of Ralph

24   Ferrara; is that right?

25          MS. ASHTON:  Yes, sir.

1                    THE COURT:  Are you a lawyer or friend or what?

2                    MS. ASHTON:  I'm his law partner.

3                    THE COURT:  Okay.  Stacey Klein, K-l-e-i-n.  Are you

4      here?

5                    THE CLERK:  Ms. Klein is connected, Judge, but hasn't

6      been able to confirm that she's able to hear me.

7                    THE COURT:  All right.  Janice Wynn, W-y-n-n, are you

8      here?  We don't have her?

9                    MS. WYNN:  Yes, sir, I'm here.

10                    THE COURT:  Did you file an objection?

11                    MS. WYNN:  No, sir.

12                    THE COURT:  And your interest is what?

13                    MS. WYNN:  Well, frankly, I was late to find out

14     about the class action.  I have a long-term care policy that

15     meets the criteria for the suit, and I had moved from Texas to

16     Florida, so I'm just playing catch-up.

17                    THE COURT:  You are just interested at this point;

18     you don't have any objection.

19                    MS. WYNN:  No, sir.

20                    THE COURT:  All right, thank you.  Annie -- is it

21     L-a-i-s-o-n?

22                    MS. LARSON:  Yes, Your Honor, I'm Annie Larson.  I'm

23     an in-house counsel at Genworth Financial.

24                    THE COURT:  Annie Larson, L-a-r-s-o-n, all right.  Is

25     it -- is the last name Y-b-a-r-r-a or B-a-r-r-a?

1           THE CLERK:  Y-b-a-r-r-a, Mr. Ybarra.

2           MR. YBARRA:  Yes, it's Y-b-a-r-r-a.

3           THE COURT:  Did you file an objection?

4           MR. YBARRA:  I did not.  I'm a class member.  I'm

5    interested.

6           THE COURT:  All right, sir.  Lathan Crain, C-r-a-i-n,

7    are you here?

8           MS. CRAIN:  Yes, I'm just a policyholder.  I have no

9    objections.

10          THE COURT:  All right, thank you, ma'am.  Margaret

11   Mahon, M-a-h-o-n?  Is Margaret Mahon here?

12          MS. MAHON:  Yes, Your Honor.  I'm a member, and I'm

13   just here to listen.

14          THE COURT:  Thank you.  Sean Bell, counsel for

15   Genworth.  Are you in-house counsel or with a law firm?

16          MR. BELL:  Good morning, Your Honor.  I'm in-house

17   counsel for Genworth.

18          THE COURT:  Sherri, S-h-e-r-r-i, Snider, S-n-i-d-e-r.

19   Ms. Snider, are you here?

20          MS. SNIDER:  I am.

21          THE COURT:  I can hardly hear you.

22          MS. SNIDER:  Hello.  Can you hear me?

23          THE COURT:  Very vaguely.

24          MS. SNIDER:  I'm a class member.  I'm just here to

25   listen.

1           THE COURT:  Thank you, ma'am.  Mr. Luck is an

2     objector.  Mr. Abramson, Glen Abramson, counsel for the

3     plaintiff.  What firm are you with?

4           MR. ABRAMSON:  Good morning, Your Honor.  I'm with

5     Berger Montague.  I'm co-counsel with Mr. Penny, Mr. Petty, and

6     Mr. Davidson.

7           THE COURT:  And you are not planning to speak.

8           MR. ABRAMSON:  That's correct, Your Honor.  I'm just

9     listening in.

10           THE COURT:  I have one here, Ms. Brown, called Alan

11     with no name at the end.

12           THE CLERK:  Judge, I haven't been able to connect

13     with Alan.

14           THE COURT:  Is there somebody named Alan on the line

15     who can talk with us?

16           THE CLERK:  I've asked him to unmute, but I have not

17     been able to hear him.

18           THE COURT:  All right.  Ryan --

19           MR. DELATORRE:  Yes, Your Honor.

20           THE COURT:  Who are you?

21           MR. DELATORRE:  I'm an attorney with the California

22     Department of Insurance.  I'm here to listen as an interested

23     observer.

24           THE COURT:  And what is your name?

25           MR. DELATORRE:  Ryan Delatorre.

```
 1              THE COURT:  All right.  Is this Louis Brown?
 2              THE CLERK:  Louis Brownstone.
 3              THE COURT:  Mr. Louis Brownstone, are you here?
 4              MR. BROWNSTONE:  I'm an interested party.  I'm a
 5    broker in California with 3,000 Genworth policyholders affected
 6    by this suit.
 7              THE COURT:  And you have no objections?
 8              MR. BROWNSTONE:  No objection.
 9              THE COURT:  All right, thank you.  Did you ever
10    determine Alan and what his last name is?
11              THE CLERK:  No, sir.
12              MR. CHIBNIK:  Your Honor, can you hear me?
13              THE COURT:  Who is you?
14              MR. CHIBNIK:  I'm sorry.  I am Alan.  My last name is
15    Chibnik.  I'm a policyholder with no objection.
16              THE COURT:  How do you spell your last name?
17              MR. CHIBNIK:  C-h-i-b as in boy, n as in Nancy, i-k.
18              THE COURT:  All right.  And does that leave us
19    without Ms. Wynn, or were you able to connect with her?
20              THE CLERK:  Yes, I was able to speak with her prior.
21    I'm asking her to unmute now.
22              THE COURT:  Ms. Wynn?
23              MS. WYNN:  Yes, sir, I'm here.
24              THE COURT:  Do you have an objection, Ms. Wynn?
25              MS. WYNN:  No, I do not.
```

1              THE COURT:  All right.  Is there anybody on the phone

2    whose name I have not called?

3              THE CLERK:  Your Honor --

4              MR. JACOBS:  Your Honor, this is Saul Jacobs.  I just

5    got on.  I was never sent the new invitation, and so it took

6    awhile, but I am here, and I would like -- we said we would

7    continue my objection today.  Thank you.

8              THE COURT:  The plaintiff is making comments on all

9    of the objections.  Is there anybody else on the phone whose

10   name I have not called?

11             MR. DAVIDSON:  Yes, Your Honor, good morning.  This

12   is Stuart Davidson.  I'm Mr. Penny's co-counsel.  I was in

13   person with Your Honor last week but couldn't make the trip

14   this week, so I'm appearing by Zoom.

15             THE COURT:  You are counsel for the plaintiff?

16             MR. DAVIDSON:  Yes, sir.

17             THE COURT:  And you'll not be speaking.

18             MR. DAVIDSON:  No, sir.

19             THE COURT:  Is there anyone else?  All right.  So we

20   have the same basic situation as we had last week, but we have

21   more people who are class members listening.  I'm not -- I

22   don't think I've told this to class members because there

23   weren't any class members last time that I recall who did not

24   object, but if you wish -- if you're a class member and you

25   wish to say something, you are entitled to say something if you

1   so desire, and you need to let Ms. Brown know, and I will call

2   on you, or if, in fact, you are not being called on and you can

3   reach us, then politely intervene and give your name and say

4   you'd like to say something, and we'll get you on the roster.

5           As of right now, are any of the class members, Ms.

6   Wynn, Mr. Ybarra, Mr. Craine, Ms. Mahon, Ms. Snider, Mr.

7   Chibnik, Louis Brownstone, are there any of you at this time

8   who know you wish to say anything?  If so, give me your name.

9           There being no request, then the floor remains open

10  to you if you would so desire based on what you hear as we

11  proceed.

12          All right, I believe that when we adjourned, Mr.

13  Penny was about to tell me about the simple elegance of

14  something, and you were responding to whose objection at the

15  time you were talking, Mr. Penny?

16          MR. PENNY:  Good morning, Your Honor.  Brian Penny on

17  behalf of the plaintiffs in the class.  I believe as we were

18  adjourning on Friday, I was about to tell you what the

19  beautiful thing about the settlement was for Mr. Jacobs.

20          THE COURT:  Jacobs or Ferrara?  I have you talking

21  after my comments, my notes on Ferrara, but I don't remember.

22  Are you specifically dealing with Mr. Jacobs' objection now?

23          MR. PENNY:  I was when I said that statement, and I

24  can -- if you'd like, I can try to pick up right where we left

25  off, but here's where I thought I would start the presentation

1    today:  I wanted to begin --

2              THE COURT:  I want you to deal with the objectors'

3    objections, and I want you to address the question of

4    predominance, and I want you to address the question of why we

5    can't let the insurance -- go to the regulators and come back

6    after you go to the regulators and we know if they're going to

7    try to change anything in the settlement proposal.

8              So I'll give you the floor to decide it, but -- how

9    you wish to proceed, but you tell me what you are talking

10   about, what topics, so I make sure that I am focusing on what

11   you are talking about.

12             MR. PENNY:  Absolutely, and just to lay out -- the

13   way I wanted to proceed this morning, Your Honor, was to talk

14   first about the aggregate value of the settlement because I

15   think it's important to set the table and let the Court know

16   exactly what the financial and monetary benefits are to the

17   class, because I think that's an important perspective to have

18   as we go back and address the objections.

19             Then I did want to then take on each of the objectors

20   in order, Mr. Jacobs, Mr. Ferrara, and then the Agulnicks'

21   objection and address everything that was raised after Friday's

22   hearing that hasn't been addressed yet.  If that's okay with

23   Your Honor, I'll proceed that way.  If you prefer a different

24   organization, I'll be happy --

25             THE COURT:  That's fine.  It's your show.  I'm happy

1  for you to proceed in that way, but you just need to be telling

2  me what you are doing, and then in addition to that, I'll need

3  to hear if they have -- who has the burden on an objection?  Do

4  you have -- once it's raised, do you have the burden of proving

5  that there's no merit to it?

6          MR. PENNY:  The objector has -- Your Honor, the

7  objector has the burden to establish their objection including

8  to establish the factual basis and predicate that underlies it.

9  After that, it's kind of open game.  It's not a shifting of

10 burdens.

11         And that is actually something that we will address

12 with each of the objectors, but I intend to make it very clear.

13 As I'm transitioning to dealing with an objector, I will make

14 that very clear for Your Honor.

15         THE COURT:  I guess somebody has told you you need to

16 do that with me so I can keep track of things.

17         MR. PENNY:  So on the value of the settlement, I

18 think before recent events, it was my opinion that the best way

19 to evaluate the value of the settlement was to look at an

20 individual class member's circumstance and compare where they

21 would be before the settlement to where they are after the

22 settlement and to what the claims were that they alleged to

23 what they're getting in the settlement.

24         With the benefit of some more hindsight now, I think

25 it's actually more important to show to the Court what the

1    aggregate monetary value is for the entire class, because I

2    think that's a useful perspective.  And the way I'm going to do

3    that is we're going to go through each of the special election

4    options that have cash damages payments, and I'm going to tell

5    Your Honor what the average cash damage payment will be for

6    each option.

7              I will also tell Your Honor what the average premium

8    reduction will be for each of those options, and then we will

9    look at Genworth's historical data on what rate class members

10   have elected similar options in the past and use that to inform

11   the calculation of the aggregate monetary damages that will be

12   paid out in the settlement.

13             Then I will address the very valuable enhanced

14   paid-up benefits that come with one of the options of the

15   settlement.  So we'll go through and look at the monetary and

16   enhanced coverage benefits for each option, and then we'll look

17   at them as a whole.

18             THE COURT:  That's really not the way it's been done

19   in the papers.

20             MR. PENNY:  That's right, Your Honor.

21             THE COURT:  So this is entirely new.

22             MR. PENNY:  I'm going to show you --

23             THE COURT:  This is an entirely new way of

24   approaching the value of the settlement; is that right?

25             MR. PENNY:  Not entirely new, Your Honor, because I'm

1    going to show you how we got to what we call the conservative

2    estimate of $100 million in cash damages payments to the class.

3              THE COURT:  Right, and that is a conclusion that

4    appears in your papers.

5              MR. PENNY:  Yes, Your Honor.

6              THE COURT:  To which somebody objected.  I don't

7    remember who it was.

8              MR. PENNY:  It was the Agulnicks, Your Honor.

9              THE COURT:  So now you're going to tell me all that,

10   and I don't have any evidence to support it, I don't have a

11   brief that deals with it, and the objectors don't have any way

12   of testing it.

13             So I guess my original -- my question is, do we need

14   to adjourn the hearing, allow you to file a supplemental paper,

15   and let everybody get on board with the same information so

16   that the judgments can be made in perspective of a record that

17   everybody understands?  What's your view on that?

18             MR. PENNY:  I would not --

19             THE COURT:  I guess my -- what I'm trying to say is

20   this:  I don't have anything in front of me, and I'm going to

21   have to be writing down what you say or get the court reporter

22   to type it up for me and see it, and then I can understand and

23   digest it.

24             I haven't prepared for what you are saying, and you

25   are, in fact, approaching the question of the value of the

1   settlement itself in somewhat a different way than is presented

2   in your papers.  So I'm soliciting your advice about how it is

3   you think we ought to proceed in view of that information.

4           MR. PENNY:  Yes, Your Honor.  I think what I'll be

5   representing to you today as an officer of the court are facts,

6   and to the extent Your Honor would like them in an even more

7   formal presentation, I think we're happy to put together a

8   declaration that will lay all this out and will be signed and

9   sworn to.

10          THE COURT:  I'm not questioning the verity of it.  I

11  trust lawyers when they appear before me to recognize they're

12  officers of the court.  I respect them as such, and I rely on

13  them as such, and if in the course of things there's something

14  that's called into question that I need to have explained, I

15  expect them to be able to explain it, because even the best of

16  statements can be misunderstood, misinterpreted, and that's

17  sort of the business we're in, is getting to the bottom of it

18  all.

19          So I don't question -- I don't think that Mr. Dailey

20  questioned the integrity of the representation.  I think he was

21  saying I don't know the factual predicate for it, if I

22  understand it, and he's shaking his head yes back there.  But

23  here's the problem:  How many different options are there?

24          MR. PENNY:  There are five, Your Honor.

25          THE COURT:  So you're going to go through a general

1    situation, and then you're going through all five options.

2    Then you're going to go through the damage payments, and then

3    the statistical base for how things have evolved, and you're

4    going to do all that, and I'm not -- I appreciate very much

5    your thought process in which you think I am intellectually

6    capable of doing that, but I have to confess to you I don't

7    know if I can assess all that in that fashion.

8            So I'm going to have to have supplemental briefing or

9    something, and it occurs to me that it might be helpful for you

10   to go through it today so everybody understands what we're

11   doing and then for you to present something that puts it all

12   together in a fashion that I can be sure I'm comfortable with,

13   and I will do as I'm sure others will do.  I'll be glad to

14   check the factual references which you cite in this hearing and

15   the papers, and then we'll go from there.

16           MR. PENNY:  Okay, Your Honor.

17           THE COURT:  We'll get started with the way you want

18   to do it, and then we'll go on with the other things that I

19   did, and it will help me to understand what's going on.

20           MR. PENNY:  Very fair, Your Honor, and thank you.

21           THE CLERK:  Judge, did you want me to admit Mr.

22   Ferrara?

23           THE COURT:  Yes.  I thought I said yes.  His law

24   partner is still in; right?

25           THE CLERK:  Yes, sir.

1            THE COURT:  Anybody who wants in, just let them in

2    and tell me they're in.  That's okay.  You be the gatekeeper on

3    that.

4            THE CLERK:  Yes, sir.

5            MR. PENNY:  So I want to start with the four options

6    that present cash damages payments to the class if they are

7    elected.  The first such option is option two.  Option two is a

8    nonforfeiture option that, if elected, will result in a cash

9    payment to the class member equal to all the premiums that

10   class member paid between 2016 and 2019.  So that's four years

11   of premium payments.  The cash value, the average cash value

12   for that payment is $10,540.

13           THE COURT:  When you say it's a nonforfeiture, do you

14   mean they keep the policy?

15           MR. PENNY:  They keep a policy.  They still have a

16   paid-up benefit on the policy that is equal to the amount of

17   premiums they have paid to Genworth in the years for which

18   premiums were not refunded.

19           So, for example, in this example when somebody is

20   getting a refund of $10,500 in premiums, if they've paid

21   $30,500 in premiums over the life of the policy, they'll get

22   10,500 back in cash, and they'll still have a paid-up policy

23   benefit worth $20,000.

24           THE COURT:  The policy will be worth $20,000.

25           MR. PENNY:  It will pay benefits up to $20,000.

1          THE COURT:  In that scenario, they have paid whatever

2   the premium is, and as of that time in your example here --

3   let's say it's through 2015.  If what they have paid in

4   achieves a benefit of $20,000, they'll keep that benefit.

5          MR. PENNY:  I think that's right.

6          THE COURT:  The benefit is not linked to the total

7   premiums paid, it's linked to the value of what the total

8   premiums paid would have -- would provide; is that what you are

9   saying?

10          MR. PENNY:  Let me back up and make sure that we're

11   not crossing signals, because I want to make sure you

12   understand how the settlement works.  Outside the settlement,

13   if a policyholder is facing a rate increase and decide they

14   don't want to pay any premiums anymore, they can choose a

15   nonforfeiture option.

16          What the nonforfeiture option does is it says you

17   don't have to pay any more premiums in the future, you still

18   have a policy with the same basic terms and conditions that you

19   had before, but the policy, if you qualify for benefits, will

20   pay out up to a certain limit, and the limit has always been

21   set as the amount of premiums that have paid to Genworth over

22   the life of the policy.

23          So if the policyholder had paid $30,000 in premiums

24   to Genworth and then decided they don't want to pay premiums

25   anymore, they elect the nonforfeiture option, they will retain

1    a policy that will pay benefits up to that $30,000.  That's

2    outside the settlement.

3            THE COURT:  So that same benefit obtains, and that is

4    the limit --

5            MR. PENNY:  And actually --

6            THE COURT:  -- paid premiums represent the limit of

7    the coverage in the paid-up benefit.

8            MR. PENNY:  Precisely right.  And, actually, a little

9    risk in changing horses here, I actually think that since we

10   just established that understanding of the nonforfeiture

11   option, we should probably talk about option one first.  Option

12   one is not a cash damages payment option, but option one is the

13   enhanced paid-up benefits for nonforfeiture elections.

14           THE COURT:  All right.

15           MR. PENNY:  The way that option one works is anybody

16   who wants to elect a nonforfeiture option in the settlement and

17   anybody who has already elected a nonforfeiture option has the

18   option to not pay any more premiums to Genworth and to have

19   that paid-up benefit doubled.

20           So in the example that I was using before where a

21   class member has taken a nonforfeiture option and retained a

22   policy benefit, paid-up benefit of $30,000, in the settlement,

23   they can elect to have that benefit doubled.

24           THE COURT:  But they have no damages.

25           MR. PENNY:  I'm sorry?

1            THE COURT:  They get no damages.

2            MR. PENNY:  Right.  There would be no cash damages

3    payment for that option.  Your Honor should know that there are

4    17,000 class members that have already elected a nonforfeiture

5    option before this settlement arrived.  For those class

6    members, the benefit of this settlement is that it will double

7    their current paid-up benefits.

8            The class -- I'm sorry.  The 17,000 policyholders

9    that are in that situation have an average paid-up benefit

10   currently of $28,000.  By clicking a box and signing a form in

11   the settlement, they can have the value of those policies

12   doubled to 56,000.  For those 17,000 class members alone, that

13   amounts to an additional $475 million in coverage benefits.

14           THE CLERK:  Judge, if I may interrupt, I just

15   admitted a Leslie Tick who is a new participant in Zoom.

16           THE COURT:  All right, is this Ms. Tick, Mr. Tick,

17   what?  Is it Mr. Tick or Ms. Tick so I know how to address

18   them?

19           THE CLERK:  I've asked them to unmute themselves so

20   they're able to speak.

21           MS. TICK:  It's Ms. Tick, T-i-c-k.

22           THE COURT:  Are you a class member?

23           MS. TICK:  No, I'm not.  I'm just observing.

24           THE COURT:  And what is your interest?

25           MS. TICK:  I'm with the California Department of

1   Insurance.

2          THE COURT:  All right.  And you don't wish to speak?

3          MS. TICK:  No, thank you.

4          THE COURT:  All right.  Let me get this straight.

5   The enhanced policy, option number one, you get an enhanced

6   paid-up benefit with double the paid-up benefit.  You do not

7   get any monetary damage.

8          MR. PENNY:  That is correct, Your Honor.

9          THE COURT:  If you choose the nonforfeiture option,

10  option number one.  So far, 17,000 people have elected to take

11  that benefit.

12         MR. PENNY:  Well, they have elected the nonforfeiture

13  option before the settlement arrived for all sorts of different

14  reasons.  They decided they couldn't pay the premiums or

15  whatever it was.

16         THE COURT:  All right.  And that average -- so this

17  was just under the contract.

18         MR. PENNY:  Correct, Your Honor.

19         THE COURT:  And you are using this to show what a

20  valuable thing this option is.

21         MR. PENNY:  Especially for those 17,000 class members

22  who currently have just the $28,000 in benefits.  The value of

23  this settlement for them is they will double that, and that

24  option is not just available to those 17,000.  It's available

25  to the entire class.  I mean, anybody can take advantage of

1    that if they like it.

2           THE COURT:  Are you telling me that 17,000 times

3    56,000 is 475 million?

4           MR. PENNY:  No, because that would be double counting

5    the benefits.  The additional benefit is the additional $28,000

6    in coverage each of the 17,000 class members would obtain.

7    That's 475 million.

8           THE COURT:  All right.  And that's just illustrative

9    of what has happened apart from the settlement.  So we can

10   expect -- the next part of that would be, I guess, an

11   explanation of what might happen in the settlement?

12          MR. PENNY:  Yes, Your Honor.  I mean, in the

13   settlement for that first option one, all of those 17,000

14   people, they have the two options in option one.  Option one is

15   either $1,000 payment or the double paid-up benefits.  I talked

16   to hundreds of people who have a nonforfeiture option already.

17   Every single one of them told me they value the double paid-up

18   benefit far greater.

19          So my expectation is every one of those 17,000 people

20   but a couple of people who things get lost in the mail are

21   going to elect to double their benefit, and when they do that,

22   that will result in an almost half a billion dollars in

23   additional coverage just for that one small segment of the

24   class on that one election option alone.

25          THE COURT:  Well, suppose all 207,000 -- I guess we

1    take away 17,000 and call it 185,000.  Suppose 185,000

2    policyholders all exercise the nonforfeiture option.  Do you

3    have any figures as to what value that would be?

4            MR. PENNY:  I don't, Your Honor.  I don't have that

5    number.  It's an enormous number.

6            THE COURT:  I guess it is, and the question is, can

7    Genworth pay it.

8            MR. PENNY:  Well, it's an --

9            THE COURT:  I know they're not going to pay it out of

10   pocket, but they're going to have to pay it as it goes along.

11   Has anybody analyzed that if everybody took that option, what

12   would happen to the company going forward and whether or not it

13   would end up folding or claiming protection under Chapter 11 or

14   whatever insurance companies do, receiverships?

15           MR. PENNY:  Practically speaking, Your Honor, I think

16   you have to understand that Genworth has billions and billions

17   and billions of dollars set aside in their reserves to pay the

18   claims in those choice one policies and other policies, and the

19   practical effect is, if everybody in the class selected the

20   double paid-up benefit, even though Genworth wouldn't be

21   getting any more premiums, their current reserve pool, my

22   estimated guess is, would actually be in much better shape --

23           THE COURT:  How many billions do they have in

24   reserve?

25           MR. PENNY:  I think it's billions, not millions.

1          THE COURT:  I meant billions.  I tried to say it.

2    How many billions do they have in reserve?

3          MR. PENNY:  I believe it's somewhere north of 9-,

4    maybe north of $10 billion --

5          THE COURT:  Then what would happen in that event,

6    there would be no -- there wouldn't be any money that would

7    come out of that.  The claims would accrue over time, and, in

8    the meantime, Genworth would have the use to invest the $10

9    billion -- 9 billion, $10 billion and increase the reserves or

10   pay them out to the company.

11         So the question I have is, what happens if everybody

12   elects -- if there's a substantial election here, what happens

13   to the reserves money?  Does it continue to accrue and increase

14   the value of the reserve, or does it generate an income that is

15   then spun off to the company?

16         MR. PENNY:  The way I understand it, and, again, this

17   is probably more in Genworth's expertise than my own.

18         THE COURT:  I'll get him to answer it.  You tell me

19   what you think.

20         MR. PENNY:  The way I understand it is as the

21   claim -- the money that is set aside in reserves is invested in

22   some very conservative manner which is part of the reason why

23   its interest rates have retained almost historic low levels for

24   20 years.  The reserve pool hasn't grown as much as was

25   anticipated, but, in any event, the money in the reserve pool

```
 1    would continue to grow, and it could not be released from the
 2    reserves unless Genworth could demonstrate to its regulating
 3    entities that it was more than adequately reserved for all the
 4    policies that they were protecting, and then I suppose
 5    surpluses could be removed from those reserves, but that would
 6    all happen under the auspices of regulators.
 7              THE COURT:  Of the state regulators.
 8              MR. PENNY:  Right.
 9              THE COURT:  Go ahead.
10              MR. PENNY:  So now that we tackled the enhanced
11    paid-up benefits, option one, I'd like to return to our
12    exploration of the other options.  We had already --
13              THE COURT:  Are you finished with option two?
14              MR. PENNY:  Yes, we're finished with option two.
15    Option three is the next one that provides a cash damages
16    payment, and it also provides for reduced premium going forward
17    and reduced benefits, of course.  Option three removes the
18    inflation benefits.
19              The average cash payment for option three is $4,677.
20    The average premium reduction would be $1,169.25.  Just to put
21    that in perspective, the average premium payment for a class
22    member in 2018 was around $2,600.  So we're talking about a
23    very substantial reduction in the premium payment alone.
24              Again, this settlement is offering people not just
25    cash damages payments but ways to modify and regulate the
```

1  premium increases that they're going to be told about in the

2  future.  So substantial cash damages payments, substantial

3  reduction of premium for option three.  Option four --

4          THE COURT:  How much are the benefits reduced?

5          MR. PENNY:  Well, the benefits are reduced by

6  removing the inflation protection which means that the daily

7  benefit maximums and the lifetime maximum, if it's an unlimited

8  policy, would be reduced back to their original levels.

9          THE COURT:  In other words, it's a retroactive

10  removing of the inflation factor?

11          MR. PENNY:  Exactly.

12          THE COURT:  Not a removal of the inflation factor as

13  applied to date.  So if I got a policy -- when were the first

14  of these policies issued that are in the class?

15          MR. PENNY:  Early 2000s, Your Honor.

16          THE COURT:  Let's just say 2002 I got a policy, and

17  all of the inflation adjustment has been made, and, as a

18  result, my policy has increased by -- the benefit has increased

19  by, let's say, 1.5 percent a year.  All of that inflation under

20  this settlement adjustment is wiped out, and I'm back to my

21  original benefit at 2002; is that correct?

22          MR. PENNY:  That's essentially correct -- yes, Your

23  Honor.

24          THE COURT:  And I keep the policy I bought in 2002

25  but have a reduced payment.  My payment is reduced by $1,169 a

1    month --

2           MR. PENNY:  25 cents.

3           THE COURT:  A year?

4           MR. PENNY:  Per year, yes.

5           THE COURT:  And I also get $4,677.

6           MR. PENNY:  That's correct, Your Honor.  So option

7    four removes the inflation benefit, but it only reduces the

8    accrued benefits by 25 percent.  So you don't go all the way

9    back to the initial policy limits.  You just reduce your

10   current benefits by 25 percent.

11          THE COURT:  And is there a cash payment?

12          MR. PENNY:  Yes.  The cash payment is $1,650, and the

13   average premium reduction is $412.50 per year.

14          THE COURT:  All right.

15          MR. PENNY:  Now, option five would reduce an

16   unlimited term policy to a six-year term policy.  You still

17   maintain --

18          THE COURT:  It applies only to unlimited term

19   policies.

20          MR. PENNY:  Or it could take your term from five

21   years to four years, four years to three years, etcetera, but

22   for unlimited, it rachets it back to six years.

23          THE COURT:  What if I have a five-year term?  What

24   does it do?

25          MR. PENNY:  Then you go to a four-year term.

1          THE COURT:  And it goes down, four goes to three,
2    three to a two, and a two to a one.
3          MR. PENNY:  Exactly.
4          THE COURT:  Is the choice, or is the base comprised
5    of policies between one- and five-year terms and then it jumps
6    to unlimited, or is there something between five and unlimited?
7          MR. PENNY:  No, I don't think so.
8          THE COURT:  What's that?
9          MR. PENNY:  There's nothing between five and
10   unlimited.
11         THE COURT:  There's nothing between five --
12         MR. DUVALL:  I'll try -- I'm sorry to interrupt.
13         THE COURT:  It might be a good idea if you come to
14   lectern so we can all hear you, particularly the people on the
15   radio, audio.
16         MR. DUVALL:  Under this particular option that Mr.
17   Penny is discussing, the reduction is essentially one level
18   down.  By example, lifetime to six years.  The next level down
19   is a bit of a function of what's available including in that
20   state or to that policyholder.
21         So Mr. Penny was illustrating perhaps the next level
22   down from six would be five.  It could be four, but the point
23   is next level down from where the policyholder currently sits.
24         THE COURT:  How does unlimited get reduced to the
25   next level down with the level being six?  I would say the

1  unlimited would have something that would be a limit, and then

2  you'd know what the limit was.  Unlimited -- we're talking

3  about the length of coverage -- right? -- the term?

4          MR. DUVALL:  Right.

5          THE COURT:  And unlimited means until I die, I guess;

6  is that right?

7          MR. DUVALL:  Right.

8          THE COURT:  So what, in the overall scheme of things

9  apart from this settlement, is the choice that I have after

10  unlimited -- I don't want unlimited, but I want it a little bit

11  less.  What's my choice?

12          MR. DUVALL:  The next level down that's available in

13  your state.

14          THE COURT:  Whatever is available in the state; is

15  that what you are saying?

16          MR. DUVALL:  Right.

17          THE COURT:  So there are 50 different choices.  So I

18  could have life less five years, or I could choose a term of

19  20 years?  What does that mean?  I don't understand it.

20          MR. DUVALL:  I don't know that there are 50 different

21  choices, Your Honor.  I do know that six years is, I guess I

22  could say, a relatively frequent term that is used.  So that's

23  probably the best example, to go from lifetime to six.

24          THE COURT:  When you all were negotiating this, did

25  you look at what the choices were in the various states,

1   whether or not -- how realistic is it that a state regulator

2   would look at this settlement and say, this is not a fair

3   settlement, this option isn't, to people in my state because if

4   they go from unlimited, then they would go to ten years or

5   12 years or something instead of going all the way down to six?

6          MR. DUVALL:  Well, we considered -- the point of this

7   settlement, Your Honor, is to allow policyholders essentially

8   the new opportunity, based on additional information, to make a

9   choice to reduce or to stop paying their premiums.

10         THE COURT:  But I'm an affluent person.  Let's just

11  assume that.  That's not true, but let's assume it.  And I want

12  unlimited care.  I really want that, and I can afford it.  Now

13  you're telling me that the unlimited option is going to drop,

14  and I'm not going to be able to have that.  No?

15         MR. DUVALL:  You can keep that policy.

16         THE COURT:  As long as I pay for it out of my

17  affluent resources.

18         MR. DUVALL:  That's right.

19         THE COURT:  So what happens in this policy, you said

20  the term goes from life to six years, and then it goes down one

21  level depending on the state's regulation.  But do I keep the

22  policy I have in terms of the kind of benefits that it

23  provides?

24         MR. PENNY:  You will keep -- the other adjustment is,

25  you will revert your five percent compound interest accruals to

1    their original policy term, but you will then keep the five

2    percent interest going forward.  So it's like a step back on

3    the daily benefit maximums, but they can start growing again

4    under this policy.

5          THE COURT:  I bet if I could be admitted to Phi Beta

6    Kappa status, I might understand that, but I'm not, and I

7    don't.  Can you help me again?

8          MR. PENNY:  Sorry, Your Honor.  For example, looking

9    at the daily benefit maximum, let's say that was $250 when the

10   policy was purchased 12 years ago, and it has, with the benefit

11   of compound interest inflation protection, grown to $350.

12         Under this option, you will reduce the term of the

13   contract from unlimited down to, like, six years, and you will

14   reduce your daily benefit maximum from 340 or $-50 down to the

15   $250.

16         THE COURT:  In other words, you eliminate the

17   inflation protection that you've achieved so far.

18         MR. PENNY:  That you've achieved so far, but then it

19   will start growing again.  You still have the five percent

20   inflation protection.

21         THE COURT:  All right.

22         MR. PENNY:  And an important point was made by Mr.

23   Duvall just as he left which is none of these changes or option

24   elections are compulsory.  Every single class member can keep

25   their existing policy if they want to.  The settlement is

1    offering more information and options for people who need to

2    make changes to their policy.  The average cash payment for

3    that option, option five, $4,187, and the average premium

4    reduction is $1,046.75.

5              THE COURT:  1,000 what?

6              MR. PENNY:  $1,046.76.  So now that we've established

7    what the average cash damages payments are for each of those

8    four options, we can consult Genworth's historic claims

9    election data to get a sense for what class member elections

10   might be made in this settlement.

11             In the past, when faced with rate increase actions or

12   others, policyholders, 20 percent of the class have elected

13   some of these reduced benefit options.  Those are the ones with

14   the cash damages payments.  Five percent have elected the

15   nonforfeiture options.

16             If we apply those same presumptions to elections that

17   would be made in the settlement, and, again, the options in the

18   settlement have cash damages payments and enhanced -- things

19   that were never offered in the past, so I think that alone

20   makes it conservative, but if they elect at the same levels,

21   that results in aggregate cash payments of $218,000,224 --

22   sorry, let me start over.  $218,224,100.  If we want to be --

23             THE COURT:  Wait a minute.

24             MR. PENNY:  Sorry.

25             THE COURT:  So we've gotten 25 percent of the

```
1    customer base there.  Have the other 75 percent kept their
2    policies and paid the premiums?
3              MR. PENNY:  Yes, Your Honor.
4              THE COURT:  So if the election rate is the same as --
5    what period is this?
6              MR. PENNY:  This is the period of about 2012 to 2018,
7    I believe.
8              THE COURT:  But won't the election rate be higher now
9    that the disclosures are more full?
10             MR. PENNY:  I expect it would be which is why I think
11   this is a conservative estimate, and just to tie this back to
12   the brief that we submitted, we submitted an even more
13   conservative estimate where we assumed that only half as many
14   class members would elect the benefits in the settlement, and
15   that's where we arrived at that $100 million number.  In fact,
16   it is $109,122,355.
17             I think this settlement will outperform those
18   conservative estimates.  Part of that is based on the fact that
19   as policy premium rates have continued to escalate over the
20   years, more and more of the class members that haven't yet
21   elected any of those options are getting to a stress point
22   where they are getting -- where the premiums are becoming
23   either unaffordable for them or they don't value the full
24   benefits in light of the new premiums.  And so I think a lot of
25   people will be taking advantage of the options in this
```

1    settlement to make those adjustments with the benefit of full

2    information and getting some pretty substantial cash damages

3    awards to boot.

4            The other reason I think that this -- these estimates

5    are conservative is based on my conversations with hundreds and

6    hundreds of class members and my co-counsel's conversations

7    with thousands of others.  Oftentimes in a settlement, the only

8    information we have about the class's reaction to it are the

9    objections that are lodged, because the approval process

10   doesn't have a mechanism to capture the positive reaction of

11   the class.

12           Here, we actually have a lot of data from the other

13   class members that have not objected.  I have spoken to over

14   500 class members, in depth conversations.  I was almost on the

15   phone all day for over a month.  My co-counsel did the same

16   thing.  Collectively, we've spoken to well over 4,000 members

17   of the class.

18           These people, the vast, vast majority of the people I

19   spoke to embraced this settlement, and they're excited about

20   it.  Many of them went out of their way to thank the named

21   plaintiffs for bringing the lawsuit and thank class counsel for

22   their work on this.  They're excited about their benefits, and

23   they're concerned about any delay that might result.

24           One anecdote to offer Your Honor on that is I don't

25   know if you noticed, but at Friday's hearing, there was a woman

1    who was sitting at the back -- there she is, Ms. Masters.   I

2    didn't even notice she was there.   Ms. Masters was unknown to

3    class counsel before the hearing, but she stopped Mr. Davidson

4    in the hall, had some questions about the settlement, and Mr.

5    Davidson answered them.   Is it okay if I read the email that

6    you sent to Mr. Davidson?

7              MS. MASTERS:   Sure.

8              MR. PENNY:   That evening, Ms. Masters wrote Mr.

9    Davidson an email where she said, "Stuart, thank you again for

10   taking the time to precisely explain the information I was

11   looking for.   I hope the final verdict was in our favor as many

12   people like myself are relying on a good outcome.   If you can

13   give me any brief information on the judge's opinion, I would

14   love to hear it.   However, I realize that it might be

15   confidential and that I'll have to wait for my letter.   Best

16   regards, Jean Masters."

17             Ms. Masters' comments echo those of hundreds of other

18   class members.   When I got back to my house on Friday evening,

19   I had phone messages from nine other class members who were

20   anxious to find out how the hearing went, and, over the

21   weekend, 43 more called me.

22             The class is anxious for the settlement.   The class

23   is really hoping for -- the vast majority of the class is

24   really hoping that this settlement is approved and that they

25   have the opportunity to take advantage of its benefits, and I

1   didn't want their voices to go unheard.

2           Your Honor, I think now I'd like to move on to Mr.

3   Jacobs' objection pretty much where we left off on Friday's

4   hearing unless you have any other questions about some of the

5   material we just went through.

6           THE COURT:  No, I'm fine with it so far.

7           THE CLERK:  If I may interrupt, I just admitted

8   Gregory Karawan into the Zoom meeting.

9           THE COURT:  How do you spell his name?

10          THE CLERK:  K-a-r-a-w-a-n.  Gregory Karawan.

11          THE COURT:  Mr. Karawan, are you a class member or --

12          MR. KARAWAN:  Good morning, Your Honor.  No, I am

13   in-house counsel at Genworth Financial.

14          THE COURT:  Is any legal work being done at Genworth?

15          MR. KARAWAN:  I'm multitasking, Your Honor.

16          THE COURT:  You know what?  I don't think I'd say

17   that.  Every time there's a lawyer who multitasks, you take on

18   risk that you're doing one of them wrong.

19          MR. KARAWAN:  Fair enough.

20          THE COURT:  All right.  Now we're going back to Mr.

21   Jacobs' objection.

22          MR. PENNY:  Right.  Your Honor, just to set the table

23   on Mr. Jacobs' objection, or at least the one that I'm going to

24   address first, is it seemed to us pretty clear that the premise

25   of his objection is that there are this subclass, as he calls

1    them, of gold class policyholders that have the same rich

2    benefits he does and that he thinks that he was disadvantaged

3    by not getting the disclosures sooner, like in 2014, because he

4    could have then gone to the market and found a better policy.

5           And he challenged the parties in this case to be more

6    creative in our settlement and create an option for him and

7    others that would basically create an entirely new policy based

8    on competitive market rates at the time.  I think I've fairly

9    summarized that part of his objection --

10          THE COURT:  Excuse me a minute.  His objection is

11   which number?

12          MR. PENNY:  159, Your Honor.

13          THE COURT:  Just a minute.  Let me get to it.  Mr.

14   Jacobs, did he fairly characterize your objection, sir?

15          MR. JACOBS:  No, Your Honor.  Along with so many --

16   God, you can't believe what's going on here.

17          THE COURT:  Mr. Jacobs, we can't hear you -- we can't

18   hear you.  Turn the volume up.

19          MR. JACOBS:  Can you hear me now?

20          THE COURT:  Not much better.

21          MR. JACOBS:  Not much better?

22          THE COURT:  That's better now.  Talk slowly.  Very

23   succinctly, tell me what your objection is, and tell Mr. Penny

24   what it is that you say.

25          MR. JACOBS:  Specifically to this, I say that -- to

1    this particular part of the objection, I say that we could have

2    gone to market and looked for more competitive rates, but we're

3    not expecting to have 2014 rates now.  It's just that the

4    policies that we could have had would have been lower than

5    Genworth, and today we'd be sitting with that.

6              Today we can't go out to the market because of my

7    physical issues.  I don't qualify.  And they're trying to

8    reduce our benefits from unlimited down to as low as five

9    months, Your Honor.  Option one and option two, based on his

10   averages, allow for five months' coverage.  If people buy into

11   option one or option two, they will get five months' coverage

12   before their policy ends.  So that doesn't make sense for

13   somebody that was looking for unlimited.  I mean, that's very

14   significant.  They failed to point that out.

15             The other thing is that the six years is now based

16   on, instead of the current amount that we would be getting of a

17   maximum benefit of $343, it's going down to $257 which is

18   two-thirds of what the normal price for healthcare care in a

19   home is today.  So they're eliminating that.

20             They have just -- I have read the statement -- the

21   other thing is, Your Honor, that's really -- it's almost

22   irrelevant what he just went through because -- let me just

23   read this California assessment of what they did not do, what

24   they should have done.  Plaintiffs do not provide an assessment

25   --

1           THE COURT:  Wait just a minute.  Is any of that in

2     your objection?

3           MR. JACOBS:  Any of which part?

4           THE COURT:  Any of what you are saying -- I can't

5     find any of it in document number one --

6           MR. JACOBS:  Which part are you referring to?  Most

7     of it is in my objection letter, yes.

8           THE COURT:  When you finish talking, I'll talk.  You

9     tell me when you're finished.  Now, don't talk --

10          MR. JACOBS:  I don't --

11          THE COURT:  Enough.  Don't say another word until I

12    talk and then I'll give you a chance, because the court

13    reporter needs to get us both.  Are the points you are making

14    now anywhere in your written objection?  If so, where?

15          MR. JACOBS:  The points that I'm making -- are you

16    referring to that -- sure, let me do it.  The policy

17    includes --

18          THE COURT:  Don't talk until you've got your thoughts

19    together.  That way the court reporter won't be taking down a

20    stream-of-consciousness discussion as you work yourself through

21    the document which all of us do from time to time, but it's not

22    helpful.

23          MR. JACOBS:  Okay.  Our main claim is in the

24    objection statement that we cannot go out into the marketplace

25    now to find a new policy, and they deceived us in 2014.  If we

```
 1  knew about this price increases in 2014, we could have looked
 2  at options.  Now, we can't, and they are moving up to $27,000.
 3  It's objection number one that -- in my objection letter that
 4  this is all referred to.
 5            THE COURT:  All right.  Thank you.
 6            MR. PENNY:  So I just want to make the point --
 7            MR. JACOBS:  I'm not quite finished.
 8            MR. PENNY:  Oh, Saul.
 9            MR. JACOBS:  Your Honor, it's real important that
10  this -- this is not in my complaint because this is as a result
11  of an answer to their objection --
12            THE COURT:  Mr. Jacobs, this is not the time for you
13  to do that.
14            MR. JACOBS:  Okay, I'm sorry.
15            THE COURT:  It's time for him to talk, and if he says
16  something else, at the end I'll give you a chance.  But you are
17  confined right now to what you've said in your original
18  presentation and in this letter.  Mr. Penny now has the time to
19  address what you've said, and if you have something else at the
20  end, I will entertain it at that time.  Now we're not going to
21  deal with new points.  All right, Mr. Penny.
22            MR. PENNY:  Thank you, Your Honor.
23            MR. JACOBS:  I'm grateful for that.  Thank you.
24            MR. PENNY:  I think it should be clear to Mr. Jacobs,
25  but in case it is not, we are not changing any of the terms of
```

1  his policy. Nothing happens automatically in this settlement.

2  This is information and options to Mr. Jacobs and every other

3  class member. They are far better off with this settlement

4  than without it even if they don't elect the options, and this

5  settlement is not harming anybody in any way.

6          And if Mr. Jacobs doesn't see any value in this

7  settlement, then what he should have done was opt out. If he

8  thinks he has another more valuable claim, he should have opted

9  out. I know the opt-out objection deadline is past, but I'd be

10  surprised if Genworth wouldn't let him opt out right now

11  because his claims have no merit. There's nothing to be

12  concerned about.

13          Here's the thing: Mr. Jacobs' entire document is

14  based on the notion that he could have gone to the market in

15  2014 and gotten a better deal and that he would have done that

16  if he had been given the disclosures earlier.

17          He's the objector, and it is his burden to establish

18  that there was a better deal to be had. He has not offered

19  anything, I mean honestly, anything to support that notion, and

20  it is a complete and entire fiction to boot.

21          THE COURT: Look, let's understand something.

22  There's no need to get exorcised about all this. You can say

23  it. This isn't an attack on Mr. Jacobs, but I want you to say

24  it all directly. Just don't get so excited, and then he won't

25  get so excited.

1          MR. PENNY:  You're right.  Thank you, Your Honor.

2          THE COURT:  Kind of back off a little bit, and I

3     understand the point is it is his job to have put in his

4     objection some proof that he could actually have gotten

5     something in 2014 that would have been better, and if he

6     doesn't do that, then that objection fails; right?  That's your

7     point?

8          MR. PENNY:  That's correct, Your Honor.

9          THE COURT:  He hasn't done it, so you say it has

10    failed on that point.  All right, go ahead.  Anything else?

11         MR. PENNY:  Yes, Your Honor.  What I was just going

12    to say is I think Genworth has a more detailed presentation on

13    this point, but had Mr. Jacobs gone to the market in 2014, what

14    he would have found were no other unlimited policies to pick

15    from and limited policies that would have cost three or four or

16    even more times as much as his current Genworth policy.  So not

17    only has he not supported it, the reality is that there was no

18    better deal to be had anywhere else.

19         THE COURT:  Excuse me.  Do you have proof of that, or

20    did you tell me Genworth is going to put that on?

21         MR. PENNY:  I'm just previewing it, Your Honor.  I

22    believe Genworth has more details on that fact.

23         THE COURT:  I'll let them speak.  They have a right

24    to speak, but I understand.  Now, what else -- his other

25    objection is different than that.  The second objection which

1   he hasn't said much about in his statement or orally was that

2   the settlement sheet and full settlement document are unclear

3   and complicated such that it is impossible to make a rational

4   decision regarding proposed settlement options.

5          MR. PENNY:  Your Honor, the point there is that

6   nobody is being asked to make an election option under the

7   settlement until the special election letter arrives at which

8   point they will have full and complete information to inform

9   that decision, and that's a very important part of this

10  process.

11         I think Your Honor should understand that in most

12  class action settlements, class members are asked not only to

13  opt out and object but have to actually file their claim forms

14  making their benefit elections before final approval.

15         And, in most instances, it is impossible to tell the

16  class member exactly what the value of those options will be

17  until final approval is granted and the claims administration

18  process ensues.

19         The *Lumber Liquidators* case is a perfect example of

20  this.  That's a case that was approved in this district, and

21  the approval of the settlement was affirmed by the Fourth

22  Circuit.  The situation in *Lumber Liquidators* was before final

23  approval and before the opt-out and objection deadline, class

24  members had to elect their remedy.  They had to say either I

25  want the cash damages in the settlement or I want the vouchers,

1    the coupons in the settlement, and they were just given

2    estimates of what the value of each of those would be.

3         Because so many people ended up taking the cash value

4    payment, that payment was actually worth less than 25 percent

5    of the projected -- the low end of the projected value, and

6    even in that instance the Fourth Circuit had absolutely no

7    problem affirming approval of the settlement even though the

8    class members had to make those elections without complete

9    information.

10        THE COURT:  I'm not sure I follow the point on *Lumber*

11   *Liquidators*.  You said they didn't know -- they had to make

12   their election before final approval but that after the

13   elections were made, the cash payment was a lot less than they

14   thought.  Was the cash payment actually made before final

15   approval?

16        MR. PENNY:  No, Your Honor.

17        THE COURT:  No, and was there a hearing after the

18   final approval to figure out what the cash payment was?

19        MR. PENNY:  So at final approval --

20        THE COURT:  In other words, how do you know that the

21   cash payment was a lot less other than outside the record in

22   the *Lumber Liquidators* case?

23        MR. PENNY:  That's an important point, Your Honor.

24   Let me make it clear.  The opt-out and objection deadline and

25   the claims filing deadline were months before final approval.

1    When the parties came before this district court, not Your

2    Honor but a different court, they had the information from the

3    claims process where before the final approval was made, it was

4    known that even though class members had been told that the

5    cash damages awards would be estimated to be between 25 and

6    40 percent of the purchase price of the flooring --

7              THE COURT:  Of the what?

8              MR. PENNY:  Of the flooring.  So the Court knew that

9    class members were told that the estimate would be 25 to

10   40 percent of the purchase price, and, in the end, what they're

11   actually going to get in the settlement is more like five

12   percent.  The Court knew all of that and granted final

13   approval, and the final approval was approved by the Fourth

14   Circuit.

15             The point of that is that it is impractical in many

16   instances to give complete and 100 percent accurate data to

17   class members before final approval because you won't know what

18   some of those options look like until a later point in time.

19             THE COURT:  But *Lumber Liquidators*, they actually did

20   know what that was before final approval.  In *Lumber*

21   *Liquidators*, they didn't have that information, what the cash

22   value would be as opposed to the value of the voucher at the

23   time they had to make the election.

24             MR. PENNY:  Right.

25             THE COURT:  That's a different circumstance than

1   here.

2        MR. PENNY:  Right, and that's what makes this

3   settlement actually much better than *Lumber Liquidators*.

4   Again, the point of this whole example of *Lumber Liquidators* is

5   that the class members had to make these decisions, whether to

6   opt out, object to the settlement, and had to make the decision

7   of what benefits they wanted without knowing the precise

8   contours of what those elections would mean.  Then final

9   approval came, and it was granted.

10       Here, the only options that have to be elected are

11  whether to opt out or object to the settlement, and the notice

12  plan gives a great amount of detail to class members on what

13  these election options will look like.  It gives them the

14  notice which describes them.  It created a website in which all

15  the documents necessary to appreciate the settlement were

16  listed on.  It had phone numbers for the claims administrator,

17  and, most importantly, for anybody who still wanted more

18  information, they could talk to class counsel directly, and as

19  I mentioned before, well over 4,000 class members did exactly

20  that and had their questions answered directly.  All the

21  information was available to the class.

22       THE COURT:  And that takes care of number two.  The

23  third one is Mr. and Ms. Skochin did not have the best interest

24  at heart in representing the overall class and gold subclass.

25       MR. PENNY:  This one, quite frankly, Your Honor --

 1          THE COURT:  Mr. and Mrs. Skochin, if I recall

 2   correctly, actually had what Mr. Jacobs calls a gold policy; is

 3   that right?

 4          MR. PENNY:  They had what Mr. Jacobs calls a gold

 5   policy, and they are one of about 40 percent of gold class

 6   policyholders who have, over the years, elected to reduce their

 7   coverage.

 8          THE COURT:  Right.

 9          MR. PENNY:  What the Skochins did, and this is in

10   every single complaint we alleged, they elected the

11   nonforfeiture option in 2018.  They would have done that years

12   earlier had they been given the disclosures sooner.  To make

13   them or to give them benefits in the settlement along with the

14   17,000 other people who did the same thing, they are getting

15   double the paid-up benefits that they would have had before.

16   It's not complete relief, but it's satisfactory relief --

17          THE COURT:  The bottom line of his objection is that

18   Skochins get no benefit out of the settlement other than the

19   class representation payment of $25,000 each, so a total of

20   $50,000 and that that's -- the class members, therefore,

21   don't -- the class representatives don't adequately represent

22   the class.  That's the objection.  So what do you have to say

23   about that?

24          MR. PENNY:  He's wrong.  The Skochins are getting

25   value in this settlement.  It's value that makes sense and is

1    commensurate with their claims.

2              THE COURT:  What value are they getting?

3              MR. PENNY:  They're getting the double the paid-up

4    benefits of their policies.  That's very good relief.

5              THE COURT:  Do you know what that is?

6              MR. PENNY:  Well, the average was 28,000 per class

7    member.  They are right in that ballpark.  I don't know exactly

8    what it is.

9              THE COURT:  And they get double that.

10             MR. PENNY:  They get double that.  That's the same

11   relief that is offered to every single class member in this

12   lawsuit.  If they want it, they can do exactly what the

13   Skochins are doing and get what the Skochins consider to be

14   valuable paid-up benefits.

15             I just showed Your Honor at the beginning of the

16   hearing, in the aggregate for just 17,000 class members who

17   already decided to take an NFO benefit, they are getting

18   collectively almost half a billion dollars in additional

19   coverage as a result of this lawsuit.

20             THE COURT:  All right, very quickly, then the

21   attorneys' fees relative to the awards are exorbitant, conflict

22   of interest exists.  I don't understand exactly what the

23   conflict is.  Can you help me with your understanding of it?

24             MR. PENNY:  I think what he means by conflict is,

25   again, he thinks that the Skochins and class counsel and

1      everybody involved on our side sold -- I think he said sold

2      them down the proverbial river by settling a case where he

3      thinks people get no benefits but where I think I showed Your

4      Honor there are substantial benefits.

5            THE COURT:  He says essentially that your claim for

6      attorneys' fees, if you get the $24 million, which is

7      15 percent on the cash payment aspect of the settlement, that

8      you will be getting the equivalent of $500 an hour times

9      50,000 hours, and you spent nowhere 50,000 hours on the case

10     and so that's exorbitant.  So what's wrong with that argument?

11           MR. PENNY:  With all due respect to Mr. Jacobs, it

12     does not reflect the way class counsel's fees are justified and

13     paid out in these lawsuits.  Even when the fees are coming out

14     of a portion of the class's relief, you are still looking at

15     lodestar multiples.  You are not talking about giving class

16     counsel just their hourly rates.  I mean, we work on a

17     contingency-fee basis.  While this case might have been a good

18     result, dozens of others are not good results.

19           THE COURT:  He is correct that we are to look at the

20     lodestar calculation method in assessing whether or not the

21     contingent fee is reasonable.  The best thing to do is address

22     that when we talk about attorneys' fees.

23           MR. PENNY:  Fair enough.

24           THE COURT:  All right.

25           MR. PENNY:  The only other point --

```
1              THE COURT:  Go ahead.

2              MR. PENNY:  I don't know if this is an important

3    point for the Court or not, but I think it's important.

4    Mr. Jacobs' objections is really based on his own personal

5    circumstances.  He pretends or he thinks that he's speaking on

6    behalf of everybody else who has these gold class policies, but

7    what he doesn't appreciate --

8              THE COURT:  How many gold class policy owners

9    objected?

10             MR. PENNY:  That's a good question, Your Honor.  I

11   believe it was ten objections filed by 13 class members had

12   gold class policies, but I think if you survey those, they're

13   objecting on all sorts of different bases.  Not many of them

14   are objecting on the basis that Mr. Jacobs is, and Mr. Ferrara

15   is also included in that class.

16             THE COURT:  Do you have the numbers of those, the ECF

17   numbers of those objections?  Maybe you can get them --

18             MR. PENNY:  I could get them for you, Your Honor.

19             THE COURT:  Maybe you can get them at the break which

20   we will take now for 20 minutes.

21             MR. PENNY:  Okay.

22             THE COURT:  Ladies and gentlemen who are listening,

23   as I understand the protocol, they are to stay connected and

24   then get back in; is that right, Ms. Brown?  We'll be back here

25   in 20 minutes, so mark your clocks.
```

1           (Recess taken.)

2

3           THE COURT:  All right.  We are resuming the hearing.

4   Mr. Penny.

5           MR. PENNY:  Thank you, Your Honor.  I think that we

6   had finished up with Mr. Jacobs' objection, and I was getting

7   ready to move on to Mr. Ferrara.  Is that where you think we

8   are, too?

9           THE COURT:  It is.  The only thing I can say is I can

10  also take this opportunity to let Genworth address Mr. Jacobs'

11  objection so it's all in one place, and then he can have the

12  time to respond to both of you.  Would you like to do that?

13          MR. PENNY:  I think that makes sense, Your Honor.

14          THE COURT:  Of course, if you have anything to say

15  about the value points that Mr. Penny made, now might be a

16  decent time to say that, too.  Otherwise, you can just agree to

17  them or whatever you want to do.

18          MR. DUVALL:  Thank you, Your Honor.  On the value

19  points, I do echo, Genworth does echo what Mr. Penny presented.

20  And just, in short, this case was about providing policyholders

21  with additional information and allowing them the choice to do

22  something with their policies, to reduce or stop paying their

23  premiums with that additional information.

24          That's what the settlement provides, and Mr. Penny

25  nicely outlined some of the specific illustrations under

1    certain of those options, how those could work out in terms of

2    cash to the class members, in terms of additional benefits to

3    the class members in addition to that information in that

4    choice.

5           With respect to Mr. Jacobs' objection, as Mr. Penny

6    said and Genworth agrees, what Mr. Jacobs' objection boils down

7    to is that for his individual circumstance, he wants some

8    better relief, better relief than he could ever obtain in a

9    lawsuit against the company, by the way, than this class

10   settlement supposedly provides for him.

11          That is the stuff of an opt-out, and Genworth would

12   and does here, in open court, stipulates that if Mr. Jacobs

13   wants to opt out and sue for some sort of better relief that he

14   thinks he can get, then he is free to do so, but that is not

15   the stuff of an objection.

16          THE COURT:  May I make -- ask this question?  If we,

17   on your agreement and Mr. Penny's, extend Mr. Jacobs an

18   opportunity to opt out, do we not have to extend that same

19   opportunity to all other class members given that there has

20   been all this briefing and argument and refining and adding to

21   information available to people?  Would I have to do that?  I

22   have never really come across that, and I'm sure you all have,

23   and can I do that?  Is that possible?

24          MR. DUVALL:  The answer to your question, Your Honor,

25   is no, that's not something that needs to be extended here, and

1    the reason for that -- my point is that -- what Mr. Jacobs is

2    raising is not actually an objection.  He's saying, I want

3    something more or different for myself, for me, personally,

4    than is being made available to the settlement class.  And I'll

5    talk about in just a moment the lack of foundation he has for

6    that.

7              But if that's his objection, I guess my primary point

8    is the objection should be overruled because it's not an

9    objection to the fairness of the settlement for the settlement

10   class.  He's saying I want something more, I want something

11   different which, again, he hasn't proven up that he could get

12   this something more or something different, and if he tried to,

13   I don't think he would win.

14             But it's -- what he's saying is I want something

15   better for myself, and I think I can get it.  That's the stuff

16   of an opt-out.  That's why we are offering for him -- he's

17   raising this objection which seems pretty unique to him.  So if

18   he wants to opt out, we stipulate --

19             THE COURT:  You are -- at the end of your sentences

20   you are tending to elide the last couple of words, and I didn't

21   understand it.  Ms. Peterson may have gotten, but I didn't.  He

22   wants to opt out what?

23             MR. DUVALL:  If he wanted better relief for himself

24   uniquely, then he should have opted out.  For that reason

25   alone, his objection should be overruled.  To the other, to use

```
 1   his vernacular, gold class members which we're talking about,

 2   unlimited benefits with the inflation protection at five

 3   percent interest over the years, these other policyholders have

 4   not raised Mr. Jacobs' issue.  He's raising that solely on his

 5   own.

 6           Mr. Penny recounted having spoken to 4,000 class

 7   members who have expressed their support for this settlement.

 8   What Mr. Jacobs is raising is completely unique to him, and so

 9   my primary point is his objection should be overruled on that

10   basis --

11           THE COURT:  Because that is -- essentially the way to

12   raise that problem is not by objecting to the settlement in

13   class action litigation but to opt out and proceed separately

14   to obtain the relief to which you think you are entitled.

15           MR. DUVALL:  Thank you for putting it better than I

16   have.  If you'd like, Your Honor --

17           THE COURT:  Let's stop just a minute.

18           MR. DUVALL:  Sure.

19           THE COURT:  Mr. Jacobs, yes or no, would you like

20   belatedly to opt out and then you can pursue whatever remedy

21   you want?  Do you wish to opt out?

22           MR. JACOBS:  I think we should be a class action in

23   and of ourselves, the 17,000 people that do feel this way.

24           THE COURT:  Wait just a minute.  I asked you the

25   simple question to be answered yes or no.  Genworth, for whose
```

1    benefit the opt-out provision ultimately exists, and the
2    plaintiffs' counsel have both agreed that if you wish to opt
3    out, you can opt out.  They will agree you can opt out, and you
4    can bring whatever claim that you wish to bring separately for
5    yourself.  Do you want to do that is my question; yes or no?
6              MR. JACOBS:  No, if that's my only choice.  I think
7    there's a better choice.
8              THE COURT:  The answer is no.  That's the answer.
9    There's no if anything.  The answer is no, I don't want to do
10   that.  All right, he doesn't want to opt out, so we'll deal
11   with it as an objection.
12             Your argument at this point is it's not an objection,
13   it's an opt-out, he has missed his opportunity to opt out.  He
14   has declined the opportunity to opt out that has been extended
15   him at this time, and so I need to dismiss the objection as a
16   -- described as a concealed opt-out issue.  Now, the next one
17   is let's assume there's an objection somewhere --
18             MR. JACOBS:  Your Honor -- are you objecting --
19   what -- did you say you are overruling --
20             THE COURT:  I didn't say anything about overruling.
21             MR. JACOBS:  I'm sorry.
22             THE COURT:  Now, go right ahead, Mr. Duvall, address
23   it, the next point.  I guess it is that he hasn't proved
24   entitlement to objection because the premise is not -- he
25   hasn't established that.

```
 1          MR. DUVALL:  He has not established the premise of

 2   his objection.  Importantly, to get to the bottom of that

 3   premise and whether it were true and if we had facts from him

 4   to prove that would require an individualized determination of

 5   his specific case which is in contrast to what the settlement

 6   class is set up to provide which is the same --

 7          THE COURT:  Excuse me a minute.  What he would have

 8   to prove, you need to define what that is.  As I understand it

 9   from Mr. Penny, he would have to offer proof that in 2014,

10   there was a better option that he now seeks on the market, and

11   the fact is he hasn't offered that proof.  Is that what you are

12   addressing?

13          MR. DUVALL:  I am addressing that.

14          THE COURT:  And Mr. Penny also said that you were not

15   only going to address that, the effect of the absence of proof

16   on his point, but that you were going to show me that what he

17   was asserting simply wasn't correct, that there wasn't any such

18   thing on the market in 2014, I believe, if I understood

19   Mr. Penny correctly.  So, please proceed.

20          MR. DUVALL:  Thank you, Your Honor.  Mr. Jacobs --

21   and, actually, just let me make one point to be clear.  This, I

22   guess, second-level response to Mr. Jacobs' objection in

23   addition to really it's an opt-out in disguise is that the

24   relief that he is saying he could have gotten, and I'm going to

25   address why he couldn't have gotten it in just a second, is not
```

1    relief that we could provide under this settlement anyway.  I

2    just want to make that clear, that I'm not agreeing that this

3    is relief that he could have gotten, but I'll get back to that

4    point.

5              As for Your Honor's questions, Mr. Jacobs has offered

6    no evidence that he, in fact, could have or did go out on the

7    market in 2014 and find himself a, quote, better policy.  I

8    think he alluded on Friday, and I'll take his illustration or

9    his reference at face value that he looked at another policy, I

10   think he said a Mutual of Omaha.  We'll call that the silver

11   policy since he uses the gold policy for Genworth.

12             Why he didn't purchase that silver policy in 2014 and

13   kept his Genworth policy, I don't actually know because he

14   didn't put in any evidence of this, but the reason may very

15   well have been that his Genworth gold policy was a better

16   policy with better and bigger coverage and, in fact, for a

17   lower price than that silver policy was out on the market.

18             By the way, we're also assuming that Mr. Jacobs could

19   have gone out and qualified in 2014 as a matter of underwriting

20   for a new policy whereas he had already qualified for the

21   Genworth policy, I believe back in 2003.  Examples of that that

22   would extend beyond Mr. Jacobs, perhaps, or maybe this would

23   apply to Mr. Jacobs -- again, I don't know -- is did he have a

24   preexisting condition as of 2014 or any other reason that he

25   wouldn't have been able to get that silver policy on the

1   market.  Those are issues that he's raising of his

2   individualized causation, his individualized reliance.

3         To the point, Your Honor, that Mr. Penny alluded to

4   that what if Mr. Jacobs had tried to prove this -- and, by the

5   way, this goes for Mr. Ferrara as well to a certain extent.

6   Had Mr. Jacobs tried to go out and replace his, quote, gold

7   coverage in 2014, it was well established by this time, and

8   I'll represent to you that Genworth was not selling its gold

9   policies as of 2014, and other carriers had stopped selling

10  those policies also.

11        So if we're talking about trying to replace --

12        THE COURT:  Do I have anything in the record to prove

13  that Genworth was not selling its so-called gold policies and

14  that no one else was selling them?

15        MR. DUVALL:  Your Honor, just to be precise here, I

16  know that Genworth was not selling its gold policies as of

17  2014.  I'm trying to respond to what Mr. Jacobs raised on

18  Friday and today.  I can substantiate that with an appropriate

19  declaration if needed.

20        I also know that the companies regularly used

21  business records, and essentially industry research showed that

22  other carriers had stopped selling those policies as well.  I

23  don't want to overstate it and I say it was every single one of

24  them, but certainly carriers were -- many carriers had exited

25  that particular product market, so-called gold policy.

1              So if what we're talking about is Mr. Jacobs now

2    going out -- this is kind of what he referenced on Friday, was

3    going out and replacing his gold coverage with silver coverage,

4    a limited term policy, a six-year term, for example.  We did

5    look into this over the weekend.  What Mr. Jacobs, based on our

6    research -- and, Your Honor, if necessary, I can substantiate

7    this as needed with a declaration from the company.

8              If he would have replaced his, quote, gold coverage

9    with silver coverage, something like maybe that Mutual of Omaha

10   policy that he described, he would have paid at least two and a

11   half times more for that silver policy and gotten less coverage

12   than he was paying for and getting with his gold Genworth

13   policy.  That was the reality in 2014.

14             Again, if we were even litigating this, he didn't

15   submit any evidence, and I'm just adding this --

16             THE COURT:  You haven't submitted any either.

17             MR. DUVALL:  I can substantiate -- we're just trying

18   to respond to what he raised primarily orally on Friday, and I

19   can substantiate that.  I do note that the California

20   Department of Insurance's statement note -- that it has filed

21   as part of the record noted that Genworth's gold policies have

22   been, I think it said underpriced, and I think that's a fair

23   assessment of those, that they have been a tremendous value,

24   including for class members like Mr. Jacobs.

25             Mr. Penny referenced that the data -- the historical

1    data that Genworth has showing what class members did with

2    their policies in response to rate increases was that gold

3    policy members, approximately 40 percent of them, reduced their

4    benefits in order to reduce or even stop paying their premiums

5    on these gold policies.

6              Well, 60 percent of them kept the policies, again

7    because they're a very good value proposition.  It's the issue

8    Your Honor touched on when I was up a little earlier, and under

9    this settlement, if Mr. Jacobs or Mr. Ferrara, by example,

10   still want to keep their gold coverage, which they may very

11   well want to do, and I haven't heard either of them say that

12   they don't want to keep it or that they can't afford to pay for

13   it, then that's, perhaps, the election they should make under

14   this settlement.  And they're free to do so.  No one is taking

15   away their coverage.

16             But, again, back to the premise of Mr. Jacobs', and

17   Mr. Ferrara's to an extent, argument is that the consequence of

18   this alleged withholding of information by Genworth back in

19   2014 was that he was somehow prohibited from paying more money

20   for less coverage earlier.  It's just a faulty premise.

21             In any event, back to the point I touched on

22   hopefully a few moments ago.  The design of Mr. Penny and class

23   counsel's case from the beginning was to put policyholders in

24   the position that they would have been in had they decided

25   earlier, based on additional information, to stop or lower

1    their premium payments, and that's exactly what the options

2    that Mr. Penny thoroughly went through, one, two, three, four,

3    and five, are designed to do.

4          If a policyholder like Mr. Jacobs looks at that

5    information and said, you know what, I'd like to reduce my

6    premium payments, there are five options to do that, two of

7    which involve not just reducing but stopping the premium

8    payments, and then the additional components of that, the cash

9    payments are designed to put that premium money back in their

10   pockets.

11         And if Mr. Jacobs elects one of those options, and

12   maybe he'll want to elect option five and take down his policy

13   to a limited term, and he can take that cash he would have

14   otherwise been paying to Genworth over the last four years and

15   do whatever he'd like with it.

16         And Mr. Penny went through some of the average

17   payments of those special election options, and these are

18   material cash payments that they can do something with.

19         That would place Mr. Jacobs in the position that he

20   would have been in had he stopped doing business with Genworth

21   in 2014.  If he had stopped doing business with Genworth in

22   2014 and gone to this other carrier and started paying more for

23   less, Genworth wouldn't have made up the difference for his

24   purchase of another carrier's insurance policy.

25         And that's what I meant earlier when I said that

1    Mr. Jacobs, on the best day of his lawsuit, couldn't recover

2    any damages from Genworth, at least the consequence that he's

3    describing.  It's inverse harm, if you will.

4              And to the extent he wants Genworth to, as part of

5    this settlement, create some policy, some gold-plus policy or

6    maybe a gold policy at a lower rate than the regulators have

7    approved, we can't do that.  We have to charge, if he keeps his

8    gold policy, the filed and approved rates for these policies.

9              THE COURT:  You keep saying that the object of the

10   suit was to get the disclosures and allow better informed

11   elections, but the suit also sought damages in the prayer for

12   relief, page 56, paragraph C.  It sought compensatory,

13   consequential, and general damages in an amount to be

14   determined at trial.

15             Now, that, to some extent, is in conflict with the

16   assertion in paragraph 12 which calls for declaratory relief,

17   injunctive relief, rescission in the event of finding material

18   misrepresentation, and return of premiums for each year paid,

19   but that would -- if he had -- so what do you say is the

20   significance of the paragraph C in the prayer for relief in

21   respect of the argument you are making?

22             MR. DUVALL:  I, of course, invite Mr. Penny to speak

23   to their own complaint, but I would say, Your Honor, the

24   significance is it is insignificant.  The best statements of

25   what class counsel were trying to achieve and what the

1   settlement does achieve for this case is as stated, as you

2   noted, in paragraph 12.  I also --

3          THE COURT:  Page 12.

4          MR. DUVALL:  And please let me give you two more

5   paragraphs that, from our perspective, I think adequately sum

6   up what the plaintiffs were trying to do in this case.  That's

7   paragraph 32 and paragraph 212.

8          THE COURT:  212, I read.  I want to go back and look

9   at 32.  I know I've read it all.  It said, "The class seeks,

10  among other relief, rescission of the policy, renewal elections

11  they made, an adequate, forthright, and full disclosure of

12  Genworth's current financial condition and plan for future rate

13  increases, and an opportunity to decide, with the benefit of

14  that information, what policy renewal elections they will

15  elect going forward."

16         MR. DUVALL:  I think that's an apt summary, and the

17  allegation in the complaint, of what this case was trying to

18  achieve.  As for the general prayer for relief, the damages

19  that the settlement has been structured to provide would be

20  what is the money in terms of increased premiums that a class

21  member like Mr. Jacobs was paying over the course of 2012, '13,

22  '14, depending on when his or her rate increases started.

23         On no day in his best day in a lawsuit could he

24  obtain replacement cost from Genworth for switching carriers.

25         THE COURT:  Let me ask you something.  Suppose that

1  the evidence were to be offered by Mr. Jacobs at a trial that

2  he had gone to the market in 2014, and in the market he had

3  gotten a policy, and the policy -- he kept a copy of what he

4  was going to be able to get.  He could have gotten it, and he

5  qualified for it, and it was the same as the Genworth policy

6  that he had, his gold policy.

7          Couldn't he recover the difference between the cost

8  of that policy and the cost of the Genworth policy as damages

9  for the fraud -- that he would elect then to sue on -- affirm

10  the contract and sue on the fraud?  So he would still have the

11  Genworth policy, but he would have as damages the difference in

12  the price if he were to prove that.  Wouldn't that be an option

13  that would have been available to him?

14          MR. DUVALL:  I would submit, Your Honor, that his

15  damages in that case, which, again, he cannot prove that case,

16  but if hypothetically he were to, his damages would be the

17  difference -- the increased premiums that he was paying to

18  Genworth over the years before -- excuse me, after he had

19  retroactively decided to change carriers.  I'm not aware of a

20  case that would allow him to recover those damages, but the key

21  point here --

22          THE COURT:  Isn't that generally what you can

23  recover, is the difference between the contract you had and

24  passed up but for the fraud?  There are lots of cases that

25  present that scenario, I was defrauded, they lied to me, so I

1    stayed with them, I could have had this instead, and the

2    measure of damages is the difference between what you could

3    have had -- and that means what it cost you.  So that's not --

4    that's the premium difference is what I thought you just said.

5         MR. DUVALL:  We would respectfully contest that and

6    that the damages were as I described.  Your Honor, if

7    Mr. Jacobs -- again, if he wants to bring that case, that's a

8    very individualized case.  There's a lot of this:  Did he

9    really go out and do this, could he have done it, what would he

10   have found -- I already previewed what he actually would have

11   found -- would he have qualified for the policies.

12        If we want to have a trial separately with Mr. Jacobs

13   on that, that's fine, but no other class members, no other gold

14   class members are saying, yeah, that's a problem for me, too.

15   The overwhelming support of the class members is in favor of

16   this settlement.

17        THE COURT:  Anything else on Mr. Jacobs?

18        MR. DUVALL:  No, I'll cede back to Mr. Penny to

19   object other than just to really emphasize that it would -- for

20   Mr. Jacobs to essentially speak for the class, it's just not

21   representative of the feedback that we have received on this

22   settlement.  I'll cede the podium.  Thank you.

23        THE COURT:  Now we're dealing with what; Mr.

24   Ferrara's objection?

25        MR. PENNY:  Yes, Your Honor.  That's what I was

1   intending to do if that's okay.

2          THE COURT:  All right.  That objection is which

3   number here?

4          MR. PENNY:  He's ECF number 170, Your Honor.

5          THE COURT:  It is an objection on the basis of

6   predominance; right?

7          MR. PENNY:  Yes, Your Honor.

8          THE COURT:  You may address that.

9          MR. PENNY:  I just lost the document.  Sorry, Your

10  Honor.  One second.  So Mr. Ferrara's objection, as he

11  emphasized several times on Friday's hearing, is based on what

12  he alleges is the lack of predominance over the materiality

13  issue.  We addressed this directly in our reply to Mr.

14  Ferrara's objection, and we made it quite clear that the

15  element of materiality is an objective element.

16         There aren't differences among the class members

17  because it is an objective standard.  We cited several cases in

18  our reply brief at page 30, footnote 11.  For example, we cited

19  the *Lilly v. Jamba Juice* case which specifically said,

20  "Materiality is judged by an objective standard rather than any

21  understanding specific to the individual consumer."

22         We also cited the Supreme Court's opinion in *Amgen*

23  which said, quote, because materiality is judged according to

24  an objective standard, the materiality of Amgen's alleged

25  misrepresentations and omissions is a question common to all

1   members of the class."

2          We also cited to the Restatement (Second) of

3   Contracts and the Restatement (Second) of Torts that are in

4   harmony, and both say that a misrepresentation is judged --

5   whether a misrepresentation is material is judged by a

6   reasonable person standard.

7          That footnote could have been a page long.  This is

8   the state of the law.  Mr. Ferrara's objection on predominance

9   has no basis in the law.  It also has no basis in fact because

10  what Mr. Ferrara's objection is based on is his presumption

11  that this narrowly defined class that he has created to

12  surround his policy has people at a more advanced age who,

13  perhaps, are in a cohort that are more susceptible to things

14  like dementia and that as a result of all that, they are

15  supposedly more locked in to these policies, to use Mr.

16  Ferrara's term, than other members of the class are.

17         The factual problem with that predicate for Mr.

18  Ferrara is it's just not true, and it's completely belied by

19  Genworth's experience with his specific subclass policy pool.

20  He should know that policyholders in his narrowly defined

21  subclass have already reduced their benefits or taken

22  nonforfeiture options at more than 43 percent.  This is not a

23  group of people who are locked in to their contracts.  In fact,

24  that 43 percent is a higher, quote unquote, take rate or higher

25  rate of people taking reduced benefit and nonforfeiture options

1    than exists in the rest of the class as a whole.

2            Again, it's the exact opposite, I think, of Mr.

3    Ferrara's presumption, and the factual predicate underlying his

4    objection is just faulty.

5            THE COURT:  All right.

6            MR. PENNY:  I don't know that he makes another

7    objection that's outside that, but I think it's worth noting --

8            THE COURT:  What he's saying is because the

9    predominance -- the lack of predominance on the materiality

10   element, you have to have a subclass, and the subclass is

11   people 75 and older.

12           MR. PENNY:  Right.  And I think, as I just explained,

13   Your Honor, first, there is no issue of predominance on a

14   materiality element, and, second, there would be no basis.

15   Actually, that second point that Your Honor just mentioned

16   reminds me that Mr. Ferrara's objection -- you could search it

17   in vain, and you would not find two important things.  You

18   would not find any specific discussion of a conflict that he

19   thinks that his subclass has with the rest of the class.  He

20   never actually says what the conflict might be if one even

21   exists.  That's important.  That's his burden.

22           He also never says what kind of relief he wants for

23   his subclass.  At least Mr. Jacobs articulated a theory where

24   he could go out to the market and he and his subclass might

25   have gotten a better deal.  I think we debunked that, but he

1    gave some indication of what he was after.

2              Mr. Ferrara has given absolutely no suggestion to the

3    Court what other remedy he would seek for his subclass.  That's

4    another defect and an important one.

5              It's important to recognize, as I think Your Honor

6    did at Friday's hearing, that what Mr. Ferrara has done is

7    arbitrarily create the limits of his class to basically

8    surround his policy.  The reason he's done that is I think Mr.

9    Ferrara is savvy enough to realize that he cannot come into a

10   class action settlement and try to demand some individual

11   relief.

12             So he's tried to create some cover for himself by

13   creating a narrow subclass arbitrarily defined to surround his

14   policy.  I think he even said as small as he could possibly

15   make it so that it might be less onerous on the parties to try

16   to, for lack of a better term, cut his subclass into a better

17   deal.

18             That's not the purpose of an objection, particularly

19   when you haven't established any actual conflict between your

20   class and the rest of the class, haven't provided any

21   indication of what additional benefits you've had, and actually

22   your primary objection, which is founded on the predominance

23   issue with regard to the materiality issue, lacks any legal

24   background or factual background.

25             I don't know that there's much more to say on that,

1  Your Honor.  I think the objection should be overruled on those

2  bases.

3           THE COURT:  Do you have anything to say on Mr.

4  Ferrara's objection?

5           MR. DUVALL:  Yes, please, Your Honor.

6           THE COURT:  All right.

7           MR. DUVALL:  I think Mr. Penny adequately addressed

8  Mr. Ferrara's essentially predominance objection to settlement

9  class.  Let me please try and add on and focus on the

10  predominance issues with respect to Mr. Ferrara's subclass.

11           Mr. Penny noted Mr. Ferrara's attempted to define one

12  very narrowly for reasons that don't entirely match up

13  consistently with his own brief and for reasons that I think we

14  all would have to speculate about, but, in any event, Mr.

15  Ferrara admitted he picked age 75 as his subclass start age

16  because he's 75.  Well, why not age 70, why not age 65?  It's

17  an arbitrarily defined number.

18           If Mr. Ferrara's answer is, well, because after age

19  75, there's an increased likelihood of diminished cognitive

20  function, why not also include class members who are suffering

21  from Alzheimer's or from dementia or have a family history of

22  that and may be at a heightened risk?  Why not include other

23  class members that have had an adverse medical event during the

24  class period, a stroke or another event that, for whatever

25  reason, made them less or completely uninsurable at this age?

1          And why only gold class policy members as Mr. Ferrara

2   has proposed?  Doesn't this logic apply to all Genworth

3   policyholders who could have conceivably suffered some sort of

4   affliction or, as Mr. Ferrara says, aged out during the course

5   of the class period such that they're in an allegedly different

6   position?

7          My point in asking these rhetorical questions is Mr.

8   Ferrara has arbitrarily defined a subclass that, itself, rests

9   on so many individualized determinations including, like

10  Mr. Jacobs', whether Mr. Ferrara or anyone else in his subclass

11  could have qualified for other policies back in 2014, '16, '18,

12  or could not have, those are individualized issues.  So it's

13  Mr. Ferrara's subclass that can't meet a predominance test.

14         We don't need a subclass in this case.  This

15  settlement gives each policyholder, regardless of age, medical

16  condition, financial condition, value judgments about their

17  policy and whether they want it or whether they want to pay

18  less premiums, the same menu of options, and they can make

19  whatever choice they want including, as Your Honor noted, to

20  keep their policy as is.

21          I don't know if Mr. Ferrara doesn't want to keep his

22  policy.  I don't know whether he can afford his policy.

23  He's -- I know he's a lawyer, and his colleagues are on the

24  phone.  This is a very creative theory, but it's just not

25  necessary for this case.  The settlement class is a cohesive

1    class that satisfies predominance, satisfies commonality.  Mr.

2    Ferrara's subclass isn't.

3              And a final point, and I'll cede the podium on

4    this --

5              THE COURT:  So what do you say -- I was going to ask

6    Mr. Penny the same thing.  What are the common issues common to

7    the class, and why do those common issues predominate?

8              MR. DUVALL:  The common issues are that the

9    information that was allegedly -- whether the information that

10   was allegedly withheld from these policyholders, the capital D

11   disclosures, the two disclosures at the centerpiece of this

12   settlement, whether that information would be material to any

13   particular class member, and the common result of that is that

14   they can each take that information and make whatever choice

15   they want with that information.  They can elect one of the

16   five options, or they can keep their policy as is, same

17   information, same menu of choices, and the beauty of it is they

18   can do what they want.

19             This is a better settlement than, for example, saying

20   we're going to cut down everyone's benefits or we're just going

21   to give everyone some cash.  They can choose from these menu of

22   options and do what they want.

23             To that point, Your Honor, to the extent that --

24   again -- I know we're done with Mr. Jacobs for now, but to the

25   extent he wants better relief for himself or to the extent Mr.

1  Ferrara, to use Mr. Penny's terms, is using a subclass to get

2  better relief, this is a settlement.  This provides valuable

3  options to all the class members.

4  If they can articulate -- this goes for Mr. Ferrara.

5  If he can articulate a theory by which he could, perhaps,

6  extract some additional benefit, which I don't see it, then

7  same point with him.  That's not the stuff of an objection.

8  That's an opt-out, and it's not a reason to tank this

9  settlement for the rest of the class that supports it.

10  THE COURT:  All right.  Mr. Penny, what are the

11  common issues?  He identified the materiality of the

12  information that was omitted as the common issue.  Is there any

13  other common issue?

14  MR. PENNY:  Yeah.  Consider, Your Honor, all of the

15  common facts which I'm going to give to you right now.  All of

16  these policyholders, everybody in the class, has a choice one

17  policy.  They've all bought the policies back in the early

18  2000s and all had them --

19  THE COURT:  That's a fact issue.

20  MR. PENNY:  Well, common issues of fact are just --

21  are the same as common legal issues to a certain extent.  We'll

22  get to the legal issues in a moment.  So they're all purchasing

23  their policies in early 2000.  None of them have gotten any

24  rate increases prior to 2013 which means they're all in the

25  same boat where they have these policies, they know that they

1    might be subject to future rate increases, but none of them

2    have gotten any for about a decade.

3           Then all of a sudden starting in 2013, all of the

4    class members start getting really significant and sequential

5    rate increases.  All of them are given the same information

6    about those rate increases, and, more importantly, they are all

7    deprived of the same allegedly more material information.

8           Every single one of them were faced with the same

9    decisions, the same quantitative and qualitative decisions when

10   they got rate increases which is they were given options to

11   reduce their benefits, to walk away from their policy, or to

12   make some other policy form changes -- I'm sorry, or to keep

13   their benefits the same and pay the higher premiums, and every

14   single one of them had to make that same decision without the

15   benefit of the allegedly material disclosures that they're

16   getting in the settlement.

17          They're all similarly situated because they all have

18   been mistreated, allegedly, by Genworth in the same way.  What

19   the settlement allows them to do is, on those common issues,

20   give all of them the disclosures, give all of them essentially

21   the same menu of options, and give all of them the option to

22   reduce their benefits, walk away from their policies, do

23   whatever they may do, or keep their policies the same.

24          That's a very cohesive class, and the important thing

25   about the structure of this settlement is the only issue that

1    might be individual to any of them is what exactly will they

2    elect in the settlement:  Keep their benefits, elect one of the

3    five options, or other.  And the settlement allows them to do

4    that individually without conflicting with each other, because

5    one class member's decision in the settlement has no effect on

6    any other class member's.

7            Not a common fund.  It's not like the relief is only

8    offered to somebody until, you know, that relief has been

9    claimed up to a certain level and then other people have

10   different choices.  There's no conflicts, and the only

11   individual issues that could be considered in this case are

12   allowed to be decided individually in the settlement.

13           THE COURT:  And the common issues of law?

14           MR. PENNY:  Look at the fraud claim.  What were the

15   allegedly misleading disclosures, were they material, what is

16   the -- what are the damages that flow from that.

17           THE COURT:  Basically it's a materiality of the

18   disclosure.  The rest of it is fact; right?

19           MR. PENNY:  Yes, but that doesn't mean that there

20   aren't common issues that predominate.  Usually common

21   issues are --

22           THE COURT:  A, were they made -- the elements of a

23   fraud claim are were they made, the misrepresentation by

24   omission, was it relied on, was it material, did damage ensue,

25   and then, depending upon the applicable law, was it intentional

1    or was it negligence.  Those are the elements; right?

2              MR. PENNY:  Essentially, yes, Your Honor.

3              THE COURT:  What other legal issues are there other

4    than materiality?  Or is materiality a fact issue or legal

5    issue?

6              MR. PENNY:  It's an element of the claim.  I don't

7    know if you want to call certain elements factual elements or

8    legal elements.  They're all elements of the claim that the

9    class members have in common with each other.

10             THE COURT:  All right.

11             MR. PENNY:  I'm asking Your Honor, should I move on

12   to the Agulnicks' objections, or is there more to be done on

13   the Ferrara objection?

14             THE COURT:  I think what we'll do at this time is

15   hear what Mr. Jacobs and Mr. Ferrara have, and then we'll move

16   on to the other one.

17             MR. PENNY:  Okay.

18             THE COURT:  Mr. Jacobs, you've heard what they have

19   to say.  Do you have anything else to say in response to what

20   they said?

21             MR. JACOBS:  Yes, I do, Your Honor, thank you.

22   Forgive me.  I'm not as polished in my presentation.  I've

23   never done this before, but a couple things I would like to

24   say.

25             One thing that clearly doesn't make sense here is --

1    why Genworth is so anxious to settle this is, they committed a

2    fraud.  They did something wrong.  We're hurt.  How is it that

3    Genworth is actually going to gain by this suit?  They want

4    this suit to be settled.  They will profit from this, and if

5    you look at page -- the bottom of page 23 in the attorney's

6    response to objections, it clearly says that they will most

7    likely benefit from this.

8            THE COURT:  Excuse me.  The bottom of page 23, what

9    language are you talking about?  That's on ECF 177.  That's the

10   response.  What are you talking about?

11           MR. JACOBS:  It says don't worry about Genworth's

12   ability to pay because --

13           THE COURT:  Wait a minute, Mr. Jacobs.  You just read

14   the exact language to me.

15           MR. JACOBS:  You want me to read the exact language?

16           THE COURT:  I want to know what you are saying -- you

17   made the statement that Genworth said that they will profit

18   from this settlement.

19           MR. JACOBS:  Okay.  I'll be happy to.  I'll read the

20   paragraph.  "Initially, Genworth has represented to class

21   counsel that it will be able to pay the attorneys' fees and

22   expenses negotiated under the settlement, as well as the cash

23   damages payments elected by settlement members.  As for

24   objectors' concerns about the impact of these payments on

25   Genworth's 'financial condition,' class counsel notes that to

1   the extent the class members elect special election options

2   that reduce their coverage, it logically and mathematically

3   follows that Genworth's overall claims liability will be

4   reduced correspondingly, which may improve Genworth's

5   'financial condition' and ability to pay."

6               THE COURT:  All right, thank you.  Anything else?

7               MR. JACOBS:  Yes.  If I may, attorney for Genworth

8   stated that why didn't I do something in -- why didn't I change

9   policies in 2014, and my answer is why would I do that in 2014?

10  I was not aware of the fraud that was committed by Genworth,

11  and at that time, yes, I was satisfied with that policy.  If

12  they told me that in a few years you're going to end up

13  spending $27,000, I would look at other things.

14              The other thing I would like to talk about is the --

15  Mr. Penny continues to say that he has 4,000 people who have

16  approved of this.  I mean, does he have a list of names, can he

17  document that, and, of that, how many are of the gold class

18  member standards?  I understand other groups possibly

19  considering this.

20              Another important point that I would like to make is

21  that I was gravely misled about the Skochins.  I had asked

22  before I entered my objection letter, you know, who is

23  representing gold class members, and they said, well, the

24  Skochins are gold class members.

25              As it turns out, I found out this past Friday, as we

1    all did, that the Skochins were not gold class members.  They

2    opted out in 2018, so, of course, they're going to be thrilled

3    to accept any policy that gives them more money, any benefits

4    from this lawsuit that gives them more money along with the

5    $50,000.  So they were more than anxious to approve and did not

6    have the interests at heart of the 47,000 people that are, in

7    fact, gold members.

8            In addition, I can tell you, just like he said, well,

9    you know, the policies in 2014 were, you know, who knows what.

10   The fact is, I checked policies in 2020, and there's a policy

11   that I would have been open to which was a dual combination

12   which allows up to 12 years between me and my wife, and the

13   price was less than what I'm paying now for Genworth and

14   appears, from research, that it would actually end up being

15   much less over the years in converse to the $27,000 from

16   Genworth.

17           I think that these attorneys, Genworth and our

18   attorneys, simply chose to ignore that there's a group of

19   people that had different needs, and they -- that they should

20   be accounted for.

21           I mean, even the offering that they're doing, the

22   options, are options that, you know -- if they pick option five

23   or if they pick option four, they would go down from -- I'm

24   sorry.  In certain cases they would go down from five years

25   coverage to four years, four years to three years.  Ours has

1   gone from unlimited coverage to a maximum of six-year coverage

2   at two-thirds the price -- at two-thirds the daily rate that

3   we're getting in the hospitals.

4           They just ignored it, and they're using every tactic

5   in the book right now to defame the gold class members and, you

6   know, try and get out of this issue that they simply chose to

7   ignore and Genworth didn't want to touch because it would be

8   too expensive for Genworth.

9           Genworth would make money off of this.  And the final

10  thing, just one final thing that I would like you to do, and I

11  would urge you to look at, again, the response -- this really

12  sums it up beautifully.  The response on page 37 and 38 of the

13  plaintiffs' retort to objections.  If I may read it, it's three

14  very short paragraphs regarding California's opinion on what's

15  taking place here.  If I may?

16          THE COURT:  Page 37?

17          MR. JACOBS:  And 38, yes.

18          THE COURT:  You want to read -- you are talking about

19  the thing that begins "in response" and ends with the paragraph

20  that -- second paragraph is on the next page, says "class

21  counsel appreciates," and the next one, "initially," and the

22  next one is "also important."

23          MR. JACOBS:  No, Your Honor.  It's really the second

24  paragraph on page 37, "California class members should not be

25  asked to take reductions."  Do you have that?

```
 1                    THE COURT:  What's the beginning word in the
 2     paragraph?
 3                    MR. JACOBS:  "California class members should not be
 4     asked."
 5                    THE COURT:  That's page 37 of 177?
 6                    MR. JACOBS:  It's page 37 of the response -- at
 7     least -- of the response of -- the plaintiffs' lawyer's
 8     response to our objections.
 9                    THE COURT:  Yeah, number 177, and there's nothing
10     like that on page 37 that I can find.
11                    MR. JACOBS:  Maybe the attorney can refer to it.  May
12     I read it to you?
13                    THE COURT:  Look at the top of the document.  Does it
14     have a number on it?
15                    MR. JACOBS:  No.  I don't have -- no.  The document
16     that I was given was really with just basically page numbers by
17     my attorneys.
18                    THE COURT:  Does it have a first page?  Does the
19     document you are reading from have a first page?
20                    MR. JACOBS:  It certainly does.
21                    THE COURT:  Stop talking and find it and read it to
22     me, please, sir, the title.  What does it say?
23                    MR. JACOBS:  The first page, very first page says
24     Skochin -- Jerome Skochin, Susan Skochin, and Larry Huber,
25     individually --
```

 1            THE COURT:  Excuse me.  Go down and look at the bold

 2   type below that.  What does it say?

 3            MR. JACOBS:  "Plaintiff's reply in support of (1)

 4   motion for final approval of class action settlement, and (2)

 5   class counsel's motion for an award of attorneys' fees and

 6   expenses service awards" --

 7            THE COURT:  That's ECF number 177.  You want me to

 8   turn page to 37.  Is it 37 on the bottom of the page or 37 on

 9   the top of the page?

10            MR. JACOBS:  It's on the bottom of the page.

11            THE COURT:  Now stop a minute.  On that page, go to

12   the very first line and read the first five words.

13            MR. JACOBS:  Okay.  On the top of the page, page 37,

14   "a consequence of this proposed settlement agreement" --

15            THE COURT:  All right.  That's fine.  Now go down

16   that page and count the lines and tell me where you want me to

17   look and tell me the line number.

18            MR. JACOBS:  Okay.  I'm sorry.  It's line -- where it

19   says "Court dated June 12" -- oh, okay.  Okay.  It's -- the

20   paragraph that starts with "To its credit," and it's --

21            THE COURT:  That's an indented paragraph where they

22   are quoting from the California Department of Insurance.

23            MR. JACOBS:  Correct.

24            THE COURT:  I've read that.  Now what about it?

25            MR. JACOBS:  It speaks perfectly clear that -- it

1    says it all, that they're concerned that the policyholders may

2    forfeit policy benefits that are worth substantially more than

3    the compensation they would receive and, conversely, that

4    settlement could provide Genworth with a windfall if deductions

5    to future claims and reserves and obligations greatly exceed

6    damages.

7            So the paragraph before that explains what the

8    attorneys did not do, what they should do.  Mr. Penny gave all

9    these calculations of --

10           THE COURT:  The paragraph before that doesn't say any

11   such thing as that.  You quit flailing around with words and

12   attribute them to the -- attributing them to a statement in a

13   document, and you confine yourself to what's in the document

14   when you are quoting the document.  If you want to make a

15   statement on your own, you can, and I think your time is about

16   up because you're wasting everybody's time now.

17           Your point is that the California Department of

18   Insurance said, "However, class members should not be asked to

19   take reductions to their policy benefits that are

20   disproportionate to the proposed cost savings and settlement

21   compensation."  And you agree with that; is that right?

22           MR. JACOBS:  Yes, sir.  They never performed a cost

23   analysis on the paragraph --

24           THE COURT:  That isn't what this says.  That isn't

25   what this says.  Now, your point is they should do a

1    cost-benefit analysis; is that right?  Yes or no?

2            MR. JACOBS:  Yes.

3            THE COURT:  All right, thank you.  Now, do you have

4    anything else, any other point you wish to make in response to

5    what Mr. Penny and Mr. Duvall said?

6            MR. JACOBS:  No.  Thank you very much, Your Honor.

7    No.

8            THE COURT:  All right, Mr. Ferrara, you have the

9    opportunity to say anything you'd like to say in response to

10   what they said.

11           MR. FERRARA:  Thank you, Your Honor.  So, first, I

12   certainly accept the compliment from counsel that I've been

13   creative.  Trust me, Your Honor, there was nothing creative

14   about what I've done.  I simply read the rule and the two

15   leading Supreme Court cases on the subject.  There was nothing

16   creative about it at all.

17           Let's turn to their comments, and I'll try to

18   respond, although I probably can't respond with the elegance

19   that they have delivered given their preparation time.  So,

20   first they say that there are common elements -- sorry, common

21   questions of fact and law that go throughout this case, and

22   they went through a whole list of them.  I think that list is

23   as good a list as we're going to find both on the questions of

24   fact or law that satisfy Rule 23(a).

25           However, the way this rules works on 23(b)(3) is that

1  those common questions, that whole laundry list that's been

2  provided by counsel, have to predominate over questions

3  affecting individual class members.  Let's focus on that issue

4  very carefully, because that's what this Court is going to be

5  focusing on.

6          Now, no one in this courtroom, I think, would

7  disagree with the proposition that in passing upon this

8  settlement, the principal feature that one looks to as the

9  jurist in this matter is the likelihood that plaintiff will

10 succeed if there's litigation on the merits.  That's the key

11 question.

12         Now, let's look at that question in terms of

13 predominance.  On the one hand, you have insurable policy

14 owners who continued, as a class, to make premium payments

15 after the fraud was exposed, and that defeats any claim that

16 the half truths were material.  That's one side of the case.

17         THE COURT:  What?  Say what you said again.

18         MR. FERRARA:  Yes.  I said insurable policy owners

19 who continued as a class, as a group, a cohort, to make premium

20 payments after the fraud was exposed defeats any claim that the

21 half truths were material.  Now, that is one side of the case

22 on whether they'll win, who will win.  Let's take a look at the

23 other group, the other policy owners.

24         THE COURT:  Wait a minute.  How is that -- according

25 to the allegations, there were people who made payments,

1    continued to make payments because they didn't have any other

2    choice.  That doesn't mean that they're not material.  That

3    means that they didn't have any other choice, as I understand

4    the allegations in the complaint.

5             MR. FERRARA:  I think that the counsel for Genworth

6    has said that there were no other choices.  I suppose that the

7    policy owners at the time, had they known the truth, would have

8    explored other options other than reducing the level of

9    coverage in their policies.

10            THE COURT:  Excuse me a minute, Mr. Ferrara.  When

11   was the truth disclosed, in your estimation?

12            MR. FERRARA:  Well, according to the plaintiffs, as I

13   recall it, Your Honor, they take the position that at point of

14   sale, there was created a, quote, expectancy, close quote, that

15   rates would never be changed.

16            THE COURT:  Mr. Ferrara, excuse me.  I didn't ask you

17   that question.  I asked you a question about when the truth, as

18   you say it, was disclosed, and you're making the point that

19   part of the case -- I'm not quite sure why you are making it,

20   but you're making the point that part of the case is that

21   people continued to make payments after they knew the truth of

22   the matter, and, therefore, the non-disclosed material --

23   information was not material.  My question to you is, in that

24   statement, when do you contend that the truth was disclosed?

25            MR. FERRARA:  All I can contend, Your Honor, is

1    what's in the complaint.

2              THE COURT:  Well, Mr. Ferrara, if necessary, I can

3    fence with you for as long as you want to fence.  I've been

4    doing it for a long time, but I'm not asking you that.  If you

5    say it's in the complaint, you tell me where it is in the

6    complaint that it was disclosed.  Give me the page, paragraph,

7    and number.

8              MR. FERRARA:  The complaint says -- I can't give you

9    the paragraph and number.  2018 is the time when the plaintiffs

10   allege that the fraud was originally disclosed, and I accept

11   that for purposes of this discussion.

12             THE COURT:  All right.

13             MR. FERRARA:  So we are talking about whether these

14   common questions predominate.  We talked about one half of the

15   equation.  The other half of the equation is determining who

16   has the likelihood of success is those policyholders who I've

17   said are vulnerable for all of the reasons identified in my

18   approach and what I said last time which was the additional

19   factor, not the sole factor but the additional factor of

20   dementia.

21             With respect to that group, they don't have this

22   immateriality problem.  They have a strong argument, and if

23   this subclass, this cohort of individuals who are I call

24   vulnerable, contested this case, they'd have a dramatically

25   better chance of prevailing over those claims than does the

1    class that basically continued to pay after the fraud was

2    disclosed.  So, to me, that's a predominance issue.

3         Let me flip now, if I may, Your Honor, because I want

4    to respond to all of their questions.  They say that there is

5    an objective materiality standard, and that's correct, Your

6    Honor.  It is objective which only means that a reasonably --

7    sorry.  The decision has to be made objectively with respect to

8    materiality whether there's a reasonable similarity of

9    similarly situated vulnerable class members to determine

10   whether or not materiality is there or not objectively.  It is

11   not a question that all are treated the same way.

12        Now, they refer to the *Amgen* case, and, Your Honor,

13   I'm well and I'm sure this Court is well acquainted with *Amgen*,

14   but in that case, the Court was saying, the Supreme Court was

15   saying, as I recall it, that the materiality was the same for

16   all class members because if the case -- if the determination

17   was made that the misstatement was material, then it would --

18   sorry, was immaterial, it would affect everyone the same way,

19   all class members the same way.  Here, since there is such a

20   division of likelihood of success on the materiality issue, the

21   *Amgen* dialogue on that subject is not relevant to this case.

22        Let me turn to the next point that they raise.  They

23   say that what are the conflicts.  Your Honor, I never use the

24   word conflicts in my approach.  What I suggested was there need

25   be a subclass of these vulnerable policy owners who are

1    separately represented who can then make a determination of

2    what should be done for that subclass.  I have no objection to

3    class counsel representing the subclass as well if they feel

4    they can do so without conflict.  I have no interest in

5    counseling that counsel for the subclass as to what they should

6    ask for.  That's between the lawyer and the client of the

7    subclass.

8            Next, the kind of relief that I suggested, Your

9    Honor, my role in this case has been to point out, or to try

10   to, the predominance issue and 23(b)(3).  I suggested that this

11   problem can be solved with a subclass.  I put in there some

12   thoughts about subclass relief, but the subclass relief to be

13   demanded has to be made by the subclass and its representative,

14   and I'm not a representative of the subclass.  They need their

15   counsel.

16           THE COURT:  All right.

17           MR. FERRARA:  Finally, Your Honor, you know, I

18   certainly don't object to the erudition with which counsel for

19   Genworth and for the plaintiffs have expressed their opposition

20   to my objection.  I expected that, and I respect that the

21   thoughtfulness has been given in responding to me.

22           However, Your Honor, I don't think that it's

23   appropriate that they lace into to their response the ad

24   hominem attack of me saying I chose 75 because that's my age.

25   What I said yesterday was that the proper age, looking at the

1    statistics I cited in my opposition, is probably around 70 and

2    a half, but what I said was, I thought 75 was better because it

3    would keep the subclass small enough for Genworth to be able to

4    deal with it and still take care of the most vulnerable group.

5         So I had an honest intention of why I took 75 and

6    didn't expect to be criticized in an ad hominem way for it.

7    Your Honor, I'm finished.  Thank you for your patience with me.

8         THE COURT:  We're going to go ahead and take lunch

9    here in a minute, but let me tell you something.  I want you to

10   tell me in your motion for approval and the brief in support,

11   ECF 135 and 136 --

12        MR. FERRARA:  That's not mine, Your Honor.

13        THE COURT:  I'm sorry, Mr. Ferrara.  I'm talking to

14   plaintiffs' counsel.

15        Where in there does it discuss predominance and what

16   the predominant issues are?  His point is there really aren't

17   any predominant issues of law, and you were skimpy in

18   discussing what they were to begin with.  You pointed to a

19   large number of predominate issues of fact, and there are.  And

20   sometimes you approve classes.

21        I know there was a discussion of it fairly

22   extensively in the motion for preliminary approval, and you do

23   discuss it in 177.  Let's see, what page is that?  Where is

24   that?  The final document you objected to people, where is that

25   discussion of Ferrara's objection?

1          MR. PENNY:  Right now, Your Honor, are you asking me
2    where in the reply brief do we respond to --
3          THE COURT:  Yeah.  I just want to lay my hands on it
4    right quick.
5          MR. PENNY:  Hang on one second.
6          MR. DUVALL:  Brian, would you like me to help you
7    out?
8          MR. PENNY:  So the issue on predominance in the reply
9    brief is addressed at page 30, and if you're looking at the ECF
10   page numbers, that's 35 of 47.
11         THE COURT:  I got it.  I'm just trying to make
12   sure --
13         MR. FERRARA:  Your Honor, this is Mr. Ferrara.  You
14   might want to ask the plaintiffs' counsel to identify the page
15   in their opening brief in support of sending notice.  They do
16   talk about predominance there.  They give it one paragraph and
17   then run off and talk about reliance which is not the
18   predominance issue.  If they can give you the cite to that
19   page, you'll see it.
20         THE COURT:  It's the paragraph that begins "to the
21   extent," and then there's a footnote 11.
22         MR. PENNY:  Yes, Your Honor.
23         MR. FERRARA:  Regrettably I don't have that document,
24   but, if I recall, there's one paragraph on the predominance,
25   and the rest of the page is talking about reliance.  So the

1  full extension, the full attention given to predominance is one

2  paragraph and doesn't touch on any of the issues on

3  predominance.  It just repeats that predominance is a factor

4  and it's been satisfied, period.  That's all it said.

5          THE COURT:  Mr. Ferrara, I was talking with

6  Mr. Penny, not you.  But I appreciate having your information,

7  and we'll go look at the document -- you are talking about the

8  motion for preliminary approval, I believe.

9          MR. FERRARA:  Yes, sir.

10          THE COURT:  Yes, Mr. Penny.

11          MR. PENNY:  I was just going to point out for Your

12  Honor, the reason that most of the attention is given to the

13  reliance element is that is usually the element that is most

14  difficult to meet on a predominance inquiry.  Materiality is

15  almost a given, as I think basically Mr. Ferrara has

16  acknowledged.  Materiality is an objective criterion, and it is

17  almost always a common issue for the entire class as it is

18  here.

19          THE COURT:  Is materiality a question of law or fact?

20          MR. PENNY:  I think it's a question of law, Your

21  Honor, but I don't know -- there's not a requirement, even in

22  the Supreme Court cases that Mr. Ferrara addresses, that the

23  common issues be common issues of law as opposed to common

24  issues of fact.  In fact, they can be both.

25          THE COURT:  The analysis is, are there common issues

1    of law and fact or law or fact, and in order for me to comment

2    on that intelligently, I need to know what you say are the

3    common issues of law and what are the common issues of fact.

4    You have identified for me the common issues of fact.  You have

5    not identified the common issues of law until just then when

6    you told me materiality was a question of law.

7            I'm sure you'll be able to root through things over

8    lunch and get back.  We will take an hour for lunch.  It's five

9    minutes to 1:00.  We'll be back five minutes to 2:00.

10

11           (Luncheon recess.)

12

13           THE COURT:  All right.  Now, right before lunch, I

14   thought -- I may be wrong, but if I am, tell me -- that you

15   told me that materiality was a question of law; right?

16           MR. PENNY:  Yes, Your Honor.

17           THE COURT:  In your brief filed -- I don't know what

18   the docket number of this thing is -- December 20 -- give me

19   the docket number of that, plaintiffs' memorandum of law in

20   support of motion to direct notice of proposed settlement to

21   the class.

22           MR. PENNY:  92.

23           THE COURT:  In your brief there, on page 28, it says,

24   "Whether Genworth's failure to disclose its need for

25   substantial rate increases was material to insureds is a

1   question of fact for a jury," citing *Amgen*.

2          MR. PENNY:  Yeah, Your Honor, it looks like I

3   misspoke there.

4          THE COURT:  Which one?

5          MR. PENNY:  Looks like it's a question of fact for a

6   jury to decide, particularly since it's an objective element,

7   so I apologize.

8          THE COURT:  Are there any common questions of law?

9          MR. PENNY:  Yes, Your Honor.

10         THE COURT:  What are they?

11         MR. PENNY:  If you look at the same brief, at pages

12  23 and 24, we talk about commonality, and we list a couple

13  of --

14         THE COURT:  Just a minute.  Let me get there.  I did

15  look at it, actually, over lunch.  Common questions include

16  whether the partial disclosures created a duty to make a full

17  disclosure.  That's a question of law, is it?

18         MR. PENNY:  Yes, Your Honor.

19         THE COURT:  That is a question -- whether Genworth

20  breached the duty.  It seems to me that's a question of fact.

21         MR. PENNY:  Well, I believe questions of duty and

22  breach would be -- I think duty would be a question of law.

23  Breach might be a question of fact and law mixed.

24         THE COURT:  I think it is.  Then the next one is

25  entitled to damages.  That's a common question of law; what?

1   Common question of what?

2          MR. PENNY:  What damages they would be entitled to,

3   whether injunctive relief or declaratory relief they'd also be

4   entitled to, those are common questions of law.

5          THE COURT:  There's nothing else other than what's

6   there, is there?

7          MR. PENNY:  A little bit further on closer to the

8   section Your Honor was looking at earlier, at page 26 through

9   28, there is a discussion of the element of reliance and how

10  reliance, in a situation such as this which we're dealing with

11  form contracts and material omissions, can be presumed, that

12  would be a question of law that would be common for the class.

13         THE COURT:  Why is that a question of law?  Why isn't

14  reliance a quintessential question of fact which is what makes

15  it uniquely amenable to jury trials?  Whether I relied on

16  something is a question of fact, it seems to me.  Now, it says

17  here that you can presume reliance, but I'm not sure that's

18  adequately treated.  My recollection is that -- in the papers.

19         My recollection is that that's sort of a unique

20  concept, and I've lost exactly what the context of that

21  statement is, but it probably needs to be fleshed out.

22         MR. PENNY:  Well, I think the important point, Your

23  Honor, is that --

24         THE COURT:  So reliance -- here's the statement that

25  somewhat perplexes me.  Page 26 in document number 92,

1    "Although reliance is generally an element of a fraud claim,

2    and Rule 23's Advisory Committee's notes to the 1996 Amendment

3    cautioned reliance may not be well-suited for a class status

4    where 'material variation in the representations made or in the

5    kinds of degrees of reliance by the persons who whom they were

6    addressed' are present, the notes also find it appropriate to

7    use a class device to resolve cases involving 'fraud

8    perpetrated on numerous persons by use of similar

9    misrepresentations,' as here."

10             Now, I would think that the price of a product, which

11   is what was not disclosed here, and the need for an increase of

12   the price over time would be a factual issue that would be

13   material, and I don't have any problem finding that.  But what

14   about reliance?  You see, it seems to me that Mr. Jacobs and

15   Mr. Ferrara are really talking about the kind or degree of

16   reliance.  Does that, then, necessitate an analysis of the

17   predominance question that is somewhat different than the way

18   you've addressed it?

19             MR. PENNY:  No, for a couple of reasons.  First, even

20   if we construe their complaints or objections through the lens

21   of reliance and a predominance issue, the facts just don't bear

22   that out.  They are presuming that everybody else that has

23   their same level of policy, same level of benefits sees the

24   world the same way they do, and that's not true.

25             We've seen from the numbers and from the historical

1   reaction of the class that a lot of class members have already

2   reduced their benefits.  They're going to find these settlement

3   options that allow them to make the same reductions but get

4   cash damages payments back to be very attractive.

5        And back to the issue of reliance itself, though --

6        THE COURT:  Doesn't that argument just actually say

7   that they are -- these are individual, very individualized

8   decisions that should be made as to whether they relied much or

9   relied at all on the representations?

10       MR. PENNY:  There's nothing wrong with recognizing

11  that there might be some individual decisions in a class case.

12  The idea of a class action isn't that everybody is identical.

13  It's that there are efficiencies to be gained by litigating

14  their claims together.  That is the case here.

15       And predominance is primarily an issue for the trial

16  court when looking at certifying a class for a trial, because

17  often, if issues don't predominate, for example differences in

18  state laws or something like that, it is going to make the

19  trial of the case impractical.

20       The *Amgen* case from the Supreme Court in the late

21  1990s made it pretty clear that when you're dealing with a

22  settlement approval, the predominance issue is much easier to

23  meet.  And the *Dukes* case from the Supreme Court also makes it

24  quite clear that you do not have to have every single element

25  or issue at law to be exactly the same for every class member.

1    You are just looking to see whether there are common issues,

2    even if the common issue is just one, that drives the lit --

3    that drives the resolution of the claims.

4           Here, whether you call them issues of fact or issues

5    of law, the duty, breach, causation, materiality, reliance

6    elements that we identified before are all of the elements of

7    the claim.  So, again, whether you call them fact, whether you

8    call them law doesn't really matter.  Essentially they are all

9    being resolved collectively.

10          THE COURT:  The Fourth Circuit has called the

11   materiality a mixed question of law and fact.

12          MR. PENNY:  Okay.  Again, I don't think it's

13   important whether we define each one as a question of law or a

14   question of fact and put it into buckets, because, again, the

15   *Dukes* case is very clear.  This is not a quantitative analysis.

16   It is a qualitative analysis.  You want to ensure that the

17   common issues that drive the resolution of the case are going

18   to be acceptable or susceptible to common proof.

19          Back to the reliance on the fraud example that Your

20   Honor was quoting from the rules, the point there is --

21          THE COURT:  I was quoting from your brief.

22          MR. PENNY:  I'm sorry, from my brief which was, in

23   turn, quoting from the Federal Rules, the comments to them.  If

24   you have a fraud case in which you are trying to say, well,

25   insurance agent A told me this and insurance agent B told him

1    something else, did they both buy the policy for the same

2    reason, that would create two individual issues.  You have two

3    different representations with two different assessments of

4    materiality for two different plaintiffs.

5            But what that quote is saying is, when you have the

6    same misrepresentations, especially if they're omissions, that

7    are the same to all the class members, that creates a

8    commonality of interest.  And, again, the wonderful thing about

9    this settlement --

10           THE COURT:  In part, that's the *Stanich* case?

11           MR. PENNY:  Yes, Your Honor, the *Stanich* case is a

12   very good example.

13           THE COURT:  But the *Stanich* case involved home

14   insurance, didn't it?

15           MR. PENNY:  Yes, Your Honor, but the point in *Stanich*

16   was --

17           THE COURT:  Does it makes a difference that here

18   we're talking about an insurance that relates to your health,

19   particularly to coverage in your old age and that everybody

20   looks at that somewhat differently depending upon their own

21   health situation and their own medical circumstances?

22           MR. PENNY:  Not necessarily, Your Honor, but, again,

23   the thing about this settlement is it creates a mechanism where

24   all the class members are treated alike, and on that issue that

25   Your Honor is raising which is, well, what might I have done

1    differently about my policy, they get to make those choices by

2    themselves unaffected by what other class members are doing.

3         So all of the reasons you want to ensure you have a

4    cohesive class are addressed in the settlement even if there's

5    some concern that there are individual issues being raised,

6    because the settlement does not pit class members against each

7    other, it doesn't disenfranchise them.  If another class member

8    selects a different option, it treats them all the same by

9    giving them the same disclosures, which were the hub of this

10   case, and the same options to makes changes to their policy,

11   and there are no -- there's no -- there are no subclasses of

12   this group that aren't represented in the settlement.

13        Again, Mr. Jacobs is saying I don't like these

14   options.  There are going to be several people who say I'm not

15   going to change my policy based on the disclosures even with

16   these options that are given to me, but it's not like his group

17   isn't getting good options.  That option five, which reduces

18   the unlimited term to a limited term and still has five percent

19   compound interest protection and puts thousands of dollars back

20   into his pocket, that looks just like the silver class policy

21   he wanted to go out in the market and buy.

22        I don't know if he doesn't see that, he doesn't care,

23   whatever it is, but it's not like his group is being left

24   behind, and he thinks that by not being -- he thinks that

25   everybody else in the gold class policy feels exactly the way

1    he does, and that is not the case.  As we just showed Your

2    Honor, over 40 percent of gold class policyholders have already

3    reduced their coverage outside the settlement.  They did that

4    and got absolutely nothing in return.

5          This settlement puts everybody in a much better

6    position, and if there are legal issues that we wouldn't have

7    been able to carry at trial about class-wide reliance or

8    something like that, the party that would have been harmed by

9    that is Genworth who is agreeing to the settlement.  Class

10   members are better off in this settlement than they ever would

11   be without.

12         THE COURT:  All right.  Anything else on those two

13   objections?

14         MR. PENNY:  Only just to point out that Mr. Ferrara,

15   when he alleged that the complaint said that the fraud was

16   revealed in 2018, that is not what the complaint alleges.  The

17   complaint alleges that for a few policyholders in 2018, there

18   was a step towards a more fuller disclosure, and the reaction

19   of the class to that shows that they needed more material

20   disclosures as well.

21         So there is not this issue that Mr. Ferrara presented

22   where the fraud has been disclosed to the class in 2018 and

23   then people decided they're still going to keep paying their

24   premiums.  That is not at all true or accurate.

25         THE COURT:  All right.

```
 1              MR. PENNY:  The only other point I'd make is he keeps
 2    talking about his subclass being a more vulnerable group, and
 3    he said that they have a stronger claim, but he still hasn't
 4    explained why he thinks they have a stronger claim, why their
 5    group is any differently situated than everybody else.  Looking
 6    at historical claims reduction practices of his group versus --
 7    they are no different than anybody else.  There's just no
 8    reason to treat them any differently than the rest of the
 9    class.
10              And he still hasn't pointed out any conflicts, so,
11    again, the basis for a subclass doesn't seem to make any sense.
12    And even if this predominance issue had some teeth to it at
13    some point, his subclass doesn't seem to address that in any
14    way.
15              THE COURT:  Are you going to address Mr. Luck's?
16              MR. PENNY:  You mean the Agulnicks'?  Mr. Luck's
17    objection was overruled --
18              THE COURT:  Agulnick, excuse me.
19              MR. PENNY:  Okay.  So the first issue that the
20    Agulnicks raised had to do with the -- they alleged undefined
21    terms in the settlement agreement, and on Friday --
22              THE COURT:  What document, what is their objection?
23              MR. PENNY:  I'm sorry, Your Honor.
24              MR. PETTY:  162.
25              MR. PENNY:  162.
```

1          THE COURT:  All right, thank you.  All right, go

2     ahead.

3          MR. PENNY:  The allegation was that there were

4     undefined terms in the settlement agreement, and as it turned

5     out, there weren't any undefined terms in the settlement

6     agreement itself.  It was in the form of the special election

7     letters.  I think the real complaint was the special election

8     letters didn't include all the information for each individual

9     class member and for those to be distributed to the class prior

10    to their decision on whether to opt out.

11         We talked a little bit this morning about the *Lumber

12    Liquidators* case and how it is not uncommon, in fact -- not

13    uncommon for non-complete information to be given to the class

14    before they have to decide whether to opt out or object.  The

15    reason for that is that the Agulnicks are trying to put forth a

16    standard for what the notice -- how complete a notice must be

17    that just doesn't exist.

18         Their standard seems to be based on contract law

19    principles, but contract law principles are not at play here.

20    Due process principles are.  That is because the operation of a

21    class-wide relief and the decision on whether class members are

22    bound by the settlement or the judgment or not are an operation

23    of the Federal Rules of Civil Procedure, not contract law

24    principles.

25         It is Rule 23(b) -- excuse me, it is Rule 23(c) that

1    says that for any class that is certified under Rule 23(b)(3),

2    like this one would be, the judgment is binding on all class

3    members.  The judgment includes the release.

4         So the issue is not whether class members have been

5    given full and complete disclosures as in forming a contract.

6    The issue is whether the notice program complied with due

7    process, and, here, we had explained that it did.

8         It's also --

9         THE COURT:  So the issue is do the options have to be

10   spelled out specifically before somebody has to opt out.

11   That's the first objection; right?

12        MR. PENNY:  Right, Your Honor.  And there's just no

13   case law to suggest that that is the truth.  And, in fact, that

14   can be highlighted by the fact that the Agulnicks haven't cited

15   to any case dealing with a class action opt-out or release.

16   All the cases they cite for this proposition that this release

17   is part of an agreement to agree deal with actual contract

18   formations, not with the operation of a class-wide relief.

19   Release, excuse me.

20        It's also important to note that the reason contract

21   law principles aren't at play and due process principles are is

22   because it is often impractical to provide complete exact

23   information to the class prior to final approval.  And that is,

24   in fact, the case here.  It would be impractical, unnecessary,

25   wasteful, and confusing to try to give each individual class

1    member its special election letter before the settlement is

2    finally approved.

3            THE COURT:  Well, you say that, but how much would it

4    cost to do that?  There's no record that I know of to tell me.

5    They have 207,000 people.  They have files on every one of

6    them, know exactly what they are.  I cannot -- I don't want to

7    say I can't envision, but I would rather much expect that

8    Genworth has pretty well figured all this out before they

9    agreed to the settlement, and, if not, afterwards.  So they

10   pretty well know, you know, what kind of -- who is going to get

11   what letter, don't you?

12           MR. PENNY:  Here's the point:  They have a sense for

13   what the settlement will cost them based on some of the

14   analysis we did before, but going through the process of

15   creating the letters will require a number of different teams

16   within Genworth to create entirely new programs to interface

17   different software programs and start generating these letters.

18   Genworth is probably better equipped to talk about that.

19           THE COURT:  They're going to have to address that

20   because I don't understand -- you have five options, you know

21   who the insureds are.  On the surface, it seems rather

22   reasonable to me to say, all right, given the variations in

23   these options and the costs and the benefits, and there are

24   benefits to every one of them, but there's also a cost-benefit

25   analysis that needs to be conducted, and that is what's the

1   benefit of this choice, option one, versus all the others,

2   because you're going to pay an increased premium, or if you

3   take the nonforfeiture option.

4           Why don't I hear from Genworth on that point and see

5   what the problem is.  Maybe now is a good time, and then you

6   can come back and do the rest of it.

7           MR. PENNY:  Sure.  When I come back after they

8   address the cost of it, there are other issues about what the

9   effect of this letter would be, how confusing it would be,

10  etcetera.  I just want to tag on top of that.

11          THE COURT:  You'll have a chance.  I don't have

12  anything in the record about how hard it would be to generate a

13  letter giving the details of the option to Mr. and Mrs.

14  Agulnick and, *a fortiori*, to all 207,000 class members.

15  Certain aspect of logic tells me it might be complex.  Another

16  application of logic may suggest that it's -- with the aid of

17  computers, it's not really all that difficult.  I don't know

18  one way or the other.  All I have are his assertions and yours.

19  Where does that leave me?

20          MR. DUVALL:  Your Honor, I can address the difficulty

21  of doing this and, frankly, more importantly, the timing

22  reasons why it shouldn't be done in this matter, but I'll take

23  Your Honor's question first.

24          As to the difficulty of doing this, Mr. Penny already

25  reviewed.  In order to get these special election letters out,

1    Genworth has to reprogram several systems and then link up

2    those systems, accounting systems, policyholder administration

3    systems, customer service systems.

4              The time to take that from now until final -- let me

5    amend that.  I don't mean now as of July 13th.  I mean when

6    we're at a point where we can do this, and I'll explain what I

7    mean in a second.  This is an estimated build-out of three more

8    months and a million dollars in cost.  Please let me tell you

9    why it's not a good idea to do that now --

10             THE COURT:  Wait a minute.  Let me see if I can get

11   you.  You can accomplish all that's necessary to do that by

12   incurring an expense of $1 million over a period of three

13   months.  Is that what you just said?  I'm having trouble

14   hearing you, so if that's what you said, tell me.

15             MR. DUVALL:  That is what I said with the very

16   important caveat that we're only able to take that process and

17   move it forward if we have finality of the settlement, and let

18   me explain what I mean by that.  The issue with providing

19   settlement class members with that information now and all at

20   once is that it will be confusing, that it will be subject to

21   change, and that it will not be something that the class

22   members can get meaningful feedback on from Genworth.

23             THE COURT:  You used the pronoun it will be.  What is

24   the "it" in that sentence?

25             MR. DUVALL:  If a special election letter went out to

1    all 207,000 class members right now before final approval,

2    that's the "it."  The reason that that is premature is that the

3    class members who would be receiving that would be looking at

4    this special election letter that they can't actually elect

5    from because it hasn't been approved by Your Honor, it hasn't

6    gone through the filter of that particular class member's state

7    regulator as to whether that can go out, and, very importantly,

8    that class member's particular policy, his or her premiums and

9    his or her benefits may change between now and that time period

10   when they actually can elect a special election option, and

11   they can change for several reasons, one of which, as Mr. Penny

12   has over viewed, is because class members may be currently

13   adjusting their policies, adjusting their premiums, and so the

14   menu that's put in front of them now wouldn't be the menu that

15   matches what's actually available to them when this settlement

16   is final because of changes they make in between.

17            Another reason is that premium increases may be

18   approved in their state and implemented.  So the actual value

19   of that cash component, the corresponding paid-up benefit may

20   be different between now and the time that they can elect.

21            THE COURT:  If there's an increase, will those

22   benefits be greater or lesser?

23            MR. DUVALL:  The settlement benefits would be greater

24   because with respect to the paid-up benefits, it's going to

25   capture those additional payments.  So, in other words -- and

1    that's exactly the point.  We need to give the class members

2    current information at the time they can make the election,

3    and, right now, it's just premature.

4              Now, I mention the ability of class members to get

5    meaningful feedback.  Genworth sends its policyholders rate

6    action letters -- by rate action, letters about their premium

7    rate increases -- throughout the year, and Genworth has been

8    doing this for several years.

9              Genworth spreads those communications out to

10   policyholders based on their policy anniversary date, and it

11   does that so that a bunch of policyholders don't get the same

12   letter on the exact same day, and a big part of the reason for

13   that is because those policyholders, as we expect the class

14   members to do, will want to call in to Genworth and talk about

15   what their current policy looks like and what it may look like

16   if they make some changes.

17             If we send 207,000 of these letters, which, again,

18   are incomplete and subject to change, out now, it's going to

19   overwhelm customer service such that the class members aren't

20   going to be able to get meaningful feedback.  That's on top of

21   this information being incomplete and, perhaps, confusing to

22   many class members for that exact reason.

23             Your Honor, this is why the parties -- we did think

24   through this in crafting this settlement.  In the settlement

25   agreement, it's paragraph 44C of the settlement agreement, we

1   provided that the special election letter would be sent by

2   Genworth after it had time to properly prepare its systems for

3   the mailing, processing, and servicing of those letters and

4   after the final settlement date for exactly this reason.

5          Likewise, paragraph 44D is that the letters may be

6   sent by Genworth not at all at once even in one state, let

7   alone all the states, but over the course of the year tied to a

8   date off of policy anniversary date, six to eight months.

9   Again, we really tried to think through these issues as to what

10  would be best for the class and what would get them this

11  information in the most effective way they can use it.

12         Just a couple final points on this, and then I'll

13  turn it back over to Mr. Penny.  Class members, before they

14  elect these options, if they want to elect an option, they'll

15  get the information tailored to them.  So it's not that they're

16  never going to get the information.  They're going to get the

17  current information at the time they need it.

18         The final point I'll make on this, unless Your Honor

19  has questions, is if we do what the Agulnicks are proposing and

20  send out these notices now, which we -- just to be candid, we

21  just can't do it, but if we were to, it would just delay

22  getting these settlement benefits out to the class.  It will

23  just back this up even further, and that's certainly not what

24  we want to do --

25         THE COURT:  Why will it delay?

1            MR. DUVALL:  Because the premise being that we have

2    to do this before final approval in order to get, essentially,

3    effective opt-outs, and, by the way, that's not something

4    that's required by Rule 23.  Mr. Penny has noted similar cases.

5    Rule 23 does not require this.  This is an opt-out settlement.

6            But if we're to take this additional step, which,

7    again, we can't agree to it and it's not something that would

8    be in the interest of the class, Genworth's policyholders, we

9    would just be -- theoretically, we'd just be pushing out, then,

10   the finalization of this and getting the benefits actually out

11   to the class in the time that they could actually use these

12   settlement benefits, and unfortunately --

13           THE COURT:  Stop a minute.  A somewhat related issue

14   is why can't -- what's the impediment to taking the proposed

15   settlement agreement to the 50 regulators, letting them decide

16   if they -- that there's a problem and then having the approval

17   occur after I know what the regulators are doing?

18           I'm concerned about that because of this letter from

19   California in which that regulatory agency suggests that it may

20   not -- it may want a different result for its insureds.  That's

21   rather much how I read what that letter says.

22           I don't know how I can do that.  I don't know how I

23   can say a settlement is fair when there are several thousand

24   insureds in California, and they may get a different outcome

25   than the insureds in Virginia or Maryland or South Dakota.  So

1    how do we deal with that situation?

2         MR. DUVALL:  Deal with that situation, Your Honor, as

3    Rule 23 allows and how other cases have dealt with it.  Your

4    Honor can give final judicial approval to the proposed class

5    action settlement as fair, reasonable, and adequate, and then

6    we, Genworth, as a regulated entity -- and the fact is the law

7    is Genworth is regulated as an insurer in 50 states, and each

8    of those 50 states has and can right now and can tomorrow

9    regulate the communications that go out to its policyholders.

10        That's a necessary part of this, but you can give

11   your stamp of final approval on the fairness of this

12   settlement, and then we can go out and implement it.  I know

13   that the brief that the parties jointly filed cited several

14   cases in which courts have granted final approval of settlement

15   terms as fair, adequate, and reasonable that had provisions to

16   the effect that regulators in a particular state could

17   eliminate the relief to class members.  Those settlements

18   are -- have been approved.

19        Here, we have actually had six months --

20        THE COURT:  I can't understand how anybody could do

21   that, any judge could do that if somebody, some regulatory

22   agency can take away the benefit conferred by the settlement.

23   I don't see how a court can do that.

24        MR. DUVALL:  Your Honor, the *Motor Fuel Sales*

25   *Practices* case, District of Kansas affirmed by the Tenth

1    Circuit, *Dickman* case in the District of Maryland, the *Feller*

2    case in the Central District of California, all of these were

3    cited in the joint papers.  They involved that scenario of a

4    settlement being approved and the regulators could essentially

5    take that relief, and I'll give you an even broader example

6    from the Fourth Circuit.  The *Berry* case, which I know the

7    parties have cited for a number of propositions --

8              THE COURT:  What case?

9              MR. DUVALL:  It's a case called Berry, B-e-r-r-y.

10   The specific citation I'm referring to is 807 F.3d at 616.  In

11   that case, the settlement, the only relief provided by that

12   settlement was that the defendant would change its background

13   check product, FCRA case.  No monetary relief, no anything

14   else.

15             The settlement provided that the defendant, after

16   final approval, could implement changes over time to respond to

17   the then current requirements of the -- of customers and the

18   market.  It has nothing about regulators.  My point is, that

19   was a far broader essentially discretion of the defendants to,

20   after final approval, change the terms of the settlement.  The

21   Fourth Circuit, over objection, approved that settlement.

22             I just point that out because that's even beyond

23   these other cases that we cited to Your Honor that allow

24   regulators to have essentially control of what happens in their

25   states following the final approval of a settlement.

```
 1              THE COURT:  That wasn't a regulator.  That was the
 2    entity in the -- that was attendant in the case, and they had
 3    to change it to be consistent with the ultimate outcome of what
 4    the settlement was.  They couldn't diminish the amount of the
 5    settlement by doing that.  They couldn't take away in the Berry
 6    case.  They could only conform to the law.
 7              And, here, California has signaled that it's not
 8    going to go along with your plan.  That's what bothers me.
 9    What page is that -- 37 of ECF number 177.  "Class members
10    should not be asked to take reductions to their policy benefits
11    that are disproportionate to the proposed cost-savings and
12    settlement compensation."  And then it is later said, "The
13    CDI," which is California Department of Insurance, "is
14    concerned that" quote, quoting this department, "plaintiffs do
15    not provide an assessment of the value of the benefits that
16    class members must forfeit pursuant to any special election
17    option and do not weigh the value of those forfeited benefits
18    against the value of the reductions in premium, damages
19    payments, or enhanced paid-up benefits that class members would
20    receive."  In fact, the CDI said that it was concerned that the
21    "proposed settlement may induce policyholders to forfeit policy
22    benefits that are worth substantially more than the
23    compensation they would receive and, conversely, that the
24    settlement could provide Genworth with a windfall if reductions
25    to future claim and reserve obligations greatly exceed damages
```

1    paid."

2           The natural reading of the articulated view of the

3    California Department of Insurance is that the approach that

4    has been outlined here is not going to cut it in California.

5    Now, I realize they didn't file any objection, but, you know,

6    it seems to me that what they did in doing that is a rather

7    clever way to keep their options open.  Because if they filed

8    an objection, and it had been overruled, then the parties could

9    have shut them down if, during the regulatory process, they

10   tried to achieve what they had set out to do in the litigation

11   and the objection but had lost.

12          So, obviously, they're keeping their hand open to

13   achieve, or be able to achieve, what it is that they haven't --

14   that they have expressed concern over.  And if that happens,

15   then -- how many California people are there?  How many

16   policyholders are there?  I've forgotten.

17               MR. DUVALL:  I don't have the number --

18               THE COURT:  She has it.

19               MR. DUVALL:  I have the percentage.

20               THE COURT:  How many is it?

21               MS. LUO:  Your Honor, it's 39,814.

22               THE COURT:  39,000 out of 207,000.  That's a lot of

23   people.  They have 39,000 people that are going to get --

24   they're going to get an explanation that's far different than

25   what the other 160,000 people are going to get, and that could

1    be -- make a big difference, I would think.  So how do I deal

2    with that?

3            MR. DUVALL:  I'll take head-on the questions you just

4    raised about California, and then I do want to go back to,

5    though, how the sequence of the settlement is unaffected.

6            California policyholders aren't going to get a

7    sweetheart deal.  They're not going to get more relief, they're

8    not going to get more material benefits under this settlement

9    than are the other states.  We represented that in the papers.

10   I represent it again to you now.  We've made the representation

11   to regulators.  This is not a situation where we're going to go

12   out and let us state, negotiate an additional material benefit

13   for its policyholders.  It's not going to happen.

14           THE COURT:  That depends on how you define that

15   benefit.  For example, do you define in that benefit a more --

16   a cost-benefit analysis of the type suggested in paragraph --

17   in page 37?

18           MR. DUVALL:  That benefit to be -- to take that head

19   on, it's not a benefit.  From our point of view, from

20   Genworth's point of view, and it will be discussing this with

21   California, that is not a good idea for policyholder class

22   members.

23           To step back, this case is about policyholders being

24   given the choice to lower or reduce their premium payments for

25   their long-term care policies, and those premium payments have

1    increased over the years, and we recognize that policyholders

2    may not want to pay those increased premiums for a variety of

3    reasons.

4              So what this lawsuit tries to achieve and what the

5    settlement tries to achieve is to allow policyholders the

6    ability to reduce or even stop paying those premiums based on

7    the information that the plaintiffs alleged in this lawsuit was

8    material to that decision.  And if they do, we treat them,

9    these electing class members, as if they had made that decision

10   earlier by putting those cash payments back in their pocket.

11             That's what this settlement is about.  It's about

12   reducing premiums.  It's not about this actuarial equivalence

13   of values of the benefits that are being reduced, and they're

14   not being forfeited, by the way.  They're being reduced in

15   order, again, to get the premiums down.

16             THE COURT:  Sounds logical to me, but suppose

17   California Department of Insurance doesn't agree with you?

18   You're going to issue a letter here.  The letter you're going

19   to issue is going to have in it the following:  It's going to

20   have an assessment of the value of the benefits that class

21   members must forfeit pursuant to any special election option

22   and an explanation about the value of those forfeited benefits

23   weighed against the value of the reductions in premium, damage

24   payments, or enhanced paid-up benefits that class members would

25   receive.

1          To me, that would be a very helpful kind of thing, if

2     I were making this decision, to have that information.  But in

3     the ordinary course of the insurance policy, if I want that, I

4     have to go out and pay somebody to prepare that analysis for

5     me.  These people who wrote this, and why, I don't know, but

6     they're saying that in order for them to sign off on this,

7     that's going to be on the table for discussion.  They're not

8     saying they're going to do it, but they're saying it's on the

9     table for discussion.

10         And if it's on the table for discussion and is

11    discussed and had it been done before it came here today, I'm

12    not -- I don't think I can approve the settlement as fair,

13    reasonable, and adequate if one group of consumers

14    representing -- what is that?  It's over ten percent of -- what

15    is it?  My math is not that good.  What did you say it was?

16         39,000 people, 37,000 people out of 207,000 get that

17    kind of deal and the others are not going to get it, what you

18    are doing is for those California people, you're saying those

19    insureds get a free analysis to look at whereas the people in

20    Virginia and Maryland have to go out and pay somebody to do

21    this analysis in order to exercise the option.  That's the

22    functional effect of this particular provision.

23         And they think that's important to avoid inducing

24    policyholders forfeiting policy benefits that are worth

25    substantially more than the compensation they would receive or

1   that it would give Genworth some kind of windfall.  To me, it's

2   a very troublesome part of this whole thing.

3           I was involved years ago in a case in which the

4   parties reached a settlement.  It wasn't a class case, it was a

5   multidistrict case and involved a number of different

6   utilities.  And the utilities were regulated industries, and

7   because the settlement would have an impact upon the economic

8   situation of the utilities and, perhaps, even provide the basis

9   for pass-through of some of the cost to the ratepayers, it all

10  had to be approved by the ratepayers in 15 different -- 13

11  different states.

12          The judge gave tentative approval to the settlement

13  agreement and the terms that were there and said, you take that

14  to the rate people, and when you get the rate people's approval

15  and it has finished, I will bless it finally, and it had to be

16  approved by the Court for reasons I can't recall.  Why wouldn't

17  that approach work here?

18          MR. DUVALL:  If we undertook that approach here, we

19  would not finish that regulator engagement process in any time

20  soon enough to get this relief out to the class.  This would go

21  on far, far longer than any of us would want it to, and it

22  would delay getting these benefits to the class.

23          THE COURT:  Excuse me a minute.  Think through what

24  you just said.  This process is going on with the regulators if

25  I approve it.  And it's going to take the same time for the

1     regulators to act whether you're doing it contingent upon an

2     ultimate finding here or after their action as it is if I sign

3     off on it today and then they are going to act.

4          So what you're telling me is that either way -- at

5     least I understand what you say -- the consequence of what you

6     are saying is that either way, this approval process is going

7     to take a long time and, in your words, keep the distributions

8     from going to the policyholders.

9          Now, if that's the case, I'm not sure how fair,

10    reasonable, and adequate this settlement is.

11         MR. DUVALL:  What I am telling you, Your Honor, is

12    that if we have to go out and complete that regulator review

13    process before this Court gives its stamp of a final approval,

14    that will take far too long.

15         THE COURT:  How long?  How long will it take?

16         MR. DUVALL:  I can't give you an answer for that.

17         THE COURT:  Excuse me, but you have people who deal

18    with these insurance people every day --

19         MR. DUVALL:  Uh-huh.

20         THE COURT:  -- every month, and you know what the

21    process is, and you know how long that takes, and you ought to

22    be able to tell me.  You may not, not you and your firm, but

23    your client does, and it may not -- you may not be able to say

24    it with any precision, but you certainly can provide me the

25    information, and given what you just told me, you are going to

```
 1    provide me the information before I do any further approval of
 2    this case, because what you have just told me is that even if I
 3    sign off on it today, it's going to take a long time to get it
 4    done, and I don't think that's right.
 5            MR. DUVALL:  Please hear me out, Your Honor.  That's
 6    not quite what I'm saying.
 7            THE COURT:  Forget about what you are saying for the
 8    time being.  Have your client get started today giving me
 9    answers on how long it's going to take to get this regulatory
10    approval process going given what has to be done in each state.
11            In Virginia, for example, you have to issue X, a
12    statement on X, and then the commission has Y time to react to
13    it and then citizens have Z time and then the general
14    history -- there's no terminal date to it, but the general
15    history says -- Virginia Power, for example, is that they
16    approve or disapprove rate increases in three months or four
17    months or whatever.
18            That seems to me to be information your client
19    certainly is bound to have, but, again, I don't want to be like
20    Judge Warner and presume that the Prussians kept marching
21    orders for the Franco-Prussian War and then be reversed because
22    of it, but it stands to reason that the company would have this
23    kind of basic information available to it and it could be
24    provided.
25            MR. DUVALL:  Here's the point I'm trying to make,
```

1    Your Honor:  If these sorts -- if this sort of process plays

2    out where the Court has not given final approval to the

3    settlement, and, instead, we come back to this Court with any

4    particular modification of a regulator to the special election

5    letter, any tweak, and we have to get those wrapped into the

6    final approval process, what will happen with the states is

7    that then there will be this piling-on effect where some states

8    may say, well, yeah, we want the modifications, too.

9         Some states may say we don't want that modification,

10   and we have to sort all that as part of the final approval

11   process.  There will be this basically hamster wheel effect of

12   trying to synthesize all of these different 50 state regulator

13   changes as part of final approval.

14        THE COURT:  Has that ever happened?

15        MR. DUVALL:  That's what -- I'm telling you that's

16   what --

17        THE COURT:  Has it ever happened?  Is there any basis

18   -- is there any basis to believe that that scenario would

19   occur?

20        MR. DUVALL:  Yes.  I am relaying to you, Your Honor,

21   the client's experience in dealing with its 50 different state

22   insurance regulators, and the reality is they are regulated by

23   50 different states' Department of Insurance.

24        California filed a statement in this case.  No other

25   regulator even filed a statement, and no regulator objected.  I

1    know Your Honor said that, well, maybe they were being clever,

2    but the notice of this settlement went out to every state's

3    regulator, not just 90 days in advance of when an objection was

4    due to be filed but 180 days in advance, and these regulators,

5    they know how to object to a settlement.  None of them objected

6    to the terms of this settlement as unfair or unreasonable.

7            Moreover, Genworth has engaged with many of these

8    regulators already about this settlement, and I can represent

9    to you, they're encouraged by that dialogue.  No regulator has

10   told them we're not going to let you do this settlement, but

11   the concern is that if we do this before the Court's final

12   approval, the back-and-forth process, and this is based on

13   Genworth's experience in dealing with these regulators, and as

14   you know, Your Honor, they do do this every month, every day --

15           THE COURT:  Slow down.

16           MR. DUVALL:  It will be a never -- I shouldn't say

17   never.  It will be a cycle that takes far longer to complete

18   and to get out the terms of this settlement and the relief

19   available in this settlement.  That will take far longer than

20   if, by contract, Your Honor gives its stamp of final approval.

21   And we can take that stamp of final approval, your Court's

22   imprimatur, and we can take it out to the states and say, here

23   is the settlement whose terms have been approved by the Eastern

24   District of Virginia as fair, reasonable, and adequate.  These

25   are the terms that we think should go out in your state.

1          That's going to be in our experience, Genworth's

2     experience, the best way to ensure that this settlement gets

3     out consistently to class members across many states, the 50

4     states, and gets out expeditiously.  That's the best thing we

5     can do to ensure that that happens.

6          THE COURT:  That's an argument that says a federal

7     court ought to issue an order that it has reason to believe can

8     be adversely affected by the action of one or more state

9     regulators which is inconsistent with what we have to do, I

10    think.

11         MR. DUVALL:  But, Your Honor, this is --

12         THE COURT:  Let's go back a minute to Agulnicks'

13    points.  I digressed from that.  They say that the letters

14    ought to be generated before I approve it, and they ought to

15    know what their choices are, and that seems to be what the

16    California insurance commission is saying as well.

17         So you are telling me it takes three months and a

18    million dollars to get the letters ready.  Is that where we

19    are?

20         MR. DUVALL:  Very importantly, from a certain point.

21    We have to get this up to a point at which, then, that step can

22    be achieved, and if we were to do that now, if we were to send

23    all these letters now, again, it would be incomplete

24    information, it'd be subject to change.

25         Class counsel, who represents these 200,000 class

1    members and has spoken to over 4,000 of them, doesn't think it

2    would be a good idea.  It would be confusing to them.  They'd

3    be looking at an election form that they can't even make an

4    election on.  It would be more harmful than helpful to the

5    class, and it would also just not --

6              THE COURT:  Wait a minute.  How can they not make an

7    election on it?

8              MR. DUVALL:  Because Your Honor won't have given

9    final approval to the settlement and because their state

10   regulators wouldn't have given its sign-off in whatever form

11   that may be to that letter going out.  It wouldn't be a good

12   idea either because of the -- that one-time overwhelming

13   effect.

14             That's why I described how Genworth sends letters out

15   to policyholders in a particular state over the course of a

16   year.  It doesn't send all the letters on the same day.

17             THE COURT:  When are you talking about sending these

18   letters out?  If I approve it today, when would these people

19   get these letters?

20             MR. DUVALL:  If you approve it today, then what we

21   can do is immediately get -- continue to push this through with

22   the 50 states, and as soon as any particular state has, we'll

23   say, signed off -- and that can take various forms, kind of

24   formal or informal forms.  As soon as they signed off, then it

25   is that process I described of getting the systems up, ready,

1    and out.

2            THE COURT:  You mean you're going to wait until you

3    get 50 states signed off before you do the three-month work to

4    integrate the system and spend a million dollars?

5            MR. DUVALL:  That's not quite what I'm saying.

6            THE COURT:  How about doing this:  How about telling

7    me specifically what you are talking about, because the more I

8    hear about this, this is an excellent idea, excellent concept

9    of a settlement that stands to be frustrated by a series of

10   very convoluted implementation plans and state regulators.

11           So that's a terrible situation for the plaintiffs to

12   be in and for the Court to be in, but I do have some control

13   over whether the Court will be in it.

14           So how will this happen then?  Tell me that.  Let's

15   assume Monday I have the order refined and entered and it's

16   there.  How long will it take, best judgment of Genworth, to

17   get these election letters and damage payments out to the

18   class?

19           MR. DUVALL:  I truly am sorry, Your Honor.  I cannot

20   give you an answer for the entire class.  What I can tell you

21   is that we are obligated under the settlement agreement,

22   Genworth is obligated under the settlement agreement to use its

23   best efforts to get this out promptly, and it is already trying

24   to do that.

25           In addition to the notices I described earlier,

1    Genworth held a 50 -- an open-to-all-50-states conference call
2    with the regulators on this settlement.  33 of them
3    participated in that.  Genworth has engaged with an additional
4    number of regulators directly one on one.  It is trying to move
5    this along.  I can't tell you with certainty exactly when that
6    will be finished, but I can tell you --
7         THE COURT:  Give me your best judgment then, please,
8    about how long it will take to get this -- get these people the
9    benefits of this settlement.  I'm sure that somebody at
10   Genworth has noodled this some.
11        MR. DUVALL:  I'm sorry, Your Honor.  As I stand here,
12   I cannot give it to you.  I'm happy to confer during a break,
13   but what I can tell you is that the quickest way to get this
14   relief out and the best way to get it out as we've proposed in
15   this settlement is to give final approval to the settlement,
16   let us finish our work with the regulators, and then push those
17   letters out in those states.
18        That will happen far quicker than if we have to go
19   out -- if we have to either send class members an advanced
20   special election letter that's not a special election letter
21   now or if we have to complete all the regulator input before
22   getting final approval.  It's just going to add another layer.
23   So I know that either of those would take longer.
24        THE COURT:  Well, you know that, but I don't have
25   anything in front of me to demonstrate that it will, and logic

1   tells me that it shouldn't.  But I gave you another option, and

2   that is that the Court says this settlement looks fair,

3   adequate, and reasonable and is prepared to issue a final

4   approval order within the meaning of the Federal Rules of Civil

5   Procedure and enter judgment as appropriate as soon as all the

6   regulatory people have signed off on it and there is no

7   material -- without any material change to the agreement.

8          It seems to me to be that that would provide you a

9   mechanism to tell the regulators that the Court -- if they

10  don't tinker with it, that the Court is satisfied with it.

11  Now, the problem is that that will delay an appeal, an appeal

12  from Mr. Ferrara if his objection is overruled, appeal from Mr.

13  Luck, an appeal from Mr. Jacobs, an appeal from the Agulnicks.

14         That will leave you open to that situation where

15  these few people can frustrate the objectives that you are

16  seeking to accomplish, and that, I think, you are both to be

17  commended for.

18         That is a downside to it, because if I issue the

19  final this week right away, then that is appealable, and you'll

20  know that it's appealed within X period of time whereas if the

21  approach -- you take the approach I suggest, then you may

22  not -- you've got an added risk of delay.  And I recognize

23  that's a problem, because I have seen situations in which

24  objectors have used that as a way to leverage getting paid off.

25         However, in this settlement, that can't happen.  All

1    it does is cause delay.  There will be no blackmail associated

2    with it.  Maybe I'll let you talk --

3              MR. DUVALL:  Thank you, Your Honor.

4              THE COURT:  -- people have break and see, and maybe

5    we have to take a recess and come back another day.  I need to

6    hear from the Agulnicks and Mr. Penny and you both -- if you

7    have anything else to say, I'll be glad to hear you on their

8    objection before I hear him.

9              MR. DUVALL:  Just very briefly on the scenario you

10   just raised, two points, Your Honor.  One, we thought through

11   this and worked with our client and its representatives who do

12   engage with the departments of insurance across the country,

13   and I am representing to you based on that input and on the

14   very thoughtful input from that that shaped this settlement,

15   that the best way to get this relief out as is and quickly is

16   to do the regulator engagement after final approval, not

17   before.  If we do it before, it's just going to create far more

18   time.

19             Point number two to Your Honor's proposal, we cannot

20   agree to that for the reason I just stated.  What -- I think a

21   slightly different way to get about to the same point is --

22   again, we represented, representing again to you now, Genworth

23   is not sweetening the pot for any particular state.  Not

24   happening.

25             This Court, of course, after final approval, will

1    have continuing jurisdiction over this settlement.  If an issue

2    comes up with a particular state that we need the Court's input

3    on, we can bring it to you as part of that implementation and

4    administration phase, the continuing jurisdiction.  But having

5    your Court's stamp of approval on before we go out and do that,

6    that will help get that settlement implemented in those states.

7    If we need to talk to you about something, we can do that under

8    your continuing jurisdiction.  That's, we think, the best way

9    to handle this.

10              THE COURT:  Well, nobody gets any benefits then for a

11   year, six months, how long?  Let's suppose -- *Kokkonen*, I

12   retain jurisdiction to administer the settlement agreement, to

13   resolve any disputes that arise under it from any member of the

14   class individually, from any objector, from the plaintiffs'

15   counsel, and how does that work?  I don't know, but let's

16   suppose that I do that.  Then what happens?  How quickly do

17   these people get anything?

18              MR. DUVALL:  Quicker than any other way we've

19   proposed again.

20              THE COURT:  I want you, when you talk to your people,

21   to find out what we're talking about.

22              MR. DUVALL:  I will ask them.

23              THE COURT:  If these people are savvy enough to form

24   a hamster wheel theory and to have all the knowledge that you

25   say they have and to believe that this is going to happen and

1    to deal with these people, surely they can give me that

2    information.  If they can't, I begin to doubt whether or not I

3    should rely on anything that comes from them.

4           And that also then brings up the question the extent

5    to which the attorneys' fees get paid.  Why should any

6    attorneys' fees get paid until these people get paid at all?  I

7    have the need to sort through that.  That's one objection I

8    believe one objector made.  All right --

9           MR. DUVALL:  I'm sorry.  Obviously the Court wants to

10   take a break.  I do want to respond to the Court's essentially

11   one point you just made.  Obviously Mr. Penny will speak to his

12   attorneys' fees and the timing of that, but if you'll just

13   indulge me, the way that this could work, Your Honor, and,

14   again, we think work best this way, you --

15          THE COURT:  Whoa, whoa.  I didn't -- if Ms. Peterson

16   got that, I'm going to give her an award.  I'm going to give

17   her whatever she wants.

18          MR. DUVALL:  You grant final approval, we go out to

19   the states, we give you, under your continuing jurisdiction, a

20   status report.  Let's say that status report is -- let's say

21   it's 90 days from now.  To be clear, I can't represent that,

22   but let's say it's 90 days from now, and we tell you, Your

23   Honor, in 33 states, letters going out exactly as is.  We're

24   having discussions with the other 17.

25          Another 90 days after that, letters going out in 49

1    states, Your Honor, and this state moved one sentence around.

2    It took a sentence from the third paragraph and put it in the

3    second paragraph, and we'd update you on that.  And if there is

4    -- again, we don't expect there to be, but if there is an issue

5    that we need to talk about with this Court, if we're at an

6    impasse with whatever state, then we can talk about it.  That's

7    how I'm envisioning -- that's how we're envisioning it working,

8    and we think it could work.

9            THE COURT:  I understand that.  You can talk about

10   it, you can raise it here.  You two are properly before the

11   Court.  The person whose, to quote Judge Williams, head needs

12   to be knocked is not.  The regulator is not before the Court.

13   There's nothing I can do except what?

14           I realize -- what you are saying, in essence, is that

15   ultimately I may end up being called upon to adjudicate some

16   change, some change in the letter or some proposed change in

17   the terms.  I don't think I have authority to do that under the

18   rate amendment doctrine, and so I don't know what good that

19   accomplishes, I guess is what -- the concept is good.  When I

20   reflect upon its execution, I don't know what good it will

21   achieve, and maybe you can explain that to me.

22           MR. DUVALL:  I'm happy to get back up here after the

23   break or keep going right now.  The reason that this concept is

24   good -- Your Honor, you are right.  You and we, we can't

25   control the extent of the regulators' jurisdiction over

```
 1    communications that go out to their particular state's
 2    policyholders, but under Rule 23, your solicitation of the
 3    regulators' input has already happened.  That was the CAFA
 4    notice process, and we sent it again and gave them 180 days,
 5    and all you got was one statement -- I'm sorry.  I'm getting
 6    dry.
 7            The CAFA notice process is designed for regulators to
 8    give the Court its -- their input on the terms of the
 9    settlement and the fairness of that settlement, and that has
10    occurred.  You received one statement from the California
11    Department of Insurance.  No objection to the fairness or
12    adequacy of the settlement.  That's what the Court needs under
13    Rule 23 and under CAFA, under 28 U.S.C. 1715 --
14            THE COURT:  Slow down.
15            MR. DUVALL:  28 U.S.C. 1715 --
16            THE COURT:  Stop just a minute.  They get the notice
17    and part of the Class Action Fairness Act notice.  They're
18    given a chance to say something.  In the process, you go back,
19    and they want to change things.  Are they estopped because
20    they've gotten notice and done nothing from exercising their
21    authority, changing things?
22            I think no, they are not.  That's just a notice
23    provision, and the fact that they didn't say anything doesn't
24    have any consequence with respect to estoppel.  And I think
25    there's a reason for that, and that is that it's up to the
```

```
 1    state regulators to decide these things, and it's appropriate.

 2    Let's take a recess of 20 minutes, and then we'll talk.

 3              MR. DUVALL:  Thank you.

 4

 5         (Recess taken.)

 6

 7              THE COURT:  All right, Mr. Duvall, let me ask you

 8    something.  You all, I'm sure, check this out.  Are you

 9    familiar with any other class action that has been certified

10    under circumstances similar to this that I could go to and look

11    at as a guide to see how best to proceed?  You all didn't cite

12    anything.

13              MR. DUVALL:  That you could look at as a guide?

14              THE COURT:  Yes.  You all -- this is a case where you

15    are proposing a class and the certification of a class action

16    when the implementation of the class order, settlement, can be

17    affected by subsequent actions of regulators in such a way as

18    to affect the fairness, reasonableness, and adequacy of the

19    class -- of the settlement.

20              And I just don't see any cases in any of the papers

21    where that issue has been discussed or analyzed.  I've sent for

22    Newberg on Class Actions to see if I can find anything on it,

23    but nobody sent it to me unless I've completely missed it in

24    the papers, and if I have, I apologize.  Do you know of any

25    case?
```

1           MR. DUVALL:  The best cases I can cite Your Honor to

2    is the *In re: Motor Fuel Sales Practices* case, District of

3    Kansas affirmed by the Tenth Circuit, the *Dickman* case out of

4    the District of Maryland, and the *Feller* case out of the

5    Central District of California.  Those were cited in our joint

6    brief on the sequencing of regulator approval after final

7    approval, and, in those cases, regulators could strike relief

8    available to class members in their states, and that settlement

9    was still approved.

10          What we're proposing here is an additional,

11   essentially, check where this Court will have continuing

12   jurisdiction, and we will report back to the Court on periodic

13   periods.  And one point of clarification, a number of my

14   colleagues told me that I did not explain this well, so please

15   let me clarify.

16          When a state signs off on the special election

17   letter, assuming final approval has been granted, and then we

18   take it to the state and that state says that letter can go

19   out, those letters will start going out in that state.  We're

20   not going to wait for all 50 states to then start mailing the

21   letter.

22          THE COURT:  I understand that.

23          MR. DUVALL:  I was told I did not do a good job in

24   explaining that.  If, in the, again, unlikely event -- because

25   Genworth has engaged its regulators already, it has tried to

1    get feedback, and it's going to try to get this settlement

2    implemented exactly as we have proposed, if any state proposes

3    and insists on a material addition to that settlement

4    agreement, I represented to you we're not going to agree to it,

5    but in the event that we are stuck with a state, we can come

6    back to Your Honor and report to Your Honor in 33 states those

7    letters have gone out as is, no problem.  17 states we're still

8    having discussion.  Fast forward, in 49 states those letters

9    have gone out as is.  In this one state, we've got this issue.

10         We could put to Your Honor, would it be acceptable to

11   Your Honor for Genworth to implement the settlement in this

12   manner.  One tweak I would give to Your Honor's question, the

13   settlement itself right now can be found to be fair,

14   reasonable, and adequate.  The standard under Rule 23 is

15   whether the settlement proposal, in its terms, are fair,

16   reasonable, and adequate.

17         If, down the line, there is an issue that has become

18   an issue with any particular state about the implementation of

19   that settlement, we can come back to Your Honor and essentially

20   say, can Genworth do this, do you think that this is consistent

21   with the terms of this settlement, Your Honor, do you think it

22   would be equitable as to these class members in this particular

23   state which I note, by the way, would follow, as the settlement

24   agreement requires, involvement of class counsel, that Genworth

25   make its best efforts to implement the settlement as is, that

1    Genworth acts in good faith in doing so.

2         That's the process we envision.  I cede to Mr. Penny.

3    Thank you.

4         MR. PENNY:  All right, Your Honor, I think my

5    function now is to pick back up with Agulnick, but is there

6    more that you'd like to hear from plaintiffs on the regulatory

7    issue before I do that?

8         THE COURT:  I still want you to go check -- I don't

9    think that *Dickman* is very helpful.  I don't think it's

10   analogous, and, actually, I don't think the *Fuels* case has much

11   to do with it either, because in those cases, it was just an

12   acknowledgment.  There was a statement, unless the regulatory

13   says no, you can't do it.  There wasn't an active pending

14   approval process, and there wasn't a letter in the file by one

15   of the regulators that criticized what you were doing, what was

16   being done in that case.  So I don't think that helps a whole

17   lot.  That's sort of general perforatory language, we're going

18   to do it unless the regulatory agency says otherwise.

19        MR. PENNY:  I understand your point.

20        THE COURT:  And the other one, the *Fuels* case had to

21   do with whether you could buy the product, but in some of the

22   places where the defendant -- the plaintiff and the defendant

23   operated, the class members and the defendant operated, the

24   state regulatory agency hadn't approved yet the sale of the

25   product.

1          That's far different than the situation we have here

2     as far as I can tell.  So I still -- I don't know what I'm

3     going to do.  I may require you to address it further, but I

4     think we've slogged that horse about as much as we can now at

5     this point.  So if you have anything else to say about

6     Agulnicks --

7          MR. PENNY:  Yes, Your Honor.  Where I left with

8     Agulnicks was a discussion about the impracticality of creating

9     these sort of tentative but more final special election letters

10    and sending them to class members before they had to opt out.

11    And I think, as elucidated by this conversation we've just had,

12    one of the major issues with that type of a process would have

13    been either offending or having to get regulator approval for

14    the tentative letters that would be going out.

15         We'd have this very same issue if we had to send

16    class members their special election letters now without or

17    with the imprimatur of regulators.

18         THE COURT:  The letters I get from my insurance

19    company have to be approved by the State Corporation

20    Commission, do they?

21         MR. PENNY:  This is going to sound like a

22    distinction, hopefully, with a difference, but the way I

23    understand it, regulators don't necessarily have to approve

24    every communication, but they have the right to comment or ask

25    for changes on policyholder communications, and the only reason

1    we are dealing with regulator issues right now in this case is

2    because of the special election letter that will be sent to

3    class members, a policyholder communication that will have all

4    sorts of negotiated disclosures and benefit options to be made.

5           It's the same letter, basically, that we're talking

6    about now having to do some sort of tentative approval before

7    that letter is finalized to regulator's satisfaction.  The very

8    same issue would present itself if we tried do this before

9    final approval.

10          The other thing which would be a concern about

11   sending the special election letter in a tentative form to

12   policyholders prior to final approval is the serious chance for

13   confusion, because class members will get that letter and will

14   think that it is a claim form that needs to be returned and

15   that elections need to be made at that point in time.

16          And even if the letter specifically says that that is

17   not what the letter is about, people will see a place for a

18   signature, a place to check a box, and they'll send it back in

19   thinking they've made their election.

20          THE COURT:  You don't have to put the signature on

21   it.  You just put -- the letter will be sent in substantially

22   this form, and the -- put on it the same thing that Blue Cross

23   Blue Shield puts on all the stuff -- and Social Security

24   inundate me with so that I finally realize in big letters, this

25   is not a bill, you could say this is not something.  I think

1    that that overstates the practical problem.

2          The real problem is that what he wants is for you to

3    tell him what exactly the cash benefit is.  What else would he

4    have you -- would you have to tell him?

5          MR. PENNY:  Well, importantly, one of the things that

6    he made a point that he needs to be told before final approval,

7    before his decision to opt out, is he said all the disclosures

8    had to be filled out.  The disclosures in the form letter

9    that's posted on the website had little Xs as to the amount of

10   future premium rate increases, etcetera.  That presents a major

11   problem that I don't think Mr. Dailey has considered yet which

12   is known as the one-way intervention problem.  That's

13   recognized by the Supreme Court, and it arises --

14         THE COURT:  You know, you learn something new every

15   day.  So help me with the one-way intervention problem.

16         MR. PENNY:  The one-way intervention problem as

17   recognized by the Supreme Court arises when class members might

18   be able to partake of the benefits of a judgment or a ruling or

19   a settlement of a class action without binding themselves to

20   the result, the idea here being they would be able to get the

21   disclosures, a primary feature of the settlement, and then

22   decide whether to opt out.  It could get the relief and not

23   bind themselves.  It's patently unfair.

24         THE COURT:  I don't know that I've ever heard it

25   called that, but why would that be the case since this is only

1    an exemplar?

2            MR. PENNY:  No, he doesn't want just an exemplar.  He

3    wants the disclosures completed to tell him what the future

4    rate increases will be, what Genworth's current --

5            THE COURT:  Nobody ever knows what the future rate

6    increases will be.

7            MR. PENNY:  I think you are misunderstanding my

8    point.  The point I'm trying to make is the disclosures, one of

9    the primary disclosures is Genworth will be telling

10   policyholders not only what rate increases have already been

11   approved but what rate increases Genworth is planning to

12   request from their state's regulator over the next six to ten

13   years.

14           That number, if it's filled in, is one of the primary

15   disclosures.  If that number gets completed in the special

16   election letter that's sent out to class members, they'll be

17   able to afford themselves that really important information

18   without having to then bind themselves to the judgment.  That's

19   the point of that.

20           THE COURT:  And that's because what you are suing for

21   is the disclosures.

22           MR. PENNY:  Correct, Your Honor.  That was the hub of

23   the entire case, was to get that sort of a disclosure as well

24   as the disclosures that surround it to the class members.  That

25   was the injunctive relief we sought in total.  The monetary

1   enhanced benefits we sought we discussed this morning.  That's

2   the additional component to the settlement.

3           It's just yet another reason why it's impractical to

4   have Genworth go through all the work and effort and prejudice

5   themselves by giving all this relief to the class before the

6   opt-out decision.  It's just not practical.  It's one of the

7   reasons why I harken all the way back to the discussion about

8   what is actually required of the notice program.

9           Complete, total, exact information, while that can be

10  the goal of every notice program, is not required, and it's not

11  required because it is just not practical in most instances to

12  do that.  And Mr. Duvall talked about not only the expense and

13  time that it will take to generate those letters but how those

14  letters would only be advisory in any event, because like I

15  think he was saying, if this settlement is not -- let's say the

16  settlement were granted final approval today but the appeals

17  process took a year to play out.

18          Every single input in this special election letter

19  would change between now and then.  Every policyholder would

20  pay another year's premiums.  That will change the calculation

21  of options one and two, the NFO benefit.

22          THE COURT:  What would be said in those letters about

23  -- while it's on appeal about what the future premiums would

24  be?

25          MR. PENNY:  The future premiums may change between --

1    like what future premiums --

2            THE COURT:  No, no, no.  What would be said -- you

3    send me a bill.  It's on appeal now.  Everybody appeals these

4    rulings.  My time comes up to renew my policy, and you send me

5    the disclosures that you send me as part of the package you

6    send me to get me to sign on.  What do those disclosures say

7    that would be different than what the disclosures would say

8    that Mr. Dailey wants?

9            MR. PENNY:  I think what you're asking is if we send

10   the letters before final approval that include the disclosures,

11   how would the disclosures change in the letter that is then

12   sent after the appeals process?  Is that what you are asking?

13           THE COURT:  Huh-uh.  We have an appeal, and what you

14   said was, and I think it's correct, people are going to get

15   letters pending the appeal, and none of the disclosures will be

16   made because the whole issue is up on appeal.  So none of the

17   disclosures required by the settlement agreement will be made.

18           But you are going forward with the business

19   arrangement with me, inveigling me to take an increased

20   premium.  Then you're going to have to say something about

21   disclosures in the future, or maybe you're not, but if you do

22   have to say something about disclosures in the future, how

23   would the ones you send me on appeal, send me while this case

24   is on appeal differ in any way from what would be sent in the

25   final letter assuming I've approved it and the appeal is over?

1          MR. PENNY:  When you say the disclosures sent to you

2    while the final approval is on appeal, you don't mean the

3    special election letter disclosures, you mean a notice from

4    Genworth about your next year's bill?

5          THE COURT:  Yeah.

6          MR. PENNY:  I'm sorry.  I wanted to make sure I

7    understood that.  My guess is that Genworth's disclosures in

8    your annual premium statement won't say much about future rate

9    increases unless you are currently faced with a future rate

10   increase.  There are many policyholders that will get a rate

11   increase if this case is on appeal.  What they will say then, I

12   imagine, will be something like what they've said in the past,

13   and the recent past, which is in your state, and this is not

14   every state, it's states that have approved this language, in

15   your state we are planning to request at least 150 percent in

16   future rate increases, something along those lines.

17         That is much less detailed and much less specific

18   than the disclosure that that same policyholder would get in

19   the settlement election letter.  In the settlement election

20   letter, that disclosure about future rate increases would be

21   specific to that state and that policyholder's policy, and it

22   would say probably not at least 150 percent, it would say

23   something like we will plan to seek future rate increases of

24   203 percent over the next six to ten years.

25         It would be more specific and it wouldn't just be --

1    the 150 percent disclosure is a bit of a low floor, and as we

2    had alleged in the lawsuit, it is not a full and adequate

3    disclosure.  The disclosure about the future rate increases

4    will be more specific, more informed, and more direct.

5           THE COURT:  Think about this for a minute:  A company

6    has the capability to determine that it's going to be

7    203 percent increase over the next five years but sends out --

8    with that knowledge sends out more than 150 percent.  Aren't

9    you right back into exactly the same problem that created this

10   lawsuit to begin with, and if that's right, and I think it is

11   right, why would Genworth do that?  Do you see?

12          MR. PENNY:  I think I see what you're saying, but I

13   think that's not the way I would envision it happening.  So if

14   Genworth is telling the policyholder that they're planning to

15   seek 203 percent in rate increases over the next six to eight

16   years, then the only problem for Genworth would be if they're

17   actually going to seek more than that, not less than that.

18          And if a regulator doesn't approve the 203 percent

19   increases that are requested and, instead, the policyholder

20   only sees 100 percent rate increases, there's no problem

21   created for the policyholder.  There's no additional lawsuit

22   there.

23          THE COURT:  That's not, I don't think, what I'm

24   trying to get at.  Let me think how to posit it to you.

25   Genworth has the obligation ongoing to make accurate

1   disclosures, and the law is, as this case well settled, once

2   you start talking about something and make a statement, you

3   need to say all of what is necessary to make it true.

4   Otherwise, you've got an omission -- a material omission;

5   right?

6            MR. PENNY:  Yes, Your Honor.

7            THE COURT:  Genworth is sending these letters out to

8   the policyholders while this case is on appeal, and the

9   significance of that is that none of the disclosures that are

10  called for by the settlement agreement will be made, but

11  Genworth knows that the disclosures it will be sending out are

12  not accurate.  They may not know the precise amount for that

13  policyholder, but they know that they're not accurate.

14           So aren't we back in the same fix that got us into

15  this case, perhaps not as egregiously on the facts as what the

16  facts were, what got it in this case to begin with?

17           MR. PENNY:  I think Genworth has to decide for itself

18  what disclosures it will be making about future rate increases,

19  and those decisions will be informed by this lawsuit and by the

20  issues raised.

21           THE COURT:  I'm sorry.  This has to do with -- what's

22  the name of the doctrine you called?

23           MR. PENNY:  The filed-rate doctrine?  Oh, the one --

24  the one-way intervention.

25           THE COURT:  One-way intervention.  Your point was if

1    you have to prepare a letter now that has in it what you would

2    prepare after you did all the calculations for that individual

3    shareholder, that shareholder could opt out, get the benefit of

4    having had the disclosure but not release the -- not release

5    Genworth for having -- and part of its consideration was making

6    a disclosure.

7              But how does that operate where Genworth has got to

8    make the most accurate disclosure it can or it's going to be

9    right back in the soup anyway?  You have to be a thrill-seeker

10   to be running Genworth and not disclose what you know about the

11   rate -- projected rate increases in the future.

12             So I guess that's all by way of saying that

13   intervention, one-way intervention doctrine is a red herring.

14   Why do I need to even get to analyzing that?  That's

15   particularly true given that there's a whole lot of other

16   consideration coming to the shareholder -- to the policyholder

17   beyond the projected rate increases, i.e., the options one

18   through five.

19             MR. PENNY:  I understand your point, Your Honor.  The

20   point I'm really trying to make, and I dressed it up in the

21   one-way intervention doctrine parlance, is really that it is

22   patently unfair for Genworth to have to make these disclosures

23   that plaintiffs fought for a year and a half to get them to

24   make to the class members before the class members actually

25   have to give them a release for it.

```
1              THE COURT:  Why is it unfair?

2              MR. PENNY:  Well, because it's not something that

3    Genworth wants -- I should let Genworth --

4              THE COURT:  Let them worry about that argument.  I

5    have to tell you that as the old boy said, I'm not sure that

6    dog hunts.

7              MR. PENNY:  It won't be the first issue that I raised

8    that didn't really get traction, Your Honor.

9              THE COURT:  It's a troublesome thing for me to make a

10   decision on that theory.  I don't think I can do that.

11             MR. PENNY:  That was maybe point four or five of what

12   I think their objection --

13             THE COURT:  Put that one back in the kennel.

14             MR. PENNY:  Put that one back where it came from.

15   Let me move off that objection then, Your Honor, and move to

16   another one of theirs.  They made an issue on Friday and in

17   their brief about the fact that the Pennsylvania unfair trade

18   practices and consumer protection law claim in some instances

19   comes with treble damages, and that on that basis alone, the

20   Pennsylvania class members should have been entitled to greater

21   relief in the settlement.

22             And the point I want to make there, Your Honor, is

23   that treble damages are discretionary.  They are not

24   obligatory.  And the Agulnicks' counsel haven't made any

25   attempt to demonstrate that on the facts of this case, an award
```

1    of treble damages would even have been likely if plaintiffs

2    crossed all other hurtles to get that Pennsylvania class

3    certified and proved their claim in court.

4            So the fact that -- we point the Court to the

5    *Rodriguez* case --

6            THE COURT:  Help me just one minute.  Are we

7    certifying a class under the Pennsylvania act?

8            MR. PENNY:  No, we're not, Your Honor.

9            THE COURT:  What does that have to do with anything?

10   If I'm not certifying a Pennsylvania settlement class, and

11   that's -- the case is going out the door, what's this have to

12   do with anything?

13           MR. PENNY:  That's a very good point.  It was

14   actually my second point which is that claim is not actually

15   being certified or settled in this lawsuit.

16           THE COURT:  But the point is, I guess, they're

17   releasing it.  The policyholders are releasing it; is that Mr.

18   Agulnick's point?

19           MR. PENNY:  You'd have to ask his counsel, but I

20   suppose that would be his point, is that there is a release.

21   The release doesn't apply specifically to his claim, but I'm

22   sure you can read it to encompass --

23           THE COURT:  So a general release.

24           MR. PENNY:  Yeah.  But the point is, and --

25           THE COURT:  The Agulnicks, they're in Pennsylvania,

1    are they?

2         MR. PENNY:  Yes, Your Honor, they are.

3         MR. DAILEY:  Yes, Your Honor.

4         MR. PENNY:  We had pointed out in our brief, we had

5    cited the *Rodriguez* case at page 37 of the reply, 37 of 47 of

6    the reply which points out that the prospect for such treble

7    damages is merely speculative and, quote, courts do not

8    traditionally factor treble damages into the calculus for

9    determining a reasonable settlement value.

10        THE COURT:  Are there tentative damages in the Fair

11   Credit Reporting Act?

12        MR. PENNY:  There are different levels of statutory

13   damages in the FCRA for willful violations versus just

14   violations.

15        THE COURT:  How about the Fair Debt Collection

16   Practices Act?

17        MR. PENNY:  I think that is also true --

18        THE COURT:  Both are willful; right?

19        MR. PENNY:  I think both -- yes, I think they have

20   levels different for willful violation.  The same kind of

21   concept is at play with the treble damages clause in the

22   consumer protection law.  You have to establish some egregious

23   conduct in order to get not just your actual damages but treble

24   damages.

25        THE COURT:  Under the Supreme Court's decisions, you

1   have to have a level of scienter in order to get treble

2   damages.

3           MR. PENNY:  And this is our point, Your Honor, which

4   is why it's so speculative.  Just like the *Rodriguez* case says,

5   that you don't really factor that into a settlement value when

6   you're analyzing whether the settlement is fair, reasonable,

7   and adequate.

8           And also to the extent that the Pennsylvania statute

9   entitles the prevailing litigant to attorneys' fees and costs,

10  Genworth is actually bearing the attorneys' fees and costs in

11  this settlement, and so to that extent they have already been

12  given value for that aspect of the claim.  I think that was all

13  the issues the Agulnicks raised.

14          THE COURT:  I think so.

15          MR. PENNY:  I'll cede the mic.

16          THE COURT:  Do you have more?

17          MR. DUVALL:  Well, I do, Your Honor.  Not much more,

18  but Your Honor had asked some questions and asked us to confer

19  with our clients, and I wanted to provide --

20          THE COURT:  I didn't know you had done that.

21          MR. DUVALL:  My intrepid colleagues did that on a

22  break.  Very quickly, I know I've spoken a lot.  I just want to

23  give Your Honor this information.  If final approval were

24  granted today, Genworth could start sending special election

25  letters out to class members in states that have permitted

1    those to go out by October of this year.  This is assuming no

2    appeal and so on, but October, so from today to October.

3            As for the regulatory feedback timeline, I'm told

4    that the discussions, Your Honor's questions, these types of

5    issues can take anywhere from three months to several years,

6    and that is the best we can do, but more to, I hope, Your

7    Honor's concern, Genworth has advised regulators, and I should

8    have mentioned this to you earlier, that they would like

9    comments to the special election letter and that if they don't

10   have any comments or prohibitions on it, then by August, then

11   they plan to start sending those out.  So, again, we've set

12   this up to move as quickly as we can after final approval.

13           And then just a real last point of emphasis on this,

14   Your Honor, if, by contrast, we hold up the final approval

15   process until that regulator engagement process and my hamster

16   wheel point --

17           THE COURT:  What's that?

18           MR. DUVALL:  Just setting up my hamster wheel point I

19   made earlier, if, for example, a state required, said we need

20   to put an additional chart in that letter, and then we had to

21   come back to this Court before final approval was granted and

22   say, well, should we offer that chart to all 50 states, well,

23   that would just not only take longer than the process I am

24   describing, but it would invite additional questions like,

25   well, does the class notice have to be redone, is there now an

1    opt-out issue.

2          What we've set are the terms of this settlement, and

3    we are prepared to implement them on the fastest possible

4    timeline to get the class consistent and equal relief.  Thank

5    you.

6          THE COURT:  Mr. Dailey.

7          MR. DAILEY:  Thank you, Your Honor.  Fortunately, I

8    know it's late in the day, and having asthma and having this

9    mask on all day, I'm a little short on air, so I'm going to be

10   brief which I'm sure is music to Your Honor's ears.

11         THE COURT:  Do you want to take a recess and get some

12   fresh air?

13         MR. DAILEY:  I appreciate that, but I think I'll be

14   okay.

15         THE COURT:  The other thing is if you had told me,

16   I'd have put you over in the corner and not had you have the

17   mask on.

18         MR. DAILEY:  I appreciate that, too, Your Honor.  I

19   should have spoken up, but I'll be all right.

20         You know, we heard about how elegant this settlement

21   was, and I do want to commend Mr. Penny and Mr. Duvall and both

22   sides.  Clearly a lot of work has gone into this, but the fact

23   that they are well intentioned and a lot of work has gone into

24   this does not mean that we're where we need to be.

25         And one of the deficiencies which has been

1   highlighted throughout today is the lack of evidence, and I'm

2   not going to belabor that point because I think Your Honor has

3   already addressed it by talking about additional submissions

4   that you would like to have.

5            So I'm going to focus on a couple of the issues that

6   they raised today, one of which I believe is somewhat of a

7   straw man that our requests may have been misconstrued, and

8   that's the request for additional information to be provided to

9   the class.

10            What you've heard from --

11            THE COURT:  Before opt-out.

12            MR. DAILEY:  Before opt-out to all the class members,

13   this concept that we've been asking for 207,000 individual

14   notices to be sent out.  And we are asking for additional

15   information to be provided, and, to be clear, that additional

16   information is information that I think everyone has conceded

17   here today is known to both Genworth and to plaintiffs'

18   counsel.

19            THE COURT:  Just so we don't have any

20   misunderstanding, what information do you want?

21            MR. DAILEY:  Yes.  It's the amount of the rate

22   increases, the number of years --

23            THE COURT:  The amount of what rate increases?

24            MR. DAILEY:  The premium rate increases.  It is the

25   information I addressed the last -- you asked me to point out

1   very specific information in the last hearing.  It was the rate

2   increases, the number of years --

3          THE COURT:  Yeah, but what rate increases are you

4   talking about; the ones they are projecting or the ones -- what

5   do you mean?

6          MR. DAILEY:  Yes.  There are known rate increases

7   that they are going to request or that they currently

8   anticipate requesting.

9          THE COURT:  Just so I understand, it is the amount of

10  the rate increase that they would calculate when they put all

11  their systems together and put in this letter that goes out to

12  the -- called the special election letter that says we expect

13  to request in your state increases, to use Mr. Penny's example,

14  of 203 percent over the next five years; is that the one you

15  are talking about?

16         MR. DAILEY:  Yes, Your Honor.  I'm not suggesting

17  that they need to provide that information in 207,000

18  individual letters.

19         THE COURT:  I guess his -- you don't know that.  You

20  don't know in each state what the rate increase would be.

21         MR. DAILEY:  They would have to do it in some number

22  of -- some number of analyses would have to capture that

23  information to disclose it.

24         THE COURT:  Well, you start with 50 states --

25         MR. DAILEY:  Yes.

```
1              THE COURT:  Then in order for -- your argument is in
2    order for you to intelligently choose whether to take one of
3    the five options, you would have to know what your rate
4    increase is; right?
5              MR. DAILEY:  Yes.
6              THE COURT:  That's 207,000 notices if there's 207,000
7    policyholders.
8              MR. DAILEY:  Well, I believe they could accomplish
9    that by using information that they already have internally,
10   and that is by the type of policy and the state.  Maybe I am
11   misunderstanding the process, but I believe with those two
12   pieces of information, they could prepare summaries that would
13   be applicable to different groups within the class.
14             THE COURT:  How would they do that?  How would they
15   do what you're talking about?  How would they pick out what
16   group gets what letter?
17             MR. DAILEY:  The same way that they're going to
18   approach and with the same information that they're going to
19   approach the state regulators and present that same information
20   to them.  They're not going to do it in 207,000 different ways.
21   They're going to do it by policy and by state.  So I wanted to
22   clarify that point, because I think there may have been
23   something that may have been misconstrued from our papers.
24             THE COURT:  How many policies are there?
25             MR. DAILEY:  You know, they attached a chart to the
```

1    settlement agreement as one of the appendices.  I believe it
2    outlined the different policies that the settlement applied to.
3    I could count them right now, Your Honor --
4              THE COURT:  How many are there, Mr. Duvall?  Do you
5    know?  She knows.
6              MS. TURNER:  Appendix A to the settlement agreement.
7              THE COURT:  How many different policies are there?
8              MR. DUVALL:  These are all choice one policies.  Just
9    because they have different numbers per state doesn't make them
10   non-choice one policies.  This is just a way to identify by
11   state form number the choice one policy.
12             THE COURT:  So we're talking about 50 policies?
13             MR. DUVALL:  We're talking about choice one policies,
14   the type of policy, one type of policy.
15             THE COURT:  That's one policy that applies in all 50
16   states.
17             MR. DUVALL:  Right.  And in one state, it may it have
18   a different form number than in another state.
19             MR. DAILEY:  So to the extent that they're going to
20   be -- they may be asking for the same rate increases across all
21   50 states in which then I think the analysis and the disclosure
22   to the class becomes even easier based on what I've just heard.
23             If they're asking for different rates to be applied
24   in different states, then we think they should provide those
25   different analyses.  So I wanted to clarify that.  The --

1          THE COURT:  Before you go anywhere, Mr. Duvall, you

2    all have talked about how difficult all this is, but if you've

3    got one policy and you're going to seek the same rate increase

4    in every state, why isn't it sufficient that you could tell a

5    policyholder we're going to seek X increases and it would

6    really just be one notice?

7          MR. DUVALL:  Two reasons, Your Honor.  While it's the

8    choice one policy with different forms per state, it's also

9    different rates per states and different rate requests per

10   state and different rate increases that may or may not be

11   granted per state.  So that does vary per state, so we can't do

12   a single nationwide notice on that question.

13         THE COURT:  But it's only 50.

14         MR. DUVALL:  It's 50 different states with 50

15   different rate increase requests and grants and considerations,

16   and some of them --

17         THE COURT:  You are just talking about the one you're

18   going to ask for, and that's -- in 50 states, you have one rate

19   increase per state, or you have -- and that's all you are

20   dealing with.  What's the big deal about doing that?

21         MR. DUVALL:  Just to be clear, and I was about to try

22   to make this point.  In some states, it maybe multiple types of

23   rate increases depending on benefit level of the policy.  For

24   example, a different rate increase may be sought and ultimately

25   applied to an unlimited benefit policy versus a limited benefit

1    policy.  But the second point --

2              THE COURT:  How many unlimited benefit policies are

3    there?  Is that the 47,000 --

4              MR. DUVALL:  I think that's roughly -- I think we

5    referenced a number on Friday of 49,000 which was unlimited

6    benefit plus the inflation protection, the interest rider.  So

7    there are different rate increase histories and pendencies and

8    potential approvals including by levels of benefit per state.

9              To the second question, this kind of gets back to

10   what --

11             THE COURT:  You know, that's a very effective way of

12   creating the appearance of a lot of work, but how many

13   different letters would you have to send?  You left the

14   impression you'd have to send 207,000 in your papers.  He says,

15   no, you probably could send 50.  That's a big difference

16   between the two, and neither one of you have given me any real

17   hard evidence about how much it would take.

18             Now is the time.  Tell me exactly how many different

19   letters you'd have to create.  Your client has said they have

20   to do X, Y, and Z and go through different permutations and

21   combinations.  I want to know exactly how much.

22             MR. DUVALL:  As I stand here right now, I can't say I

23   question, but the fundamental point is, what basically is being

24   asked for is for us to give the first capital D disclosure

25   which is one of the centerpieces of the settlement, and in the

 1    lawsuit, it was a contested issue.

 2              THE COURT:  Look, then let's get the issue on the

 3    table that way.  The issue is not how much trouble it is.  The

 4    issue is that you are being forced to part with the

 5    consideration, and you don't get the benefit.  That's the issue

 6    on this; right?

 7              MR. DUVALL:  That's a big issue.

 8              THE COURT:  What's the other issue?

 9              MR. DUVALL:  The issues I've already articulated

10    about the difficulty and time it takes to do that, the time it

11    will take to get the class their relief, that delay.

12              THE COURT:  No, no.

13              MR. DUVALL:  I agree with you that a big issue is

14    we'd essentially be asked to get part of the settlement out

15    now.  Big issue.

16              THE COURT:  All right.  And then somebody has to

17    answer to how many -- how much work you're really talking about

18    doing.  Has somebody got that done?

19              MR. DUVALL:  I'm sorry, Your Honor.

20              THE COURT:  How much work is it?  You have created --

21    you know, sort of like Lady Macbeth over the cauldron boiling

22    and bubbling and so forth, and out come all these beasties and

23    scary things, and, right now, I don't have enough information

24    to know how much of a job it really is.

25              MR. DUVALL:  I'm happy to supplement the record with

1    those facts, Your Honor.

2              THE COURT:  You don't know, all right.

3              MR. DUVALL:  Thank you.

4              THE COURT:  So why should anybody in the class get

5    part of the consideration in the lawsuit remembering that the

6    gravamen of the claim in a lawsuit that is being settled is a

7    prayer for disclosures.  Why should you get part of it without

8    you giving up anything, i.e., opting out or staying?

9              MR. DAILEY:  Well, what they're really asking for,

10   Your Honor, is that they should be allowed to continue to not

11   tell the class the truth, that they should be allowed to

12   continue to withhold this information.

13             THE COURT:  You turned that around in a way that was

14   nice for you, but that isn't what I asked you.  I asked you why

15   should you be allowed to get part of the consideration of the

16   settlement and not give up something.  That's the way

17   settlements work.

18             MR. DAILEY:  Well, we haven't opted out, so we are

19   part of the settlement if and when it gets approved.

20             THE COURT:  No, but you've objected.

21             MR. DAILEY:  We have objected until --

22             THE COURT:  If I sustain your objection, then they

23   have to provide information, and then you have the right to opt

24   out.  That's the result.  If I overrule your objection, you

25   have the right to take that to the Fourth Circuit and see if

1    they'll say you are right and I'm wrong.

2          MR. DAILEY:  But the information that we're asking

3    for goes directly to one piece which is what is the value --

4    how much are they going to increase my policies.  If I'm giving

5    them a full release, then I want to know how much more they're

6    going to charge me in the future and how much that's going to

7    cost me.  That's not all of the disclosures and all of the

8    disclosure relief.  That goes to one particular piece about

9    what I'm getting --

10          THE COURT:  What else are they going to disclose

11    under your theory?  They're going to disclose -- as I

12    understand it, we're going back to those options.  They're

13    going to disclose what the cash payment is, because that's part

14    of the value of the settlement.  They're going to disclose

15    which one -- and you know which options you can choose.  What

16    do they have to disclose?  I need to know what you're talking

17    about.

18          MR. DAILEY:  That's all I'm asking for them to

19    disclose.

20          THE COURT:  What?

21          MR. DAILEY:  The rate increases --

22          THE COURT:  Projected rate increases in the future in

23    that state for you.

24          MR. DAILEY:  Yes, Your Honor.

25          THE COURT:  Projected rate increases.  Then what

1    else?

2              MR. DAILEY:  The number of years that they plan to

3    request those rate increases.

4              THE COURT:  That's it?

5              MR. DAILEY:  Then the information that Mr. Penny went

6    through earlier today --

7              THE COURT:  What?  Tell me exactly what you want.

8              MR. DAILEY:  So he talked about one side of the

9    equation which was information about the payouts and how they

10   value the different options, what class members will get.  We

11   would like --

12             THE COURT:  Will you please, Mr. Dailey, tell me what

13   you want, not what he said.  I just want to know what you want.

14             MR. DAILEY:  We would like -- before today, that's

15   what we were asking.  Some of the information he gave today was

16   not all the information we're asking for --

17             THE COURT:  You're still not doing it.  You are

18   talking about what he did.  I want to know, please, sir, what

19   is it that you want disclosed?

20             MR. DAILEY:  The value of the cash payouts.

21             THE COURT:  That would just be the amount; right?

22             MR. DAILEY:  Correct.  And he went through some of

23   those today which we had never heard before today.

24             THE COURT:  So the cash payout amounts.

25             MR. DAILEY:  And then the value of the benefits that

1   the class members are being asked to give up when they reduce

2   their benefits; for example, going from the unlimited payout to

3   a six-year or one of the other reduced benefit options.

4              THE COURT:  How do they do that?

5              MR. DAILEY:  How do they do what, Your Honor?  I'm

6   sorry.

7              THE COURT:  How do they tell you what is the value of

8   the benefit that you're being asked to give up?  What do they

9   do to do that?

10             MR. DAILEY:  Provide the internal calculations that

11  they've done on that very issue to determine if this was

12  feasible to them to agree to as a settlement.  My clients don't

13  have --

14             THE COURT:  You are assuming they did that; right?

15  Do you know they did it?  Has class counsel done discovery on

16  it and have you asked class counsel on that?

17             MR. DAILEY:  I don't know if they have done that.

18             THE COURT:  How do I even know this exists?

19             MR. DAILEY:  One, I believe it's going to be

20  requested by the regulators.  California has already indicated

21  that's the information that they would like.  So consistent

22  with what we said in our objections, unbeknownst to us,

23  California, the California Department of Insurance filed

24  theirs.  It was much more detailed, but they said the same

25  exact same thing in more detail about they're going to request

1    information about the value that class members are giving up in

2    exchange for what they're getting.  So that's information that

3    we're also requesting.  If Your Honor --

4              THE COURT:  Is that it?

5              MR. DAILEY:  That's all on that point, yes, Your

6    Honor.

7              THE COURT:  Is that all you are asking for that they

8    disclose to you?

9              MR. DAILEY:  Yes, Your Honor.

10             THE COURT:  Okay, I've got it then.

11             MR. DAILEY:  The next point I'd like to address is

12   the Pennsylvania subclass.

13             THE COURT:  Okay.

14             MR. DAILEY:  I'll amend my prior statement that

15   that's all that I'm asking for because there is a piece related

16   to this point on the Pennsylvania subclass that I'm also asking

17   for.  So they've said that we're not entitled to it because --

18             THE COURT:  Not entitled to what?

19             MR. DAILEY:  Not entitled to any additional recovery

20   for Pennsylvania subclass because of the treble damages, and

21   they focused on the treble damages element of the claim.

22             But they, class plaintiffs' counsel, pled that claim.

23   Nothing has changed since they pled that claim.  It survived up

24   until this point, up until the settlement, and now it's been

25   abandoned without any explanation other than it's hard to prove

1    at trial.

2              Well, we knew that the day that they filed the

3    complaint.  There hasn't been some intervening change in the

4    law.  They have not provided any facts that I'm aware of

5    that -- none have been in the papers to say that this claim

6    won't survive.  They've just talked in generalities about how

7    those types of cases are difficult.

8              What they don't address is that there are statutory

9    damages.  So unlike other parts of the argument of plaintiffs

10   where they said if you keep your policy, you're not damaged, so

11   if you decide to keep your policy and pay the premiums, you're

12   not entitled to any benefit under the settlement.

13             I disagree with that.  I disagree with that as a

14   whole for some of the reasons raised by the other objectors,

15   but I'm not going to retread that water.  It's not necessary.

16   But I disagree with it with respect to the Pennsylvania

17   subclass because there are statutory damages tied to the

18   misrepresentations regardless of whether they would have done

19   something different or not.

20             So in addition to the measure of damages that Your

21   Honor discussed with both sets of counsel, there are statutory

22   damages that are separate and distinct --

23             THE COURT:  What are the statutory damages?

24             MR. DAILEY:  I forget the amount, Your Honor, but I

25   can get the amount for you.  If you would like, I can send the

1    case or the statutory cite.

2            THE COURT:  Does anybody know what the amount of the

3    statutory damages are in Pennsylvania under the Pennsylvania --

4            MR. PENNY:  I don't think there are any, Your Honor.

5            THE COURT:  That's fairly key to what's going on here

6    right now.  What's the statute?  Anybody have the statute here?

7            MR. DAILEY:  The reason I don't have that is this is

8    the first -- I don't -- they raised the treble damages, but the

9    issue on the statutory damages came up today.

10           THE COURT:  What?

11           MR. DAILEY:  I wasn't anticipating that the issue of

12   the statutory damages would come up today, so I don't have that

13   handy.  I can get that and submit that --

14           THE COURT:  That's part of your objection.  I would

15   think you'd know about it.

16           MR. DAILEY:  If Your Honor can give me a moment, I

17   can find it quickly.

18           MR. PENNY:  It's probably against my interest to try

19   to help out Mr. Dailey, but I think there is a provision.  It's

20   actual damages or $100, whichever is greater.

21           THE COURT:  $100 for what?

22           MR. PENNY:  Per violation --

23           THE COURT:  Per practice.

24           MR. PENNY:  And, in this instance, the relief far

25   exceeds that statutory damages floor.  So you're looking at

1   actual damages.

2          MR. DAILEY:  I don't believe that members who decide

3   to keep their policy would recover anything under what they

4   represented to the Court.  So if someone decides to keep their

5   benefits and continue to pay the premiums, my understanding

6   from the presentations earlier was those class members would

7   not recover anything but would still be giving a release, and

8   if you're a member of the Pennsylvania class, there's no need

9   to give up your Pennsylvania statutory damages.  You are able

10  to do both.  You are able to keep your policy, and you're not

11  subject to the argument that they raised earlier because of the

12  statutory damage element.

13         Your Honor, I don't have any additional points to

14  raise in response to theirs outside of what's already been

15  raised in the papers, but --

16         THE COURT:  The papers are about as confusing and

17  baffling as anything I've ever seen.  "The settlement agreement

18  as proposed creates conflicts between class members and treats

19  class members' compensation differently without sufficient

20  explanation."

21         I read that, and I cannot for the life of me figure

22  out what on earth is being said there.  That's your objection,

23  page eight of ECF 162.

24         MR. DAILEY:  What I'm getting at, Your Honor, is the

25  fact that under the proposed settlement, they talk about it in

1    terms of five options.  In our objection, I laid out what are

2    actually 13 different options that are set out in the

3    settlement appendices and the various settlement options in the

4    treatment.  One of those is if the state regulators --

5              THE COURT:  You don't explain what this is.  I cannot

6    understand what you are objecting to here.  What is the

7    objection?

8              MR. DAILEY:  Yes, Your Honor.  I will back up.  In

9    appendix C to the settlement agreement, they set out --

10   plaintiffs' counsel and Genworth's counsel discuss it as five

11   options, and in appendix D to the settlement agreement, it's

12   described as five options.

13             But when you go through the categories that are in

14   appendix D, that special elections letter, there are actually

15   13 different options.  One of those is that if the regulators

16   don't allow them to do what they're requesting, you get $100.

17   And we heard from Mr. Penny that some members may get $28,000

18   worth of benefit if they double their benefit package.  He

19   described that scenario, someone who got -- they had 28,000 in

20   paid-up benefits, they chose an option --

21             THE COURT:  What are you objecting to?

22             MR. DAILEY:  The difference in the compensation for

23   these different options without explanation for the variance.

24             THE COURT:  What are you talking about?  Variance,

25   what are you talking about?

1          MR. DAILEY:  The different settlement options have

2     different value without explanation, so there are different

3     class members --

4          THE COURT:  That's different than -- you are saying

5     different value without explanation.  You were talking about

6     variations a minute ago, and I don't understand.

7          MR. DAILEY:  What I was referring to inartfully, Your

8     Honor, is variations in the value.

9          THE COURT:  What does that have to do with whether

10    there are five or 13 options?

11         MR. DAILEY:  It doesn't have to do with whether

12    there's five or 13 options because the same problem exists

13    whether you look at it as five options or 13 options.

14         THE COURT:  Why am I being asked to focus on the fact

15    there's a difference in one place that says five options and

16    one place 13?

17         MR. DAILEY:  My objection is not the fact they

18    describe it as five options and that it's 13 options.

19         THE COURT:  I am denying this objection out of hand

20    because I can't understand it, it's inarticulate, and I've

21    given you a chance to explain it.  That hasn't helped any at

22    all.  Looks to me like you put together a whole lot of stuff

23    without thinking it through too much.

24         You have objection three, "The settlement contains a

25    conflicting opt-out release in favor of defendants with an

1  opt-in election procedure to obtain benefits to the detriment

2  of the class members."  Now, I don't understand -- I have read

3  that, and I do not understand what provisions you are talking

4  about.  I realize -- I see what you say, but I don't understand

5  it when I read the settlement agreement.  So can you help me

6  with what you mean in objection three?

7          Upon reflection, maybe you'd like to drop that

8  objection because it doesn't seem to me to fly anyway, but

9  maybe if you can explain it to me.

10         MR. DAILEY:  What I'm getting at, Your Honor, and I

11 have not asserted that in my presentation, but I was getting

12 at --

13         THE COURT:  Well, then, we'll drop it.  It's

14 withdrawn.  Okay?  Do you agree?

15         MR. DAILEY:  Yes, Your Honor.

16         THE COURT:  All right, now, let's go back to

17 objection two.  "Counsel has not established that there is a

18 meaningful benefit when compared to the alleged damages and

19 risks of losing."  That is, I gather, your objection that the

20 value is not explained, the $100 million.

21         MR. DAILEY:  Yes, Your Honor.

22         THE COURT:  He explained it this morning, how he got

23 there, and I think the other day when you were raising your

24 objection you said there wasn't any evidence to support it, and

25 I think you were right, there wasn't any evidence to support

1  it, but he's explained how he arrived at that figure on the

2  basis of the evidence that does exist in the record and how he

3  applied the various factors that he applied to get to a figure

4  which I think he said was actually on the conservative side.

5  Does that satisfy your objection to number two?

6           MR. DAILEY:  No, Your Honor.

7           THE COURT:  What should be done here?

8           MR. DAILEY:  First, that information is not in the

9  record.  It may have been produced in the case --

10          THE COURT:  It's in the record here.

11          MR. DAILEY:  We have counsel's representations in the

12  record about other data that was not presented in court today

13  for Your Honor to evaluate or for me to evaluate, and while I

14  have no reason to believe that Mr. Penny is misrepresenting

15  information, I think the Court should have an opportunity to

16  evaluate that data as well as others.  I may see something in

17  it that he didn't see.

18          And so I don't agree that that is sufficient for him

19  to have established that, and I don't believe that him saying

20  it makes it evidence that this Court can consider.

21          Once it's been presented and authenticated and

22  admitted in the court, then the Court can consider it.  Until

23  then, it's just representations of counsel.  It's just

24  argument, and it has no weight that the Court can give to it.

25          THE COURT:  All right.  That's your objection on

1    number two.

2                MR. DAILEY:  Yes, Your Honor.

3                THE COURT:  Now, in Roman numeral I of your -- let me

4    find it.  You say, you recite in the first objection a number

5    of things that are said in the notice; right?  And then you

6    say, "Absent from all of these options is any consideration for

7    any class member that chooses not to do business with

8    defendants and wants to walk away completely from their current

9    policies.  Yet, the proposed settlement would have them release

10   their claims."

11               Now, is that still an objection after what he said?

12               MR. DAILEY:  I believe, based on their

13   representations, their view is that that's not true, and I

14   accept that.

15               THE COURT:  So that's withdrawn, and I don't need to

16   deal with it.

17               MR. DAILEY:  Yes, that portion.

18               THE COURT:  Yes, that's what I'm talking about.  Then

19   it says, "Furthermore, class members who do wish to maintain

20   policies with Genworth are asked, without the benefit of

21   knowing all the terms, to sort through and figure out which of

22   the foregoing categories they fall into and then figure out

23   what the benefit is to them as compared to their current

24   situation."

25               That argument in that paragraph is what you initiated

```
1    your discussion about, and that is the not providing the

2    additional information to the class about opting out such as --

3    and you told me that was the amount of the rate increases

4    projected and the number of years, the cash payout amount, and

5    the value of benefits being asked to give up.

6              MR. DAILEY:  Yes, Your Honor.

7              THE COURT:  So now I've got that.  Thank you.

8    Anything else?

9              MR. DAILEY:  I have nothing further, Your Honor.

10             THE COURT:  All right, thank you.  If it's bothering

11   because of the mask situation, get over there in that back

12   corner and sit down, and you can take your mask off.  You're

13   not going to expose anybody over there.

14             MR. DAILEY:  Thank you, Your Honor.

15             THE COURT:  I'm sorry.  You've taught me something.

16   We'll have to tell people --

17             MR. DAILEY:  That's okay.  If I thought it was going

18   to create a real health risk to me, I would have spoken up.

19   Just made me a little hoarse, and, like I said, probably --

20             THE COURT:  Do you want some water?

21             MR. DAILEY:  I suspect, Your Honor, and I don't

22   control your schedule, I suspect we're nearing the end, and I

23   think I can tough it out until we're finished.

24             THE COURT:  We may or may not be nearing the end.  Do

25   you have a plane?
```

1            MR. DAILEY:  I drove from Philadelphia, Your Honor,
2       so I'm fine.
3            THE COURT:  I guess people aren't flying today.
4       Okay, thank you.  Well, he's raised a couple of points, the
5       Pennsylvania subclass, and essentially I think what he's saying
6       is you haven't explained why you didn't extract more tribute
7       because of the value of that case, i.e., you should have said
8       we have a hard time -- here's why we have a hard time proving
9       the Pennsylvania subclass liability, and --
10           MR. PENNY:  Your Honor, as you will recall from the
11      motion to dismiss proceedings, etcetera, the Pennsylvania UTCP
12      -- UTPCPL claim was largely a tagalong claim to the primary
13      fraud claim.  They overlapped in many respects.
14           THE COURT:  Is the basic proposition that you are now
15      being called upon to deal with the dog that you brought to the
16      field trials that doesn't hunt that you should have left alone,
17      add a little lard in it, as Judge Williams said, but now having
18      said it, you have to say why it is that you are not -- you
19      didn't pursue it and get any good out of it is his argument; is
20      that right, Mr. Dailey?
21           MR. DAILEY:  Yes, Your Honor.
22           MR. PENNY:  And what I'm trying to explain in my
23      briefing to Mr. Dailey and to the Court is that this is a
24      settlement.  There are many claims that are brought in
25      lawsuits, and you settle the claims on behalf of the entire

1    class as best you can.  That claim was not worth anything more

2    at the settlement table than any of the claims that were

3    settled.

4            A $100 minimum statutory damages claim, even if you

5    were successful at trial, does not get you over the hump.  The

6    major problem with the Pennsylvania claim is that -- and I hate

7    to have to say this as a plaintiff's attorney in open court, it

8    is very, very challenging to certify a Pennsylvania consumer

9    fraud claim in a lawsuit.

10           It is much easier to certify a run-of-the-mill fraud

11   claim based on common law.  That claim is not worth any more in

12   this settlement than the fraud claims that were alleged that

13   might actually have been worth less, but, again, this is all

14   part of the calculus --

15           THE COURT:  Where in your paper, I think is the

16   issue, does all this appear?

17           MR. PENNY:  In the reply brief you mean?

18           THE COURT:  No.  In your notice, in your motion to

19   approve, where does it say, look, we're giving up and these

20   people are giving up whatever rights they have under the

21   Pennsylvania law because, in our view, there would be no

22   greater relief obtained under the Pennsylvania law than under

23   the settlement of count one which is the fraud claim?

24           MR. PENNY:  It doesn't specifically say that in the

25   notice.

1          THE COURT:  It needs to, according to him.

2          MR. PENNY:  I don't think he's right.  I don't think

3     he cited any case or even made a cogent legal argument that

4     would suggest that a class notice has to be so detailed that it

5     informs the class members of all the negotiation process that

6     went into creating the benefits.

7          The class members need to know what the claims

8     alleged in the lawsuit were.  That's what we said in the

9     notice.  They need to know what was settled, and they can

10    assess for themselves whether they want to be part of that

11    settlement and be bound by the release or exclude themselves.

12         They have all that information in front of them.

13    They don't need to specifically be told that those Pennsylvania

14    residents that could have pursued the Pennsylvania consumer

15    protection claim might have been, on their very best day,

16    entitled to $100 in statutory damages, might have been, at the

17    discretion of the judge, awarded three times that amount if

18    they could have gotten through a very difficult class

19    certification process, etcetera, and that class counsel took

20    all this into consideration.  They don't need to have all those

21    details.

22         THE COURT:  You're from Pennsylvania.  Why wouldn't

23    you want those details, because you have a class -- I mean an

24    opportunity to recover that is independent and apart from the

25    count one.

1        MR. PENNY:  It's not really independent and apart.

2   The consumer fraud claim and the common law fraud claim were

3   rising or falling on basically the same set of facts.  If you

4   will remember, at the motion to dismiss hearing, we spent all

5   the time talking about the common law fraud claim, and the

6   Pennsylvania law claim got sustained basically on the basis of

7   the discussion about the fraud claim.

8        It's not a separate claim.  It's not a more valuable

9   claim.  It's not a claim that was entitled to any specific

10  deference or reward at the settlement table or in the approval

11  process.

12       THE COURT:  That's why you didn't put it in the

13  settlement, in the notices and in the proposed -- yeah, the

14  notices.  Would it hurt to add into the notice that we're also

15  settling the claim for such-and-such which is essentially the

16  same as the ones being settled and it doesn't add anything to

17  the case, and, in the opinion of counsel, the settlement fairly

18  encompasses what you'd be entitled to get for that?

19       MR. PENNY:  I mean, I suppose you could have --

20       THE COURT:  Or words more eloquent than that.  You do

21  a lot of elegant stuff, so --

22       MR. PENNY:  I'm sure you could have any sort of

23  additional disclosures and information in the --

24       THE COURT:  Draft one up.

25       MR. PENNY:  Draft one up for what?

1          THE COURT:  Draft up a little bit of add-on for the

2     notice.  You haven't set the notice out yet, have you?

3          MR. PENNY:  Sure we have.

4          THE COURT:  I'm sorry, final notice.  Okay, yeah,

5     you're right, I'm sorry.  It's too late in the day.

6          MR. PENNY:  It is getting late.

7          THE COURT:  Suppose I conclude that you should have

8     done that but you didn't.  What do I do?

9          MR. PENNY:  In order --

10         THE COURT:  Require a subsequent notice to go out?

11         MR. PENNY:  In order to make that conclusion, you'd

12    first have to find some legal basis that says that notice has

13    to be that complex, and then if you did, I suppose the remedy

14    would be to send a supplemental notice to all the class members

15    within an additional period to opt out.

16         THE COURT:  Well, it isn't really all that complex to

17    say that, but I think the fact is that it's the same claim, and

18    the idea that -- same claim that's being settled, and you're

19    getting good value for what you are settling is the -- or are

20    you is the real issue, and it looks to me like that there's a

21    lot of value to class members here.  I have a lot of other

22    problems with this matter but not necessarily that one.  Does

23    that take care of all of what we've got?

24         MR. PENNY:  I think so unless you'd like to hear any

25    more about the Agulnicks.

1          THE COURT:  As evidenced by my last question, it's

2     probably time to close the door right now.  I think I've got --

3     I think I've got questions, and I need some answers.  I would

4     like to sort through my notes and put to you the questions in a

5     deliberate way so I'm not just grabbing from my notes right now

6     and my memory.  So I'm going to do that, but I will require

7     some further information before I can make a final decision on

8     this.

9          I will tell you, just so you know, I do want to

10    understand the timeline and the alleged complexities of doing

11    what Mr. Dailey wants done.  That's not to say it's

12    appropriate, but it is to say I need to understand what is

13    being -- what really it is beyond the plaintive cries of

14    distress and trouble, and I'm sure it's work, and I'm sure it

15    is trouble.

16         So you might start getting on that, and tomorrow or

17    the next day, you'll -- I'll be in touch with you.  I probably

18    will do it by telephone conference so you can ask questions,

19    and then I'll follow it up with an order, and we'll move out on

20    it.

21         I think this case had a lot of complexity to it, and

22    I think the settlement shows a lot of thought and balances some

23    very difficult considerations based upon the nature of the

24    claim that is asserted in count one, and we must always remain

25    mindful that the settlement has to be evaluated in the final

1    analysis against the evidence and the likelihood of prevailing

2    on the count that is asserted in the complaint, not on things

3    that might have been brought.

4              So I have to sort that out, and I'm going to think it

5    through, and I'll be in touch with you.  Thank you very much.

6              THE CLERK:  Judge, if I may interrupt, Janice Wynn

7    has raised her hand.  I don't know if she'd like to say

8    something.

9              THE COURT:  Ms. Wynn, if you'd like to say something,

10   then you can let us know what you'd like to say, and if you'll

11   give me a minute, I'll get my notepad back out and ready to go.

12   Let's see, you are a class member who did not file an

13   objection; is that right, Ms. Wynn?

14             MS. WYNN:  Right, but --

15             THE COURT:  I'm having a little trouble hearing you.

16   Can you speak up, turn your volume up?

17             MS. WYNN:  Yes, sir.

18             THE COURT:  How do you spell your name, Ms. Wynn?

19             MS. WYNN:  Whiskey Yankee November November.

20             THE COURT:  Do you have a military background, do

21   you?

22             MS. WYNN:  Yes, sir.

23             THE COURT:  Not many people left who know the old

24   language.  Okay, what would you like to say, ma'am?

25             MS. WYNN:  Well, I basically have a question

1    regarding the documents that were posted on the website

2    regarding this special elections, the appendix C options, and

3    then also the appendix D sample letter.  Paragraph 1A1, the

4    option two for basic paid-up plus cash, in appendix C it refers

5    to amount premiums paid up through December 31st, 2015, and

6    then damages payment equal to premiums paid January 1st, 2016,

7    through December 31, 2019.  Appendix D, however, changes that

8    to plus premiums you have paid on or after January 1st, 2020.

9         I have a 45 percent rate increase that went into

10   effect December of 2019, so I have been paying these extra

11   premiums.  Will that be part of the basic paid-up amount?

12        THE COURT:  I believe that's a question for

13   plaintiffs' counsel to answer, and you need to come to the

14   lectern so the court reporter can hear you.

15        MR. PENNY:  Yes, Ms. Wynn, I think you are talking

16   about the nonforfeiture option that will return to you some of

17   your premiums but also retain a paid-up benefit, and you want

18   to ensure that the payments that you are making in 2020 will be

19   part of the paid-up benefit calculation, and I can understand

20   your confusion, and you have a very detailed eye because what

21   you picked up on is something that was stated in the settlement

22   agreement that was then amended in the amended settlement

23   agreement that corrects the issue that you are worried about.

24        The way we had initially described that benefit in

25   the settlement agreement neglected to say what happens to the

1    2020 payment because I think we weren't thinking that the

2    settlement process keeps playing out, so we amended it to make

3    sure that your 2020 payments and any payments thereafter will

4    be captured in the paid-up benefit.  So I can give you that

5    comfort.

6              THE COURT:  When the special election letter goes out

7    and the payment calculation is made.

8              MR. PENNY:  Correct.

9              THE COURT:  Does that answer your question, Ms. Wynn?

10             MS. WYNN:  Yes, sir.  Thank you.

11             THE COURT:  Is there anything else you'd like, Ms.

12   Wynn?

13             MS. WYNN:  No.  My husband says go Navy.

14             THE COURT:  I'm an Army man, but I support Navy.

15   Thank you very much for your participation.  Is there anybody

16   else who has anything who is on the telephone?  Thank you, Ms.

17   Brown, for reminding me of that.

18             THE CLERK:  No one else has raised their hand.

19             THE COURT:  Okay.  That said, we will be in

20   adjournment.

21             It's just too late in the day for me to go through it

22   anymore.  When do you want to do the attorneys' fees, folks?  I

23   can't do anything tomorrow or Thursday or Friday.  I can't do

24   anything again until July 27th or 28th.  Also the 31st.

25             Counsel, I'm going to give you all preference

1  because -- on your date selection because you have the biggest

2  job to deal with.

3          MR. PENNY:  Your Honor, I can do the 27th or the

4  28th.  That would be my two preferences.

5          MR. DUVALL:  Those dates are fine with Genworth.

6          THE COURT:  27th at 10:00 a.m.  Ladies and gentlemen

7  who are on the phone, if you want to participate, what do they

8  do, call you or what, Ms. Brown?

9          THE CLERK:  Yes, Judge, they would contact me

10  directly.  My phone number will be in the order, and once they

11  contact me, I'll give them the Zoom credentials.

12          THE COURT:  It's the same number, is it?  So you have

13  the number that you used today; is that right?

14          THE CLERK:  No, sir.  It will be a new invitation

15  that will be sent out.

16          THE COURT:  The same number or different number?

17          THE CLERK:  It will be a different number.

18          THE COURT:  So be on the lookout for that, and we

19  have their names up here.  Do we have ways to get hold of them?

20          THE CLERK:  They will contact me directly.

21          THE COURT:  Okay.  So you call Ms. Brown directly,

22  and do you have -- they have called you before, so they have

23  your number.  All right, thank you.

24          MR. PENNY:  And, Ms. Brown, if you want to tell the

25  people on the call that whatever order or information is

1    provided, it will be posted on the settlement website.  They

2    can consult that as well.

3           THE COURT:  Very good, thank you.  If you want the

4    transcript, you need to order it, folks.  And you might need it

5    given some of the discussion that's gone on today in order for

6    the things that you're going to have to respond to.  All right,

7    we will be in -- now we will be in adjournment.

8

9

10                    (End of proceedings.)

11

12

13           I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15

16

17    _____/s/_____              _____

      P. E. Peterson, RPR                Date

18

19

20

21

22

23

24

25