IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JEROME SKOCHIN,
et al.,

      Plaintiffs,

v.                       Civil Action No. 3:19cv49

GENWORTH FINANCIAL, INC.,
et al.,

      Defendants.

## MEMORANDUM OPINION

This Memorandum Opinion addresses the objections that have been tendered by individual class members in opposition to PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT (ECF No. 135) ("Motion to Approve the Settlement"). The objections are set out in letters and pleadings bearing ECF Nos. 116, 119-123, 127, 128, 132, 133, 148, 149, 153, 154, 156, 158, 159, 161, 162, 164, 166, and 169-172. The parties have responded in writing to the several objections.[1] On July 10 and 14, 2020, the Court heard argument on the objections from the objectors and the parties. Thereafter, the Court ordered further briefing on several

---

[1] PLAINTIFFS' REPLY IN SUPPORT OF (1) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND (2) CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND SERVICE AWARDS TO THE NAMED PLAINTIFFS (ECF No. 177).

issues, and in response, the parties submitted CLASS COUNSEL'S SUPPLEMENTAL MEMORANDUM PURSUANT TO THE COURT'S JULY 20, 2020 ORDER (ECF No. 201) and JOINT STATEMENT OF POSITION IN RESPONSE TO THE COURT'S JULY 21, 2020 ORDER (ECF No. 203).

Upon further review of the position asserted in the July hearings and the various relevant pleadings, the Court, on September 14, 2020, ordered further briefing on the asserted value of the Settlement to the class and the financial impact of the Settlement on the Defendants. ORDER, ECF No. 208; ORDER, ECF No. 210. Class Counsel responded to that order by filing CLASS COUNSEL'S SUPPLEMENTAL MEMORANDUM PURSUANT TO THE COURT'S SEPTEMBER 14, 2020 ORDER (ECF No. 211) and DECLARATION OF JONATHAN M. PETTY (ECF No. 212). Defendants filed DEFENDANTS' MEMORANDUM IN RESPONSE TO THE COURT'S SEPTEMBER 16, 2020 ORDER (ECF No. 213) and DECLARATION OF JAMALA ARLAND IN SUPPORT OF DEFENDANTS' RESPONSE TO THE COURT'S SEPTEMBER 16, 2020 ORDER (ECF No. 214).

Having considered all of the submitted information and for the reasons set forth on the record during the hearings on July 10 and July 14, 2020 ("July Hearings") as well as the reasons set forth below, the various objections relating to Plaintiffs' Motion to Approve the Settlement will be OVERRULED. Objections relating to CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND SERVICE AWARDS TO THE NAMED PLAINTIFFS (ECF No. 142)

("Motion for Attorneys' Fees") will be addressed in a separate memorandum opinion.

### BACKGROUND

**I.   Procedural  History:  the  Class  Action  Complaint,  its Amendments, and the Claims**

To resolve the objections to the Plaintiffs' Motion to Approve the Settlement, it is necessary to understand the claims asserted by the Plaintiffs because it is those claims, not others that might have been asserted, that are being resolved by compromise.  And, of course, any relief that might be awarded in the event of success at a trial on those claims is circumscribed by the claims that would be tried.   Thus, relief achieved by settlement must be measured in perspective of what relief is sought and what relief is conceptually available.

**A.   The Various Iterations of the Class Complaint**

Jerome  Skochin,  Susan  Skochin,  and  Larry  Huber ("Plaintiffs"), individually and on behalf of a proposed class of Genworth Choice 1 policyholders as of January 1, 2012, filed this class action against Defendants Genworth Life Insurance Company ("GLIC") and Genworth Life Insurance Company of New York ("GLICNY") (collectively "Genworth" or "Defendants").   COMPL., ECF No. 1. The  initial  Complaint  was  filed  on  January 18, 2019.   Then, following the initial pretrial conference, the Plaintiffs filed an Amended  Class  Action  Complaint  ("Amended  Complaint"),  asserting

3

claims against GLIC and Genworth Financial, Inc. for breach of contract, fraudulent omission, and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. Ann. § 201-1, et. seq. ("UTPCPL").

On May 13, 2019, Genworth filed a motion to dismiss the amended complaint. ECF No. 39. Genworth's motion to dismiss argued that Plaintiffs' claims should be dismissed based upon the filed-rate doctrine and, alternatively, that Plaintiffs' failed to state a claim under Fed. R. Civ. P. 12(b)(6). DEFS.' MEM. LAW SUPP. MOT. DISMISS, ECF No. 40. On August 29, 2019, the Court issued a Memorandum Opinion and Order denying, in part, Genworth's motion to dismiss. ECF Nos. 78, 79. In that Memorandum Opinion, the Court held that the filed-rate doctrine did not bar Plaintiffs' claims; that Plaintiffs' fraud claims were plausibly alleged; and that Plaintiffs' UTPCPL claim was plausibly alleged. However, Plaintiffs' breach of contract claim was dismissed with prejudice. Id. The Court permitted Plaintiffs to file a Second Amended Complaint ("SAC") by September 20, 2019 and Genworth to answer the SAC by October 4, 2019. ORDER, ECF No. 79.

Plaintiffs filed their SAC on September 20, 2019, asserting a claim for fraudulent inducement by omission and a claim under the UTPCPL. SAC at 50-56, ECF No. 84. In Genworth's answer to the SAC filed on October 4, 2019, Genworth asserted twenty affirmative defenses and avoidances. DEFS.' ANSWER PLS.' SAC, ECF

4

No. 85.   As part of the Settlement, it was agreed that the
Plaintiffs would file a Third Amended Complaint ("TAC").   For the
most part, the TAC tracks the SAC.   Nevertheless, because the TAC
is the operative complaint, the Plaintiffs' claims will be outlined
with reference to the TAC.

**B.   The Factual Backdrop for the Class Claims**

Plaintiffs and class members each have Choice I Long Term
Care Insurance policies issued by Genworth.   Long Term Care ("LTC")
insurance is intended to defray the cost of home care, assisted
living care, nursing home care, and other specialized skilled
facility care required when an individual can no longer perform
the basic activities of daily life.   TAC ¶ 3, ECF No. 90.

Plaintiffs allege that, since 2012, Genworth has steadily and
substantially increased the premiums on its LTC insurance
policies.   TAC ¶ 1, ECF No. 90.   When Genworth learned that there
were substantial deficiencies in its reserves going forward, it
created an internal action plan to seek significant premium rate
increases systematically across its older policy classes.   Id. ¶
17.   Plaintiffs also allege that, to avoid reporting a current
negative loss recognition testing margin, Genworth relied almost
entirely on billions of dollars in future rate increases to plug
the hole in its reserves.   Id. ¶ 18.

Then, say the Plaintiffs, Genworth began implementing its
rate increase plan.   TAC ¶ 22, ECF No. 90.   However, Genworth's

5

plan for substantial future rate increases was never shared with
Genworth's LTC policyholders.  Id. ¶ 24.  Rather, it is alleged
that Genworth told policyholders only that it was "likely" that a
premium rate would increase in the future, without telling
policyholders that Genworth actually had significant holes in its
reserve and that Genworth planned to increase premiums by at least
150% over the next few years.  Id. ¶¶ 24-29.  Plaintiffs allege
that Genworth only partially disclosed material information when
communicating the premium increases to its LTC policyholders and
that, without the undisclosed information, Plaintiffs and the
Class could not make informed decisions in response to their policy
option renewals.  Id. ¶ 1.

In other words, it is alleged that the undisclosed information
was material to decisions that LTC policyholders made respecting
whether, and to what extent, to renew or retain their LTC coverage;
that the undisclosed information was necessary to make accurate
the disclosed information; and that, therefore, the omissions made
the disclosed information fraudulent.  It is also alleged that
Genworth intended that policyholders would rely on the knowingly
inadequate disclosures in making the election among their policy
choices.

Generally speaking, the choices given to policyholders
respecting whether, and to what extent, to maintain LTC policies
were to: (1) maintain the existing LTC coverage and pay the

increased premium; (2) reduce the LTC coverage and pay a lower premium; or (3) opt for a paid up LTC policy.  Plaintiffs maintain that, had they known the scope and magnitude of Genworth's plans for future rate increases, they would have made different policy option elections.  <u>Id.</u>

### C.   The Claims

In Count One, the TAC presents a claim for fraudulent inducement by omission.  TAC at 49-54, ECF No. 90.  In particular, the TAC alleged:

> 207. <u>By failing to adequately disclose material information about Genworth's rate increase action plans</u>, current reliance on its planned future increases actually being approved, and the <u>risks to Genworth's solvency</u> if such increases were not approved, Genworth <u>withheld material information</u> from Plaintiffs and the Class.

> 208. Genworth <u>intended</u> that Plaintiffs and the Class Members <u>rely upon the incomplete information</u> it did provide in hope that they would pay the increased rates.

> 209. Plaintiffs and Class Members were unaware of the scope and magnitude of Genworth's entire rate increase action plan when they made their renewal elections.  They were also unaware of Genworth's reliance on this rate action plan, which also included significant increases on other LTC policies, to build adequate reserves to pay their future claims.

> 210. Without a complete picture of Genworth's massive rate increase plan, Plaintiffs and the Class Members elected to renew their contracts.  Had they known the full scope and magnitude of Genworth's rate action plans, and the Company's reliance on massive rate

increases in the future to remain viable, they
would have made different policy option
elections.

TAC ¶¶ 207-210, ECF No. 90 (emphasis added).  The relief sought in

Count One was:

(a)   a declaration that Genworth had withheld
      material information as alleged;

(b)   an injunction requiring Genworth to make
      adequate and corrective disclosures and
      allowing LTC policyholders to make new
      elections in light of the new
      disclosures;

(c)   an order allowing LTC policyholders to
      rescind previously made elections; and

(d)   return of premiums for the policies as to
      which rescission is allowed.

TAC ¶ 212 (a-d), ECF No. 90 (emphasis added).  Put another way,

the TAC says that on Count One:

213.  To avoid doubt, if the above relief is
obtained, plaintiffs seek to be placed in the
same position they were in before Genworth
made the aforementioned omissions, meaning
they would still have the same guaranteed
renewable Choice I LTC policy they had prior
to the omissions, and must then decide whether
to maintain that policy in light of the
current premiums that would be due.

TAC ¶ 213, ECF No. 90 (emphasis added).

In Count Two, the TAC presented a claim for violation of the

Pennsylvania Unfair Trade Practices And Consumer Protection Law

(the "Pennsylvania UTPCPL").  The Pennsylvania UTPCPL claim is

based on the same factual assertions as form the basis for the

8

fraudulent inducement claim in Count One.  And, the relief sought for Count Two is "declaratory and injunctive relief, damages, treble damages, costs of litigation attorneys['] fees" and other just relief.  TAC ¶ 224, ECF No. 90.

Then, the TAC presents a PRAYER FOR RELIEF that is not tethered specifically either to Count One or Count Two.  That section of the TAC seeks:

> B.   That the conduct alleged herein be declared, adjudged and decreed to be unlawful;
>
> C.   That Plaintiffs and the Classes they represent be awarded <u>compensatory, consequential, and general damages</u> in an amount to be determined at trial;
>
> D.   That Plaintiffs Jerome and Susan Skochin and the Pennsylvania Subclass they represent be awarded <u>statutory damages</u> pursuant to Count Four;
>
> E.   <u>Injunctive</u> relief as is warranted;
>
> F.   Costs and disbursements of the action;
>
> G.   Pre-and post-judgment interest;
>
> H.   Reasonable attorneys' fees; and
>
> I.   Such other and further relief as this Court may deem just and proper

TAC at 57, ECF No. 90 (emphasis added).

## II.  Discovery

Shortly after the Initial Pretrial Conference, the parties began serving written discovery requests.  Plaintiffs served their

initial requests for production of documents on May 1, 2019, and Genworth served requests for production and a first set of interrogatories on each of the three named Plaintiffs on May 8, 2019. PLS.' MEMO. IN SUPP. at 5, ECF No. 92. The parties timely responded and objected to each, and their counsel met and conferred several times regarding the timing and scope of the discovery requests. Id. With respect to Genworth's document production, counsel for the parties negotiated stipulations concerning the collection and production of electronically-stored information, as well as a set of search terms and custodians. Id.; STIPULATED PROTECTIVE ORDER, ECF No. 49; STIPULATED PROTECTIVE ORDER ESI, ECF No. 50. In total, Genworth produced 205,000 pages of documents to Plaintiffs between May 3, 2019 and July 9, 2019. PLS.' MEMO. IN SUPP. at 5, ECF No. 92.

On August 16, 2019, Plaintiffs deposed Genworth's Vice President for LTC Insurance Product Management and Genworth's corporate representative, who was responsible for the development of rate increase action plans, new LTC products, and helping oversee the state regulatory approval process of LTC rate increase requests. PLS.' MEMO. IN SUPP. at 6, ECF No. 92. On August 27, 2019, Plaintiffs took the deposition of Genworth's Senior Project Leader for In-Force Management, who was responsible for developing rate increase notification letters sent to the Settlement Class, as well as for providing support for the customer service team

following state regulatory decisions on Genworth's rate increase requests. PLS.' MEMO. IN SUPP. at 6, ECF No. 92.

On August 30, 2019, Genworth disclosed its expert Ted Nickel, the Wisconsin Commissioner of Insurance from 2011-2019, pursuant to Fed. R. Civ. P. 26(a)(2) and produced Nickel's expert report for class certification. Mr. Nickel was deposed on September 20, 2019. PLS.' MEMO. IN SUPP. at 6, ECF No. 92.

On September 10 and 12, 2019, plaintiffs Larry Huber, Susan Skochin, and Jerome Skochin sat for depositions. All three Named Plaintiffs testified that they understood the role and obligations of class representatives and demonstrated their competency and ability to serve as such by, inter alia, overseeing the litigation through the pleading, motions to dismiss, and discovery phases; participating in discussions with their counsel concerning case developments, strategies, and significant filings; and searching for and producing documents in discovery and responding to interrogatories. PLS.' MEMO. IN SUPP. at 6-7, ECF No. 92.

On September 16, 2019, Plaintiffs served Genworth with over 200 requests for admission, ten interrogatories, and additional document requests. That same day, Genworth served Plaintiffs with its second set of document requests. Further, leading up to the settlement, Plaintiffs' counsel prepared their motion for class certifications and related motions to be filed on October 1, 2019. PLS.' MEMO. IN SUPP. at 7, ECF No. 92.

11

### III. The Mediation

Upon completion of argument on Genworth's motion to dismiss on July 12, 2019, the Court advised the parties that the breach of contract claims likely would be dismissed and urged the parties to consider settlement of the fraud claims.  On August 1, 2019, the parties contacted Rodney A. Max of Upchurch, Watson, White & Max Mediation Group, Inc. regarding his availability to serve as a neutral mediator.   The first mediation session took place on Saturday, September 28, 2019.  According to Plaintiffs' Counsel, between the first and second mediation session, "Genworth worked extremely hard, with in-house and outside legal counsel, business analysts, actuaries, and key decision-makers to craft a detailed response to Plaintiffs' initial proposal for settlement, which Genworth presented to Plaintiffs on October 17, 2019.  That day, the parties spent the entire day in internal deliberations and face-to-face negotiations, but ultimately were unable to reach a complete resolution of all outstanding issues."  PLS.' MEMO. IN SUPP. at 7, ECF No. 92 (citation omitted).

On October 18, 2019, the parties conducted a second day of mediation.  Over the next several days, the parties corresponded by emailed and telephone to reach an agreement.  On October 29, 2019, the parties entered into an agreement and entered a notice of settlement with the Court.  NOTICE OF SETTLEMENT, ECF No. 88.

As part of the Settlement Agreement, Plaintiffs filed the TAC, which included the same claims as the SAC on behalf of policyholders from all fifty states and the District of Columbia and added GLICNY as a defendant. ORDER, ECF No. 89. In the TAC, the Plaintiffs request the following relief:

> a. declaratory relief in the form of a declaration that Genworth withheld material information from Plaintiffs and the Class regarding its plans for future rate increases and its reliance upon obtaining at least some portion of future rate increases on its LTC policies to be able to pay future claims;
>
> b. injunctive relief in the form of an adequate and corrective disclosure to Plaintiffs and the Class that reveals the omitted information, and the right to make new policy renewal elections in light of the new disclosures;
>
> c. if Genworth is found to have omitted material information, then rescission of their policy renewals each year since Genworth first made those omissions; and
>
> d. return of premiums paid for each year a renewal of the policy was rescinded.

TAC ¶ 212, ECF No. 90 (emphasis added). In sum, the Plaintiffs sought "to be placed in the same position they were in before Genworth made the aforementioned omissions, meaning they would still have the same guaranteed renewable Choice I LTC policy they had prior to the omissions, and must then decide whether to maintain that policy in light of the current premiums that would be due." TAC ¶ 213, ECF No. 90

13

## IV.  Preliminary Consideration of the Proposed Settlement

On  January  15,  2020,  the  Court  held  a  hearing  on  the
PLAINTIFFS' MOTION TO DIRECT NOTICE OF PROPOSED SETTLEMENT TO THE
CLASS  (ECF  No.  91).    Thereafter,  the  Court  issued  an  order
preliminarily  approving  the  settlement  and  certifying  the
settlement  class  under  Fed.  R.  Civ.  P.  23.    ORDER  GRANTING
PRELIMINARY APPROVAL OF SETTLEMENT AND DIRECTING NOTICE TO CLASS,
ECF No. 98 (the "Preliminary Approval Order").  The Preliminary
Approval  Order  directed  that  notice  be  sent  to  the  proposed
settlement  class  summarizing  the  settlement  terms  and  fixing
procedures and a schedule allowing policyholders to opt out of the
class  and  to  file  objections  to  the  settlement  (the  "Notice").
Id.  The Preliminary Approval Order also set a schedule for the
filing  of  motions  seeking  final  approval  of  the  proposed
settlement.   Id.

An Order Amending the Preliminary Approval Order (ECF No.
104)  was  entered  on  March  31,  2020.    The  amended  Preliminary
Approval Order required that the Notice be sent to class members
on  April  14,  2020,  and  on  that  date,  the  Notice  was  sent  to
potential class members.  The Notice explained the options class
members have to communicate with Class Counsel about the Settlement
Agreement, their rights and options thereunder, and how to examine
certain  information  on  a  website  that  was  set  up  as  part  of  the

settlement process.   Class members were also informed that they could contact independent counsel of their choice for advice.

As required by the Class Action Fairness Act, 28 U.S.C. § 1715, on December 30, 2019, notice of the proposed settlement and the terms thereof were sent to the appropriate state representatives in each of the 50 states, the District of Columbia and the U.S. Virgin Islands, as well as to the Attorney General of the United States.   DEFS.' NOTICE OF COMPLIANCE, ECF No. 95.   That notice afforded the various governmental entities a full and adequate explanation of the settlement terms and the procedures necessary for them to participate in this case.

According to Class Counsel, they spoke to over 4,000 policyholders with questions regarding the Settlement Agreement. PLFS.' REPLY at 6, ECF No. 177.   Over the course of the sixty days allotted in the Notice, 191 policyholders opted out of the Settlement Agreement and 32 objections were filed by 43 Class Members.   However, five of the objections have since been withdrawn, and two objections were not filed within the required time.   Id. at 6, n. 1.   Additionally, the California Department of Insurance ("CDI") filed a statement concerning the Settlement Agreement.

The Court held a hearing on Plaintiffs' Motion to Approve the Settlement (ECF No. 135) on July 10, 2020 and July 14, 2020.[2]

## V.   The Terms of the Settlement

To understand the objections to the Settlement Agreement, it also is necessary to understand the terms of the Settlement Agreement itself.   In broad terms, as explained by Class Counsel, the Settlement Agreement "directly addresses [the] alleged harm <u>by providing</u> class members with <u>additional Disclosures</u> about future rate increases, and then <u>allowing them options to restructure their benefits and premiums</u> in light of those Disclosures, if they so wish."   MEM. IN SUPP. at 1-2, ECF No. 136 (emphasis added).   The pertinent terms of the Settlement Agreement are discussed below.

To begin, Genworth will send a Special Election Letter to all Settlement Class members who have not opted out of the Settlement Agreement.   The Special Election Letter will:   (1) make certain Disclosures, which will include information about (i) Genworth's plans (at the time that the Disclosure is sent) to seek cumulative future rate increase; and (ii) Genworth's financial condition at the time that the Disclosure is sent; and (2) offer Settlement Class members the ability to choose from several Special Election Options for continuation or termination of their respective LTC policies.      The Special Election Letter will allow Settlement

---

[2] A hearing on Plaintiffs' Motion for Attorneys' Fees was held on September 11, 2020.   ORDER, ECF No. 200.

Class Members to restructure their policies with either Cash Damages or enhanced paid-up benefits, depending on the option that is elected, while taking into consideration the information provided within the Disclosures.   These Special Election Options include:

I.   General Special Election Options.  For   Settlement Class members who are not included in categories II through IV below, the following Special Elections Options may be available.

    A. Paid-up Benefits Options and Damages Options For Settlement Class Members Who Have Not Previously Gone Into Non-Forfeiture Status. These two paid-up benefit settlement options would be available to all Settlement Class members in all States who have not previously gone into Non-Forfeiture Status.

        1. A settlement option consisting of two components: (a) a paid-up benefit option equivalent to 100% of the Settlement Class member's paid-in premiums through December 31, 2015 less any claims paid over the lifetime of the policy, and (b) a damages payment equal to premiums paid during the time period beginning January 1, 2016 through December 31, 2019; or

        2. A settlement option consisting of a paid-up benefit equal to two times the difference between the Settlement Class member's paid-in premiums to date less claims paid to the Settlement Class member to date.  This option will not include any damages payment.

    B. Reduced Benefit Options ("RBOs") and Damages Options.  The first two RBO settlement options would be available to all Settlement Class members in all States with either lifetime or limited benefit period policies, excluding Settlement Class members who have previously elected a Stable Premium Option, a New York Landing Spot Option, or Settlement Class members whose level of benefits are below the level of benefits available in the below

offered options. The third RBO settlement option would be available to all Settlement Class members that currently have policies with a lifetime benefit period.

1. A settlement option consisting of two components: (a) removal of the Benefit Inflation Option ("BIO") with a reduction of their Daily Benefit Amount ("DBA") to their original DBA (*i.e.* the DBA they had prior to any BIO increases), for a reduced annual premium, and (b) a damages payment equal to four times the differential between the Settlement Class member's current annual premium for his or her existing policy and the current annual premium for the new reduced level of benefits; or

2. A settlement option consisting of two components: (a) removal of the BIO with a 25% reduction to their current DBA (after benefit inflation) for a reduced annual premium, and (b) a damages payment equal to four times the differential between the Settlement Class member's current annual premium for his or her existing policy and the current annual premium for the new reduced level of benefits; or

3. For Settlement Class members with lifetime benefits, a settlement option consisting of two components: (a) election of a 6-Year Benefit Period (or the next lowest option if a 6-Year Benefit Period is not available) and a 25% reduction to their current DBA (after benefit inflation), for a reduced annual premium, and (b) a damages payment equal to four times the differential between the Settlement Class member's current annual premium for his or her existing policy and the current annual premium for the new reduced level of benefits.

II. Options For Settlement Class Members Who Went Into Non-Forfeiture Status After January 1, 2014 But Prior To Making An Election In The Settlement. These election options will be provided to Settlement Class members who elected a NFO after January 1, 2014, but prior to making an election in the Settlement:

18

          1. A settlement option consisting of a paid-up benefit equal to two times the difference between the Settlement Class member's paid-in premiums to date less claims paid to the Settlement Class member to date.  This option will not include any damages payment; or

          2. An option to elect a damages payment of $1,000 and retain their current paid-up benefit.

III. Options For Settlement Class Members With Partnership Plans.  These election options will be provided to Settlement Class members who have Partnership Plan policies:

    A. Paid-up Benefit Options and Damages Options For Settlement Class Members With Partnership Plans Who Have Not Previously Gone Into Non-Forfeiture Status.  These two paid-up benefit settlement options would be available to those Settlement Class members with Partnership Plans who have not previously gone into Non-Forfeiture Status.

          1. A settlement option consisting of two components: (a) a paid-up benefit option equivalent to 100% of the Settlement Class member's paid-in premiums through December 31, 2015 less any claims paid over the lifetime of the policy, and (b) a damages payment equal to premiums paid during the time period beginning January 1, 2016 through December 31, 2019; or

          2. A settlement option consisting of a paid-up benefit equal to two times the difference between the Settlement Class member's paid-in premiums to date less claims paid to the Settlement Class member to date.  This option will not include any damages payment.

    B. For Settlement Class members who are able to further reduce their benefit periods without jeopardizing their Partnership Plan status and:

          1. Who have limited benefit period policies, a settlement option consisting of two components: (a) a reduction to the Settlement Class member's Benefit Period to the next lowest available level and a 25%

reduction of their current DBA (after benefit inflation), with a reduced annual premium, and (b) a damages payment equal to four times the differential between the Settlement Class member's current annual premium for his or her existing policy and the current annual premium for the new reduced level of benefits.

2. Who have lifetime benefit period policies, a settlement option consisting of two components: (a) a reduction to a 6-Year Benefit Period (or the next lowest option if a 6-Year Benefit Period is not available) and a 25% reduction of their current DBA (after benefit inflation), with a reduced annual premium, and (b) a damages payment equal to four times the differential between the Settlement Class member's current annual premium for his or her existing policy and the current annual premium for the new reduced level of benefits.

IV. Options For Settlement Class Members In States That Do Not Allow Disclosure To Be Mailed Or Special Election Options To Be Offered.                 To the extent that any state refuses to allow any form of the Disclosures and the Special Elections agreed to in the underlying Agreement, the Settlement Class members in that state will be offered:

A. For Settlement Class members whose policies are still in force, an option to elect a $100 credit against future Class Policy premiums; or

B. For Settlement Class members whose Class Policies are in Non-Forfeiture Status only, an option to elect a $100 one-time credit to the Settlement Class members' Non- Forfeiture Option benefit pool.

DECLARATION OF BRIAN D. PENNY IN SUPPORT OF PLAINTIFFS' MOTION TO

DIRECT NOTICE OF PROPOSED SETTLEMENT TO THE CLASS, Appendix C (ECF

No. 93-1) (citation omitted).[3]

Under the terms of the Settlement Agreement, notice and administration costs for the Settlement will be funded by Genworth. Settlement Agreement ¶ 53, ECF No. 93-1.   Named Plaintiffs will each request $25,000 in connection with their representation of the Settlement Class.  Plaintiffs' counsel will seek approval of: (a) attorneys' fees in the amount of $2,000,000.00 for the non-monetary disclosure benefits achieved for the Settlement Class, and 15% of the "Cash Damages" paid to Settlement Class members, subject to a floor of $10,000,000.00 and a cap of $24,500,000.00; and (b) payment of expenses or charges resulting from the prosecution of this action in an amount not to exceed $75,000. All fees and expenses the Court awards shall be paid by Genworth in addition to any amount payable by Genworth to Class members as damages, or otherwise.

The Settlement Agreement also provides that, if final approval is given by the Court, Genworth then will require time to prepare its administrative system for preparing and mailing the Special Election Letters and for processing and servicing the

---

[3] A template of the Special Election Letter and the kind of Disclosures to be made therein (which will be customized to some extent for each Settlement Class member) is attached to the Settlement Agreement at Appendix D.  Special Election Letter at 49, ECF No. 93-1.[4] See Second Supplemental Declaration of Cameron R. Azari, Esq. on Implementation of Settlement Notice Plan and Administration ("Azari Decl.") ¶ 6, ECF No. 179.

responses.  DECLARATION OF BRIAN D. PENNY IN SUPPORT OF PLAINTIFFS'
MOTION TO DIRECT NOTICE OF PROPOSED SETTLEMENT TO THE CLASS,
Appendix C ¶ 44(c), ECF No. 93-1.  In particular, the Special
Election Letters will be mailed six to nine months after final
approval, if given.  Id. ¶ 44(d).

Until the Special Election Letter is received, class members
will not have the Disclosures about Genworth's plans for future
rate increases or its financial condition.  And, the Disclosures,
are important to class members in deciding which option to elect.

However, under the Settlement Agreement, class members must
have decided whether to opt out (or to remain in) the class sixty
days after the Notice was mailed.  Thus, although class members
know much about the options available to them before the opt-out
date, they did not know about what specific Disclosures will be
made available about Genworth's plans for future rate increases.

Additionally, by virtue of the Special Election Letters,
many, if not most, class members will be able to choose from
options that provide some cash damages or paid up benefits.
However, the value of the cash damages and paid up benefits were
not knowable at the time that class members had to decide whether
to opt out.  It appears that those values will not be knowable
until the Special Election Letters are sent because of time
required for Genworth to devise and implement the system for
calculating the cash payment and paid up benefit amounts.  Genworth

22

is not prepared to invest the time and expense in devising and implementing the necessary systems until it knows whether the Settlement Agreement will be approved.

These two aspects of the Settlement lie at the core of most of the objections to the adequacy of the Notice and to the Settlement Agreement itself.

In exchange for the benefits provided under the Settlement Agreement, each class member will release Genworth from any and all claims.  Settlement Agreement ¶ 44, ECF No. 93-1.

It is against this background that the objections will be considered.

### LEGAL FRAMEWORK

A district court may approve a class action settlement agreement only after complying with the procedures set forth in Fed. R. Civ. P. 23(e).  Rule 23(e) encompasses three stages and two separate hearings to effectuate the settlement approval process.  At the first stage, the parties must present the proposed settlement to the court for the court's preliminary approval, and, if the class has not yet been certified, for conditional class certification.  In the second stage, assuming that the class action settlement was approved preliminarily, notice must be sent to potential class members describing the terms of the proposed settlement, class members must be given an opportunity to object or to opt out of the settlement, and the court then must conduct

a fairness hearing at which class members may appear and support or object to the settlement.   At the third and last stage, the court must take into consideration all of the information before it and determine whether "final approval" of the settlement is merited.

Fed. R. Civ. P. 23(e) provides that "[t]he claims, issues, or defenses of a certified class-or a class proposed to be certified for purposes of settlement-may be settled, voluntarily dismissed, or compromised only with the court's approval."   Fed. R. Civ. P. 23(d).   A class settlement can be approved "only after a hearing and on a finding" that the proposed class-action settlement is "fair, reasonable, and adequate."   <u>See</u> <u>In re MicroStrategy, Inc. Sec. Litig.</u>, 150 F. Supp. 2d 896, 903-904 (E.D. Va. 2001).   When determining whether to approve a class action settlement, the court will first consider whether the process leading to the settlement was fair and then turn to whether the terms provided within the settlement are adequate.   <u>See</u> <u>Jiffy Lube Sec. Litig.</u>, 927 F.2d 155, 158-59 (4th Cir. 1991).

The Fourth Circuit has set a multifactor standard to assess whether a class action settlement is "fair, reasonable, and adequate."   The "fairness" evaluation centers on the settlement process itself.   <u>Whitaker v. Navy Federal Credit Union</u>, No. 09-cv-2288, 2010 WL 3928618, at *2 (D. Md. Oct. 4, 2010).   In making this determination, a court should consider:

24

> (1)   the posture of the case at the time
>        settlement was proposed;
>
> (2)   the extent of discovery that had been
>        conducted;
>
> (3)   the circumstances surrounding the
>        negotiations; and
>
> (4)   the experience of counsel in the area of
>        [the] class action litigation.

See In re Jiffy Lube Sec. Litig., 927 F.2d 155, 159 (4th Cir.
1991). The "adequacy" evaluation focuses on the substance of the
settlement. Whitaker, 2010 WL 3928616, at *2. In assessing the
adequacy of the proposed settlement, a court must consider:

> (1)   the relative strength of the plaintiffs'
>        case on the merits;
>
> (2)   the existence of any difficulties of
>        proof or strong defenses the plaintiffs
>        are likely to encounter if the case goes
>        to trial;
>
> (3)   the anticipated duration and expense of
>        additional litigation;
>
> (4)   the solvency of the defendant[ ] and the
>        likelihood of recovery on a litigated
>        judgment; and
>
> (5)   the degree of opposition to the
>        settlement.

See In re Jiffy Lube Sec. Litig., 927 F.2d 155, 159 (4th Cir.
1991). The reasonableness, fairness, and adequacy analysis of the
overall settlement will be made in a separate memorandum opinion,
but the basic principles must be kept in mind when assessing the
objections.

25

A lack of objection to the settlement by class members and opt-outs from the class demonstrates low opposition to the settlement and weighs in favor of its approval. See In re Mills Copr. Sec. Litig., 265 F.R.D. 246, 257 (E.D. Va. 2009). See Mills, 265 F.R.D. at 257-58. However, under Fed. R. Civ. P. 23(e), the Court must protect unnamed class members from "unjust or unfair settlements affecting their rights." Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 623 (1997).

Class members, of course, have a right to object to the proposed settlement terms; and, thus, they are entitled to present their objections before the court decides whether to approve the proposed settlement. See Fed. R. Civ. P. 23(e)(5)(A) ("Any class member may object to the proposal if it requires court approval under this subdivision (e). The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection."). An objector is generally entitled "to be heard, to examine witnesses and to submit evidence on the fairness of the settlement." Flinn v. FMC Corp., 528 F.2d. 1169, 1173 (4th Cir. 1975).

In deciding whether to approve a settlement the court must account for the "strong judicial policy in favor of settlement to conserve scarce resources that would otherwise be devoted to protracted litigation" when considering class members' objections.

26

Robinson v. Carolina First Bank NA, No. 7:18-cv-02927, 2017 WL
719031, at *8 (D.S.C. Feb. 14, 2019).   The objectors to a class
settlement generally bear the burden of proving any assertions
they raise challenging the reasonableness of a class action
settlement.   United States v. Oregon, 913 F.2d 576, 581 (9th Cir.
1990) ("In this circuit, we have usually imposed the burden on the
party objecting to a class action settlement."); see also Schechter
v. Crown Life Ins. Co., No. 2:13-cv-05596, 2014 WL 2094323, at *2
(C.D. Cal. May 19, 2014) (stating that objectors bear the burden
of showing that settlement approval would contravene its equitable
objectives).

## DISCUSSION

Before the July hearings, the Court considered all objections
and the responses to them.   Then, at the hearings, objectors were
afforded the opportunity to present their objections orally to the
Court.   Class Counsel and attorneys for Genworth responded to each
of the objections.   And, as explained above, the Court called for
additional briefing and information.

The objections to the Settlement can be organized into seven
categories: (1) challenges to the adequacy of the Court-approved
Notice; (2) challenges on the basis that the Settlement offers no
concrete benefits; (3) arguments that the Plaintiffs should have
challenged the rate increases; (4) concerns that the payment of
Settlement benefits and/or attorneys' fees will impair Genworth's

27

ability to pay future claims or result in additional rate increases; (5) a contention that subclasses are warranted; (6) challenges to the options provided under the settlement; and (7) challenges to the amount of attorneys' fees or service payments.

In this Memorandum Opinion, the Court will address each category of objections except objections to the amount of attorneys' fees or service payments, which will be addressed in a later opinion.

1. **Objections Based on Inadequate Notice and the Lack of Assertedly Necessary Information**

   A.   **The Requirements for Adequate Notice**

   Fed. R. Civ. P. 23(e) requires notice of the proposed settlement (and consequent dismissal) of a class action to all members of the class.  The rule is "meant to protect class members from the binding effect of a settlement in a class suit where the class members had no opportunity to object to the proposed settlement."  Kevin D. Hart, Annotation, Propriety of notice of voluntary dismissal or compromise of class action, 52 A.L.R. Fed. 457 (1981).  Notice afforded to class members "must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  Hege v. Aegon USA, LLC, 780 F. Supp. 2d 416, 429-430 (D.S.C. 2011) (quoting Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812 (1950)); Fed.

R. Civ. P. 23(c)(2).   Under the due process requirements of the Fifth Amendment, putative class members must be given "[r]easonable notice combined with an opportunity to be heard and withdraw from the class."   See In re Serzone Products Liability Litigation, 231 F.R.D. 221, 231 (S.D.W. Va. 2005).   Further, Fed. R. Civ. P. 23 provides that:

> The notice must clearly and concisely state in plain, easily understood language:
> (1) the nature of the action;
> (2) the definition of the class certified;
> (3) the class claims, issues, or defenses;
> (4) that a class member may enter an appearance through an attorney if the member so desires;
> (5) that the court will exclude from the class any member who requests exclusion;
> (6) the time and manner for requesting exclusion; and
> (7) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).   In essence, notice must provide class members with enough information to make an informed choice regarding the proposed settlement.   In re Serzone Products Liability Litigation, 231 F.R.D. at 231.   Thus, "due process does not necessarily require a global class action settlement notice to contain detailed, comprehensive information about the law of class members' states."   Hege, 780 F. Supp. 2d at 430.

B.    **The Distribution of the Notice**

Before evaluating the adequacy of the Notice, it is appropriate to recount the procedures used to disseminate the Notice and to understand how effective that process was.

The Settlement Administrator (the "Administrator") reviewed the class member mailing list sent by Genworth, removed duplicate entries, and updated addresses where necessary.  On April 14, 2020, the Administrator mailed the Notice Package directly to 207,195 potential class members.  The Administrator also mailed a Notice Package to anyone who requested one by way of the toll-free telephone number, mail, or email.  As of June 25, 2020, the Settlement Administrator mailed 945 additional Notice Packages. The Administrator estimates that this approximates a 99.8% deliverable rate to identified likely class members.[4]

On April 14, 2020, the Administrator also established the settlement website (www.longtermcareinsurancesettlement.com), where copies of, <u>inter alia</u>, the (1) operative TAC, (2) Joint Stipulation of Class Action Settlement and Release, (3) Amendment to Joint Stipulation of Class Action Settlement and Release, (4) Plaintiffs' Motion to Direct Notice of Proposed Settlement to the Class, (5) Joint Motion of the Parties for Leave to Amend the Joint

---

[4] <u>See</u> Second Supplemental Declaration of Cameron R. Azari, Esq. on Implementation of Settlement Notice Plan and Administration ("Azari Decl.") ¶ 6, ECF No. 179.

Stipulation of Class Action Settlement and Release and to Amend the Order Preliminarily Approving Settlement and Directing Notice to Class, (6) Order Granting Amendment to Preliminary Approval Order of Settlement and Directing Notice to the Class, (7) Class Notice, (8) List of Class Policies, (9) Appendix C – Special Election Options, and (10) Appendix D – Special Election Letter were posted and available for download.[5]  As of June 25, 2020, there were 12,790 unique visitors to the settlement website and 26,663 web pages presented to visitors.  Azari Decl. ¶ 11, ECF No. 179.

Additionally, the Administrator established a toll-free telephone number through which individuals could receive answers to "FAQs" about the Settlement.  As of June 25, 2020, the toll-free number had fielded 6,119 calls.  On May 22, 2020, the Publication Notice was published in The New York Times, The Wall Street Journal, and USA Today.  Id. ¶ 15.  The combined average weekday circulation of these three publications is approximately 2.82 million.  Id. ¶ 14.

There are no objections to the mode of notice or to the adequacy of its reach and distribution.  Instead, the objections to the adequacy of the Notice are based upon the adequacy of the substantive information provided in the notice or upon the

---

[5] Id. ¶¶ 10-12, 14.

assertion that additional information should have been included within the Notice.  In reality, these are two sides of the same coin.

###    C.    Specific Objections

####        (1)   Richards, Simpson, Saville, Sweeny, Heckmann, Jacobs, Agulnick, Ostrich, Goldberg, Wright Objections to the Sufficiency of the Notice

Jon C. Richards (ECF No. 119), Ronald and Pamela Simpson (ECF No. 121), James M. Heckmann (ECF No. 158), William and Roberta Saville (ECF No. 132), John and Mary Sweeney (ECF No. 133), Saul and Harriet Jacobs (ECF No. 159) and Ronald and Toby Agulnick (ECF No. 162) make essentially the same objection to the adequacy of the Notice: they say that the Notice contains insufficient information.  Specifically, Richards objects because the Notice does not allow class members to easily evaluate the Settlement Agreement and the benefits it purportedly provides.  Richards Objection ¶¶ 1, 3, ECF No. 119.  The Simpsons argue that the Notice needs to have an "adequate description of the benefits to be received by members of the Class."  Simpson Objection at 1, ECF No. 121.  Heckmann states that the proposed Settlement Agreement is based on "vague specifics."  Heckmann Objection at 1, ECF No. 158.  The Savilles argue that the Notice is "hopelessly and unreasonably vague, and contains so many undisclosed conditions and possible outcomes that it cannot reasonably be evaluated by any class member, nor for that matter, by the Court."  Saville

Objection at 1-2, ECF No. 132.  The Sweeneys object to the Notice because they were not able to see what the policyholder's exact settlement offer was or how the awards will affect policyholders with increased premiums.  Sweeney Objection at 1, ECF No. 133. The Jacobs object that the settlement does not sufficiently explain the numbers and formulas involved: "[w]e don't believe an accountant could make sense of this offer let alone a laymen." Jacob Objection at 2, ECF No. 159.  And finally, the Agulnicks object that the Notice does not provide class members sufficient detail to make a decision:

> For example, the settlement provides that class members will be subject to already planned rates increases by Defendants as part of the settlement, but the settlement does not disclose what the actual or proposed rate increases will be, the planned number of years over which these increases will be sought by Defendants, or even that Defendants will commit not to seek rate increases larger or more numerous than currently planned. In addition, other terms of the proposed "Special Election Options" may or may not be applicable to Class Members' separate policies, but there are insufficient disclosures to make that determination. The Special Elections Letter also contains blanks and alternate language, without any indication of how a Class Member can obtain the missing information or figure out which alternate language applies to them. Yet, all of this information is known to Defendants and is capable of being disclosed.

Agulnick Objection at 2, ECF No. 162.

Additionally, Ronald and Pamela Simpson (ECF No. 121), Mark Ostrich (ECF No. 123), Sanford and Marion Goldberg (ECF No. 156), Saul and Harriet Jacobs (ECF No. 159), Donna Wright (ECF No. 161),

33

and Ronald and Toby Agulnick (ECF No. 162) object to the proposed Settlement Agreement on the related ground that the class members should know exactly which Special Election Options or other relief will be provided to them, the exact calculation of premiums or benefits resulting from the exercise of those options, and what the actual cash damages payments from the election of those objections will be before having to opt-out of the settlement.

Specifically, on that point, the Simpsons state that the Notice is "silent as to what consideration flows to the members of the Class" and that the Notice should have included "an adequate description of the benefits to be received by members of the Class." Simpson Objection at 1, ECF No. 121. Mark Ostrich states that "there should be some way for class members to understand financially the choices presented to them in the proposed settlement." Ostrich Objection at 7, ECF No. 123. The Goldbergs state that, "[t]he terms of the settlement are not specifically defined . . . based upon the status of the existing policy and other benefits." Goldberg Objection at 1, ECF No. 156. The Jacobs argue that they should have been given the exact amount they will be provided under the Settlement terms before they were required to make a choice to opt-out. Jacobs Objection at 2, ECF No. 159. Wright states that the Settlement "requires class members to provide" a "release of all claims without knowing the actual rate increases or paid up benefits or other terms of the proposed

34

'Special Election Options' that might be applicable to separate policies." Wright Objection at 11, ECF No. 161. Lastly, the Agulnicks state that Class Counsel should prepare separate notices and letters for each class member detailing what benefit the Settlement affords them and the damages they have suffered. Agulnick Objection at 6, ECF No. 162.

Although stated somewhat differently, all of these objections[6] take the view that the Notice is defective because it does not specifically tell each class member what relief that member can expect to receive from the settlement. And, most of these objections, directly or indirectly, take the view that the Notice is defective because class members must decide whether to opt-out (or not) of the action before they know exactly what disclosures Genworth will make as part of the settlement, exactly what elections they will have the ability to make, or exactly what damages they will receive. And, it is reasonable to construe all of these objections as arguing that the Settlement Agreement is defective for the same reasons.

Beyond doubt, the Notice and the Settlement Agreement are complex. However, complexity alone does not render the Notice inadequate or defective. Nor does complexity alone render the

---

[6] That is, ECF Nos. 119, 121, 123, 132, 133, 156, 158, 159, 161, and 162.

Settlement Agreement objectionable for being unfair, unreasonable, or inadequate.

The complexity arises, in the first instance, from the fact that the Settlement provides a variety of remedial options to the class members. That, of course, is a recognition that, as respects the product at issue – long-term care insurance – one kind of remedy does not fit all class members even though their claims arise out of the same facts (i.e., misrepresentation by omission). That recognition, and the crafting of a settlement to take it into account, is not grounds to find either the Notice or the Settlement Agreement inadequate. That is particularly so where, as here, the various options are outlined with such specificity as is currently available.

The Court is satisfied that, with reasonable study, class members can understand the various options and can discern, from among them, which best fits their respective circumstances. In like measure, if no option fits a class member's circumstances, the member was allowed to opt out of the Settlement.

In assessing the adequacy of the Notice, as well as the fairness of the settlement itself, it is important that, according to the record, the Notice reached more than 99% of the more than 207,000 class members. Azari Decl. ¶ 8, ECF No. 179. It is also significant that objections were lodged by 0.021% of the class and only 0.092% of the class opted out. See Azari Decl. ¶¶ 15-16, ECF

No. 179 (noting that of the 207,410 potential class members 191 individuals opted out and 43 individuals objected via 32 separate objections).   In other words, the overwhelming majority of the class did not complain that the Notice, albeit complex, was beyond comprehension or that the Settlement Agreement was substantially unfair in requiring class members to opt out (or remain in) the settlement class before they received the disclosures from Genworth, knew exactly what elections they had to make, or knew exactly what damages they might receive.

Here, as in In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg. Sales Practices & Prod. Liab. Litig., the fact that so few members of the class objected to, or opted out of, the settlement is a testament to the conclusion that the Notice was adequate as well as to whether the settlement is fair and reasonable.   952 F.3d 471, 485 (4th Cir. 2020).   In other words, on this record, the Court concludes that the overwhelming number of recipients of the Notice found that neither it, nor the Settlement Agreement it described, was objectionable either because the Notice did not adequately explain the settlement terms or because those terms were unfair or unreasonable or inadequate.

Moreover, it is not necessary that class members have an exact explanation of the settlement benefits that they will receive before they must decide whether to opt out.   Indeed, many class settlements require class members to elect one remedy or another

before opting out. See, e.g., In re Equifax Inc. Customer Data Sec. Breach Litig., No. 1:17-MD-2800-TWT, 2020 WL 256132, at *2-3 (N.D. Ga. Jan. 13, 2020); In re Anthem, Inc. Data Breach Litig., 327 F.R.D. 299, 331-32 (N.D. Cal. 2018); see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 328 (3d Cir. 1998).

In sum, the Notice adequately explains the class claims, the issues, and the defenses. It also defines the Settlement Class. It explains how and when class members may object to, or exclude themselves (opt-out) from, the settlement. Further, the Notice explains in considerable detail the Settlement terms. It gives class members sufficient information to make an informed choice whether to accept the Settlement, object to it, or opt-out of it.

### (2) Agulnicks' Objection That the Notice Fails to Define Certain Terms

In their objection, the Agulnicks argue that several parts of the Notice contain undefined and incomplete terms. At the July 10, 2020 settlement hearing, counsel for the Agulnicks expanded on their objection, stating that several pieces of information should have been included in the Notice before class members were required to opt-out. Specifically, the Agulnicks' counsel pointed to the following part of the election letter:

> [[As you evaluate these choices, please be aware that as of [Date] over the next [XX] years we are planning to seek additional rate increases of up to [[203%] for [lifetime

> benefits] and [134%] for [limited benefits]]
> in the state where your policy was issued.] or
> [As you evaluate these choices, please be
> aware that we do not have immediate plans to
> seek rate increases on your policy and
> policies like yours [that previously selected
> a Stable Premium Option] in the state where
> your policy was issued, although future
> premium increases are possible [after the
> expiration of your premium rate guarantee
> period.]] These potential rate increases would
> not be applicable if you choose a settlement
> option with a reduced paid-up benefit [(Option
> 1 or Option 2)]. Please also review the
> important disclosures we are providing as part
> of the settlement about our rate increase
> plans and our reasons for seeking such
> increases later in this letter.

Settlement Agreement at 50, ECF No. 93-1, suggesting that the number of years in which Genworth plans to seek additional rate increases should have been disclosed and that class members cannot "evaluate whether or not [the] settlement is reasonable without this information."   July 10 Hearing Tr. at 33, ECF No. 195.

Although the Agulnicks point to additional information that they claim would have been helpful in deciding whether to opt-out of the settlement, none of the additions that they propose are necessary to render the Notice adequate.   "The test for whether a given item must be included in a class notice is whether that information is such that 'a reasonable person would consider [it] to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment.'"   Good v. American Water Works Co., Inc., No.

39

2:14-cv-01374, 2016 WL 5746347, at *8 (S.D.W. Va. Sept. 30, 2016) (quoting <u>In re Nissan Motor Corp. Antitrust Litigation</u>, 552 F.2d 1088, 1104 (5th Cir. 1977)).  Genworth's plans for future rate increases, which will be disclosed to class members in the Special Election Letter, are certainly important in deciding which option to exercise, but that information is not known now, and, indeed, is not now knowable.  It will become known near the time that the Special Election Letter will be sent.  Thus, the question becomes whether the Disclosure information, albeit important, must be given to class members before they must decide whether to opt out. That is only partly an objection to the adequacy of the Notice. It also is an objection to the fairness, reasonableness, and adequacy of the Settlement Agreement.

But the response is the same whether the objection is treated as pertaining to the adequacy of the Notice or the fairness, reasonableness, and adequacy of the Settlement Agreement itself. So the point will be addressed here.

Although understanding the magnitude of projected future rate increases is important in deciding which option to pursue when presented with specific options, it is not information that is necessary in deciding whether, on the one hand, to participate in a plan that will give the class member both the Disclosure of the likely future rate increases (when that is known) and the specified options available at the time the Disclosure is made; or, on the

40

other hand, to opt out of the class action and proceed on one's own with a fraud claim.

It is fair and reasonable to require the opt-out decision before the details of the forthcoming Disclosure are made because the Disclosures will be accompanied by the right to make elections in light of the Disclosures. That is what this action is all about. That is what the Plaintiffs say they were entitled to and that is what the class is getting by virtue of the Settlement Agreement.[7]

In other words, as to the fraud by omission claim, the Plaintiffs know that the Settlement Agreement, if approved, will give them what they say, in their claims, that they need to decide upon the options that will be presented to them in the Special Election Letter. And, in addition, class members know that they will receive a cash payment or a paid-up policy.

Putative class members who considered these results insufficient were able to opt out and pursue their claims

---

[7] Moreover, including the additional information that the Agulnicks suggested, such as detailed information about Genworth's current financial state, would have made the Notice more complex, and unnecessarily so. Rather than discussing all the potential developments that may occur in the case, the initial notice needed only to alert the class members to an action affecting their rights and "sufficiently inform [them] of the terms of the proposed settlement[] and their available options." Decohen v. Abbasi, LLC, 299 F.R.D. 469, 478 (D. Md. 2014) (citing In re MicroStrategy, Inc. Sec. Litig., 150 F. Supp. 2d 896, 906 (E.D. Va. 2001)).

individually.  And, they had enough information to allow them to make that decision, notwithstanding that they do not know Genworth's specific plans for rate increases, the exact amount of the cash payments, or the exact value of the paid-up benefit (none of which is known now and will not be known for months).

Armed with the knowledge that they will receive what they are entitled to (disclosures and new elections) under the policy and more (cash benefits and paid-up benefits), putative class members had sufficient information whether to take the settlement course or set sail on their own.  No more is required.

As Class Counsel and Genworth have explained, the alternative proposed (or implied by the objectors) is not a viable one.  The proposed alternative is to have Genworth distribute the Special Election Letters and then allow class members to opt out if they do not like the options made available to them.  Genworth has explained that an estimate of that sort would be only preliminary because policies renew at different times and an estimate today likely would not be valid when the time for policy renewal arrives. In other words, class members would be confused because the information they receive - a preliminary disclosure and estimate now and another disclosure and estimate proximate to removal - would almost certainly conflict.  And, from the record, that appears to be the case.

Note

x

Apart from that point, the course posited by the Settlement Agreement is what Genworth is willing to do. That course gives class members what they sued for and more. Class Counsel consider this course to be acceptable in perspective of the discovered evidence and an evaluation of the likelihood of success. No objector has shown Class Counsel's opinion to be erroneous or even flawed.

All things considered, the Notice is adequate under the applicable law and the objections to the Settlement Agreement addressed in this section do not make its terms unfair, unreasonable, or inadequate.

### (3) Whether Additional Information Should Have Been Included in the Notice

The Simpsons state that the Notice "is totally inadequate in its description of the background and bases for" the litigation. Simpson Objection at 1, ECF No. 121. However, contrary to the Simpsons' assertion, the Notice does provide this information.

The Notice includes a description of the class action. The description provides a brief outline detailing when the Complaint and Amended Complaints were filed, as well as the allegations that form the basis of the lawsuit and the defenses to the class claims.

### 2. Objections Arguing that the Settlement Fails to Provide Substantial Value to Class Members

Ronald and Pamela Simpson (ECF No. 121), Mark Ostrich (ECF No. 123), David Frame (ECF No. 149), Steven Gratz (ECF No. 153),

James Heckmann (ECF No. 158), and Ronald and Toby Agulnick (ECF No. 162) object to the Court approving the terms of the Settlement Agreement because they do not believe that the settlement affords policyholders any substantial relief. The basis of these objections is that the Settlement Agreement does not offer anything new or valuable to class members.

The Simpsons state that neither they, nor the majority of the Class, "will benefit in any way from the Settlement." Simpson Objection at 1-2, ECF No. 121. Ostrich states that "class members are getting nothing of value from Defendant Genworth to their benefit in the settlement . . . . While the terms in the Notice of Settlement pretend[] to give something of value to the class members[,] . . . this is nothing more than a pretense." Ostrich Objection at 4, ECF No. 123. Frame states that "the options for the election are the same as those already provided by the Genworth company. . . . So the value of the settlement to the policyholder is minimal." Frame Objection at 1, ECF No. 149. Heckmann argues that "it appears there is no benefit to any particular policyholder as a consequence of this Proposed Settlement Agreement." Heckmann Objection at 2, ECF No. 158. And, Gratz argues that the amount offered to the members of the class "does not in any way get the level of benefits back we lost and may need some day" and maintains that the Court should prohibit Genworth from changing premiums and

44

benefits to class members in the next five years.  Gratz Objection
at 3, ECF No. 153.

Additionally, the Agulnicks expanded on their objection to
the terms of the Settlement Agreement at the July 10, 2020 hearing,
suggesting that the Court reject the settlement "as it's currently
presented, require this additional information to be provided,
disclosed to class members, have it re-noticed, and have people
have the opportunity to opt out, object, or remain part of the
settlement."  July 10 Hearing Tr. at 35, ECF No 195.  The Agulnicks
further argued that there is no "definition of what the value is
for any of the various options."  July 10 Hearing Tr. at 36, ECF
No 195.  Specifically, within the Special Election Letter template,
ECF No. 93-1 at 50, the Agulnicks argued that the class members
were not provided with the value "they would forfeit by electing
these options versus the value of the benefits that they get."
July 10 Hearing Tr. at 38, ECF No. 195.

Contrary to these objections, the Settlement Agreement
affords class members considerable benefits.  First, the
Disclosures to be made pursuant to the Settlement Agreement will
inform the class members about anticipated future rate increases,
Genworth's current financial condition, and Genworth's need for
the anticipated future rate increases to remain solvent and to pay
future claims.  Then, in light of these Disclosures, class members
are given the opportunity to make new policy elections.  So, in

essence, the Settlement Agreement offers class members the ability to make new policy elections, equipped with information about possible premium increases in future years.  As Class Counsel explained at the July 10, 2020 hearing, the purpose of the class action is to afford class members the opportunity to "re-choose" their policies as if they had been informed about Genworth's long-term plans for rate increases in 2014, when rate increases first began to occur.  July 10 Hearing Tr. at 90, ECF No. 195.  The terms of the Settlement Agreement require the Disclosures, the omission of which is a central component of the class complaint.

Moreover, the Settlement Agreement provides Special Election Options with features that were not previously available to class members, including cash damages and non-forfeiture benefits designed to compensate class members for financial harm caused by the alleged non-disclosures in the past.  And, while several objectors state that the cash damages payments resulting from the Settlement are nominal, this is not correct.  As the parties stated at the July 14, 2020 settlement hearing and again in their response to the Court's order:

> [W]hile the Parties cannot at this point know what the final impact of Class Members' elections of the Special Election Options will be, based on reasonable and conservative assumptions, the Parties estimate, and the accompanying Declaration of Jamala Arland shows, that the Cash Damages payments to Class Members alone will exceed $100 million. Arland Decl. ¶ 12.  In reaching that estimate, the

> Parties have made the following assumptions:
> if fifteen percent (15%) of Class Members
> elect a Special Election Option and Class
> Members' choices are evenly divided across the
> five Options—*i.e.*, that 3% of Class Members
> will elect each of the five Options, then Cash
> Damages payments would be $130,997,988. *Id.*

JOINT STATEMENT OF POSITION IN RESPONSE TO THE COURT'S JULY 21, 2020 ORDER at 3, ECF No. 203. In supplemental information, Genworth reported that the potential Cash Damage payments can reasonably be estimated to be in the range of $80 to $174 million. DEFENDANTS' MEMORANDUM IN RESPONSE TO THE COURT'S SEPTEMBER 16, 2020 ORDER at 2, ECF No. 213. And, if the most conservative and the most liberal assumptions are disregarded, the estimated value would be $130 million.

In determining whether to approve a class action settlement, the issue is not whether everyone affected by the settlement is completely satisfied. Instead, the test is whether the settlement, as a whole, is a fair, adequate, and reasonable resolution of the class claims asserted. See, e.g., In re Genworth Fin. Sec. Litig., 210 F. Supp. 3d 837, 839 (E.D. Va. 2016). The terms of the Settlement Agreement provide class members with Disclosures, as well as options to weigh in light of those disclosure. It is true that the Settlement Agreement does not present class members with every conceivable option, or even, the best option in light of the particular circumstances faced by each class member. But, that does not mean that the Settlement Agreement lacks value.

A settlement is a compromise between parties to avoid the risk of having the matter decided at trial where either side might lose. Here, Class Counsel negotiated with counsel for Genworth to create a solution that was in line with the key objectives of the lawsuit and, by any measure, Class Counsel was successful in doing so. The options provided to class members take into consideration, insofar as possible, the wide range of circumstances class members might be facing and affords class members the opportunity to make selections from the options afforded.

The Settlement Agreement stands to confer substantial benefit on more than 200,000 policyholders. It affords class members the opportunity to obtain substantial monetary damages and the ability to make a new election for their long-term care policies based on additional disclosures relating to Genworth's plans for future rate increases and financial viability. The Settlement Agreement provides a mechanism for those who do not think that they will be benefitted to opt out. And, the Settlement Agreement provides a mechanism for those who object to the terms of the Settlement to object to it. The options provided to class members within the Settlement enable class members to elect an option based on their individual financial circumstances and other factors that a policyholder might find important. In the Court's view, these are substantial benefits obtained for class members as a result of the Settlement Agreement.

### 3. Objections that the Rate Increases Themselves Should Be Challenged

Three of the objections to the Settlement Agreement allege that Plaintiffs should have challenged the increases in premium rates that Genworth charged class members over the class period. Steven Gratz (ECF No. 153) argues that Genworth should not be allowed to reduce the amount of benefits offered or be able to increase premiums over the next five years—thereby arguing that class members should be able to keep their current benefits without any increase in premiums. Gratz Objection at 3, ECF No. 153. The Jacobs assert that if they had knowledge of the planned rate increases in 2014, they "would have looked into other companies offering alternative policies." Jacobs Objection at 1, ECF No. 159. Last, Ralph Ferrara argues that the terms of the Settlement require that class members "be subjected to abusive accumulative rate increases of as much as approximately 203% on policies with lifetime benefits. Indeed, keeping the policy on those terms could never be characterized as maintaining 'the benefit of the bargain.'" Ferrara Objection at 11, ECF No. 170. He argues that prevailing at trial would bestow full benefits without premium rate increases or cash damages sufficient "to procure a long-term care insurance policy with terms comparable to [Ferrara's current] [p]olicy." Id. at 11. In one way or another, these objections

are grounded in the assertion that the rate increases made by Genworth should have been challenged in this action.

In assessing these objections, it is necessary to keep in mind the basis of this class action and the class claims. As explained in the Memorandum Opinion denying in part Genworth's MOTION TO DISMISS THE AMENDED COMPLAINT (ECF No. 39), "all the [plaintiffs'] claims (for breach of contract, for fraud, and under the UTPCL) are based on the theory that Genworth withheld material information from the plaintiffs.  That is not a challenge to the reasonableness of the rate." Skochin v. Genworth, 413 F. Supp. 3d 473, 483 (E.D. Va. 2019)(Payne, J.)(emphasis added).  The Memorandum Opinion continued

> Here, the plaintiffs have alleged a claim for fraud based on Genworth's half-truths. The Amended Complaint alleges that Genworth spoke only half-truths to the plaintiffs in order to persuade them to keep their policies when the plaintiffs would not have done so otherwise. Genworth emphasized its financial stability when the plaintiffs began their plans, and Genworth continued to tout that stability. It did so even as it began to realize that it faced dire financial straits and well-knew that it would have to rely on substantial future premium increases to survive. And, instead of informing their policyholders of this information, it said only that premium rate increases were "likely" to occur in the future, a statement that was a half-truth. And, the plaintiffs allege that Genworth intentionally decided not to release this information so that policyholders would continue to pay into their policies, which then caused the plaintiffs financial detriment. That is enough to state a half-

> truth claim under either Maryland or
> Pennsylvania law.

Skochin v. Genworth, 413 F. Supp. 3d 473, 486-87 (E.D. Va. 2019)(Payne, J.).

However, because Genworth's past rate increases were approved by state or federal regulators, any objections to the propriety of the rates themselves are barred by the filed-rate doctrine.[8]  Thus, the Court overrules all objections based on the notion that the settlement is inadequate for failure to have challenged the past increases.

### 4. Objections that the Settlement Will Financially Stress Genworth

Lana Olsson (ECF No. 116), Jon C. Richards (ECF No. 119), Thomas D. Luck (ECF No. 122), Rian and Michael Keller (ECF Nos. 127, 128), John and Mary Sweeney (ECF No. 133), Paul Junis (ECF No. 166), and George Brehmer (ECF No. 172) object to the proposed Settlement on the ground that the Settlement will financially stress Genworth and could be used to justify higher premiums in the future.  In essence, the objectors argue that terms of the settlement will further strain Genworth's resources and will negatively affect Genworth's financial situation.  As a result, say the objectors, the settlement will impair Genworth's ability

---

[8] The filed-rate doctrine is a federal and state common law doctrine that precludes lawsuits that challenge the payment of rates filed with a state or federal regulator.  See, e.g., AT&T Co. v. Cent. Office Tel., Inc., 524 U.S. 214, 221-23 (1998).  This doctrine precludes civil lawsuits that challenge the alleged misconduct leading to the payments of the filed rates.  The Court need not examine this doctrine in detail at this time, as it is not material to the outcome at hand.

to pay policyholder claims and will necessitate higher premiums in the future.

There is no explicit requirement that a class action settlement provide assurances that a defendant will be financially viable in the future.   Nonetheless, the Court is obligated "to appraise the reasonableness of particular class-action settlements on a case-by-case basis, in light of the relevant circumstances." In re MicroStrategy, Inc. Securities Litig., 148 F. Supp. 2d 654, 663 (E.D. Va. 2001) (internal quotations omitted).   And whether a class action defendant is able to pay claims to policyholders plays a role in the Court's fairness analysis under Fed. R. Civ. P. 23.

With that in mind, it is necessary to recall that a core contention in this action was that premium increases were caused because Genworth's reserves were not adequate to meet its potential obligations under the LTC policies at issue here.   Accordingly, it is reasonable for class members to question how a settlement purporting to pay substantial cash damages and attorneys' fees might affect Genworth's financial viability and ability to pay claims in the future.

In response to these concerns, Genworth represented to Class Counsel and the Court that it will be able to pay the attorneys' fees and to meet its other obligations under the Settlement Agreement, including the cash damages payments elected by Settlement Class members.   PLFS.' REPLY at 28, ECF No. 177. Genworth further represented that the attorneys' fees, service awards, and cash damage expenses of the Settlement Agreement "will not be used as actuarial justification by Genworth in seeking

52

additional future rate increases." Id. Additionally, in support of the position that the Settlement Agreement will not put an untenable financial strain on Genworth, Class Counsel and Genworth jointly offered the statement of Jamal Arland, the current Vice President and Actuary for Long Term Care In-Force Management for Genworth. Arland Decl. ¶ 1, ECF No. 203-9. Arland has sworn that "[t]he ultimate financial impact of the Settlement to Genworth is subject to several different factors, including but not limited to, number and types of Special Election Options that are chosen; and the number, demographics and existing benefits of Class Members." Id. ¶ 14. But, according to Arland:

> [A]s part of Genworth's efforts to determine the feasibility of implementing the Skochin Settlement, Genworth has modeled its expectations of the impact of the Settlement in various scenarios, including if all Class Members elected Special Election Options. In all scenarios, the average reduction in future benefits that Genworth would pay exceeded the average reduction in future premiums that Genworth would collect if the Class Member maintained his or her current coverage.

Id. ¶ 15 (emphasis in original). Genworth has presented information sufficient to overcome objectors' concerns on the basis of their financial ability. Based on the statements of Arland and the assurance given by Genworth, the objections as to Genworth's ability to pay future claims are overruled.

## 5. Subclasses

Sanford and Marion Goldberg (ECF No. 156), Susan and Harriet Jacobs (ECF No. 159), Ronald and Toby Agulnick (ECF No. 162), and

Ralph Ferrara (ECF No. 170) object to the settlement terms, maintaining that subclasses are necessary in order adequately represent the varying interests of the policyholders within the proposed class.

Under the terms of the Settlement Agreement, the Settlement Class is defined as:

> [A]ll Policyholders of Class Policies excluding: (1) those Policyholders of Class Policies whose policies went into Non-Forfeiture Status prior to January 1, 2014; (2) those Policyholders of Class Policies that entered a Fully Paid-Up Status at any time up to the date the Class Notice is mailed; (3) Genworth's current officers, directors, and employees as of the date Class Notice is mailed; and (4) Judge Robert E. Payne and his immediate family and staff.

Settlement Agreement at 11, ECF No. 93-1. "Class Policies" are defined as "Genworth long-term care insurance policies, or, for group policies, certificate forms identified in Appendix A to this Settlement Agreement in force at any time during the Class Period and issued in any of the fifty (50) states of the United States or the District of Columbia (the "States")." Id. at 9.

Fed. R. Civ. P. 23(c) provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues . . . [and] [w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(4)-(5). This section grants a court the authority to create subclasses in situations in which

common and noncommon issues are intermingled.  Subclasses may be appropriate when class members seek different types of relief or where there are similar types of factual differences between the claims of different groups or class members.  However, "a class need not be subdivided merely because different groups within it have alternative legal theories for recovery or because they have different factual bases for seeking relief."  7A Wright & Miller, Federal Practice and Procedure § 1790 (3d ed. 2020).

**A.    Subclass Based Upon Individual Policyholders'
         Circumstances**

The Jacobs argue that there should be a separate sub-class for class members who hold "gold standard" policies, i.e., policies that allow unlimited benefits and are protected by limiting inflation increases to 5%.  Jacobs Objection at 1, ECF No. 159.

In response, Class Counsel argues that simply having class members with the same policy form, but different premiums or different benefits packages does not create interclass conflicts: "in fact, the Settlement embraces these differences by offering a number of Special Election Options to choose from after each Class member receives the Disclosures."  PLFS.' REPLY at 33, ECF No. 177 (emphasis in original).

At the heart of both arguments is the assertion that the Settlement Agreement options do not adequately provide for the objectors' individual circumstances.  Jacobs asserts that, had

Genworth disclosed the information about the premium increases in 2014, he would have gone to the market in 2014 and gotten a better long-term care plan.   Jacobs maintains that the Settlement Agreement should have provided him with a different option that reflects this reality.   Jacobs does not raise any issue that is unique to gold policy members that would justify creating a subclass. And, in reality, Jacobs is not objecting to the fairness of the settlement, but rather is arguing that the Settlement Agreement should provide him with a different type of relief.   If Jacobs was unhappy with the Settlement Agreement, he could have opted-out and proceeded separately to obtain the requested relief to which he thought he was entitled.   Further, if any gold class members want to keep their existing policy and benefits, this is an option available to them under the Settlement Agreement.   At the hearing, Jacobs was given the opportunity to again opt-out and chose not to do so.   For the foregoing reasons, Jacobs' objection will be overruled.

The Goldbergs maintain that the Settlement Agreement "does not define how it will take into account the length of time each policyholder has paid premiums and total amount paid, which directly effects each insured policyholder differently including but not limited to the scope of coverage." Goldberg Objection at 1, ECF No. 156.  The essence of the objection is that, to be fair and reasonable, the Settlement Agreement must be tailored to each

individual policyholder's circumstance and the relief should vary depending on the circumstances.  The Goldbergs do not suggest how that would be accomplished.

However, their proposal is simply unworkable.  Indeed, if the Court considered this objection to be viable, a class action could not be certified because individual issues would predominate over the common issues that really drive the case.  For the foregoing reasons, the Goldbergs' objection will be overruled.

### B.    Predominance

At the July 10, 2020 hearing before the Court, one objector, Ralph Ferrara ("Ferrara"), argued that common questions of law and fact do not predominate over the class so that the class does not meet the requirements of Fed. R. Civ. P. 23(b)(3).  July 10 Hearing Tr. at 67, ECF No. 195.  Based on the lack of predominance among the class members, Ferrara maintains that a subclass should be created for policyholders over the age of 75 who have had a policy for fifteen years or more.  Id. at 68-69.  For the following reasons, the Court finds that the Plaintiffs have satisfied the Rule 23(b)(3) predominance requirement and will overrule Ferrara's objection.

To address Ferrara's objection, it is necessary to ascertain whether common questions of law and fact predominate or whether the case presents the sort of individualized inquiries that preclude class certification.  Under Rule 23(b)(3), the district

court is required to determine whether "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." This rule is "designed to secure judgments binding all class members" that will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Achem Prods., Inc. v. Windsor, 521 U.S. 591, 614-15 (1997) (internal quotation marks omitted). A reviewing court must ascertain "whether the class is cohesive enough to warrant adjudication by representation." Morris v. Wachovia Securities, Inc., 223 F.R.D. 284, 299 (E.D. Va. 2004).

In the TAC, Plaintiffs allege that Genworth fraudulently induced the plaintiffs to elect to continue coverage by telling them only that premium increases were "likely" without explaining that increases were necessary for Genworth to survive and that significant rate increases were already planned. TAC ¶¶ 193-213, ECF No. 90. A claim of intentional misrepresentation by concealment, or fraudulent concealment, is found if the Plaintiffs prove "(1) Defendant owed Plaintiff a duty to disclose a material fact; (2) Defendant failed to disclose that fact; (3) Defendant intended to defraud or deceive Plaintiff; (4) Plaintiff took action

in justifiable reliance on the concealment; and (5) Plaintiff suffered damages as a result of Defendant's concealment." <u>Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.</u>, 262 F. Supp. 2d 618, 628-29 (D. Md. 2003) (citing <u>Green v. H & R Block, Inc.</u>, 735 A.2d 1039, 1059 (Md. 1999)).

Ferrara argues that a subclass should be created for policyholders who (a) are 75 years of age as of June 30, 2020; (b) have been insured under a Choice 1 policy for at least 15 years; (c) have policies with unlimited benefit terms and have 5% compound interest riders; and (d) otherwise meet the Class definition. Ferrara Objection at 5-6, ECF No. 170. The predicate of this contention is that the materiality of Genworth's fraudulent conduct differs dramatically depending upon the age of the individual class member. Ferrara maintains that the materiality of the deception is significantly more impactful for older policyholder as compared to younger ones because, given their age and lack of alternative long-term insurance options, these policyholders are not in a position in which they cannot chose to end their policies. Thus, he states that there is no homogeneity among class members on the issue of materiality. However, Ferrara's argument misunderstands the assessment of materiality in a fraudulent inducement claim.

The 1996 Advisory Committee Notes to Rule 23(b)(4) address class treatment when materiality and fraud are at issue, albeit only briefly, stating in relevant part:

> [A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action . . . . On the other hand, although having some common core, <u>a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.</u>

Fed. R. Civ. P. 23(b)(4) advisory committee's note to 1996 amendment (emphasis added).  Here, the Plaintiffs state that the questions of law and fact common to the Class Members are:

- whether Genworth omitted material information from the rate increase letters;

- whether by failing to provide certain information Genworth breached the duty of good faith and fair dealing;

- whether Genworth also violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

- whether Genworth should be enjoined from further misconduct; and

- the appropriate measure of damages or other relief to which Plaintiffs and the Class Members are entitled

TAC ¶ 183, ECF No. 90.

### (1) Materiality

Plaintiffs assert in the TAC that, "[w]hen a policyholder decides whether to renew their LTC policy, the premium rate is a

material term of the renewal. Whether the insurer plans to increase
rates in the future, the frequency of those planned increases, and
the amount of future increase needed by the insurer to remain
financial[ly] stable are also material to all policyholders." TAC
¶ 197, ECF No. 90.

There is neither allegation nor proof that there was a
"material variation" in the information, or lack thereof, provided
to class members.  Rather, as to each policyholder, Genworth
withheld "material information about the frequency and amount of
future increases it had already planned to seek." Id. ¶ 198.  The
information provided to each class member was the same, regardless
of the specifics of the class members' policies, and there is no
assertion otherwise.  This distinguishes this case from actions
less suited for class actions.  See, e.g., Morris v. Wachovia
Securities, Inc., 223 F.R.D. 284, 299-300 (E.D. Va. 2005) (finding
that the information available to each class member, and the access
to that information, varied in significant ways such that class
representation was not warranted).

Further, materiality is measured by an objective standard.
Material Misrepresentation, Black's Law Dictionary (11th ed. 2019)
("Contracts. A false statement that is likely to induce a
reasonable person to assent or that the maker knows is likely to
induce the recipient to assent. 2. Torts. A false statement to
which a reasonable person would attach importance in deciding how

to act in the transaction in question or to which the maker knows
or has reason to know that the recipient attaches some importance.
See Restatement (Second) of Torts § 538 (1979).").   Thus, the
omission of information about Genworth's financial viability and
the planned premium increases either is or is not material.
Contrary to Ferrara's assertion, there are not degrees of
materiality among class members.   Any evidence presented on the
element of materiality would be the same as to each policyholder
because the determination is an objective one, not an
individualized one.   Here, the theory of liability is that
Genworth's omissions were objectively material to every single
class member.   Therefore, on the pleadings and this record, the
predominance requirement is met.

### (2)  Reliance

Further, numerous courts have found that, where there are
uniform presentations of allegedly misleading information or
common omissions throughout the entire class, "the element of
reliance may be presumed class-wide thereby obviating the need for
an individualized inquiry of each class member's reliance."
Stanich v. Travelers Imdem. Co., 249 F.R.D. 506, 518 (N.D. Ohio
2008).   The Fourth Circuit has held that, "when a complaint alleges
illegal omissions of information, reliance need not be shown, but
can be inferred from a showing of materiality." Morris v. Wachovia
Securities, Inc., 223 F.R.D. 284, 301 (E.D. Va. 2005) (citing Banca

_Cremi, S.A. v. Alex. Brown & Sons, Inc._, 132 F.3d 1017, 1028 n.13 (4th Cir. 1997)). So, the Court's predominance analysis should focus on whether there was a material variation in the kinds of degrees of reliance by the policy members in the potential class. See _Stanich v. Travelers Imdem. Co._, 249 F.R.D. 506, 517-18 (N.D. Ohio 2008) (certifying a homeowner insurance's policyholder class "[w]here there are uniform presentations of allegedly misleading information, or common omissions throughout the entire class, especially through form documents"). And, typically, "differences in damages among potential class members do not generally defeat predominance if liability is common to the class." _Morris v. Wachovia Securities, Inc._, 223 F.R.D. 284, 299 (E.D. Va. 2005). Ultimately, the Court's analysis must look to the following:

> If the "qualitatively overarching issue" in the litigation is common, a class may be certified notwithstanding the need to resolve individualized issues. For example, if "common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."

_Soutter v. Equifax Info. Servs., LLC_, 307 F.R.D. 183, 214 (E.D. Va. 2015) (citations omitted). This case falls within the circumstances envisioned by Rule 23's Advisory Committee Notes. Common questions regarding Genworth's liability to class members for its allegedly material omissions and the elements of

materiality and reliance are uniform questions across the policyholders.

For the foregoing reasons, Ferrara's objections will be overruled.

### C.  The Pennsylvania Subclass

The Agulnciks assert that the Pennsylvania subclass alleged in the TAC "has a separate and distinct statutory unfair trade practices and consumer protection law claim."  July 10 Hearing Tr. at 48-49, ECF No. 195.  But, they state, the Settlement Agreement "does not provide for subclasses in any way."  Id. at 49.

In Count Two of the TAC, the Skochins, on behalf of the Pennsylvania subclass, allege that Genworth "violated the Pennsylvania CPL by knowingly misrepresenting and intentionally concealing material facts regarding its plan to systematically, sequentially and substantially raise premium rates across the Choice I policy class, Defendants' reliance on these premium increases to build adequate reserves to pay the future claims of the Class and Subclass members, and the frequency and magnitude of future rate increases necessary to ensure that stability."  TAC ¶ 219, ECF No. 90.  Under Count Two, the Plaintiffs seek "an order awarding declaratory and injunctive relief, damages, treble damages, costs of the litigation, attorneys fees, and any other just and proper relief available under the Pennsylvania CPL."  Id. ¶ 224.

In response to the Agulnicks' argument, Class Counsel stated that the Pennsylvania claim is

> not a separate claim. It's not a more valuable claim. It's not a claim that was entitled to any specific deference or reward at the settlement table or in the approval process. . . .

July 14 Hearing Tr. at 177, ECF No. 196.   And, as the Court articulated, "The parties agree that the statutory claim under the UTPCPL is based on the same facts as the fraud claim." Memorandum Opinion at 29, ECF No. 78.

There is nothing that makes the members of the proposed Pennsylvania subclass materially different than policyholders in other states.   And to the extent that members felt that the UTPCPL claim is more valuable to them than the options presented in the Settlement Agreement, they were given the option to opt-out of the settlement and pursue their claims against Genworth separately. For the foregoing reasons, objections that the Settlement Agreement is inadequate for failure to have a Pennsylvania subclass will be overruled.

### 6. Objections Requesting Other Damages Options

Cheryl Runser (ECF No. 148) objects that the settlement does not refund the premium that she has paid ($32,948.52).   Alan Kurtz (ECF No. 154) suggests that the settlement must be revaluated. William Jr. Van Dam (ECF No. 171) calls for the addition of other options.   Thomas and Paula Spitznagle (ECF No. 169) make a similar

suggestion.  None of these objections and suggestions are supported by explanations of how they might be implemented or how they are an improvement over the terms negotiated by Class Counsel.  Thus, these objectors have not satisfied their burden.  These objections will be overruled.

**CONCLUSION**

For the foregoing reasons, and to the extent outlined above, the objections to Plaintiffs' Motion to Approve the Class Settlement will be overruled.

It is so ORDERED.

/s/   _REP_
_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: November 5, 2020